IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

MARQUETTA WILLIAMS,              )
                                 )
          Plaintiff,             )
                                 )
     v.                          )      Civil Action File
                                 )
                                 )      No. 5:23-CV-00655
CITY OF CANTON, et al.,          )
                                 )
          Defendants.            )

----------------------------------------------------------------

     Deposition of DARRELL L. ROSS, Ph.D., called by the

Plaintiff, taken pursuant to the Federal Rules of Civil

Procedure, was reported by Debbie Young, Certified Court

Reporter and Notary Public, at the Holiday Inn Valdosta

Conference Center, 1805 West Hill Avenue, Valdosta, Georgia,

commencing at approximately 11:25 a.m. on the 4th day of

March 2024 and concluded on the same date.

DEBBIE YOUNG, CCR
No. 6072-1397-4926-1312
P.O. BOX 693
TIFTON, GA 31793-0693
229-392-3309

**COPY**

1

---

INDEX TO EXHIBITS

| Plaintiff's Exhibit | Description | Page |
|---|---|---|
| 1 | Curriculum Vitae of Darrell L. Ross, Ph.D. | 7 |
| 2 | Darrell L. Ross, Ph.D. – Cases Retained: 2018-2023 | 8 |
| 3 | Opinions Report of Darrell L. Ross, Ph.D. | 17 |
| 4 | October 29, 2020 – Webinar Video | 25 |
| 5 | 2008 – Western Illinois University College of Education and Human Resources FY07 Consolidated Annual Report | 29 |
| 6 | "Examining the Liability Factors of Sudden Wrongful Deaths in Police Custody" | 32 |
| 7 | AELE Mission Statement | 36 |
| 8 | *Civil Liberty in Criminal Justice*, 8th edition | 36 |
| 9 | October 29, 2020 – Video | 51 |
| 10 | "Emerging Trends in Police Failure to Train Liability" | 54 |
| 11 | "A Risk Management Analysis of the Claims, Litigation, and Losses of Michigan Law Enforcement Agencies: 1985-1999" | 55 |
| 12 | October 29, 2020 – Video | 57 |
| 13 | 2023 AELE Seminar – Video | 57 |
| 14 | "How Gun Policies Affect Police Shootings" | 58 |
| 15 | In the Executive Ethics Commission of the State of Illinois – Final Report | 74 |
| 16 | *The Times Herald* "Jackson Prison Riot Quelled by Tear Gas" | 79 |

2

---

| Plaintiff's Exhibit | Description | Page |
|---|---|---|
| 17 | Michigan State University Hall of Fame Interview – Video | 82 |
| 18 | 2023 AELE Presentation – Video | 84 |
| 19 | Certificate of Organization for Eques Group, LLC | 97 |
| 20 | Randall L. Murphy – LinkedIn Page | 100 |
| 21 | October 29, 2020 – Essential Questions Video | 157 |
| 22 | *Police Chief* – August 2010 Article "Stopping Random Gunfire in Phoenix" | 169 |
| 23 | Office Huber In-Service Attendance Sheet | 195 |
| 24 | "National Consensus Policy and Discussion Paper on Use of Force" | 220 |

(Exhibits bound under separate cover.)

3

---

APPEARANCES

For the Plaintiff,
MARQUETTA WILLIAMS:

     ROBERT F. DICELLO, Esquire
     JOE F. FOUCHÉ, III, Esquire
     (via Zoom)
     DiCello Levitt, LLP
     8160 Norton Parkway, Third Floor
     Mentor, Ohio  44060
     440-953-8888
     rfdicello@dicellolevitt.com
     jfouche@dicellolevitt.com

For the Defendants,
CITY OF CANTON, et al.:

     KEVIN L'HOMMEDIEU, Esquire
     (via Zoom)
     VIVIANNE DUFFRIN, Esquire
     (via Zoom)
     CARRIE D'ANDREA, Esquire
     (via Zoom)
     218 Cleveland Avenue, Southwest
     Canton, Ohio  44702
     330-489-3395
     kevinlhommedieu@cantonohio.gov

For the Defendant,
ROBERT HUBER:

     MEL L. LUTE, JR., Esquire
     ANDREA K. ZIARKO, Esquire
     (via Zoom)
     Baker, Dublikar
     400 South Main Street
     North Canton, Ohio  44720
     330-499-6000.
     lute@bakerfirm.com
     andreaz@bakerfirm.com

4

1    JOHN D. LATCHNEY, Esquire
       (via Zoom)
2    Hanna, Campbell & Powell, LLP
     3737 Embassy Parkway
3    Suite 100
     Akron, Ohio  44333
4    330-670-7602
     jlatchney@hcplaw.net
5

6

7    ALSO PRESENT:  Mr. Jonathan Cope
                    (via Zoom)
8

9    ----------------------------------------------------------

10   PRELIMINARIES:

11           (Disclosure submitted to all counsel.)

12           (Ms. Ziarko not present in Zoom meeting.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1            DARRELL L. ROSS, Ph.D.,

2    having been first duly sworn, was examined and testified

3    as follows:

4            MR. DICELLO:  And just for the record, we're

5    going to be providing copies of everything shown here digitally

6    to the group after the depo.  If anybody needs anything during

7    the depo, please let me know.

8                    EXAMINATION

9            BY:  MR. DICELLO

10   Q.   All right.  Good morning, Doctor.

11   A.   Good morning.

12   Q.   Could you please state and spell your name for the

13   record?

14   A.   Darrell Lee Ross, D-A-R-R-E-L-L; middle initial -- or

15   middle name, Lee, L-E-E; last name, Ross, R-O-S-S.

16   Q.   Okay.  I know you've been deposed before.

17   A.   Yes, sir.

18   Q.   And so I'm not -- I'm going to spare you the rules --

19   the reading of the rules and all that.  But if you have any

20   questions for me as we go forward, please don't hesitate to

21   clarify anything that comes up as we go, fair?

22   A.   Okay.

23   Q.   I understand that you rely upon your background,

24   knowledge, education, and training as a corrections officer to

25   form your opinions?

1            MR. LUTE:  Objection.  You may answer.

2    A.   As well as additional knowledge and information

3    teaching police officers.

4    Q.   In Exhibit 1 we have on the screen, is -- is that a

5    copy -- an accurate copy of your CV -- current CV?

6    A.   I believe so, yes.

7    Q.   And you know what --

8    A.   January '24.

9    Q.   -- I'm going to do?  I'm going to give you the mouse

10   wheel here so you can scroll -- make sure you get a chance to

11   scroll the entire thing.  I think you should be able to just

12   bring it up as you can.  There you go.  We'll get through the

13   wonky technology problem here in a minute.  You can scroll

14   through it, just -- I just want you to confirm it's the whole

15   CV.

16   A.   Oh, okay.  This mouse is taking forever, but --

17   Q.   Sorry.

18   A.   -- it looks -- it looks -- now I think I'd add in

19   professional training activities.  In May, I'm on the -- I'm

20   scheduled to make a presentation on managing use of force and

21   supervisory liability at the annual AELE -- or excuse me, AELE,

22   Americans for Effective Law Enforcement Conference in Vegas,

23   but that's current.  That's it.

24   Q.   All right.  Thank you.

25           MR. DICELLO:  And, Counsel, could we not count

1    that time scrolling it against my time with the witness today?

2    Is that okay?  I'm not going to have a lot of these kinds of

3    exhibits.

4            MR. LUTE:  Yeah.  No, go ahead.

5            MR. DICELLO:  Okay.  Thank you.

6    Q.   All right.  So you've had a chance to look at every

7    piece and page of Exhibit 1, your CV; is that right?

8    A.   Correct.

9    Q.   And is it a complete and current copy of your CV?

10   A.   Correct.  With the addition that I already have

11   articulated.

12   Q.   All right.  I'll to show you what's been marked as

13   Exhibit 2.  This is your testimony list.  Same question, if you

14   could just take a look at it.  Scroll it please, and when

15   you're done, let me know.

16   A.   Yes.

17   Q.   Okay.

18   A.   Three pages.

19   Q.   And I -- I understand that that is a copy of your

20   testimony from just 2018 to 2023; is that right?

21   A.   That's correct.

22   Q.   Okay.  Have you testified since 2023 in any

23   proceeding?

24   A.   Go back up.

25   Q.   Okay.

1    A.   I took a deposition -- if I can get this, would be
2  Number 35, *Raimy versus City of Niles*, that would back -- back
3  in January, the deposition.  And let's see, Number 42, *Hehrer*
4  *versus Clinton County*, I took a deposition, and Number 44,
5  *Lovell v. Kalamazoo*.  The Hehrer case was a deposition back in
6  October, and Lovell was also in February, Number 44.  That's
7  it.
8    Q.   Okay.  So in October, you took a deposition with
9  respect to item Number 42?
10   A.   Correct.
11   Q.   In February, you took a deposition with respect to
12 item Number 44?
13   A.   Correct.
14   Q.   And with respect to item Number 35, what was -- when
15 did you take that deposition?
16   A.   I think it was January 29th or 30th of this year.
17   Q.   Okay.
18   A.   This is not working.  It's froze.
19   Q.   You went up.  You got to pull the -- get the arrow
20 over the document.  Yeah, you'll just push around.
21   A.   Well, it's somewhere here.
22   Q.   You're on my screen.  So I'm below you if that makes
23 sense.  Here you go.  Oh, you got to go up.
24   A.   Yeah, 35, that would've been January of this year,
25 '23.

9

1    Q.   Okay.  Have you testified in any courtroom
2  proceedings not listed on this report -- or rather in this
3  exhibit?
4    A.   No.
5    Q.   With respect to your testimony shown on this exhibit,
6  has any of it been for a plaintiff?
7    A.   No.
8    Q.   Have you ever testified for a plaintiff?
9    A.   I've written reports for a plaintiff attorney and
10 plaintiffs on behalf of plaintiff.
11   Q.   Have you ever testified on behalf of a plaintiff's
12 case in court?
13   A.   No.
14   Q.   Do you know how many cases you are currently
15 scheduled to testify in, in this calendar year?
16   A.   If I can -- I need to look at this real quick.  I
17 don't have any scheduled trials pending at this time that I'm
18 aware of.
19   Q.   Do you -- are you -- are you retained on cases for
20 this calendar year in addition to this case?
21   A.   Just the ones on that list.
22   Q.   Okay.  So as we sit here today, you are not retained
23 on any other matters except for what's on the list and this
24 matter; is that --
25   A.   Yes, that's correct.

10

1    Q.   What is your rate to testify in deposition?
2    A.   In deposition?
3    Q.   Yes, sir.
4    A.   It's $3,000 for the dep, flat fee.
5    Q.   And that $3,000 is paid by the party who deposes you;
6  is that right?
7    A.   That's correct.
8    Q.   What is your hourly time on cost or charge on a case
9  that you're retained on?
10   A.   Hourly time?
11   Q.   What is -- what is the charge that you have or what's
12 the way in which you charge or bill for a case you're retained
13 on?
14   A.   $450 an hour.
15   Q.   Do you know how many hours of time you've spent on
16 this particular matter?
17   A.   Yes, 50.
18   Q.   Do you know if you've met with any of the attorneys
19 in this case regarding that 50 hours?
20   A.   Met with them personally or talked to them on the
21 phone?
22   Q.   Let's start with met with them personally.
23   A.   Not until today.
24   Q.   How about on the phone?
25   A.   Yes.

11

1    Q.   And who -- with whom have you spoken prior to today
2  regarding this matter?
3    A.   Mr. Beck, Mr. Lute, and Mr. L'Hommedieu.
4    Q.   And do you know what the reason was for your
5  conversations with Mr. Beck?
6    A.   I think it was originally back in August of '23, when
7  I was originally contacted to consider working on the case.
8    Q.   And do you remember what you said in that?
9    A.   I said I'd be interested in looking at the material
10 as a fact-based information and what was forward, the
11 information.
12   Q.   And at the same time that you spoke with Mr. Beck,
13 did you speak with anyone else from his office?
14   A.   Not at that day, not that I recall.
15   Q.   Prior to receiving materials on the case, did you
16 speak to any other attorneys?
17   A.   No.
18   Q.   After -- first -- and so when you received materials
19 on the case, do you remember what you first received?
20   A.   Everything that's on my report.  A thumb drive of
21 every item and document and video that's on my report.  So
22 there's quite lengthy number of documents, but on my report
23 I've documented every document, item, video, report,
24 investigation that I received.
25   Q.   And was -- were those the materials that you reviewed

12

1  in order to decide whether you were going to take this matter?
2      A.  That was part of it, yes.
3      Q.  Anything else?
4      A.  No.
5      Q.  What was it about the materials reviewed that stands
6  out to you today?  We'll go over them later but in more detail.
7  But what was it about the materials provided in your initial
8  review that stood out to you?
9      A.  Well, to boil it down to just to be responsive, I
10  think the -- the volume and intensity and cadence and the speed
11  of the gunfire that Mr. Williams was firing and the limited
12  reaction time that Officer Huber had to determine how to
13  respond.
14      Q.  And that was your initial --
15      A.  Initial.
16      Q.  -- conclusion or opinion upon reviewing the first
17  materials you received; is that right?
18      A.  It's -- that's best of my recollection, yes.
19      Q.  And that would've been -- where would that
20  information which formed the basis of that initial conclusion
21  have been found?  What materials do you recall looking at?
22      A.  There were several videos that I reviewed.  There was
23  the prosecutor's summary from the Bureau of Criminal
24  Investigation report, their interviews and report, as well as
25  Officer Huber's report and interview with BCI.  That's the

                                                            13

1  initial impression.
2      Q.  Yeah, and we're -- we're just talking initial
3  decision to take the matter?
4      A.  Yes.
5      Q.  All right.  Following your receipt of the initial
6  round of materials and your initial review, you spoke to
7  Mr. Lute; is that right?
8      A.  Later -- well, it was kind of interesting because
9  there was a lag time in terms of reviewing materials.  And just
10  around -- before Christmas, I got an email that said the report
11  was due in January, which I hadn't learned that before.  So it
12  was kind of a quick -- I mean, I had read the materials, but we
13  had conversed.  It was either Mr. Lute or Mr. Beck, one of the
14  two, that we talked about the -- the need to get the report in,
15  and I wanted -- just wanted to make sure I had everything, and
16  I had everything.
17      Q.  All right.  Is that the sum and the substance of what
18  you recall talking about with Mr. Lute or was there additional
19  topics that you discussed with Mr. Lute?
20      A.  No, not that I recall, just going over some of my
21  preliminary opinions, my impressions, and that was about it.
22      Q.  Same with Mr. L'Hommedieu, do you recall what you
23  discussed with him?
24      A.  Yes.  This would've been after the new year.  I don't
25  remember the -- recall the specific date, but it was to also

                                                            14

1  provide opinions about the training of Officer Huber and the
2  policies of Canton Police Department.
3      Q.  Is that the sum and substance of what you recall
4  discussing with Mr. L'Hommedieu?
5      A.  Yes.  And just the policies, procedures, protocols of
6  the Canton Police Department and officers' training.
7      Q.  When you write a report for someone who is
8  retained -- retaining you, could you describe your approach
9  from a bias point of view?  What it is that you do to control
10  for bias?
11      A.  Well, I use the methodology called content analysis.
12  I also use grounded theory, which assimilates a triangulation
13  approach to all of the documents that I've been provided.  And
14  so I painstakingly go through all the interviews, all the
15  reports, the videos that are provided, the policies and
16  procedure, the training records, background and experience of
17  the officer that's involved or officers that may be involved.
18  It's quite a intensive kind of review; the contents -- the
19  historical value of those contents that are contained within
20  the file itself:  the trends, the patterns, the themes that
21  begin to emerge.  That gives me a sense, an idea, of the
22  patterns of what I'm dealing with in a particular case.
23          I also look at the deposition testimony, the
24  interview testimony.  I kind of try to cross-reference those to
25  see if there's any gaps or consistencies with the testimony,

                                                            15

1  any witnesses that may be involved, and certainly the evidence
2  that's provided that's in the file material.  So it's a
3  combination, what I call a triangulation, which is a research
4  methodology that brings all the sum and substance in to develop
5  patterns and themes and trends consistent with what the issues
6  as I see them in the particular case or the allegations that
7  are made, claims, assertions.
8      Q.  And is that the full extent of how you approach
9  this -- the notion of bias when you draft a report?
10      A.  I would say so, yes.
11      Q.  Although you've never testified for a plaintiff in
12  court, you said you have authored reports for plaintiffs?
13      A.  Yes, I have.
14      Q.  When was the last time you did that?
15      A.  Let me see, would've been 1999 or 2000, somewhere in
16  there.  It would've been a Mississippi case, a motor carrier in
17  Mississippi as I recall.
18      Q.  So either 24 or 25 years ago; is that right?
19      A.  Correct.
20      Q.  When you create a report, you are asked to reach
21  various opinions.  You're familiar with that process, right?
22      A.  Correct.
23      Q.  In this particular instance, were you asked which
24  opinions to create or did you create the opinions and offer
25  them to counsel?

                                                            16

1    A.   I created my own opinions.  That's part of my
2    methodology.
3        Q.   I say that because there was some conversation
4    regarding, I think, one of the attorneys that you offered --
5    that discussed a training?
6        A.   Yes.  They wanted me to look at the training.  So in
7    looking at the records and the testimony, I formed my own
8    opinion.  But it was in that topic area of that particular
9    subject matter.
10       Q.   Were you directed to any of the subject area or
11   matter by the attorneys?
12       A.   No.
13       Q.   Okay.  All right.  If I could have the -- let me go
14   back.  We're going to put up on the screen what's going to be
15   marked as Exhibit 3 that is your report, God willing.  If you
16   could, just scroll through that and make sure we have a full
17   copy for the audience.
18       A.   This is going to take some time.  This is longer than
19   the CV.
20       Q.   By my count, it was about one page per hour that you
21   spent on the case.
22       A.   Just about, yes, sir.
23       Q.   Okay.  Have you had a full opportunity to review
24   Exhibit 3, your report?
25       A.   I didn't read, but I scrolled through the pages that

                                                                17

1    I submitted, yes.
2        Q.   And do you -- do you have a copy in front of you?
3        A.   Yes, I do.
4        Q.   All right.  And so did you, in scrolling the report,
5    have any concern that the document is other than the document
6    you have in front of you right now?
7        A.   I don't have any other concerns.
8        Q.   Okay.  And so your report, is it complete and
9    current?
10       A.   Yes.
11       Q.   Are there items listed or identified that you relied
12   upon in your report that are new?  Meaning, have you received
13   any new information or materials other than the items listed in
14   your report?
15       A.   No.
16       Q.   And so the items that you reviewed were compre--
17   is -- and -- that are listed in your report are comprehensive
18   and accurate; is that right?
19       A.   Yes, they're....
20       Q.   And --
21       A.   When you mean "comprehensive," I've reviewed -- are
22   you talking about the file that I reviewed, or....
23       Q.   Comprehensive as to your opinion.  It's the -- it is
24   the sum total of what you relied upon --
25       A.   Yes --

                                                                18

1        Q.   -- for your opinion?
2        A.   -- yes, sir.
3        Q.   Okay.  Does your report contain all of your opinions
4    about this matter?
5        A.   Yes.
6        Q.   As my first question began today, I asked you what
7    you relied upon.  And I started with your background,
8    education, knowledge, and training with respect to a
9    corrections officer.  Do you recall that question?
10       A.   Yes.
11       Q.   All right.  And I understand you have additional
12   items that you rely upon beyond being a corrections officer --
13       A.   That's correct.
14       Q.   -- in forming your report; is that right?
15       A.   That's correct.
16       Q.   You rely upon your teaching experience to form your
17   opinions, correct?
18       A.   Yes.
19       Q.   And your teaching experience is fully stated in your
20   CV?
21       A.   I don't think it's full.  That -- that's only a
22   portion of my teaching and/or training.
23       Q.   What would you like to add to your testimony here
24   today that your CV you think doesn't cover or that would more
25   fully give us an understanding of your teaching experience?

                                                                19

1        A.   Well, I've taught over 25 different courses at the
2    university level, and I've taught -- I don't even have a number
3    of all the training -- the training topics, but they're listed
4    in my CV.  So I identified what I thought were pertinent to my
5    opinions based on the factual fact pattern and incident of
6    this -- of this particular incident.
7        Q.   Okay.  And as any courses or teaching experiences
8    come up that you think are relevant, then please let us know.
9        A.   I sure will.
10       Q.   That is, those that are not listed on the CV.  Okay?
11       A.   Yes.
12       Q.   You rely upon the articles you've authored over the
13   years to form your opinions; is that right?
14       A.   As appropriate.
15       Q.   You rely upon the books you've authored, including
16   "Civil Liability in Criminal Justice," 8th edition, published
17   in 2023, to form your opinions; is that right?
18       A.   Yes, it's true.  It's correct.
19       Q.   And that includes your other book that you authored,
20   "Guidelines for Investigating Officer Involved Shootings,
21   Arrest Related Deaths, and Deaths in Custody," published in
22   2018, to form your opinions; is that right?
23       A.   Yes.  It's a co-authored text, but yes.
24       Q.   You rely upon your experience consulting for law
25   enforcement agencies to form your opinions; is that correct?

                                                                20

1    A.    That's true.

2    Q.    You rely upon your attitudes and beliefs about law

3 enforcement to form your beliefs; is that true?

4    A.    Yeah, I would agree.  That's fair, yes.

5    Q.    And you rely upon the documents and evidence you were

6 given in this case to form your opinions?

7    A.    Yes.

8    Q.    What is a criminal justice practitioner?  It's a term

9 I've seen you use repeatedly throughout your speaking and

10 writing.

11    A.    Yeah.  It is one that is employed by various entities

12 or agency or organizations within the criminal justice system,

13 vis-à-vis law enforcement, corrections, sheriff's departments,

14 state police, courts, parole and probation, community

15 supervision.  So all entities within the criminal justice

16 system that are charged or the mission of them is to serve the

17 public.

18    Q.    And so these would be the government side of the

19 criminal justice system; is that right?

20    A.    That's correct.

21    Q.    Throughout your life, you've been a dedicated

22 consultant, trainer, proponent, and defender of criminal

23 justice practitioners and their agencies; is that fair?

24    A.    Yes.  But I would -- but I would also expand that to

25 look at making sure that in all aspects of that, that equal --

21

1 equal representation, equal justice issues, due process issues

2 are identified and maintained and served within the criminal

3 justice system.

4    Q.    Could you give me an explanation of what you mean by

5 that?

6    A.    Well, as I -- my impression of your question seems to

7 suggest that I'm only one side of a criminal justice issue, but

8 I would differ and say I'm looking at it from a holistic

9 situational aspect of whether the criminal justice serves the

10 community in what realm and what capacity and how professional

11 and accountable and transparent it is.

12    Q.    What do you mean when you say, "a holistic

13 situational aspect"?

14    A.    Well, looks at all sides, looks at all issues, looks

15 at all topics, looks at all subject matters, all emerging

16 trends and patterns and issues that are within the criminal

17 justice system that impact the law enforcement position or job

18 or position, as well as those that work in the legal system,

19 both defense and prosecutorial, judge, judicial, as well as the

20 correctional entities.

21    Q.    Okay.  And so my -- I'm trying to understand the

22 nuance, what you're reacting to in my question -- my initial

23 question about your dedication was the suggestion or inference

24 that you heard in it that you're just one-sided?

25    A.    That's what I heard.

22

1    Q.    Okay.

2    A.    That's my impression.

3    Q.    Let me ask the question again, see if it's -- if you

4 get the same.  Throughout your life, you've been a dedicated

5 consultant, trainer, proponent, and defender of criminal

6 justice practitioners and their agencies?

7    A.    I guess I'm having problems with the "defender," like

8 I'm flying around the country with a cape on my back as the

9 defender for those.  And so I have a problem with that term

10 however you're using that.

11    Q.    Any --

12    A.    But I would say, as I have been asked that particular

13 question from different angles in the past, that I'm

14 certainly -- that I've worked in the criminal justice system as

15 a corrections officer and as a professor preparing men and

16 women to enter the field.  To me, that's dedicated and devoted.

17 I don't know the -- aspect of defender, I guess that I

18 would differ with you there, but other than that --

19    Q.    And -- and so --

20    A.    -- we're on the same page.

21    Q.    -- I understand that some folks who do litigation try

22 to disparage or attack other people, and I try to avoid that at

23 all cost.  I just don't believe in that.  So let me give you an

24 understanding of what I mean by "defender."  I mean, for the

25 last 24 or 25 years, you have testified in defense of criminal

23

1 justice practitioners, fair?

2    A.    Primarily.

3    Q.    Yes, and their agencies?

4    A.    Correct.

5    Q.    All right.  So in that context, you've been a

6 defender of their agency -- criminal justice agencies and

7 personnel, fair?  That's all I'm getting at.

8    A.    In that capacity.  But it's -- it also has to be, I

9 think, attributed to a portion of your question that I -- I

10 look at both sides of the issue.  Okay?  And in that act of

11 making presentations and writings and publications and working

12 with agencies, I also point out potential problems and

13 deficiencies that are part and parcel of my work as well.  So

14 it's not just a pie chart of 99 percent this and only

15 1 percent, but it -- it's looking at various aspects and that's

16 how I've tried to -- through my consulting, training,

17 education, and -- and working with various entities throughout

18 the -- the time that you've referenced.

19    Q.    I want to make sure I understand your answer fully.

20 You -- when you do your reporting or you're testifying, you

21 consider both sides of the case; is that --

22    A.    Oh, absolutely --

23    Q.    -- okay.

24    A.    -- yes, sir.

25    Q.    And you have chosen over the last 24 or 25 years to

24

1  only testify for defendants in civil justice or civil rights
2  related litigation; is that right?
3       MR. LUTE:  Objection.  Go ahead.
4       A.  Well, in terms of "chosen," I'm very selective in the
5  cases that I work on.  So there's an aspect of selection.  But
6  quite frankly, I don't get called by plaintiff's attorneys to
7  do work.  And I've certainly turned down many, many, many -- I
8  can't even tell you how many cases I've turned down because I
9  felt that whatever the topic matter may be, that was not a good
10  fit for me to -- to work in that particular case based on
11  different problems and issues that emerged out of the incident.
12       Q.  And so the matters you've testified to in the last 24
13  or 25 years were matters that you felt fit you?
14       A.  Absolutely, without question.
15       Q.  Let's see if I can get this to work now.  I have an
16  Exhibit Number 4.  It's going to be a video of you.  Make this
17  work.  I want you to listen to the video for a second as we
18  make it play.  Tell me if you remember your webinar of
19  October 29th, 2020, and your comments offered here.  Wait a
20  second.  I don't know how to fix that.
21       COURT REPORTER:  Can we go off the record?
22       MR. DICELLO:  Yes.
23       (A discussion ensued off the record.)
24       Q.  All right.  We finally figured out the technical
25  problems.  Let's play Exhibit 4 from your seminar of

25

1  October 29th, 2020.  It's a clip of something that you said.
2       MR. DICELLO:  Go ahead.
3  *(Playing of video started.)*
4  *(Playing of video stopped.)*
5       MR. DICELLO:  Thanks, Joe.  You can -- you can
6  turn off sharing.
7       Q.  Okay.  Did you have an opportunity to hear and see
8  Exhibit 4?
9       A.  Yes.
10       Q.  It -- is it -- is it fair to say that you believed
11  when you said the words that it was, "a most challenging time
12  for criminal justice agencies," when you said those words?
13       A.  Yes.
14       Q.  You believe that?
15       A.  Yes.
16       Q.  And you believe that today?
17       A.  Yes, I do.
18       Q.  And I -- I noticed that you have -- and I've seen
19  this in other times when you've spoken and we'll see some more,
20  but you do have a genuine -- this is not made up -- this is a
21  genuine regard for those in law enforcement, don't you?
22       A.  Absolutely.
23       Q.  And you, yourself, having been in the community of
24  it, I want to show respect to the fact that -- that just --
25  just for having genuine regard, I'm not trying to take a shot

26

1  at you.  Do you understand that?
2       A.  It depends on what you say.
3       Q.  And I -- and I think that's fair, but I want to make
4  sure that we understand each other that right now your genuine
5  regard for law enforcement was evident in Exhibit 4; is that
6  fair?
7       A.  Yes.
8       Q.  And you hold that same belief, that same regard,
9  today for law enforcement?
10       A.  Yes.
11       Q.  And you indicated that you would include yourself in
12  their choice of continuing to persevere.  You said, "As we
13  continue to persevere."  Do you remember saying that?
14       A.  Yes, I remember saying that, yes.
15       Q.  What is it that needs -- needed in October of 2020,
16  that law enforcement needed to persevere through?  What were
17  you referring to?
18       A.  The whole issue of communities distrusting law
19  enforcement and going through defunding the police, riots,
20  disturbances.
21       Q.  You're referring to the George Floyd riots at the
22  time?
23       A.  Well, there were all sorts of riots during that time,
24  not just George Floyd.
25       Q.  In 2020?

27

1       A.  Yes.
2       Q.  By October?
3       A.  Oh, yeah, yes.  There was -- that happened in May or
4  early June -- late May.  I think it was Memorial Day weekend as
5  I recall.
6       Q.  Yeah.
7       A.  So Portland, Oregon, was going through it.  Detroit
8  was going through it.  There was different -- different --
9       Q.  But those were all reactions to George Floyd.  I just
10  want to make sure we're clear that the national media was
11  showing only riots in those cities related to George Floyd?
12       MR. LUTE:  Objection.  Go ahead.
13       Q.  Is that your -- is that your recollection?
14       A.  No.  I think it was a -- New York City certainly
15  through the summer.  I think it was more than that.  So that
16  might've been the trigger, the catalyst, but it was certainly
17  much more than -- more than that.
18       Q.  What are you referring to?  More than -- much more
19  than George Floyd?
20       A.  Yes, yes.
21       Q.  What are you referring to that -- that you're --
22       A.  Well, police, in general, and criminal justice
23  practitioners, in general.  And so -- but this has been going
24  on prior to this, the kinding to work with society.  I mean, I
25  go back to the '60s, so -- and -- and -- there's ebbs and flows

28

1    through our society, through our culture.  And so it -- it's
2    made it a difficult job to -- I see it at the -- at the
3    institution where I work at in higher ed, difficult to -- to
4    recruit students to seek education in criminal justice, let
5    alone recruit officers to work in agencies.
6         So it's -- it's a challenging time for -- if you're a
7    chief or a sheriff or an officer, but this is not the first
8    time in this country where that's been challenging times.  And
9    so it's my way of expressing as -- as a presenter and as an
10   observer and one who had worked in the system and in the field
11   and prepare men and women to enter the field.  Particularly
12   when I worked at Ferris State University.  I worked in the
13   police academy there for seven years.  It's a lot different
14   then than it is today.  And that's all I was acknowledging for
15   them as they do try to persevere as they work in a very -- to
16   work with the community and the expectations that -- that are
17   challenging to administrators and police officers.
18        Q.   Thank you.  All right.  Let me see if I can go to
19   Exhibit 5.  What did I just do here?  All right.  We've got to
20   take that one down and hopefully get this taken up.  Okay.
21   Showing you now what's been marked as Exhibit 5.  This is from
22   Western Indiana University -- Illinois University, excuse me,
23   2008.  And it's a request for a new program that you sought.
24   We're going to go to page 20.  Let me get this figured out
25   really quick, which I think I can.

29

1         MR. L'HOMMEDIEU:  What exhibit is this?
2         MR. DICELLO:  It's going to be Exhibit
3    Number 5.
4         MR. L'HOMMEDIEU:  And what is it again please,
5    Bobby?
6         MR. DICELLO:  One second.  Let me get right to
7    the number here, 15, 16, 17, 18, 19, 20.  It is a -- at page 20
8    of the exhibit, it is a request -- it is down here for a new
9    academic program proposal that was submitted -- here we go.
10   Let me check that.  Hold on a second.  This is the wrong one.
11   Let me get the right page, one second.  I can do it this way.
12   I'm on the wrong one, one second.  Let me close this out.  This
13   is so frustrating.  Okay.  There we go.  There we go.  Finally,
14   I see it now.  Okay.  Try this again, share screen.  Okay.
15        Q.   (Continuing)  So this is page 20 of the document's
16   PDF pagination.  It is a request for new academic program
17   development for fiscal year 2008.  You were the department
18   chair at the time, correct, Doctor?
19        A.   Yes, at Western Illinois University.
20        Q.   Western Illinois.  And in the document, as the
21   chairperson of the Law Enforcement and Justice Administration,
22   you proposed a new doctoral degree program, and that is LEJA's
23   Doctorate in Criminal Justice, correct?
24        A.   Yes, sir.
25        Q.   And what does LEJA stand for?

30

1         A.   Law Enforcement and Justice Administration.
2         Q.   All right.  And the idea of that program was to
3    assist criminal justice practitioners to maximize their
4    potential; is that right?
5         A.   Correct.  I can't read that --
6         Q.   Well, let me -- let me --
7         A.   -- but if that's --
8         Q.   -- zoom in for you --
9         A.   -- what you're saying.
10        Q.   -- then.  Let me zoom in.  Hold on one second.  I can
11   zoom in for you.  Okay.  Yeah, if you read the first
12   sentence -- can you read it from where you're sitting?
13        A.   Yes.
14        Q.   Okay.
15        A.   "To maximize their potential," I think that's what
16   you're referring to.
17        Q.   Yes.  That's that first sentence.
18        A.   Okay.
19        Q.   Were you able to read that?
20        A.   Yeah, I can read that.
21        Q.   Okay.  Great.  And so the -- again, just so -- now
22   that you've read it, the program was to assist criminal justice
23   practitioners to maximize their potential; is that right?
24        A.   Correct.
25        Q.   All right.  How long have you been educating criminal

31

1    justice practitioners with that goal?
2         A.   Practitioners or students?
3         Q.   Practitioners, I asked.
4         A.   Yes.  I would say since at least 1985.
5         Q.   Let me see if I can get this one up now.
6         MR. DICELLO:  Can you all see that document, I
7    hope?
8         A.   I can see it, but I can't read it.
9         Q.   Well, I'll zoom in.
10        MR. DICELLO:  Can everybody in -- in TV land
11   see it?  Is it -- it should --
12        MR. L'HOMMEDIEU:  Yeah, we can see that, yes.
13        MR. DICELLO:  -- it should say, "Examining the
14   liability factors," at the top.  Do you see it there?  What --
15   what do you see on the screen?  Let's just -- off the record.
16        (A discussion ensued off the record.)
17        Q.   This is Exhibit 6.  It's an article that you wrote in
18   1998 titled, "Examining the Liability Factors of Sudden
19   Wrongful Deaths in Police Custody," and that's when you were at
20   East Carolina University, correct?
21        A.   Yes.
22        Q.   Okay.  I'll try to get through this now.  Let me do
23   this.  This would've been for *Police Quarterly*, Volume 1,
24   Number 4 in 1998, correct?
25        A.   Yes.

32

1    Q.   And at page 67 of the document, which we'll get to --
2    here we go.  I'll zoom in.  You write, "While there is no
3    absolute protection against civil lawsuits, a municipality and
4    its police can defend their actions by knowing the legal issues
5    involved and by developing proactive measures to reduce the
6    frequency of litigation."  Do you see that?
7    A.   Yes.
8    Q.   Do you believe that today to be true?
9    A.   Yes.
10   Q.   At page 69 of this document, you write, "Each case
11   will obviously comprise numerous variables for the plaintiff to
12   attack.  In any lawsuit, not all initial allegations will
13   withstand judicial scrutiny.  The agency should, however, be
14   prepared to justify and defend each claim."  Do you see that?
15   A.   Yes.
16   Q.   Do you still believe that to be the case today?
17   A.   Yes.
18   Q.   What is the academic purpose of the statements that
19   I've just shown you?
20   A.   I think they're more than academic.  I think
21   they're --
22   Q.   Well, I'd like to ask if you could just stay with my
23   question.  What is the academic purpose?
24   A.   It's the reality within the work of criminal justice
25   system, and in this case, it was talking about police officers

33

1    and corrections officers who deal with these types of
2    incidents.
3    Q.   And when you say, "this is the reality," what do you
4    mean?
5    A.   This is the -- the nature of working in the criminal
6    justice system; the intrinsic nature of these types of
7    incidents.  This is a very narrow slice, narrow percentage, of
8    the types of incidents officers have to respond to.  So it
9    was -- it's an acknowledgement that that is the current state
10   of the affairs, and it's still that way today even more so.
11        And the article goes on to -- to assist those who
12   read it, practitioners, students, others, to acknowledge and to
13   make them aware of you can expose yourself to civil liability
14   unnecessarily.  Let's -- let's work on trying to mitigate that,
15   but should you be sued, here's what's going to be potentially
16   happen based on the results, the outcome of case decisions by
17   reviewing that article --
18   Q.   Is --
19   A.   -- for that article.
20   Q.   -- is one of the purposes of your writing to reduce
21   future litigation against law enforcement?
22        MR. LUTE:  Objection.  You may answer.
23   A.   That may be portions of it, but it's more get -- for
24   a generic, get the house in order by doing these certain things
25   that the Court has laid out, has identified as helpful,

34

1    assisting ways, methods, strategies to -- to respond to these
2    types of agencies -- or excuse me, these types of incidents but
3    with that agency with these officers.
4    Q.   Okay.
5    A.   So it's -- it's an awareness.  It's -- it's guidance.
6    It's based on the trends and patterns of case decisions.
7    Q.   I believe the last sentence of your article reads,
8    "Understanding the mechanics of this type of litigation in
9    state and federal court and providing officers with continued
10   direction in these types of encounters will assist in defending
11   or reducing future litigation."  Did I read that right?
12   A.   Correct.  So it's a two-pronged approach.
13   Q.   Do you still believe that understanding the mechanics
14   of that type of litigation will assist officers and agencies in
15   defending or reducing future litigation?
16   A.   Yes.
17   Q.   Is that one of the purposes that you hold today in
18   testifying.
19   A.   Depending on what the nature of the lawsuit is?
20   Q.   Well, in this lawsuit?
21        MR. LUTE:  Objection.  Go ahead.
22   A.   Sure.  Absolutely.
23   Q.   All right.  You testify from time to time for a
24   501(c)(3) organization titled Americans for Effective Law
25   Enforcement or AELE, correct?

35

1    A.   Yes.
2    Q.   We have it in front of us here.  I'm going to put it
3    up on the screen for everybody else what's going to be marked
4    as Exhibit 7.  I believe it says here, "The Americans for
5    Effective Law Enforcement is a resource center and legal
6    educational provider dedicated to offering interested parties
7    objective, timely, accurate, legal, scientific, and
8    evidence-based information and operational guidance for the
9    enhancement of the criminal justice community and to reduce
10   potential criminal and civil liability of criminal justice
11   professionals and their employers."  Did I read that right?
12   A.   Correct.
13   Q.   Okay.  And this would have -- this is from the
14   "About" page of their website.  Are you familiar with this
15   particular mission statement of AELE prior to today?
16   A.   I don't believe I have ever reviewed that, no.
17   Q.   Do you agree with that mission statement as a
18   presenter for AELE?
19   A.   Yes.
20   Q.   You have a book that you've published.  I brought a
21   copy.  I have read every page.
22   A.   Well, thank you.
23   Q.   And -- well, you're welcome.  It's quite a feat to
24   write a book so large, 601 -- 606 pages, including the index.
25   It is *Civil Liability in Criminal Justice*, 8th edition, and

36

1  it's draft -- it was written or authored by you; is that right?
2      A.   Correct.
3      Q.   Okay.
4           MR. DICELLO:  Now for the folks watching, I
5  don't have -- and if folks needed to know, we did not have --
6  this is for the record -- the ability to use copying devices.
7  They told me they had them, but they're not working here at the
8  Holiday Inn in Valdosta.  But I will be citing by page and
9  reading the pages as we need them to be read.  And I'd
10  certainly give the book to you, Doctor, to make sure I'm
11  reading it accurately.  All right.  And so we'll -- we will
12  supplement our page references with the exhibits following this
13  deposition so everybody has a copy of each page that we read.
14      Q.   (Continuing)  So easy enough, the first page, you
15  write, "Filing a civil lawsuit in the United States has become
16  all too common since the 1970s."  And I just want to hand that
17  to you, make sure I read that sentence right.  It's the bottom
18  page -- or bottom paragraph of the first page.
19      A.   Yes.
20      Q.   And that's the first sentence, correct, of that
21  paragraph?
22      A.   Of that paragraph.
23      Q.   Yes.  And the next sentence, could you read it,
24  please?
25      A.   "Litras and DeFrances (1999) conducted a study by the

1  Department of Justice" --
2      Q.   I think there's a spot about litigious.  Maybe you
3  missed it.
4      A.   You said the next sentence.
5      Q.   Oh, I'm sorry, please continue.  I apologize.
6      A.   "Of justice over the overall trends of 500,000 tort
7  cases filed in United States during fiscal years 1996 to 1997."
8      Q.   And the next sentence.
9      A.   "Civil cases" ariding out -- "arising out of 75
10  largest counties were studied."
11      Q.   Okay.  Can I have that back?  I don't know what I'm
12  missing here.  No, the second sentence of it you -- yeah, you
13  missed.  It says, "American society has become highly litigious
14  resorting to filing civil lawsuits without hesitation."  That
15  was the second sentence.  Could you -- could you read that out
16  loud, please?
17      A.   Okay.  "American society has become highly litigious
18  resulting to filing civil lawsuits without hesitation."
19      Q.   Okay.  And there's no footnote to that statement, is
20  there?
21      A.   No.
22      Q.   What is the source of information that you rely upon
23  in offering that statement in your 2003 book?
24      A.   It's a general observation --
25      Q.   2023 book, excuse me.

1      A.   -- general observation and not just criminal justice,
2  in American society in general.
3      Q.   And I understand, it's a general observation?
4      A.   Yes.
5      Q.   And the observation is that society has become highly
6  litigious, right?
7      A.   Correct.
8      Q.   And so what is the factual basis for that statement?
9      A.   Well, I think I go through the course of the textbook
10  laying down the foundation by citing numerous cases and
11  decisions.  But it's -- it's part and part of not only -- it's
12  a general statement where if you were to go to -- and I do cite
13  this later in Chapter 1 or 2 -- the administrative office of
14  the courts that shows all of the litigation that's filed:
15  bankruptcy, economic, environmental, medical malpractice,
16  businesses, all sorts of various occupations and disciplines
17  that are sued.
18      Q.   Have you studied or compiled a listing or catalog of
19  all the various industries that have been sued and how
20  frequently?
21      A.   I have not.
22      Q.   Okay.
23      A.   But I rely on the administration office of the court
24  and their annual reports that -- and I don't think they
25  actually report every industry or business or occupation as far

1  as I know.
2      Q.   Is there any other source that you rely upon in
3  making that statement?
4      A.   No, not that I can think of off the top of my head.
5      Q.   At page 3 of your book, we're going to go to -- all
6  right.  Let's go -- I've got the little orange sticky note
7  right across from the paragraph.  If you could, read the first
8  sentence of the paragraph I'm showing you on page 3 of your
9  book.
10      A.   The sentence, "Criminal justice agencies and
11  personnel are also vulnerable and easy targets for litigation."
12      Q.   Okay.
13      A.   Is that what you wanted me to read?
14      Q.   That's right.  Do you believe that to be true today?
15      A.   Yes.
16      Q.   And upon what academic evidence or information do you
17  make that statement?
18      A.   Well, I cite various studies throughout the whole
19  book in various chapters, first of all.  So the book not only
20  looks at decided cases from the Supreme Court and/or lower
21  appellate court or district court level case decisions, but
22  also integrates a number, quite a few, research articles from
23  legal journals, from academic, other journals, criminal justice
24  journals, practitioner journals, to some extent, that all
25  contribute to supporting various patterns, trends, and themes

```
1    of each particular chapter that I write on.
2         Q.   Can you think of any publication that you've ever
3    seen or read it or relied upon that shows criminal justice
4    agencies and personnel are vulnerable or how they've come to
5    what methodology they use to establish vulnerability?
6         A.   I believe the Isidore Silver's book on police civil
7    misconduct is one right off the top of my head that's been
8    around since the '70s and '60s.
9         Q.   That's a book from the '70s?
10        A.   Yes.  It's been written, I think, every three to four
11   years --
12        Q.   And what is --
13        A.   -- edition.
14        Q.   -- what was cited in that book as a vulnerable aspect
15   of criminal justice agencies and personnel?
16             MR. LUTE:  Objection.  Go ahead.
17        A.   The likelihood, the trends of, patterns of -- and
18   this is, again, all law enforcement and corrections, criminal
19   justice -- the availability, the accessibility of suing
20   criminal justice practitioners.  And he cites that quite
21   through his particular text.
22             Also, I can recall -- I believe her name is
23   Karen Blum, who is a professor of law -- and I can't remember
24   what university.  I believe it's on the East Coast.  But she's
25   written quite a bit.  She's -- she's spoken several times at

                                                              41
```

```
1    the Annual Section 1983 Litigation Conference in Chicago for
2    the Institute of Technology at Chicago, as well as Nahmod, who
3    is the conference chair, who is a law professor there.  So
4    those right off the top of my head would be examples of
5    evidence of that based on your question.
6         Q.   And when you -- when you say, as you did in your
7    book, that they are vulnerable, what do you mean -- what do you
8    mean by that?
9         A.   Well, the very nature intrinsic aspect of restricting
10   people's constitutional rights makes you vulnerable to a lot of
11   lawsuit and litigation.
12        Q.   And --
13        A.   So during an arrest, during a use of force, during a
14   search and seizure, during a pursuit, I mean, all the various
15   types of duties officers perform, and then correctional
16   officers within the jail and the prisons, so yeah, they --
17   you -- you do have -- you are vulnerable to a lawsuit.
18        Q.   I mean, isn't anyone?
19        A.   Not necessarily, no.
20        Q.   No one?  Wait, hold on a second.  Any of us could be
21   sued for anything at any time.
22        A.   Correct.  But I --
23        Q.   So --
24        A.   -- think the odds of me being sued versus a police
25   officer that stops somebody on a traffic stop is much lower --

                                                              42
```

```
1    and/or yourself -- than a police officer, because again,
2    restricting people's constitutional rights.
3         Q.   And have you ever done a comparative analysis of any
4    kind in your studies of how often citizens sue each other
5    versus how often citizens sue officers?
6         A.   No, I have not.
7         Q.   Okay.
8         A.   Again, I would rely on the Administrative Office of
9    the Courts, AOC, Administrative Office of the Courts, which
10   shows where that does happen but not with any specificity, but
11   I mean, they give numbers and trends and patterns and the
12   outcomes of those lawsuits.
13        Q.   You also say that criminal justice agencies and
14   personnel are easy targets -- targets for litigation.  What do
15   you mean by an "easy target"?
16        A.   Meaning that they can be set up.  They can respond to
17   one thing and something else totally different than what the
18   call was or what the initiating response was.  I worked on a
19   case long ago where -- in Michigan -- where the individual had
20   numerous weapons in his house and was calling the sheriff's
21   deputies to come to the house.  And the family intervened and
22   said do not respond to the house because he's setting up for
23   suicide-by-cop situation.  So that's generally what I'm -- what
24   I'm talking about in terms of targets and vulnerability and
25   accusations that may not be quite accurate.

                                                              43
```

```
1         Q.   So it's your belief from your work on other cases
2    that American citizens -- some, excuse me -- some American
3    citizens use the civil justice or criminal justice system to go
4    after police?
5         A.   Oh, definitely.  Now, what percentage, I don't
6    know --
7         Q.   Well, I have a better --
8         A.   -- but -- but it does happen.
9         Q.   -- yeah, I have a -- I have a more pertinent
10   question, which is, what's easy in the targeting that you've
11   seen?  What is the -- how do you get to the notion of an easy
12   target?  I understand there could be a target.  Anyone could be
13   a target, right?
14        A.   Well, I'm -- I'm dealing with --
15        Q.   But wait, my --
16        A.   -- the book --
17        Q.   -- but my question is anyone could be a target of
18   litigation, right?
19        A.   It's possible.
20        Q.   And -- and so I'm trying to understand how an officer
21   with qualified immunity, lawyers, is an easy target?
22        A.   Because of the nature of their job.
23        Q.   Just because they do their job, they could be sued
24   for doing it?
25        A.   Yes.

                                                              44
```

1    Q.   And is that different than any other profession you
2 can think of?
3    A.   I think it parallels, but I think roughly speaking
4 there is about -- this is an estimate coming out of the
5 Silverdore [sic] book -- anywhere from 50 to 60,000
6 Section 1983 and/our state lawsuits annually against police
7 officers and corrections and jail officers.  So, yeah, they can
8 -- they can obviously be easy targets.  When you stop someone
9 on a traffic stop, there's all sorts of allegations that can
10 and possibly be made against that officer; maybe some accurate,
11 maybe some inaccurate, but it can be a set up.
12         In -- in corrections, it's the same way where I've
13 seen that -- that occur.  It certainly has occurred when I even
14 worked in prisons many years ago.  But that -- that can happen,
15 so that's a general fact.  That's the -- the culture in the
16 world and the society we live in.
17    Q.   When you say it's a general fact, what are you
18 referring to?  What's a general --
19    A.   Going back to your question, easy target.
20    Q.   So in -- in your mind, it's a general fact that
21 officers who enforce the law are easy targets of litigation?
22    A.   Can be.
23    Q.   It can be?
24    A.   Yes.
25    Q.   And you hold that belief today?

45

1    A.   Yes, I do.
2    Q.   Now, did you bring that belief into your work in this
3 case?
4    A.   No.
5    Q.   You did not bring that belief into your work?
6    A.   No.
7    Q.   It -- is it part of your work at all today?
8    A.   No, it's not.
9    Q.   Why is it in your book?
10    A.   Because the book is different from me working on it
11 and retained on a case to provide an opinion about the fact,
12 the incidents, that occurred in the -- in the case.
13    Q.   But you agreed with me earlier that you rely upon
14 your book in your drafting of your opinions in this case.
15    A.   In terms of how cases inform my opinion, case
16 decisions that either the Supreme Court has decided on or an
17 appellate court or a lower court.
18    Q.   So in your book, you only rely on the cases?
19    A.   No.  I've already articulated that I use other
20 outside sources, such as research, law journals, academic
21 research articles on the topic germane to the chapter.
22    Q.   What I'm trying to understand, is earlier you
23 testified that you do rely upon your book, your 8th edition,
24 2023 book, with respect to forming your opinions in this case.
25 Do you remember that testimony?

46

1    A.   As it was general to your question.  Now, you're
2 asking me to --
3    Q.   Hold -- hold -- wait, I just want to --
4    A.   -- no, no, no, let me finish.  Let me finish, sir.
5    Q.   -- I think we're confusing each other.  Let me
6 just --
7    A.   I think you're confused.
8    Q.   Okay.  Let me hear you finish.
9    A.   And it's in my article -- or my -- my report --
10    Q.   Yeah.
11    A.   -- in fact, case decisions that I have used in the
12 book or in other articles inform my opinions.
13    Q.   That's true, yes.  So if I heard you just now, you
14 said case decisions in your book inform your decision.
15    A.   Yes, they do.
16    Q.   Okay.  Do you remember my question, which was, do you
17 rely upon your book informing your opinions in this case?  And
18 you said, "Yes."  Do you remember that?
19    A.   Yes.  But --
20    Q.   Okay.  And so now --
21    A.   -- but, let me -- let me qualify that.
22    Q.   Okay.
23    A.   Not every page.
24    Q.   Not every page?
25    A.   No.  And certainly some of the pages that you

47

1 reference for me to -- to read, those are general statements.
2 But my focus in this case, in this incident, and this report is
3 focused on the fact patterns of this incident.
4    Q.   Okay.
5    A.   And everything, perhaps, that I have been trained and
6 experienced will come in to have some influence or impression
7 of forming my opinion.
8    Q.   I just want to understand.  Do you still hold the
9 belief that you wrote, in 2023, that criminal justice agencies
10 and personnel are also vulnerable and easy targets for
11 litigation?  Do you still hold that believe today?
12    A.   For the second time, yes.
13    Q.   Okay.
14    A.   Or third.
15    Q.   And now I only have one other question on that.  You
16 are not bringing that belief into this case; is that right?
17    A.   That's correct.
18    Q.   At page 232 of your book, the last paragraph above
19 the words, "Chapter Focus Questions," can you repeat -- the
20 sentence that I'm directing you to begins, "Administrators
21 should."  Do you see that sentence there?
22    A.   Yes.
23    Q.   Could you read that out loud, please.
24    A.   "Administrators should continue to maintain the
25 commitment providing and expanding regular training in order to

48

1   avert future lawsuits alleging inadequate training."
2       Q.   Do you believe that to be the truth today?
3       A.   Yes.
4       Q.   Do you hold that belief in your work in this case?
5       A.   I'm not sure if I follow your question --
6       Q.   Do you --
7       A.   -- on that.
8       Q.   -- do you bring that belief in your -- into this case
9   today in your work on the report?
10      A.   That administrators should follow Canton in terms
11  of --
12      Q.   That --
13      A.   -- developing and providing training to their
14  officers?
15      Q.   -- that they should continue to maintain the
16  commitment to providing and expanding regular training in order
17  to avert future lawsuits alleging inadequate training?
18      A.   Yes.  I would agree with that.
19      Q.   Okay.  So that belief you are bringing into the case?
20      A.   Yes.
21      Q.   If you could turn to page 311, there's a sentence on
22  that page that reads, "Learning from the case examples
23  presented in the previous chapters."  Do you see that sentence?
24      A.   Now I do.
25      Q.   Do you see that?

49

1       A.   Yes.
2       Q.   "Learning from the case examples presented in the
3   previous chapters and applying the components previously
4   discussed - combined with risk management strategies - will
5   assist in placing the agency in the best position to defend
6   against the next lawsuit."  Did I read that right?
7       A.   You did.
8       Q.   Do you hold that belief today?
9       A.   Yes, I do.
10      Q.   And do you bring that belief into this litigation?
11      A.   I suppose so.  I mean, it's part and parcel of my
12  section on training.
13      Q.   Okay.  Now, my question is:  What academic purpose do
14  you serve from your point of view in teaching students what
15  we've reviewed here at pages 3 and 232 and 311 of your book?
16      A.   To follow the law.
17      Q.   I'm sorry?
18      A.   To follow the law.
19      Q.   That is the purpose?
20      A.   Correct.
21      Q.   And if you don't follow the law, you can get sued?
22      A.   You can get sued when you follow the law as well.
23      Q.   Okay.  So the -- so the purpose in citing how to
24  defend against the next lawsuit or to avert future lawsuits or
25  that they are vulnerable and easy targets of litigation, that

50

1   is, law enforcement, those statements are all made to teach
2   students to follow the law?
3       A.   Correct.  Or practitioners and administrators who
4   read the text.
5            MR. DICELLO:  Okay.  Joe, if you would call up
6   Exhibit 9.
7            MR. FOUCHÉ:  One moment.  Are you ready?
8            MR. DICELLO:  I am.
9       Q.   We're going to play this from your video of
10  October 29th, 2020.
11           MR. DICELLO:  Go ahead, Joe.
12  *(Playing of video started.)*
13  *(Playing of video stopped.)*
14      Q.   Okay.  The part of your statement I want to direct
15  you to is, "We're trying to get qualified immunity."  Do you
16  remember saying that after seeing the video?
17      A.   Yes.
18      Q.   And if I understand what you're saying here, you urge
19  criminal justice practitioners to be up to date about case law
20  in order to avoid qualified -- or to -- rather in order to get
21  qualified immunity as a defense?
22      A.   Yes.
23      Q.   All right.  In speaking with law enforcement over
24  your career, have you found qualified immunity to be something
25  that protects officers from lawsuits?

51

1       A.   It's a shield according to the United States Supreme
2   Court.
3       Q.   And do you think it acts as a shield?
4       A.   It can.
5       Q.   And so when you spoke in October of 2020 in your
6   seminar, you were intent on teaching officers to shield
7   themselves from lawsuits, fair?
8       A.   To follow the law --
9       Q.   To follow --
10      A.   -- in order to be awarded qualified immunity.  Once
11  an officer or the department is outside the law, it's very hard
12  and normally would not end up in a qualified immunity decision.
13  So, I mean, that's -- that's -- the goal of my book and my
14  training and teaching has to be to help criminal practitioners,
15  from whatever rank, title, position they have, to understand
16  the law, to follow the law, and to understand that if you have
17  these things in place -- and one way to do that is through a
18  risk management system -- is to be -- being -- following the
19  law.
20           So if you do get a lawsuit, which we already have
21  discussed it's not difficult for that to occur, then the goal
22  is to get qualified immunity, which the Supreme Court started
23  in 1982 with *Harlow versus Fitzgerald*.  So the goal is you just
24  can't waltz into court and say, "Your Honor, give us qualified
25  immunity."  There's got to be a lot of steps.  And that's where

52

1  in some cases, qualified immunity is not going to be awarded
2  because these measures were not in place.  So that's the whole
3  theme and items that are presented to assist them in that
4  manner.
5       So -- and I don't want to go too far afield with
6  this -- but if I'm an administrator -- and I teach a lot of
7  administrators -- don't expect the Court to give you a
8  qualified immunity if you haven't put these measures in place.
9  Okay?  Hello.  So there you go.
10     Q.   And so that we understand that the -- the foundation
11  upon which you teach officers to follow the law, you're not a
12  lawyer, right?
13     A.   I'm not.
14     Q.   You've never served as a judge or any legal officer
15  before, right?
16     A.   No, I'm not.
17     Q.   Okay.
18     A.   Or have not.
19     Q.   And so you, if I understand, compile, read, and
20  present case law as written in judicial opinions to law
21  enforcement, right?
22     A.   Correct.
23     Q.   And you help them understand those decisions, right?
24     A.   We try.
25     Q.   That's your goal?

1     A.   That's the goal.
2     Q.   It's been your career's work?
3     A.   Yes.
4     Q.   And your goal in that respect is to help them secure
5  qualified immunity by following the case law?
6     A.   Correct.
7     Q.   Okay.  Now, an article in 2000 that you wrote will be
8  our next exhibit.  And this is October -- I'm sorry, this is
9  "Emerging Trends in Police Failure to Train Liability."  Let me
10  get it up for the folks here.
11          MR. LUTE:  What's that number?
12          MR. DICELLO:  It's Exhibit 10.
13          MR. LUTE:  Ten?
14     Q.   (Continuing)  Okay.  Zoom in trying to find the spot.
15  Well, last sentence of I think the first paragraph of page 172
16  of this article says, "What appears to be clear is that the
17  police have been and continue to be targets of litigation."
18  Did I read that correct?
19     A.   Correct.
20     Q.   And again, in your -- in this article, you don't cite
21  any source for that statement, do you?
22     A.   Other than if you read the whole article it refers
23  back to case decisions.
24     Q.   And so when cases are filed and read by you, you have
25  concluded by doing that and presenting those cases in articles

1  to law enforcement and to others, that police have been and
2  continue to be targets of litigation; is that right?
3     A.   Correct.
4     Q.   All right.  Let's go to an article that you wrote in
5  2011.  This -- or it's 2006 -- this is Exhibit 11.  And this
6  document is titled, "A Risk Management Analysis of the Claims,
7  Litigation and Losses of Michigan Law Enforcement Agencies:
8  1985-1999."  And it was co-authored with Madhava,
9  M-A-D-H-A-V-A, R. Bodapati, B-O-D-A-P-A-T-I.  Do you see the
10  article?
11     A.   Yes.
12     Q.   Do you recognize it?
13     A.   Yes.
14     Q.   And this is while you were with the Department of
15  Criminal Justice at East Carolina University in Greenville,
16  North Carolina, correct?
17     A.   Yes.
18     Q.   Let me go up here.  Okay.  From page 54 of that
19  article, you write, "Providing ongoing training in these
20  categories may place the organization in a better position to
21  defend a failure to train claim."  Do you see that?
22     A.   Yes.
23     Q.   This appears to be the same sentence written in your
24  book, and I just wanted to make this clear.  Did you create
25  your book from the journal article and -- of 2006 and the

1  others that you've written?
2          MR. LUTE:  Objection.  Go ahead.
3     A.   I'm not -- I'm not sure if I understand your
4  question.
5     Q.   Did you use the articles as the -- at times as the
6  body of the book?
7     A.   Maybe as a basis from springboarding into a
8  particular chapter, if I'm understanding your -- your question
9  correctly.
10     Q.   You are.  You are.  Gosh almighty, this is so
11  frustrating.  I'm sorry for the delays here.  Goodness
12  gracious.  Hold on.  All right.  Let's do that.  Okay.  You
13  also write, "Providing ongoing training in these categories may
14  place the organization in a better position to defend a failure
15  to train claim."
16          And you also say, "Ongoing training" -- let me see if
17  I find it down the article.  There it is at page 55.  "Ongoing
18  training will increase officer confidence and competence, and
19  place the officer and the department in the best position for
20  justifying and defending a level of force when faced with a
21  legal claim of excessive force."  Did I read that right?
22     A.   Correct.
23     Q.   Is there -- is there a -- it's interesting.  You --
24  you don't note that article ongoing training will increase
25  officer confidence and competence and place the community in a

1 safer position relative to the officer.  Why is that?  Why are
2 you focused here on, instead, defending a level of force when
3 faced with a legal claim?
4     A.   Because that's the nature of the book.  That's the
5 nature of the trends and the patterns of the case decisions I
6 referenced and researched.
7           MR. DICELLO:  Joe, if you would call up
8 Exhibit 12, it's going to be --
9           MR. FOUCHÉ:  One moment.
10          MR. DICELLO:  -- video of October 29th, 2020,
11 again?
12          MR. FOUCHÉ:  Okay.  Are you ready?
13          MR. DICELLO:  Uh-huh (positive response).
14 *(Playing of video started.)*
15 *(Playing of video stopped.)*
16    Q.   Do you recall -- after seeing the video marked
17 Exhibit 12, that snippet, do you recall saying that back in
18 October of 2020?
19    A.   Yes.
20    Q.   And do you believe that to be true today, what was
21 said in the video?
22    A.   Yes.
23          MR. DICELLO:  Joe, if you would, go to
24 Exhibit 13.
25    Q.   This is a video from an AELE seminar that you gave

                                                              57

1 last year, 2023.  It's part two of a two part video from AELE.
2 *(Playing of video started.)*
3 *(Playing of video stopped.)*
4    Q.   And after reviewing the video marked as Exhibit 13,
5 do you now recall saying those remarks at the close of your
6 presentation?
7    A.   Yes.
8    Q.   Do you still hold those statements to be true today?
9    A.   Yes.
10   Q.   Let me show you what's been marked as Exhibit 14, and
11 this is from the RAND Research Institute, "How Gun Policies
12 Affect Police Shootings."  I noticed you cite no publication
13 from RAND in any of your work; is that fair?
14          MR. LUTE:  Objection.  You may answer if you
15 know.
16   A.   I'd have to go back and look.  I don't know that to
17 be accurate or true without researching, but....
18   Q.   At page 1 to 2 -- well, looking at -- at the -- at
19 the statements, this is updated January 10th of 2023, it says,
20 "Although the Federal Bureau of Investigation has tried to
21 collect information on police shootings from about 17,000 local
22 law enforcement agencies, recent efforts by news organizations
23 (such as *The Washington Post* and *The Guardian*) have
24 demonstrated that the FBI's data collection efforts miss many
25 such cases." You're familiar with this?

                                                              58

1    A.   Oh, yes.
2    Q.   Yeah.  You're familiar with that -- that fact or that
3 observation?
4    A.   Well, with that observation.
5    Q.   That observation.  And -- and you've spoken about
6 that specifically, that *The Washington Post* and other sources
7 have -- are not necessarily reliable sources of information
8 for --
9    A.   That's correct.
10   Q.   -- for these numbers?
11   A.   That's correct.  There are no reliable numbers on
12 that topic.
13   Q.   Right.  Which is an interesting thing to say and
14 admit to and observe.  It's something you do quite a bit.
15 There isn't reliable data on shootings out there.
16   A.   That's right.
17   Q.   And so any statement you've ever made about them
18 being targets for using force could not include the data that
19 is not reliable, right?
20   A.   I've used the estimated data and cautioned -- like
21 any research, you have to caution folks with limitations of any
22 study.  And there are limitations with the data that has come
23 out on officer-involved shootings over the year -- years.  The
24 FBI used to track officer-involved shootings, but the problem
25 there was not every agency contributed or submitted data on use

                                                              59

1 of force or officer-involved shootings.
2         But the Bureau of Justice Statistics, when you look
3 at use of force, has chronicled that the use of force and the
4 estimates of use of force since 1996 occurred till the day, and
5 it's about 1.8 percent of all officer contacts.  And now this
6 has threatened or actually used use of force, excluding deadly
7 force.
8    Q.   And there's another source, it's the National Violent
9 Death Reporting System, NVDRS.  Are you familiar with that?
10   A.   Yes, I am.
11   Q.   Yeah.  And at the bottom of this article, it says,
12 "Similarly, states whose violent death data are available
13 through the National Violent Death Reporting System have, on
14 average, roughly twice as many police shootings counted in the
15 system as appear in the FBI's supplemental homicide data or the
16 CDC's vital statistics record."  And then it cites Barber, et
17 al., 2016.  Did I read that right?
18   A.   Correct.
19   Q.   So the notion that accurate reporting of
20 officer-involved shootings -- the notion that the reporting is
21 accurate is hotly contested; would you agree?
22   A.   Oh, yeah, absolutely.
23   Q.   You've said in prior speaking and -- and
24 presentations that you triangulate data on the shootings to
25 come to the conclusion that there's not many shootings that

                                                              60

1   happen; is that right?
2       A.   When you say, "many"?
3       Q.   I think you've said in the past that the incidence of
4   violence by police officers is virtually nonexistent.
5       A.   I didn't say that.
6       Q.   You sure?
7       A.   You'd have to show me the -- piece on
8   nonexistent.
9       Q.   Well.
10      A.   And when you say police --
11      Q.   .001 percent, do you remember --
12      A.   Yeah, it's less than 1 percent.
13      Q.   Okay.  Less than 1 percent?
14      A.   Right.  And when --
15      Q.   And --
16      A.   -- you say -- let me --
17      Q.   Please.
18      A.   -- yeah, I need to clarify.  When you say, "police
19  violence," explain that.
20      Q.   It would be claims of excessive force, police
21  shootings, the items that you actually talk about in your
22  October 29, 2020, lecture that speak to in custody, as well as
23  other sources -- I think you say -- of police violence.
24      A.   You think I do.  Could you show me where I say
25  "police violence," because I don't use that term?

61

1       Q.   What term do you use?  I may be missing -- I'm trying
2   to get to the --
3       A.   Either --
4       Q.   -- sum and substance of the issue.
5       A.   -- whatever the case may be, whether it's use of
6   force or excessive force.
7       Q.   Use of force.
8       A.   Yeah.  It could be deadly force or nondeadly force.
9   I don't use the term "police violence."
10      Q.   And why not?
11      A.   Because I don't believe in that.
12      Q.   Why not?
13      A.   I just don't because the -- there's -- what evidence
14  does it show that our police are violent?  Show me the
15  evidence.
16      Q.   Well, how about the conviction of Derek Chauvin?
17      A.   That's a conviction of -- but it -- of a criminal
18  case.  It doesn't say anything about police violence.  I don't
19  equate that with police violence.
20      Q.   You do not equate the conviction of Derek Chauvin for
21  killing George Floyd as police violence?
22      A.   No, I do not.
23           MR. LUTE:  Objection.  Go ahead.
24      Q.   What do you -- what do you equate it with --
25      A.   With the use of excessive force.

62

1       Q.   And excessive force is not violence?
2       A.   No, not in my -- not -- not anything I've ever read
3   or studied or examined or ever testified to or trained to or
4   anything.  That's the society's culture that we're in that have
5   equated from police misconduct, if you will, or excessive force
6   to now, and it used to be police brutality.  Now it's police
7   violence, which I -- I don't ascribe to that.
8       Q.   Okay.  Thank you.  And now I see our confusion on
9   the -- on the numbers, because I used a term that you don't
10  even --
11      A.   I don't, no.  No, I don't use that.  Now, if we
12  have -- if it's a bona fide incident, and that's the thing
13  about newspapers.  Sometimes those are very inaccurate.  So --
14  so the problem --
15      Q.   I believe --
16      A.   -- with this is looking at the data, because the data
17  has estimates and the data has limitations and is inaccurate
18  depending on who's reporting it.  And that's the problem we
19  have.  I've long called for a better system of reporting.  I'm
20  solely for that, to get the true, accurate data and try to give
21  society and culture and our republic a better viewpoint of what
22  does actually happen in confrontations.
23      Q.   Because right now we have no idea.
24      A.   Exactly.  We have some.  It's limited, but it has
25  limitations.

63

1            MR. LUTE:  How are you doing, Doctor, in terms
2   of --
3            THE WITNESS:  Yeah, I'd take a break now.
4            MR. LUTE:  Can we take a break?
5            MR. DICELLO:  That's sounds fine, yeah.
6            (A recess was taken at 1:15 p.m. and deposition
7   resumed at 1:36 p.m.)
8            (Ms. Ziarko joined the Zoom meeting.)
9            MR. DICELLO:  Back on the record, just -- the
10  court reporter brought something to my attention that I want to
11  clarify.  For those of you keeping score as terms of the
12  exhibit listing, Exhibit 8 is Dr. Ross's book, "Civil Liability
13  in Criminal Justice," and that's published 2023.  And as I
14  indicated, apparently it wasn't clear, the pages that we took
15  from that book were page 1, 3, 232, and 311.  Those will be
16  part of Exhibit 8.  So if that was confusing, I do apologize.
17      Q.   All right.  Now we're going to turn to your
18  background experience, education, knowledge, and training over
19  your career.  Okay?
20      A.   Yes.
21      Q.   You're not and have never been employed as a police
22  officer?
23      A.   That's correct.
24      Q.   And this might sound redundant, but just to be clear,
25  in no capacity have you ever stepped out of a police car to

64

1    investigate the source of random or celebratory gunfire as a
2    police officer, correct?
3        A.    Correct.
4        Q.    You've never been involved in an officer-involved
5    shooting, correct?
6        A.    Correct.
7        Q.    You've never investigated an officer-involved
8    shooting as a member of any government agency?
9        A.    Correct.
10       Q.    But you've done so as an expert?
11       A.    "Done so"?
12       Q.    That is, investigated an officer-involved shooting
13   for the purpose of being retained as an expert?
14       A.    Yes.
15       Q.    Okay.  You've never been a supervisor of any police
16   agency, correct?
17       A.    Correct.
18       Q.    And you've never been educated trained or experienced
19   as a lawyer?
20       A.    That's correct.
21       Q.    Or as a medical professional?
22       A.    Correct.
23       Q.    A neuroscientist?
24       A.    Correct.
25       Q.    Cognitive scientist?

                                                              65

1        A.    No.
2        Q.    Nor medical professional or scientific researcher?
3        A.    Scientific researcher, I would beg to differ with
4    that, but not a medical researcher.
5        Q.    And when you think of yourself as a scientific
6    researcher, help me understand what you mean.
7        A.    Looking at various issues dealing in and around force
8    from a scientific perspective, using quantitative methods,
9    methodology, and statistical analysis to analyze various
10   outcomes in terms of particular use of force and areas of
11   in-custody deaths, I would say primarily.  And then using the
12   qualitative method to examine, which is part of the science of
13   discipline, qualitative methods of examining case law, case
14   decisions, trends, patterns, that type of thing.  And -- and
15   risk management issues which you cited as an article, risk
16   management comparisons out of Michigan, that is a scientific
17   methodology and a scientific paper or article published by a
18   peer-reviewed journal article on that data.  So that's how I
19   look at it and others.
20       Q.    With respect to that article, what was the
21   methodology that you employed that would be scientific?
22       A.    We were access -- we were gained access -- we were
23   provided access by the MMRA, Michigan Municipal Risk
24   Management Authority, of their losses and claims over the
25   period of time.  And we looked at a longitudinal -- looked at

                                                              66

1    the data from a longitudinal perspective, as well as a time
2    series perspective, as well as doing a statistical analysis of
3    the outcome and trends and patterns of that -- those lost
4    claims.
5             MR. DICELLO:  Could you repeat back his answer,
6    please?
7             COURT REPORTER:  Just one moment.
8             MR. DICELLO:  Putting you to work now.
9             COURT REPORTER:  I know.  Let me make sure I
10   got it all because some of it didn't transcribe correctly.
11   Hang on.
12            MR. DICELLO:  Okay.  Take your time.
13            (The record was read by the court reporter.)
14            MR. DICELLO:  Thank you.
15       Q.    What statistical analysis did you undertake regarding
16   those claims?
17       A.    I'd have to go back and look specifically, but I want
18   to -- it was correlational, and I don't remember if we used
19   Pearson's or logic regression.  I'd have to look at the
20   article.
21       Q.    And as a subject of research, why were the MMRA's
22   losses and claims interesting to you?
23       A.    Because the -- first of all, I -- I have known
24   various of the senior risk managers.  In fact, I used to work
25   with one at the prison when he left the prison and he came to

                                                              67

1    work for them.  And we were talking at a conference one year
2    that you're the risk manager and you -- one of the risk
3    managers for that company -- and I've never seen a report as it
4    results or as it refers to the agencies where they provide
5    insurance.
6             So we got to talking about that, and I said we'd be
7    glad to do an analysis for you as a risk manager who is deep
8    into insuring agencies.  And so we were provided a contract
9    with them to analyze their loss and their claims to get an idea
10   of -- so they could get an idea of how their sheriff's
11   departments, police departments, correctional departments were
12   faring with loss in claims due to, vis-à-vis civil -- civil
13   liability and litigation within their entities.  It was like 83
14   out of 85 counties, as I recall, and almost 3,000 loss claim
15   rulings.
16       Q.    And do you remember the name of the senior risk
17   manager for MMRA that you were talking about?
18       A.    MMRMA, it was Bill Page at that time, and I think
19   he's since retired.
20       Q.    And again, the initials are MM --
21       A.    MMRMA, Michigan Municipal Risk Management Authority.
22       Q.    Have you done any work for any other risk management
23   authorities or like-styled entities?
24       A.    Not that I can recall.  When you say, "work,"
25   research for them, or --

                                                              68

1    Q.   Yeah, any work at all.
2    A.   -- any -- I have done work -- brought in -- was
3  brought in to the State of Mississippi several times to provide
4  training for the Chiefs of Police Association, and I believe
5  they were part of funding that training on two occasions as I
6  recall.
7    Q.   Who was part of funding?
8    A.   The risk managers for -- and I don't remember their
9  acronym or their -- but it was for the State of Mississippi.
10    Q.   So you had you -- you conducted training funded by
11  risk managers for the State of Mississippi?
12    A.   Yes, yes, sir.
13    Q.   Any other risk manager or insurance companies that
14  deal with law enforcement that you've worked for?
15    A.   No.  That'd be it.
16    Q.   Okay.  So your scientific research then you said was
17  quantitative -- dealt with force from a quantitative
18  perspective?
19    A.   Both.  I've done quantitative and qualitative.
20    Q.   And I recognize that you said both, but I'm going to
21  just focus on this quantitative piece.
22    A.   Sure.
23    Q.   What do you mean by saying that, that you've dealt
24  with force from a quantitative perspective?
25    A.   I've looked at incidents and analyzed the data over

69

1  longitudinal period of time, at least in -- in most of the
2  research I've done is at least a year, perhaps a little bit
3  more or a little bit less, collected the data, analyzed it
4  through a statistical procedure.
5    Q.   What is a longitudinal analysis?
6    A.   Usually, it's -- it's several months or a year or
7  more.
8    Q.   What --
9    A.   Multiple years.
10    Q.   -- that you do what?
11    A.   That you collect data and analyze it.  So like with
12  MMRMA, it was, as I recall, over 10 or 15 years.  In the
13  research realm, that's called a longitudinal assessment.  It's
14  not just taking a snapshot of a month or two, but it's
15  longitudinal.  It's over a period of years.  A time series
16  would be a chunk.  So you'd take 20 years and you break it down
17  into blocks of 5 years to assess trends and patterns and common
18  outcomes.
19    Q.   My understanding of longitudinal analysis is that a
20  research subject or subjects are studied over a period of time.
21    A.   That's correct.  Usually several -- many months it
22  can -- usually over a year or more.
23    Q.   What research subjects in the MMRMA work were studied
24  over a period of time?
25    A.   It wasn't subjects.  It was the lost claims, the

70

1  claims that they had generated in the -- in their offices.  And
2  we looked at those claims over that period of time, not a
3  subject or a person.
4    Q.   Got it.  So you were looking at the financial claims?
5    A.   Yes.  On a particular topic that dealt with insurance
6  provided for law enforcement.
7    Q.   That helps -- that helps clarify everything, thank
8  you.
9    A.   You're welcome.
10    Q.   Are you trained as a statistician?
11    A.   I have been, yes.
12    Q.   What training have you received as a statistician?
13    A.   Well, six, seven courses that I took in my education,
14  undergrad, masters, and Ph.D. program.
15    Q.   All at the University of Michigan State?
16    A.   At Michigan State University.
17    Q.   All right.  So thank you for clarifying the idea of
18  scientific researcher.  And in the context that we've just
19  talked about, that is what you meant when you identified
20  yourself as a scientific researcher?
21    A.   Yes.
22    Q.   Okay.  You have not graduated from any law school?
23    A.   That's correct.
24    Q.   You have never taken any law school courses; is that
25  right?

71

1    A.   At a law school?
2    Q.   Yes.
3    A.   No.
4    Q.   Any other place?
5    A.   Oh, yes.  Through my education at Michigan State
6  University and continuing education all throughout my career
7  with various attorneys over the past, goodness, 30, 35,
8  40 years plus.
9    Q.   I think we're having a definitional issue here.  When
10  I say, "law school courses," I mean courses taught at law
11  schools.
12    A.   Yeah, I've never -- I -- I have -- you mean, being a
13  student at a law school to take a class?
14    Q.   Or -- or opted into a class to take one as a guest or
15  some other --
16    A.   Not at a law -- no, but I've taken training provided
17  at law schools, conference training, seminars, but not as a
18  student in a law school.
19    Q.   What kind of seminars have informed your knowledge of
20  the law?  What is --
21    A.   Section 1983 litigation, federal constitutional law.
22    Q.   Do you remember who provided those seminars?
23    A.   Yes, some.  I mean, I'm going back now when I was
24  with the Department of Corrections and when I was at
25  Ferris State University and when I was with Pressure Point

72

1    Control Tactics out of Waterloo, Illinois, various conferences
2    I -- I have been through throughout the years.  So I can give
3    you Michael Brave, who was an attorney.  I can give
4    Laura Scarry, which is an attorney.  Just recently, in January,
5    in the past several years -- his name is escaping me -- Jeb
6    Brown has been an attorney that I've gone through his courses.
7    Rodney Hill is another one.  I'll stop at these four or five
8    off the top of my head.  There's been many others.
9        Q.   So the gist is -- and that's what I'm trying to get
10   to -- lawyers have presented conferences and you've attended
11   those conferences and learned from those lawyers.
12       A.   Yes.
13       Q.   Okay.  Any other law school courses that you've
14   taken?
15       A.   Not law school courses but a -- I think I referred to
16   this -- or discussed this previously with Law Professor Nahmod
17   at the Illinois -- at the Chicago Institute of Technology and
18   their law program that they put a seminar every year on
19   Section 1983.  I've been to that several times, as well as
20   early days AELE, back in the '80s and '90s, before I was ever a
21   presenter for them, I attended numerous of their seminars which
22   were all by current and/or retired judges and/or current
23   attorneys at the time on the topic of that seminar.
24       Q.   Okay.  Any other law school or legal training as you
25   can recall right now?

1        A.   No.
2        Q.   But you have been a corrections officer?
3        A.   That's true.
4        Q.   And that was from 1973 --
5        A.   Three.
6        Q.   -- to '85?
7        A.   Well, I worked for the Department of Corrections
8    during that time.  I was an officer from '73 to about '78, '79,
9    and then I became a resident unit manager of a psychiatric cell
10   block of 500 mentally ill prisoners.
11       Q.   And did you carry a firearm?
12       A.   When I was a corrections officer, I -- I did on the
13   post and during escort and transport of prisoners.
14       Q.   Did you ever use it?
15       A.   No.
16       Q.   All right.  Let's go to Exhibit 15.  Yeah, there it
17   is.  Oh, boy, I can't see it here.  Let me stop the share.
18   Here we go.  All right.  You left state service at
19   Western Illinois University on July 1st, 2010, to take a
20   position at Valdosta State University, where you currently
21   work, correct?
22       A.   Correct.
23       Q.   In January -- in the January 26th, 2010, edition of
24   *The McDonough* -- spelled M-C-D-O-N-O-U-G-H -- *County Voice* --
25   *The Voice* newspaper, a letter to the editor was written by you,

1    correct?
2        A.   Yes.
3        Q.   The letter was titled, "Law Enforcement Professor
4    Says Poncin" -- P-O-N-C-I-N -- "Has Judicial Qualities,"
5    correct.
6        A.   Where are you reading from?  I can't see it on that
7    page.
8        Q.   I'm not reading.  I'm asking you if you --
9        A.   Oh, okay.
10       Q.   -- if you remember the --
11       A.   I remember it.
12       Q.   Okay.  And -- and so that's correct?
13       A.   That's correct.
14       Q.   The letter included references to your background as
15   a criminal justice professor and William Poncin's experience as
16   a state's attorney?
17       A.   That's correct.
18       Q.   The letter concluded that you would encourage the
19   public to vote for Mr. Bill Poncin for Ninth Judicial Circuit
20   Court Judge in McDonough County, correct?
21       A.   That's correct.
22       Q.   The article was signed Dr. Darrell Ross, Professor
23   and Director School of Law Enforcement and Justice
24   Administration, correct?
25       A.   That's correct, but it was not my signature.  But

1    that's correct.
2        Q.   You were -- tell me more about that.  I don't
3    understand the need -- what's the -- what's the reason for
4    offering that?
5        A.   Because I didn't sign that that way.
6        Q.   What does that mean for you?
7        A.   I did not sign -- to me, it means that I didn't sign
8    that -- that document in that way.  Mr. Poncin did.
9        Q.   Okay.  Is there anything about Mr. Poncin signing it
10   that you believe bears on the Governor's Office of Executive
11   Inspector General's investigation into the matter?
12       A.   Yes, it does.
13       Q.   And what's that?
14       A.   Because I -- I did admit that I wrote the letter on
15   his behalf -- at his behalf, and I meant to give it to him
16   personally when he was not in the office.  And so I used the
17   email and sent him the university's email and that's what led
18   to that particular -- so what I was doing was giving a letter
19   of reference, a recommendation, for one of my faculty who was
20   running for judge.
21       Q.   Right.  The signature that he made was representing
22   your signature?  That was the intention?
23       A.   Yes.
24       Q.   Did you authorize that?
25       A.   I did not.

1  Q.  Did you report that to the office?
2  A.  I believe I did.  Whether they heard it or not is --
3  fell on deaf ears.
4  Q.  Do you maintain that he fraudulently --
5  A.  I didn't say "fraudulently," but I didn't sign it
6  that way knowing that perhaps someone might allege an
7  impropriety on my part.
8  Q.  So you would've never signed it that way is what
9  you're saying?
10  A.  That's correct.
11  Q.  You issued a public response concerning the matter,
12  though?
13  A.  That's correct.
14  Q.  You never mentioned anything of that sort in the --
15  A.  Not that I recall, no, based on my advice of an
16  attorney that I....
17  Q.  The State Officials and Employees Ethics Act of
18  Illinois prohibits state employees from intentionally
19  misappropriating state resources by engaging in prohibited
20  political activity for the benefit of any campaign for elective
21  office, correct?
22  A.  Correct.
23  Q.  You were found to have violated the Ethics Act by
24  using your university email account to send a letter to the
25  editor soliciting votes on behalf of Mr. Poncin's campaign for

77

1  circuit court judge, correct?
2  A.  Actually, I sent it to Mr. Poncin, not to the
3  newspaper, and he forwarded it.  And I said I did use the
4  university's email system to send it to him because he was not
5  in the office on that particular day.
6  Q.  And you were found to have violated the Ethics Act
7  that were --
8  A.  That's true.  And he won judgeship by the way.
9  Q.  He was one of your --
10  A.  Faculty.
11  Q.  -- faculty members at the time?
12  A.  Yes.
13  Q.  He's a former state's attorney?
14  A.  Correct.  I had 40 faculty and I had 10 that were
15  attorneys, and he was one of the attorneys that taught in the
16  program.
17  Q.  Do you remember earlier I asked you if you had been
18  in -- let me make sure my words are clear -- I'm tired -- a
19  proponent of criminal justice practitioners.  Remember me
20  saying that -- asking you about that?
21  A.  Yes, that line of questioning.
22  Q.  All right.  Would you consider your letter on behalf
23  of the former state's attorney and teacher at your school who
24  you supervised to be advocacy for or promotion of him?
25  A.  I'd say it was a recommendation for him.

78

1  Q.  Okay.  And so from 1973 to '85, you worked in the
2  Michigan Department of Corrections, correct?
3  A.  Correct.
4  Q.  I'm going to go back in time.  We're going to have
5  some fun.  I'm going to show you an article from 1973 from
6  the -- from the riot that took place.  Do you remember that
7  riot?
8  A.  Which one?
9  Q.  The riot that involved a small group of inmates who
10  staged a work stoppage in the license plate plant that was
11  two weeks after you became a --
12  A.  I recall the incident.  I don't know if I recall an
13  article, but we'll see.
14  Q.  And -- and so let me -- let's be clear, this record
15  is not good.  You became a corrections officer in 1973 in
16  August?
17  A.  Correct.  Actually, I think it was July.
18  Q.  July.  And shortly after becoming a corrections
19  officer, there was a riot --
20  A.  Correct.
21  Q.  -- that occurred --
22  A.  About two weeks after -- on the job.
23  Q.  -- and that occurred at what prison?
24  A.  State prison, Southern Michigan, Jackson, Michigan.
25  Q.  I believe you've said on many occasions that was

79

1  two weeks after you started.
2  A.  That's correct.
3  Q.  And so the riot occurs on August 31st, 1971.  Does
4  that help you understand when you started work?
5  A.  The riot was in '71?
6  Q.  I'm sorry, August 31st, 1973.
7  A.  '73, yeah, I was -- as I recall, I started in July of
8  '73.
9  Q.  Okay.  Let's see if we can call up this article,
10  "Jackson Prison Riot Quelled by Tear Gas."  Do you see that?
11  A.  Correct.
12  Q.  This is The Times Herald, Port Huron, Michigan,
13  Friday, August 31st, 1973.  Do you see that?
14  A.  Correct.
15  Q.  You recognize the building?
16  A.  Not the way you've got it portrayed.  It's all black
17  and white but similar.  It looks like the prison yard.
18  Q.  Below the picture, "An estimated 125 Southern
19  Michigan Prison inmates occupied a portion of the prison yard
20  Thursday afternoon before tear gas forced them to return to
21  their cells."  Did I read that right?
22  A.  Correct.
23  Q.  "The disturbance started in a license plate shop in a
24  dispute over wages" -- or it says, "wage," right?
25  A.  Correct.

80

Q.   Is that -- does that refresh your recollection as to
what occurred in the riot?

A.   Yes.  But I believe it was over other things than
just dispute about wage, nevertheless.

Q.   The second paragraph of the article says, "The
disruption at Southern Michigan Prison here began at 7:30 a.m.
Thursday when a small group of inmates staged a work stoppage
in a license plate plant.  The action gathered support from
some of the 2,400 inmates at the prison, with as many as 168
actually resisting pleas by officials to return to their
cells."  Do you remember that?  Do you remember those facts?

A.   Yeah.  They -- they rioted and actually they had --
it did start, I believe, in the factory and then it spread into
the dining hall area and then into the yard.

Q.   It goes on to say, "Guards began lobbying tear gas
cannisters."  Do you remember that?

A.   I do.

Q.   Dale Foltz, do you know who he is?

A.   I do.

Q.   He was the acting prison warden, correct?

A.   Correct.

Q.   He said, "In the end, just 25 inmates remained and
guards 'continued to lob tear gas until they were put in
detention cells,'" correct?

A.   Correct.

81

Q.   You indicated:  "Things will be quite tense for a
while.  This small group of men hurt all the residents here,
and most of those who went back to their cells in the beginning
will be mad," correct?

A.   Correct.

Q.   But there was no physical contact made between prison
official -- officers and inmates was there?

A.   I don't recall.  I -- I don't.  I didn't have any
contact with any other than later when I was assigned in the
segregation unit to process inmates into segregation.

Q.   And all the injuries were from tear gas?

A.   As far as I recall, yeah.

Q.   The riot happened after the movie, *Deliverance*, came
out, correct?

A.   Most likely.  I think *Deliverance* came out in '70 or
'71, as I recall.

MR. DICELLO:  Joe, if you could, call up
page -- or Exhibit 17.

MR. FOUCHÉ:  Exhibit 17 is not visible on my
end, nor is 18.

MR. DICELLO:  All right.  Refresh your -- your
screen or your -- let's go off the record so we get this
technical issue taken care of.

(A discussion ensued off the record.)

Q.   Doctor, do you recall being interviewed for an award

82

at Michigan State University?

A.   Yes.

Q.   In 2013?

A.   Correct.

Q.   Okay.  We're going to play a snippet --

A.   The Hall of Fame award by the School of Criminal
Justice at Michigan State.

Q.   That's right.  You're a Hall of Fame inductee.

A.   That's correct.

Q.   Congratulations.

A.   Thank you.

Q.   During that interview on video, you said the
following.

MR. DICELLO:  Let's play the tape, Joe.  Can't
hear anything, Joe.

*{Playing of video started.}*

*{Playing of video stopped.}*

Q.   Do you recall saying that now after reviewing the
video?

A.   Sure.  Yes.

Q.   Was that your motivation to actually become an
academic?  The movie, *Deliverance*?

A.   No.

Q.   Okay.  Let me try --

MR. DICELLO:  Joe, if you would pull up

83

Exhibit 17.

MR. LUTE:  I think that was 17.

MR. DICELLO:  I'm sorry, that was 17.  Thank
you.  Let's do 18, sorry.

Q.   This is from 2023, ten years later.  There's a video
that we're going to show you.  This was an AELE presentation.
It's part one of a force seminar that you gave last year.

MR. DICELLO:  Joe, go ahead and play it.

*{Playing of video started.}*

*{Playing of video stopped.}*

Q.   In 2023, in Las Vegas at an AELE seminar.  You
repeated the *Deliverance* story, correct?

A.   Correct.

Q.   Was it -- again, I'll ask the reason why you decided
to promote yourself and make a career of academia and
specifically criminal justice academia?

A.   Not academia, no.  It was to further myself in
education so I could promote myself.  And it was based on the
disturbance, the riot that occurred, and knowing that at the
time, the way to advance yourself there was a push on
education, which came out of the '60s through the riots and
early '70s when President Nixon was in office and they started
the federal funding called the LEAP Fund.  And so I saw that if
I wanted to make a career in corrections, the best way to do
that was access that funding and go through schooling to -- in

84

1  order to do that, because that was the emphasis at the time.
2  Q.  It does seem, though -- and tell me if this is
3  correct -- that the threat of violence against you,
4  specifically sodomy, was one of the reasons that got you
5  thinking about changing your career; is that right?
6  A.  No, that's incorrect.  I wouldn't agree with that at
7  all.
8  Q.  Well, when you wrote -- said, "Big Bubba is going to
9  get me and take me in the shower," weren't you referring to
10  sodomy.
11  A.  Sexual relations.
12  Q.  So -- so it wasn't --
13  A.  No -- not specifically sodomy, no.  I didn't -- I've
14  never said that.
15  Q.  From your experience as a corrections officer, what
16  kinds of activities did inmates, violent inmates, engage in the
17  shower?
18  A.  Sexual relations.
19  Q.  Meaning?
20  A.  All sorts of different types of activities.
21  Q.  Such as?
22  A.  Could be rape, could be --
23  Q.  What kind of rape?
24  A.  Well, there's only one kind of rape between males.
25  Q.  Could be oral?

85

1  A.  Could be oral.
2  Q.  Or --
3  A.  Could be sodomy.  It could be a whole host of things.
4  It could be also taking you hostage, okay, and physically
5  assaulting you, sexually assaulting you, so forth, yes.  That
6  was not my motivation, though, to -- I mean, it was -- it was
7  said in -- in terms of this is what was happening during that
8  particular time.  And the way that I just explained to
9  higher -- to promote yourself was to get your degree.  And I
10  said, I -- I'm not going to be a corrections officer my entire
11  life.
12      And so to promote myself within the Department of
13  Corrections in that -- at that time, which there were openings,
14  but you had to have education -- higher education, starting out
15  with a four-year degree.  So that's what really gave me an
16  impetus and a motivation to go with my -- my -- to get -- to
17  get a degree.  In which it really worked out, because I was
18  able to get a job as a supervisor, then went in parole and
19  probation and then into the academy.  And without the
20  education, I wouldn't have been able to do that.
21  Q.  Now, when you teach courses to either aspiring or
22  existing law enforcement professionals, do you tell them the
23  sodomy story -- or the -- excuse me, the *Deliverance* story in
24  class?
25  A.  The *Deliverance* story?

86

1  Q.  Yeah, the story --
2  A.  You mean the movie?
3  Q.  -- the story that we just heard about how it was that
4  you got to thinking about getting involved in education.
5  A.  Have I used it where?  In -- in class?
6  Q.  In classes.  Have you told that to your students?
7  A.  I have --
8  Q.  And -- and do you --
9  A.  -- I don't recall.  I have -- I'm sure I have several
10  times.
11  Q.  And have you taught them or told them that story at
12  Valdosta State University?
13  A.  I don't know, to be honest with you, because
14  primarily my teaching is online.  I teach graduate students, so
15  I don't -- there's no avenue for that kind of interaction.  I
16  may have mentioned it in a class as a guest lecturer.
17  Q.  Right.  And so this is another important piece.  At
18  the time you speak of "Big Bubba," in 2023, you were speaking
19  to law enforcement, correct?
20  A.  Correct.  And they would understand what I'm talking
21  about.
22  Q.  Tell me more about that.
23  A.  Well, they would -- their experience would give them
24  an idea of what corrections are like in this case.  I believe
25  those were jail administrators and jail personnel.  So they

87

1  would understand the ideology behind and the thinking that
2  corrections officers do have as they work within and amongst a
3  prisoner population where the prisoner population has nothing
4  to lose for that type of behavior or activity.
5  Q.  Does your belief about what law enforcement knows
6  regarding -- I think you said -- the realities of a "Big Bubba"
7  type situation include law enforcement officers who act and
8  function as police?  Do you think they understand that?
9  A.  I think they do.  In fact, I've had several tell me
10  that after the session.
11  Q.  Have you ever told the "Big Bubba" story to any of
12  the lawyers in this case?
13  A.  No.
14  Q.  You're a former law enforcement professional as a
15  corrections officer, correct?
16  A.  Correct.
17  Q.  And your friends are law enforcement professionals,
18  correct?
19  A.  Some.
20  Q.  You are a law enforcement trainer, correct?
21  A.  Correct.
22  Q.  When's the last time you trained a class of law
23  enforcement professionals?
24  A.  January of this year, January 2024.
25  Q.  And what'd you -- what'd did you teach?

88

1    A.   I taught in-custody deaths at the AELE jail seminar.
2    Q.   When's the last time you taught any sort of tactics?
3    A.   Probably 2010 or '12, somewhere in there.
4    Q.   How do you stay current with use-of-force tactics?
5    A.   I go and attend seminars and conference
6  presentations, primarily at the ILEETA, I-E-L [sic] --
7  International Law Enforcement Educators Trainers Association,
8  as well as other conferences.
9    Q.   Aside from conferences, do you do any other work to
10  stay abreast of the current tactics used in use of force?
11    A.   Oh, yes.
12    Q.   In the use-of-force context?
13    A.   Oh, in use of force, now you're -- you're -- sure,
14  attend training, again, instructor training, where I have done
15  that before previously.
16    Q.   When's the last time you attended instructor
17  training?
18    A.   I think it was 2018 or 2019.  Actually, it was this
19  past 2024 at the AELE conference on the application and use of
20  the GLOVE.
21    Q.   And for those who don't know, the GLOVE is a device
22  that an officer could put over their hand and it issues an
23  electric charge.
24    A.   It's a distractionary piece of equipment, yes.  And
25  it has a very, very low admittance -- an ampere admittance

89

1  voltage.
2    Q.   Do you teach on the GLOVE?
3    A.   I have not.
4    Q.   Have you been trained to use it?
5    A.   Yes, I have.
6    Q.   Do you possess a GLOVE?
7    A.   I do not.
8    Q.   You also have friends who are law enforcement
9  trainers, correct?
10    A.   Correct.
11    Q.   And that includes tactics training as well?
12    A.   Yes.
13    Q.   You're a law enforcement consultant for law
14  enforcement officers and law enforcement agencies, correct?
15    A.   Yes.
16    Q.   Your friends are consultants for law enforcement
17  officers and law enforcement agencies, correct.
18    A.   Some.
19    Q.   You are a law enforcement trainer who gives lectures,
20  right?
21    A.   Correct.
22    Q.   And just so that we're clear, the last time you
23  taught officers how to handle themselves in the field was when?
24    A.   It would've been November of '23.
25    Q.   And what did you teach in November of '23?

90

1    A.   Arrest-related deaths.
2    Q.   So you gave a lecture?
3    A.   Yes.
4    Q.   Anything else?
5    A.   And application.
6    Q.   What application did you teach?
7    A.   Prone -- grounding and prone restraint.
8         COURT REPORTER:  I'm sorry, repeat that.
9         THE WITNESS:  Grounding and prone restraint.
10    Q.   What is grounding?
11    A.   It's techniques to ground to take an individual who
12  is resisting arrest to the ground and to control and restrain
13  that person.
14    Q.   And what is prone restraint?
15    A.   Prone restraint is actually after the person's been
16  grounded, to control them to use various empty-hand control
17  techniques and/or intermediate weapons, depending on the case,
18  to apply handcuffs and leg restraints.
19    Q.   When was the last time you taught police officers
20  the -- the subject of lethal force?
21    A.   Would've been July of '23.
22    Q.   And what did you --
23    A.   But -- but it's -- when you say -- you have to look
24  at -- many of my use-of-force programs touch on all aspects of
25  force, not just singularly specifically on one or the other.

91

1  So it would've been specifically, to answer your question,
2  would've been July of '23.
3    Q.   And that would've been with the seminar on use of a
4  motor vehicle as a potential weapon?
5    A.   No.
6    Q.   No?
7    A.   That was in May of '23 at AELE.
8    Q.   I see.  I see.  There was another seminar that I'm --
9  I must be confused.  There was another lethal-force seminar
10  that you conducted in 2023?
11    A.   Correct.
12    Q.   July?
13    A.   Yes.
14    Q.   What did you teach?
15    A.   Deadly force, lethal force and the science behind it
16  and case litigation, as well as the second day was looking at
17  simulators, the use of simulators.
18    Q.   And what tactics did you teach?
19    A.   How to approach traffic stops, parked vehicles, with
20  reluctant type of employees -- or arrestees, subjects.  There
21  was one scenario that we did that was a domestic violence
22  situation, as well as a active shooter.
23    Q.   In your scenarios involving domestic violence or
24  active shooter, what hands-on practical teaching did you give?
25    A.   We -- myself, as well as another instructor, had --

92

1  the first day was all lecture in all information.  The second
2  day was practicing the hands-on approach to watching for
3  weapons, their distance, reactionary time, being able to
4  assess -- assess, and threat analysis, that type of thing.
5       Q.   What is a hands-on approach?
6       A.   Hands-on is realistic training where it moves from
7  the classroom to actual physical application of a tactic or a
8  technique that has been taught.
9       Q.   And what school of training or what techniques did
10  you teach with respect to a hands-on approach?
11       A.   I think I've already explained that.
12       Q.   Okay.
13       A.   Yeah.
14       Q.   Have you taught de-escalation ever?
15       A.   Yes, I have.
16       Q.   When was the last time?
17       A.   Oh, my gosh.  It would've been part of the
18  November 23 training, but I have been teaching de-escalation
19  and crisis intervention since my days working at the prison and
20  the training academy and in-service, as well as at Ferris State
21  University in the academy.  And subsequently, with
22  pressure-point control tactics, almost every instructor program
23  that I've ever put on or with basic officers going through,
24  there's always a segment, always a block on de-escalation.
25       Q.   And what education did you receive with respect to

93

1  de-escalation?
2       A.   I -- first, when I was working at the prison, we got
3  some training on that, limited.  It was experience on how to
4  talk a prisoner into a cell or out of a cell.  It was also when
5  I was with the Department of Corrections Crisis Intervention, I
6  underwent a seven-week program, GIST, as an instructor, just on
7  de-escalation and crisis intervention.  I've had subsequent
8  training that I've gone through with -- at ILEETA.
9       Q.   What's ILEETA?
10       A.   Again, the conference at ILEETA, various sessions
11  that they bring in.  There was the integrated communication
12  assessment and tactics training that PERF has produced since
13  2016.
14       Q.   And real quick, who's PERF?
15       A.   Police Executive Research Forum.
16       Q.   And who is ILEETA one more time, just for the court
17  reporter?
18       A.   International Law Enforcement Educational Trainers
19  Association has an annual conference where various instructors
20  will bring their various courses.  It could be a two-hour
21  course.  It could be an eight-hour course, four-hour course.
22  It could be a several-day course that they present, and I
23  attend almost every year that conference and those various
24  sessions that are placed that are -- that are conducted.
25       Q.   Any other sources of education regarding

94

1  de-escalation tactics?
2       A.   No.  Other than, again, my own experience in doing it
3  and in training it for over 30 years and reading up and
4  researching the -- the published documents on the process and
5  the techniques.
6       Q.   Have you ever coached or taught any agencies in the
7  state of Ohio regarding de-escalation tactic?
8       A.   Coached?
9       Q.   Or taught?
10       A.   Taught?
11       Q.   Consulted for, however you want?
12       A.   Well, I'd have to say with -- when I was with
13  Pressure Point Control Tactics, PPCT, we had a lot of
14  instructors that came from Ohio.  I've not been to any specific
15  law enforcement department to do a seminar by myself, but I
16  know that we have trained numerous -- I have trained -- been
17  part of training numerous Ohio law enforcement officers through
18  PPCT.
19       Q.   And I believe you said, "instructors."  You've
20  trained force instructors that come from Ohio; is that right?
21       A.   Yes.
22       Q.   Okay.  You worked for a law enforcement agency known
23  as the Michigan Department of Corrections; is that right?
24       A.   Correct.
25       Q.   And your clients are law enforcement officers and

95

1  agencies, correct?
2       A.   Correct.
3       Q.   You are and have been a teacher of college courses
4  for those who want to become law enforcement administrators,
5  correct?
6       A.   Correct.
7       Q.   Many of your students have been law enforcement
8  professionals, correct?
9       A.   Yes.
10       Q.   And you run a Center for Applied Social Sciences at
11  Valdosta State University, correct?
12       A.   Yes.
13       Q.   And it received start-up money from a company that
14  makes training simulators used by law enforcement
15  professionals, correct?
16       A.   Correct.
17       Q.   In July of 2011, the Board of Regents of the
18  University System of Georgia approved formation of the Center
19  for Applied Social Sciences at Valdosta State University,
20  correct?
21       A.   Correct.
22       Q.   You are a co-founder of the Eques, E-Q-U-E-S, Group,
23  LLC, with Randall Murphy?
24       A.   Correct.  It's no longer in operation, but, yeah,
25  that's true.

96

1    Q.   Eques is the Latin word for "Knight"; is that right?
2    A.   Correct.
3    Q.   All right.  This will be Exhibit 19.  Let me do this.
4  I'll get it up for everybody to see, hopefully.  All right.
5  Let's zoom in.  All right.  We have the Domestic Limited
6  Liability Certificate of Organization for Eques Group, LLC.  Do
7  you see that?
8    A.   Correct.
9    Q.   Do you recall organizing the company on 11 -- that's
10  November 3rd, 2015?
11    A.   Correct.  I was a very, very small partner in that.
12  I didn't put any funds in with that, but I was part of the
13  training of that, yes.
14    Q.   So let's go back to the next page.  Okay.  And let's
15  zoom in.  I believe the Eques Group has a principal office
16  address of 821 Dawsonville Highway, Suite 250-123 in
17  Gainesville, Georgia; is that right?
18    A.   It's not correct.  Now, at the time, it was.
19    Q.   Right.  At the time.
20    A.   At the time.
21    Q.   What was Dawsonville -- 821 Dawsonville Highway, what
22  was that?  Is it a -- what kind of building?
23    A.   That's a good question.  I think it was where
24  Randy Murphy had an office, Randy Murphy.
25    Q.   Who's Marci Murphy?

1    A.   That's his wife.
2    Q.   And who's Randy Murphy?
3    A.   He was a retired major from the Kansas City, Kansas,
4  Police Department and came to work for the Meggitt Corporation
5  in Suwanee, Georgia.  And after his work there, after his
6  employment, he started this particular consulting and training
7  organization.
8    Q.   The two of you are listed as organizers of the
9  company; is that right?
10    A.   Correct.
11    Q.   How did that company come to be?
12    A.   He asked me if I wanted to do some consulting and
13  training with him, and I said, "Yes, I could."  But I said, "I
14  can't put up the money for it," which he did himself.
15    Q.   When -- when --
16    A.   So --
17    Q.   -- when did he first have that conversation with you?
18    A.   Oh, goodness, I don't know.  Well, I think we had
19  talked about it for many, many years.  We never actually
20  pursued it, but I think around 2014, 2015, somewhere in that
21  nature --
22    Q.   Okay.
23    A.   -- neighborhood.
24    Q.   With respect to your knowledge of Mr. Murphy, when
25  did you first meet him?

1    A.   I believe 1989 or 1990.
2    Q.   And how did you meet him?
3    A.   Through PPCT, Pressure Point Control Tactics.
4    Q.   Tell me more about that.  What is that?
5    A.   I was -- well, what is that?
6    Q.   Yeah, about the meeting and how you guys came
7  together and who PPCT is.
8    A.   PPCT, at the time, was the world's largest
9  use-of-force trainer of subject-control tactics, starting in
10  around 1984, 1985.  I became an advisory board member for them
11  in 19-- I want to say '87 or 1988, and I became the director of
12  research for PPCT.  And as we brought in new staff instructors,
13  I was responsible for directing these new individuals that were
14  coming on a staff there.  Everyone was required to do a
15  research project.  And so based on my background, I became the
16  director of research, so I director supervised his research,
17  and that's when I met him at that time.
18    Q.   And that --
19    A.   Either it was 1989, 1990, '91, somewhere in there.
20    Q.   Did you stay in touch with him as he grew in his
21  career?
22    A.   Yes, I did.
23    Q.   And did you know him to be at Meggitt -- or Meggitt
24  (pronouncing), M-E-G-G-I-T, double T, Training Systems?
25    A.   Meggit --

1    Q.   Meggitts.
2    A.   -- yes.  Yeah, Suwanee, Georgia.  He -- as I said, he
3  became the -- their director of research after his subsequent
4  retirement from Kansas City, Kansas, Police Department several
5  years after.
6    Q.   We're going to go to Exhibit 20.  Do you recognize
7  who this is?
8    A.   Yes.
9    Q.   Is that Randy L. Murphy?
10    A.   Yes.
11    Q.   Co-founder and chief knowledge officer at
12  Cyber Ops Alliance?
13    A.   Correct.
14    Q.   What is Cyber Ops Alliance?
15    A.   I do not know.
16    Q.   According to his LinkedIn account, in a post
17  eight years ago titled, "Why the Eques Group," he indicates
18  that "It was no accident that the founding partners chose
19  Eques.  It is the Latin word for 'Knight.'"  Did I get that
20  right?
21    A.   That's what it says, yes.
22    Q.   Do you recall choosing the -- do you recall choosing
23  the name?
24    A.   I think that was -- as I recall, I -- I agreed with
25  it.  That was his idea.

1    Q.  Your -- the post says, "The Knight was expected to
2  have not only the strength and skills to face combat in the
3  violent era of the Middle Ages, but was also expected to temper
4  this aggressive side with a chivalrous side to his nature.  The
5  ideals described were emphasized by the oaths and vows that
6  were sworn in the Knighthood Ceremonies, much like the Oath a
7  Police Officer takes today."
8        It goes on to say, "The virtues of the Knights of
9  King Arthur's Court are the same as today:  To serve citizens
10  with valor, to protect the weak and defenseless, and fight for
11  the welfare of all, to live with honor, obey authority and to
12  always speak the truth.  The Eques Group's approach to risk
13  management was developed through decades of experience working
14  with the law enforcement profession."
15        I'll stop there.  Do you recall these concepts as
16  being shared between you and Randy?
17    A.  Limitedly, or not that we spent any time on that.  I
18  think it was primarily his goal to align that with that
19  particular metaphor.
20    Q.  Did you agree with that metaphor?
21    A.  Oh, yeah, I did.  Sure.  I think that's part and
22  parcel of speaking the truth and providing a service that --
23  that's appropriate, that's professional.
24    Q.  And that service would be to law enforcement
25  professionals and that agencies, correct?

                                                        101

1    A.  That's what it was designed to do, yes.
2    Q.  Mr. Murphy is also the former director of research at
3  Meggitt Training Systems.  You've said that before, correct?
4    A.  Yes, that's true.
5    Q.  And Meggitt, with Randall Murphy, helped you found
6  the Center for Applied Social Sciences; isn't that right?
7    A.  That's correct.
8    Q.  How did that relationship start such that Meggitt
9  would eventually give $20,000 to start your -- your center?
10    A.  We did a research project for -- I was on part of a
11  research project that Mr. Murphy designed, and I helped him
12  design for the Meggitt Corporation on the use of simulators.
13    Q.  That's the 2012 --
14    A.  Correct.
15    Q.  -- research that you did?
16    A.  Yes.
17    Q.  And we'll talk about that.  Okay.  And that research
18  in 2012, just to summarize, was seeing if simulators created
19  stress reactions in officers, generally stated, correct?
20    A.  In a virtual environment.
21    Q.  In a virtual environment.
22    A.  Yes.
23    Q.  All right.  And you used Meggitt systems at that
24  point?
25    A.  Yes.

                                                        102

1    Q.  How did you find out about this Meggitt technology?
2    A.  I had -- first of all, I had been on their FATS
3  machine, shoot-don't-shoot machine, many, many, many years
4  before.  And through our association with PPCT, and then when
5  he went to work for them, he contacted me and asked me to be
6  the director of the research of this project.
7    Q.  When did he do that?
8    A.  I want to say 2008 or '09, while I was still at
9  Western Illinois University.
10    Q.  So you brought this relationship, informal, though,
11  it was at the time, with Mr. Murphy to Valdosta.
12    A.  You say, "brought this relationship"?
13    Q.  Yeah, you would have had Mr. Murphy as a professional
14  contact, a friend, a relationship as you entered
15  Valdosta University.
16    A.  Yes, I came -- yeah.  Right.  Because I've known him
17  since, like, 1989, 1990, somewhere in there, '91.
18    Q.  And so it makes sense you would have turned to his
19  gear, his technology, and he would have then helped support the
20  founding of your center, fair?
21    A.  Well, that's what happened, yes.
22    Q.  Yeah.  Now, he left Meggitt in 2015, the same year
23  you both founded Eques.  Do you know that?
24    A.  That's correct, roughly around that time.
25    Q.  And did he leave to join the company that you

                                                        103

1  founded?
2    A.  I think his -- his -- as -- as I recall my
3  understanding of why he left, was Meggitt was going in a
4  different direction, and Meggitt was -- we had finished the --
5  the project.  He had presented the project.  He had refined the
6  equipment for Meggitt, and his funding for his job ran out.
7  And that's when, after that happened, we began to talk about --
8  like I said, we had talked about training together, consulting
9  together many years before that, but that's in and around the
10  time that Eques began.
11    Q.  And then you would join with him in 2015, and as it
12  says here in the post, "The Eques Group" -- "Eques Group's
13  approach to risk management was developed through decades of
14  experience working within the law enforcement profession,"
15  correct?
16    A.  Correct.
17    Q.  The post indicates, "We use research-based,
18  evidence-based, and field-proven methods to offer our clients
19  practical, rational and sound risk management solutions,"
20  correct?
21    A.  Correct.
22    Q.  "The Eques Group's approach goes beyond certification
23  and verification," correct?
24    A.  That's what it says, yes.
25    Q.  And did you issue certifications and verifications

                                                        104

1   with Eques?
2       A.   I don't recall that we ever certified anyone.
3       Q.   Did you have a certification process --
4       A.   No.
5       Q.   -- or verification?  Did you have a verification
6   process?
7       A.   That's a good question.  I'm not sure.  We reviewed
8   policies and procedures and training and assisted in refining
9   that.  So if verification, I guess, that would be part and
10  parcel of that.  That's how I would look at it.
11      Q.   Finally, the post says, "With direct input from our
12  clients, we assist with the development of policies,
13  implementation and monitoring of the processes to help meet or
14  exceed established standards of professional law enforcement."
15      A.   Correct.
16      Q.   Did I read that right?
17      A.   Yes, sir.
18      Q.   And is that what the company did?
19      A.   Yes.  We -- like I said, primarily we didn't have
20  very many projects, but we did help refine and revise policies,
21  recommended implementation, and did training.
22      Q.   Why don't you have any of this mentioned in your CV?
23      A.   Because we are no longer doing it, and I -- I do have
24  the actual training programs that we put on and the consulting
25  that we did in -- in the latter part of my CV.

1       Q.   And you and Mr. Murphy founded Eques together but
2   Eques is not mentioned in any of your CV, right?
3       A.   Yes.  It's not there.
4       Q.   Is -- what happened to Eques?
5       A.   Well, we didn't get as much business as we thought we
6   did -- or would.  And so he decided to because he was the
7   primary consultant for it and financier for it, so we just --
8   and there were some medical issues that he was undergoing,
9   which I'm not going to talk about, so that's primarily.
10      Q.   Were there any agencies that Eques ever worked for?
11      A.   Were there any?
12      Q.   Any agencies?
13      A.   Yeah, Topeka, Kansas.  That was one that I recall
14  offhand.  We did some other training, as I recall, but not
15  specifically.
16      Q.   What kind of training do you recall for Topeka?
17      A.   We went in and did an assessment of their
18  use-of-force reports.  We then looked at I think it was like
19  six months of use-of-force incident reports.  We then gave them
20  recommendations with their legal counsel and their chief and
21  their administrators, recommendations on revising their
22  use-of-force policies, their response to the mentally-impaired
23  policies, as well as we trained the whole department in use of
24  force, in the policy and implementation of that, as well as we
25  trained the whole department in arrest-related death, custodial

1   death types of issues.
2       Q.   And were these through seminars?
3       A.   Yes.
4       Q.   Where you would talk about the case law?
5       A.   Yes.
6       Q.   Any other --
7       A.   Some of it.  Some of it was case law, but not the
8   full extent of it.
9       Q.   What was -- any other aspects that you would teach at
10  Topeka besides the case law in a lecture-style format?
11      A.   The policy, the reason for the policy, how to
12  implement the policy, answering questions about the policy.  As
13  I recall doing that, we had our legal counsel for the City
14  there as well, providing additional training with us at the
15  time, as well as the chief.
16      Q.   Can you think of any other agencies -- strike that.
17           Can you think of any other training that you gave to
18  Topeka?
19      A.   No.  That would be it.
20      Q.   With respect to any other agencies that Eques would
21  have worked for, can you think of any other agencies?
22      A.   No, sir, not right off the -- no.
23      Q.   The research that we talked about was published in
24  the *Law Enforcement Executive Forum*, you and Mr. Murphy and
25  M.H. Hazlett, H-A-Z-L-E-T-T, in 2012, correct?

1       A.   Yes.  Michael Hazlett, that's correct.
2       Q.   Michael?
3       A.   Yes.
4       Q.   And you analyzed perceptions and misper-- the title
5   was, "Analyzing Misperceptions and" -- oh, my gosh -- the title
6   was, "Analyzing Perceptions and Misperceptions of Police
7   Officers in Lethal Force Virtual Simulator Scenarios."  And
8   that was published in the *Law Enforcement Executive Forum*,
9   correct?
10      A.   Yes.
11      Q.   During -- in that research, you don't disclose your
12  relationship to Mr. Murphy nor any of the financial benefits
13  that his company conferred upon you relative to your research,
14  do you?
15      A.   No.  I never have.
16      Q.   Are you familiar with the need to make disclosures
17  where research is concerned?
18           MR. LUTE:  Objection.  You may answer.
19      A.   I'm aware of it, but for that journal, it wasn't
20  necessary.  It wasn't required of us or informed of us to do
21  so.
22      Q.   Have you been trained or studied in the ethics of
23  reporting interests -- shared interests in the creation of
24  journal articles for publication?
25      A.   Sure.

1    Q.   In peer review?
2    A.   Yes.
3    Q.   Do you know if *Law Enforcement Executive Forum* is
4    peer review?
5    A.   Yes, it is.  It was.  It's no longer in -- in
6    publication.
7    Q.   What is your knowledge of -- of disclosure
8    requirements from an ethical point of view in journals that
9    appear --
10   A.   When it's necessary and when it is -- is required by
11   that particular journal.
12   Q.   Is that the full extent of your knowledge?
13   A.   Yeah, yes.
14   Q.   Randall Murphy is also noted as a contributor to your
15   book, authored and first published by you and Mr. Gary Vilke,
16   and that is the 2018 *Guidelines for Investigating Officer*
17   *Involved Shootings*, correct?
18   A.   Yes.
19   Q.   In the contributor description of Mr. Murphy, there's
20   no mention of your relationship to him, correct?
21   A.   Correct.
22   Q.   Nor is there any mention in your description as a
23   contributor of Mr. Murphy's relationship to you or Meggitt?
24   A.   Correct.
25   Q.   Now, I believe we've touched on this in your academic

109

1    work a bit.  I have a couple -- I have one exhibit to show you,
2    but the bottom line, I think we can agree, is that your
3    academic writings show a desire to defend criminal justice
4    practitioners.  Would you agree?
5    A.   No.  I would agree to make them aware of certain
6    issues and topics and subjects matter that emerge from
7    incidents, liability, legal, tactical, training, so forth.
8    Q.   And the desire to make them aware is so that you
9    might defend them or allow them to defend themselves in
10   criminal justice cases?
11   A.   Allow them to defend themselves, and I might add as
12   I've already alluded to earlier, to work on implementing
13   recommendations to enhance their ability to having more
14   efficient and effective law enforcement or correctional
15   organization.
16   Q.   In what we've documented as Exhibit 10, which was the
17   2000 article titled, "International Police Strategy and
18   Management" -- or for the *International Police Strategy and*
19   *Management Journal* titled, "Emerging Trends in the Police
20   Failure to Train Liability," you said, "Ongoing training is
21   critical to the avoidance of police-directed civil litigation
22   and in structuring a defense to legal assertions," correct?
23   A.   Correct.  I think we've already gone over that, but
24   yes.
25   Q.   And you also wrote in that same article -- that same

110

1    exhibit or that same document, "There is no systematic method
2    for collecting information specific to civil litigation.
3    Researchers are forced to speculate about the trends and
4    patterns of police civil litigation," correct?
5    A.   Right.  There's no entity that -- that actually
6    collects, analyzes, assesses those.  But I have -- I have done
7    that in several subject matters through content analysis.
8    Q.   You wrote in that same article, "Surveys administered
9    by AELE reports civil lawsuits filed against the police in 1967
10   rose from 1,741 cases to 3,894 cases in 1971, a 124 percent
11   increase," correct?
12   A.   Correct.  And that was their survey that they did,
13   yes.
14   Q.   But you don't mention in your -- any of your research
15   in that article that *Monroe v. Pape* was already ten years old
16   by 1970 -- I'm sorry, was -- was five years old by '71 -- I'm
17   sorry, by '61.  Try this again.
18   A.   That was ten years old.
19   Q.   Ten years old by '71.  It was decided in '61.  I'll
20   do that again.  You don't mention that *Monroe v. Pape* was
21   already ten years old by 1971, correct?
22   A.   Correct.  I'm only reporting -- as I recall -- I'd
23   have to look at the article first, but secondly, I'm reporting
24   what the survey of AELE found.
25   Q.   I understand.  And as you report your -- and I notice

111

1    this in your work quite a bit -- you will report case decisions
2    into your research or you will report other folks statistical
3    findings regarding the number of lawsuits filed, correct?
4    A.   Correct.
5    Q.   Is there any particular reason why you've never, I
6    think -- I don't think ever one time published anything about
7    the manner in which African Americans are or are not treated
8    with disparate treatment by a police?
9    A.   I think we -- I have in the -- our book on
10   officer-involved shootings.  We -- I look at the numbers of --
11   the numbers of reported shootings and/or the litigation that
12   looks at that, but not, perhaps.  I'd have to go back and I
13   believe it's Chapter 3 or 4, as I recall, and to look at the
14   numbers that have been reported.
15   Q.   You -- you --
16   A.   But -- well, I've trained on that.  And so if I don't
17   put it in an article or a book, I mean, so what's the point?
18   Q.   Well, I -- I don't know what the point is.  I'm --
19   A.   Yeah --
20   Q.   -- I'm just pointing out that --
21   A.   -- so, I mean, I'm just trying to answer your
22   question.
23   Q.   -- but as an academic studying 1983 litigation,
24   you've never published any journal article in any peer-review
25   source that talks about 1983 litigation from the perspective of

112

1  the arrested citizen, have you?

2  A.  Not in a Section 1983 perspective.  I think I did

3  with my dissertation that was looking at citizen resistance

4  during police arrests.  And that was a -- a article that was

5  published by the FBI, as I recall.

6  Q.  Timely article back then?

7  A.  Back then, yes.

8  Q.  Yeah, that would be the Kent State experience and

9  other --

10  A.  Well, no, this was way after that.  This was -- my

11  dissertation was done in 1990.

12  Q.  Sure.  But, I mean, if historical context of --

13  A.  Oh, sure.

14  Q.  -- your career starting with -- about the Kent State

15  time, give or take, and then going into the 1990 time frame,

16  you had mentioned it in your Ph.D. dissertation, right?

17  A.  Correct.

18  Q.  Have you ever written on it beyond that?

19  A.  No, not that -- now you're racking my brain.  I'd

20  have to look, but I don't recall specifically what you're, I

21  think, alluding to.

22  Q.  Have you ever engaged in the systematic collecting or

23  trend analysis of use-of-force complaints against police?

24  A.  You mean using citizen complaints as a unit of

25  analysis?

113

1  Q.  Yes.

2  A.  Not specifically.  I think I do comment in the book

3  studies that have looked at that.  I've certainly brought it

4  into my training, but not a specific article on that topic.

5  Q.  In that article of 2000, you wrote, "Surveys

6  administered by AELE report civil lawsuits filed against the

7  police in 1967 rose."  And that was the time frame of 1971.

8  *Monroe v. Pape* started civil rights litigation as we know it;

9  would you agree?

10  A.  I would agree.

11  Q.  And would you agree that by 1971, '81, even '91, it

12  was an emerging area of the law?

13  A.  What was?

14  Q.  Civil rights litigation.

15  A.  Sure.

16  Q.  Under 1983.

17  A.  And I think I've written about it.  In fact, it's in

18  my book --

19  Q.  Yeah, I --

20  A.  -- *Monroe versus Pape*, as well as Monell, as well as

21  numerous other Supreme Court decisions.

22  Q.  And is the growth of civil litigation in that area

23  therefore a by-product of the arrival of new case law and

24  doctrine an interpretation of 1983, or is it indicative of

25  police being targeted?

114

1  A.  I think it's probably both.

2  Q.  Now, remember I asked you if you used your articles

3  to help make your book?  I think we talked about that earlier.

4  A.  Correct.

5  Q.  I'm going to give you -- if -- if you take your book

6  here, I'm going to just try to get something clear, something

7  that I was curious about.  The first sentence of page 5, second

8  paragraph, when you have that locked in, let me know.

9  A.  Page 5?

10  Q.  Uh-huh (positive response).

11  A.  Yeah, I'm there.

12  Q.  Okay.  And it's going to be the first sentence of

13  page 5, second paragraph.

14  A.  Okay.

15  Q.  You see that sentence?

16  A.  Yes.

17  Q.  Okay.  Let me just call up the article for you here

18  so we have both.  Okay.  I have -- I'm going to pull up here --

19  okay.  All right.  That should work.  Let me close this.  It

20  should go up now.

21  The paragraph I'm directing you to -- and I'm going

22  to show it it to the group here in the -- in your paper is the

23  first sentence of page 5, second paragraph, and it seems to be

24  nearly identical to the second full paragraph of page 171 shown

25  here in the article.  So your book at page 5, second paragraph

115

1  matches almost exactly to this particular article at 171.  So

2  after you've taken a look at both sentences, let me know the

3  opening sentences.

4  A.  Of paragraph 2?

5  Q.  It's going to be page 5, second paragraph of the book

6  compared to second full paragraph of 171 of the article, which

7  is what is behind me.

8  A.  Okay.

9  Q.  In the 2023 edition of your book, you add research

10  that was available in 2000, but never included it in the

11  original 2000 article.  You say, "Previous research reveals

12  that civil lawsuits against police are widespread," and then

13  you count Worrell, W-O-R-R-E-L-L, Kappeler, K-A-P-P-E-L-E-R, as

14  authors or sites.

15  And you also write, "It's also a major concern to law

16  enforcement officers."  And you cite Garrison, Scogin,

17  S-C-O-G-I-N, and Brodski, B-R-O-D-S-K-I, and police chiefs.

18  You cite Vaughn, V-A-U-G-H-N.  You finally say government

19  leaders, and you cite MacManus, M-A-C-M-A-N-U-S, all in page 5

20  of your book.

21  So again, in page 5 of your book, you're citing these

22  folks, but it appears that you are -- and tell me if I'm

23  correct -- you're incorporating the 2000 research and adding

24  these research sources to the book.

25  A.  As research comes out and has new information, yeah,

116

1    I try to.
2    Q.   Well, that research was available in '98.
3    A.   Okay.  I didn't include it then.
4    Q.   In '97, and I'm wondering why?
5    A.   I wasn't aware -- I wasn't aware of it.
6    Q.   Okay.  That's fine.  And that's -- that's all I was
7    wondering.  I was also interested in how you have evolved your
8    ideas around this widespread major concern in law enforcement
9    regarding civil lawsuits against police.  How did you --
10   A.   Because things change, trends change, cases change,
11   more research comes out and changes.  So I try to keep up as
12   best I can on the research, the cases.  I mean, this book is --
13   I could have tripled the pages for the number of cases.
14        And so things change, research change, trends change,
15   and so I try to keep up to the best I can to provide the best
16   information possible.  And -- and as new research, I try to add
17   it.  I mean, that's -- that's -- with this new edition, I -- I
18   can't remember or recall, but I -- it's over a hundred new
19   cases, as well as probably 50, 60 new research articles, either
20   law articles, legal articles, journals, academic data, so forth
21   and so on.  So I tried it.
22   Q.   And so between 2000 and 2023 then, you've been
23   tracking research regarding civil lawsuits against police,
24   correct?
25   A.   Yes.  And part of the problem as I say in the text,

117

1    which we're not talking about, is that there's no accurate
2    data --
3    Q.   Yeah.
4    A.   -- and there's no entity that routinely --
5    governmental agency or private agency that routinely -- that --
6    that's a -- would be a huge task, but no one does it.
7    Q.   In your book, although you cite some cases that
8    involve the First Amendment and you quote the First Amendment
9    in a table, your book has no discussion or analysis of how the
10   First Amendment can be a source of constitutional violations,
11   such as with retaliation?
12   A.   Yeah.  I didn't go into that much because I -- I
13   focused more on the other amendments, and so....
14   Q.   And why is that?  I'm just interested.
15   A.   Just -- just my own choice.
16   Q.   Okay.  There's no discussion or analysis of how can
17   officers can violate the First Amendment rights of public
18   protesters if they use excessive force during rallies or
19   marches, especially following George Floyd, correct?
20   A.   Yes.
21   Q.   Why is that?
22   A.   I didn't see a need to put that in there.
23   Q.   In a -- in a book on civil liability and criminal
24   justice?
25   A.   Well, like I said, I could have wrote voluminous --

118

1    I've never had a chapter on that.  I do talk about racial
2    profiling and other types of issues in other subsequent
3    chapters.
4    Q.   There's no mention of selective enforcement of the
5    law as a problem or even a debate amongst law enforcement,
6    correct?
7    A.   Explain.
8    Q.   Your book doesn't mention selective enforcement of
9    the law as a problem for law enforcement.
10   A.   Explain what you mean.
11   Q.   In what way?  What do you -- what I'm -- I --
12   A.   I don't understand your question.  Selection
13   enforcement of what?
14   Q.   The law.
15   Q.   Okay.  And give me some -- give me more than that or
16   I can't answer your question.
17   Q.   The manner in which, say, black, white, or brown
18   people are arrested, the manner in which traffic stops are
19   conducted and for whom those conductive stops result in
20   violence.  There's been no mention of that.  Selective
21   enforcement is that you -- you're familiar with the doctrine of
22   selective --
23   A.   Yes.  But I'm -- but I also -- I have cases -- case
24   decisions on that very topic.
25   Q.   Well, you have -- granted you -- you have cases --

119

1    A.   So that's not --
2    Q.   -- that's --
3    A.   -- you know --
4    Q.   -- well, you have cases that involve the allegation,
5    correct?
6    A.   Okay.
7    Q.   You cite cases where that --
8    A.   Right.
9    Q.   -- all right.  But -- but you don't explore from an
10   academic perspective the phenomenon of or the research behind
11   selective enforcement, do you?
12   A.   No.  And that's my choice.
13   Q.   And --
14   A.   It's my book.
15   Q.   -- of course.
16   A.   If you want to write a book on selective enforcement,
17   well, be my guest.  I'd love to read it.
18   Q.   I'm -- I'm -- I am trying to understand precisely
19   your -- the context of your ambitious subject, civil liability
20   in criminal justice.  So there's no mention of one of the
21   nation's largest and most corrupt police scandals involving the
22   victims of a police unit in Chicago, Illinois?  You might be
23   familiar with Jon Burge.
24   A.   Yes.  But I would take cumbrance with your -- I mean,
25   I write about the Rampart scandal, the Christopher Commission

120

1   with Rodney King case and others.  So, I mean, this is --
2   anyway.
3       Q.   Well, I'm interested in that.  I'm not criticizing
4   you.  I'm interested in why you didn't write about Burge
5   because he commanded Area 2 detectives from Chicago and you
6   worked in Western Illinois University.  And he did his work
7   from 1970s through the early '90s as they shocked and
8   suffocated and beat suspects.  I'm just wondering if --
9       A.   I just didn't -- I'm not aware of that -- that
10  particular case or that particular incident.  I'm not privy to
11  that, so I didn't include it.
12      Q.   Okay.  You're not familiar --
13      A.   I'm not familiar with that.
14      Q.   -- with Jon Burge --
15      A.   I didn't put Serpico in there either, and so....
16      Q.   But you're familiar with Serpico?
17      A.   Oh, yeah, absolutely.
18      Q.   But you're not familiar with Jon Burge who
19  tortured --
20      A.   No.
21      Q.   -- people into false confessions?
22      A.   No, I'm not that one.  That one I -- there -- there's
23  some things I'm not privy to.  I -- so it wouldn't be in the
24  book.
25      Q.   Granted, I'm fine with that.  I thank you for your

121

1   answers.  There's no mention of the findings in the Bureau of
2   Justice Statistics 2020 report based on this 2020 survey about
3   interactions between police and the public that black and
4   Hispanic persons were more likely to experience the threat of
5   force or use of nonfatal force during their most recent police
6   contact in 2020 more so than a white person.  You don't mention
7   any of that, do you?
8       A.   I don't.  But I do cover consent decrees and the
9   CRIPA, which is where the DOJ comes in and does investigation.
10  So I have a whole chapter on that.
11      Q.   But you do rely and know of the justice statistics
12  with respect to the number of civil litigation or allegations
13  of excessive force or force in arrests, right?
14           MR. LUTE:  Objection.  Go ahead if you know.
15      A.   Say that again.
16      Q.   The Bureau of Justice Statistics 2020 report covers
17  police encounters, number of them over -- across the country,
18  and provides data in that respect.  You're aware of that data?
19           MR. LUTE:  Objection.  Go ahead.
20      A.   I think I already talked about that earlier.  1996 it
21  started where the -- yes, and I used to have a table in my
22  former additions, but I didn't include it in this one because
23  it became cumbersome.  And I do talk about that, as well as
24  quite a few other items in that regard.  So, I mean, it's --
25      Q.   Why doesn't your book mention the notion, even the

122

1   claim, that black and Hispanic persons are more likely to
2   experience the threat of force?
3           MR. DICELLO:  Objection.  You may answer if you
4   know.
5       A.   I don't -- I -- I'm looking at the civil liability,
6   the trends and patterns of that and then other research.  So I
7   can't include everything.  There was no -- there's no
8   conspiracy to exclude or include one thing or the other.  And
9   so that's -- if I don't have it in there, that's -- that's the
10  reason.  I do cover other aspects of that, absolutely, and as
11  well as in our other text on officer-involved shootings and
12  arrest-related deaths, custodial deaths, which we've already
13  talked about.
14      Q.   Best I can tell, none of your research or writings
15  mentioned tort reform.
16      A.   Only from the regard of qualified immunity in
17  Chapter 5 where I do talk about that where there are numerous
18  individuals that I recite their research that call for the
19  Supreme Court to -- to reverse their decision on that.  So I do
20  talk about that.  That isn't, to me, part of tort reform trying
21  to -- and I've certainly covered it in a lot of the training.
22  In fact, I just talked about that back in the fall three times
23  as I recall in training about tort reform and about qualified
24  immunity at the state and at the federal level.
25      Q.   Have -- have you ever done any research or writing on

123

1   how tort reform has reduced the number of lawsuits filed?
2       A.   No, I have not, not that I can recall.
3       Q.   Have you ever done any training or given any lectures
4   regarding the number or type of lawsuits filed since tort
5   reform?
6       A.   I am sure I have, but not specifically in the -- in a
7   slide that says here's tort reform and here's the outcome and
8   the results and the -- the trends of that.  I've trained quite
9   a bit on consent decrees and qualified immunity and the trends
10  towards that and as well as it's in my book as well.
11      Q.   You have no detailed discussion about the blue wall
12  of silence in any of your writings, do you?
13      A.   No.
14      Q.   You have no detailed discussion about the blue code,
15  do you?
16      A.   No.
17      Q.   Or the blue shield?
18      A.   No.
19      Q.   Why not?
20      A.   It's not part of the book.  It's not part of my
21  emphasis or part of what I'm trying to do with this
22  particular -- the goal of this particular text.
23      Q.   What's the -- what is the blue wall of silence as far
24  as you know?
25      A.   I'm not sure how you're using it, so I don't know

124

1  what you mean by that.  You'd have to tell me.
2      Q.  Well, you just answered my question if it's mentioned
3  in the book.
4      A.  It's not, but I'm not sure how you're using the blue
5  wall of silence.  Is that something -- the uniform of the
6  police that they're conspiracy?  I'm not sure what you're
7  using.
8      Q.  Have you ever heard that phrase before "the blue wall
9  of silence"?
10     A.  Not really.
11     Q.  Do you know anything of the mentioning of the phrase
12  "the blue code" or heard anything like that before?
13     A.  No, no, not that I can recall in any of my research
14  or classes.
15     Q.  You've never heard of the blue shield?
16     A.  I'm not sure what you're using or how you using it.
17     Q.  I'm not -- I'm just asking if you have any -- have
18  ever --
19     A.  Blue shield?
20     Q.  -- heard of this term --
21     A.  No.
22     Q.  -- these terms?  All right.  Are you aware of the
23  concept that officers don't report each other's wrongdoing?
24  Are you aware of that concept?
25              MR. LUTE:  Objection.  Go ahead.

                                                              125

1      A.  Where --
2      Q.  I'm not saying that it happens or not.  Just saying,
3  are you aware of the concept that some --
4      A.  Good, I'm glad you qualified it.
5      Q.  Yeah, because I know you -- you're sensing this --
6      A.  I'm -- no, I'm trying to think, okay, what -- what is
7  your intent on that.  I've heard of that.  Sure.
8      Q.  Okay.  So you have heard of the blue wall of silence?
9      A.  No.  I've heard what you just mentioned in terms of
10  officers not reporting other officers.
11     Q.  How about --
12     A.  I've actually seen it.
13     Q.  -- and how about the notion of officers protecting
14  each other when they create -- or when they engage in acts
15  of -- of violence?
16     A.  That can happen.
17     Q.  Have you ever heard that concept referred to as the
18  blue wall of silence?
19     A.  Not really, no.
20     A.  Not really, or --
21     A.  Not -- not in terms of the way you're defining or --
22  or phrasing it, the concept.
23     Q.  How would you define it, or --
24     A.  Conspiracy.
25     Q.  Conspiracy to what?

                                                              126

1      A.  To defraud, conspiracy to cover up.  Like, for
2  example, the Rampart Precinct situation in LAPD.  Okay.  I
3  don't recall ever seeing anything about a code of silence or a
4  blue shield, but certainly that kind of behavior of cover up
5  and looking the other way, if you will, was certainly there and
6  not reporting others misconduct or crimes.
7      Q.  And while you don't mention the blue wall of silence,
8  the blue code, or the blue shield for the reasons you've given,
9  apparently not knowing the terms, you do cite at page 8 of your
10  book studies that identify the claims which plaintiffs are more
11  likely to win against police officers, don't you?
12     A.  I don't know.  I'd have to look at the --
13     Q.  Please --
14     A.  -- whole context --
15     Q.  -- please take --
16     A.  -- of that.
17     Q.  -- please take a look at page 8.
18     A.  Okay.  I'm -- where are you at on page 8.
19     Q.  You can just scan the page.  As I said, that you
20  study -- you cite studies there that identify the claims which
21  plaintiffs are more likely to win against police officers.
22     A.  Okay.
23     Q.  Is that right?
24     A.  Well, I don't know where you're --
25     Q.  Just look at the cites on the book and tell me if --

                                                              127

1      A.  What -- what cites are you referring to?
2      Q.  Those that are on the page.
3      A.  Which ones?
4      Q.  All of them.
5      A.  Be specific.
6      Q.  All of them.  There's -- the page isn't very large.
7  It's just I believe there are studies cited there that identify
8  the claims which plaintiffs are more likely to win.
9      A.  I think it was Kappeler in 1993, if that's what
10  you're referring to.
11     Q.  Yeah.  And the studies that mentioned the claims,
12  litigation, financial losses of law enforcement agencies
13  insured by the Michigan Municipal Risk Management Authority are
14  listed there, right?
15     A.  Correct.  From our study that we've already
16  identified and gone over.
17     Q.  At page 9, you report on how Texas police chiefs say
18  the fear of lawsuits make it more difficult for them or their
19  officers to do their job, correct?
20     A.  That's a survey that I think del Carmen did as well
21  as Michael Vaughn.
22     Q.  At page 13 and 14, you have tables about how large-,
23  medium-, and small-sized police agencies have paid out in
24  damages --
25     A.  Yep, there you go.

                                                              128

1     Q.   -- right?
2     A.   There you go.  It's there.  The Schwartz study,
3  probably one of the more comprehensive studies on the issue.
4     Q.   And while you've never mentioned the likelihood of
5  black folks being exposed to violence by police, you have
6  mentioned, as I see here these tables, the amounts paid by
7  police agencies in a book you teach to students in college on
8  the civil justice system; is that right?
9     A.   Correct.  It shows the trends of payouts that is from
10  one law professor from Berkeley, her study, and the trends and
11  the payouts of numerous studies, which is probably the most
12  comprehensive study that I'm aware of that published this type
13  of data when there's not much data out there.
14     Q.   At page 16, you write that there are efforts --
15  that -- that you write the following:  "Efforts to acquire
16  detailed and consistent data about the trends of civil
17  litigation in law enforcement continue to be problematic as
18  there is no governmental entity which requires agencies to
19  collect and submit information about lawsuits filed against
20  them," correct?
21     A.   Correct.
22     Q.   And then page 18, you write, "As stated, detailed
23  national data are not systematically collected, therefore it is
24  difficult to identify definitively the trends in police civil
25  litigation," correct?

1     A.   Right.  There's limitations on all of this
2  information.
3     Q.   At the same page, you mentioned, however, the
4  Schwartz study, which you say provides useful data, which shows
5  the breadth and scope of payouts, awards of plaintiffs over a
6  broad-base number of diverse law enforcement agencies
7  nationwide and underscores the fact that an officer or
8  administrator is almost always indemnified.
9     A.   That's what she shows with her study.
10     Q.   And why are you including the notion that officers
11  are almost always indemnified in court --
12     A.   Because that's what her study's showing.
13     Q.   -- let me finish my question.  Just wondering why
14  you're -- as an academic, you're focused on whether officers'
15  liability is covered by an insurance company?  That's what
16  indemnification means.
17     A.   Correct.
18     Q.   So why are you focusing on that in your research?
19     A.   Because that's the outcome and results of her study.
20  That's what one of her central findings were.  And I'm
21  reporting that in a civil liability, but because again, it's
22  probably the most exhaustive study that I'm aware of to date on
23  this topic.  So that should -- if you're a reader, that should
24  speak volumes to you.
25     Q.   And -- and so I just want to understand your focus on

1  the concept of indemnification as an academic is inspired by
2  what?
3          MR. LUTE:  Objection.  You may answer.
4     A.   I've already answered.  She showed -- this is her
5  outcome.  It's not my outcome.  So I go through two to three
6  pages of a very detailed analysis, again, the most
7  comprehensive, which I teach my students, that this is civil
8  liability can not only be a problem, but if you lose, you have
9  big losses to look at.
10          So should -- as you read through the book, go through
11  a course, go through a training, should at least encourage to,
12  all right, how do we correct these issues?  How do we run a
13  more efficient and effective organization?  Which goes back to
14  many of the things that you've already asked me through the
15  course of the morning and the afternoon from a risk management
16  perspective.  And I identify various high-profile topics.  One
17  of them obviously is force, as well as search and seizure and
18  false arrest, false imprisonment, and so forth.
19          So this comes out of her study to -- to go along with
20  reporting.  So to be fair to her, to be an accurate reporter of
21  this and using this, which I got permission from her to do
22  this, by the way, and this is what her outcome of her study
23  shows.  And that's all it means.
24     Q.   And I appreciate that.  Did you -- do you cover or
25  have you ever researched actuarial data in insurance claims?

1     A.   The MMRMA.  That was the loss and the loss claims.
2  That's the only ones I've ever had privy to.
3     Q.   And as a function of teaching civil liability in the
4  criminal justice system, do you spend time in other courses on
5  whether officers are indemnified for the wrongdoing?
6     A.   Not specifically on that, no.
7     Q.   Okay.  At page 18, you say, "What appears to be clear
8  and continues to be shown" -- "what appears to be clear and
9  continues to be shown, as illustrated by the studies presented,
10  is that police continue to be targets of litigation"; is that
11  right?
12     A.   That's what I said, and we've covered that this
13  morning.
14     Q.   And this is your reading of the information that you
15  would say on page 16 is problematic?  That is, it's difficult
16  to identify the trends of police in police civil litigation,
17  correct?
18     A.   It is difficult.
19     Q.   And this is your conclusion from that data; is that
20  right?
21     A.   Yeah.  The bulk of the research that I have in -- in
22  this chapter would demonstrate that.
23     Q.   At the first sentence of your summary of Chapter 1 on
24  page 22, you're now summarizing the whole chapter.  First
25  sentence, you say, "As the above discussion indicates, criminal

1  justice agencies continue to be targets of civil liability,"
2  right?
3      A.  That's true.
4      Q.  Do you believe that today?
5      A.  Yes, I do.
6      Q.  Are you bringing that into this case?
7      A.  No.
8              MR. LUTE:  Objection.  Go ahead.
9      Q.  You're not?
10     A.  No.
11     Q.  So are you bringing Chapter 1 into your case -- into
12  this case, your knowledge of the information contained in the
13  whole chapter of the book you -- you wrote?
14     A.  No.  Did you see anywhere in 50 pages of my report
15  where I referenced that at all?
16     Q.  I just remember your answer to my first question if
17  you rely on your writings, including your books and forming
18  your opinions.
19     A.  It does, the case law.
20     Q.  I'm wondering if Chapter 1 of your book is -- and --
21  informs any of your opinions in this case?
22     A.  All of my sum and substance of all of my career
23  writings, research have influence on my opinions.
24     Q.  Thank you.
25     A.  But not specifically Chapter 1 or any chapter of this

133

1  book.
2      Q.  In your acknowledgements, you say, "Many thanks to
3  the various civil litigators who successfully defend criminal
4  justice officers."  You can -- I'll let you get to the
5  acknowledgements.
6      A.  Yeah, I'm aware of that statement.
7      Q.  So you said --
8      A.  As well as others, so let's be fair.
9      Q.  Oh, we will be.  "Many thanks to the civil" -- "to
10  various civil litigators who successfully defend criminal
11  justice officers and agencies in civil litigation matters.
12  Working with them on civil cases has greatly increased my
13  knowledge of the civil process.  Their legal skills and talents
14  illustrated during discovery, motion preparation, and in the
15  courtroom are unmatched and have enhanced my ability to write
16  about the many civil liability issues facing criminal justice
17  practitioners."  Did I read that right?
18     A.  That's correct.
19     Q.  Please explain to me why you included that in a
20  academic course book on the civil justice system.
21     A.  Because it's true.  I mean, much of what I know or
22  some of what I know is based on working with and learning from
23  litigators who we already talked about earlier in terms of
24  identifying -- I don't know -- eight or nine off the top of my
25  head.

134

1      Q.  Any reason why you chose to not include plaintiff's
2  lawyers in that acknowledgement?
3      A.  I rarely get the chance to interview them.  They
4  interview me.
5      Q.  Any other reason?
6      A.  That's it.
7      Q.  When was the last time you worked with a plaintiff's
8  lawyer on a civil case?
9      A.  I think I said 1999 or 2000.
10             (A recess was taken at 3:19 p.m. and deposition
11  resumed at 3:43 p.m.)
12     Q.  All right.  We're back on the record.  We're going to
13  now turn towards your opinion in this case.  Do you have a copy
14  of it in front of you?
15     A.  Yes.
16     Q.  All right.  We previously marked the opinion as
17  Exhibit 3 -- or the report, excuse me.  And you have a copy of
18  it in front of you.  If you would, turn to paragraph Number 14
19  of your report.  The numbered paragraph on page 6.
20     A.  Yes.
21     Q.  All right.  And just by way of background, everything
22  listed from paragraphs 1 to 13 is accurate; is that correct --
23     A.  Yes.
24     Q.  -- in your report?  And so as it relates to
25  Number 14 -- paragraph 14, you say your "opinions are based on

135

1  my specialized knowledge, research, training, and experiences
2  of these practices, training various criminal justice,
3  military, and private security personnel.  The following social
4  science methodologies were used to review the case documents
5  including histography."  I'll stop right there.  What is
6  histography?
7      A.  It is the examination of the -- of documents, videos,
8  items of historical nature that have historical relevance to a
9  particular matter of fact, subject, or incident.
10     Q.  All right.  So when we say the methodology that you
11  use, one of those methodologies was examining the documents; is
12  that right?
13     A.  That's correct.
14     Q.  Grounded theory, what's grounded theory?
15     A.  Grounded theory is taking all of the documents in
16  this case or other issues.  It's an inductive theory, a process
17  that looks and combines all of the collective nature of coding,
18  collecting of information, data, if you will, or incidents or
19  documents, interviews, and based on the thematic and patterns
20  of that to develop a particular theory or in this case, an
21  opinion or opinions.
22     Q.  Where did you learn grounded theory?
23     A.  I learned that at Michigan State University.
24     Q.  In what context have you applied grounded theory in
25  this case?

136

1      A.   By looking at all of the documents that I have listed
2  on item 16.
3      Q.   And from those items you developed a theory?
4      A.   I -- I developed opinions.
5      Q.   Opinions.  Is that what you mean by "as it relates to
6  grounded theory"?
7      A.   Yes, in this case --
8      Q.   Yes.
9      A.   -- in this matter, in this incident, yes.
10     Q.   So grounded theory would mean that you then formed
11  opinions after reviewing the documents; is that right?
12     A.   Correct.
13     Q.   And then finally, the third piece -- or not
14  finally -- the third piece you have is discourse analysis.
15  What's that?
16     A.   Yeah, discourse analysis is the communication and
17  interaction between individuals and the subject matter in terms
18  of verbalization or nonverbalization of the interactions
19  between individuals or groups, or in this case, Officer Huber
20  with Officer Paris and the radio.  So it's a discourse.  It's
21  trying to look at -- or it does look at analyzing that
22  communication process between subjects and individuals.  As the
23  name implies, discourse communication.
24     Q.   Finally, content analysis is the fourth piece of your
25  methodology.  What is that?

137

1      A.   Content analysis is very similar to histography, in
2  that, it looks at secondary -- it's a secondary analysis of
3  already archival information.  Much like with the case law that
4  I use for the books, that's secondary or content analysis.  So
5  this combines all of the documents identified in item 16 for
6  the patterns, trends, thematic information that I was able to
7  identify and develop my opinion based on the contents of all of
8  the documents that are contained -- well, that were provided to
9  me in this case.
10     Q.   All right.  And so for layman, let me see if I can
11  translate this properly, and -- tell me if I do, please.
12  Your methodology was to review the case documents, form
13  opinions from those documents, and from the discourse or the
14  exchanges that you saw that were recorded in various recordings
15  provided to you, and then examine the content as well -- or
16  analyze the content of what you reviewed.
17     A.   That's correct.
18     Q.   Okay.  This is a very long report, so we're going
19  to -- we're going to zip through it in the spots that I need to
20  get through.  We're going to go to Opinion Number 1.  It's not
21  numbered, but it's the first opinion I find, and I have it as,
22  "In my opinion, CPD administrators have taken a proactive
23  approach."  That's the beginning of it.  Let me know when you
24  see that.
25     A.   Are you on page 10?

138

1      Q.   Yes.  I'm sorry, the first opinion is, "The Canton
2  Police Department administrators have not abdicated their
3  responsibility in developing and implementing operational
4  policies for their police officers, particularly on the use of
5  force."  Is that your first opinion in this case?
6      A.   Yes, it is.  That's correct.
7      Q.   And there are subopinions, and that's the one I spoke
8  to.  We'll get to that in a minute.  You write in the second
9  full paragraph of, I believe, it is -- well, it's the first
10  full paragraph at the top of this -- the next page, following
11  Number 17, as I would expect, you write, "CPD administrators
12  have developed and maintained operational policies and
13  procedures which provide guidance to department officers."  Did
14  I read that right?
15     A.   Yes.
16     Q.   Help me understand why you would expect that.
17     A.   In contemporary police departments, it's -- and
18  currently within where we're at in -- in -- well, in this case
19  '21, '22, that it is obviously very warranted that police
20  departments have policies and procedures with which to guide
21  their officers in making various decisions regarding to their
22  performance, response, aspect of their duties.
23          And I -- I -- you know, from my own research and
24  looking at this, I would expect in contemporary policing -- and
25  that's what I found here -- that they do have policies and

139

1  procedures, and they're current, or at least current in terms
2  up to that date of the incident.
3      Q.   So you began your review of this case with the
4  presumption that they would be in compliance.
5      A.   Yes.  Or that they would have policies and procedures
6  and protocols to guide officers.
7      Q.   I believe you've said in the past that the mission of
8  a department should be in policies; is that right?
9      A.   A mission statement can be with policies and
10  procedures, correct.
11     Q.   I believe you have also said that a policy should
12  articulate the management philosophy of an agency?
13     A.   It can in the introduction or in the beginning
14  portion of a policy manual.
15     Q.   And I believe you've said policies provide operations
16  to shape organizations that trickle down to form the culture of
17  an agency?
18     A.   Yes.
19     Q.   And I believe you've said that policies emphasize the
20  core values of the vision -- or operationalized vision of an
21  agency, right?
22     A.   That's correct.
23     Q.   The difference between policy and procedure I think
24  you've spoken on, is that procedure guides the conduct of the
25  officer --

140

1    A.    Yes.

2    Q.    -- the actions that they take?

3    A.    Yes.

4    Q.    Especially when it relates to split-second decision

5    making?

6    A.    Or any other type of action.

7    Q.    Policies guide officer thinking, correct?

8    A.    Correct.

9    Q.    So with that said, we don't have any dispute in this

10   case, do we, that there is no policy or procedure in the

11   entirety of the Canton Police Department related to how

12   officers could prepare for or deal with celebratory gunfire,

13   correct?

14   A.    Repeat that, please.

15         MR. DICELLO:  Could you read that back, please?

16   (The record was read by the court reporter.)

17   Q.    Let me -- let me strike the question and say it a

18   different way.

19         All right.  There's no specific procedure in the

20   entirety of the Canton Police Department that addresses

21   celebratory gunfire, correct?

22   A.    That's correct.

23   Q.    And there's no specific provision in the policies or

24   procedures of the Canton Police Department that provide

25   informational guidance or a requirement for update training of

141

1    any kind regarding how to deal with celebratory gunfire,

2    correct?

3    A.    That's correct.

4    Q.    If I understand your report in sum and substance,

5    you're saying, however, the other provisions of the policy

6    address gunfire and use of force sufficient to warrant, in your

7    opinion, the idea that as you indicated here at Opinion 1, the

8    Canton Police Department administrators have not abdicated

9    their responsibility in developing, implementing operational

10   policies for their officers, right?

11   A.    That's my opinion, yes.

12   Q.    Okay.  And within that opinion is contained a subset

13   of other opinions that I think are related here.  By the way,

14   you cite Policies 208, 300, 302, 310, and it goes on for some

15   time including body-worn camera policy and SWAT policies as you

16   state in your report, correct?

17   A.    Correct.

18   Q.    And those policies, you believe, do show that the

19   City of Canton has not abdicated -- or its administrators have

20   not abdicated its responsibility to properly guide their

21   office?

22   A.    That's a -- I would agree with that.

23   Q.    Okay.  Now, so that we're clear, do you understand

24   plaintiff's claims in this case to mean that there's no

25   guidance giving officers, no reminders given officers to start

142

1    their day, not even that which would happen during roll call,

2    nothing is done at all to address the phenomenon of celebratory

3    gunfire on New Year's Eve?  Do you understand that to be part

4    of the claim?

5    A.    As part of the claim, yes.

6    Q.    And do you also understand that at no point has

7    plaintiff made a claim that says officers should distinguish

8    between gunfire generally as celebratory or noncelebratory?

9    A.    From your expert's report, that seems to be his

10   opinion.  That was my impression of reading his report.

11   Q.    Let me just ask again, just from the -- you've read

12   the complaint?

13   A.    Yes.  It's been a while, but yes.

14   Q.    I understand.  And the complaint doesn't urge a

15   policy that would force an officer to make that discernment in

16   training, correct?

17         MR. LUTE:  Objection.  You may answer.

18   A.    I don't recall the wording of the complaint, the

19   assertion, but my impression of reading the material and

20   reading the expert Mr. DeFoe's report, that was the line of --

21   of complaint in that respect regarding policy and procedure

22   and/or training.

23   Q.    I understand how you read his report and we can -- we

24   can address that.  I'm just trying to understand if you -- if

25   we're on the same page with respect to the allegations made in

143

1    the complaint?

2    A.    I don't recall that specifically.

3    Q.    Okay.  That's fair enough.  I'll leave it at that.

4    The other piece of this is -- because we're going to get into

5    this -- you say that "The CPD has taken proactive steps to

6    provide their officers with the written policies, which

7    appropriately guide their performance in the field and to

8    respond to a wide range of circumstances."  You see that in

9    your report?

10   A.    I don't know where you're reading from.

11   Q.    That's right below Officer Huber's testimony, which

12   you cite in --

13   A.    Which page?

14   Q.    -- support of -- I don't know the page number here

15   because I don't think there -- 12, there it is.  Wait, wait a

16   minute.  Let me see again.  Hold on, 13.  It's page 13.  Do you

17   know another opinion there?

18   A.    That's my opinion of all of the information contained

19   regarding policy and procedure.

20   Q.    Right.  That they had taken a proactive --

21   A.    Yes, I agree with that.

22   Q.    -- approach?

23   A.    Yes.

24   Q.    Okay.  Now, what do you mean in this report when you

25   say, "proactive approach"?

144

1    A.    They're not being forced; that they're a contemporary
2   law enforcement agency understanding the utility and the need
3   to guide officers through policy and procedure.  There was not
4   a edict or any other.  It was the proper and due course of
5   action and due course of business to lead the department and
6   administrate the operation of the department through policies
7   and procedures through the administrator's own initiative.
8    Q.    When you say, "not being forced," what is the -- what
9   is the relevance of "forced"?  What do you mean by that, with
10  respect to a proactive approach to policies?
11   A.    By like in some cases or in some instance or some
12  departments, there's an incident that occurs and maybe a court
13  induces other -- or there's other consent decree requirements
14  or a mandate or something of that nature that's external to the
15  department as a result of some particular lawsuit, case
16  decision, entity, judgment, injunction, declare-- whatever.
17  And that doesn't -- that's not in this case at all.
18   Q.    That helps me understand perfectly, because I think
19  you've spoken about, written about, and advocated that officers
20  should not be reactive to critical events to change policy but
21  that they should be forward-thinking in terms of what the
22  policy needs are, right?
23   A.    Yes, I'd agree with that.
24   Q.    Okay.  And so what you're saying here is, in your
25  opinion, the administrators were not forced by a critical event

                                                              145

1   or other order or consent decree to establish a policy but
2   that, instead, they did their own policy making on their own?
3    A.    Correct.
4    Q.    Okay.  Now, you indicated in that spirit that CPD had
5   used -- uses Lexipol, right?
6    A.    Yes.
7    Q.    You -- you vouch for the reputation of the company at
8   the bottom of the first paragraph under your word opinion of
9   page 13.  You say, "Lexipol is a reputable company."  And how
10  did you come to that?  What information did you rely upon in
11  this case to -- to make that opinion?
12   A.    Well, several.  I know many chiefs and administrators
13  across the country and even sheriffs that use Lexipol as a
14  policy management system.  They've been in business for some
15  years now.  There was, I believe, some reference to research
16  that I've seen in the past, the use of Lexipol as a outside
17  entity to assist and guide the departments in writing their --
18  their policy.  And it's not just stopping at the policy, but
19  it's obviously having revision of the policy.  And they make it
20  unique to the unique issues of the community and the department
21  and the state or what have you in terms of that.
22        I have not seen anything negative ever written or
23  brought against Lexipol.  But I find in looking at their
24  website prior to this case and prior to -- and -- and talking
25  to Gordon Graham, who is the primary individual that is the

                                                              146

1   impetus behind Lexipol with others, I've talked to other
2   attorneys and other departments that have used Lexipol.  So in
3   the collective totality of all of that, I find that they're
4   a -- you know, an onboard reputable entity that -- that
5   provides a unique service to -- for a department.
6    Q.    All right.  You go on to say that "The Canton
7   administrators have addressed the reasonable use of force
8   consistent with Graham v. Connor," correct --
9    A.    Yes.
10   Q.    -- in your analysis?  And then in the next paragraph,
11  at the top of what is page 14 -- there we go -- that -- that
12  Canton describes a force continuum.
13   A.    You're on page 14 at the top?
14   Q.    Yes, top of the 14.
15   A.    Yes, I see that.
16   Q.    And you're familiar with it.  You go on to say you
17  teach it, and consistent with the principles that you outline
18  in the previous paragraph, the second paragraph of page 14, you
19  indicate that the policy outlines levels of resistance that a
20  continuum would have and directs how officers should respond
21  within that continuum, right?
22   A.    Correct.
23   Q.    And -- and ultimately, your -- your thought here is
24  that they have a continuum.  It's flexible.  They -- they can
25  use it and there -- they -- it is -- it is there in the policy

                                                              147

1   for them to know?
2    A.    Yes.  Officers are trained to it, and it's useful for
3   guiding their response.
4    Q.    Okay.  Now, on -- essential to this case -- and I'm
5   fascinated by the notion that you write -- we'll see it
6   later -- that there's no -- you said, there's no requirement
7   that you could find in the literature that says that Canton had
8   to put in a specific provision in its policies and procedures
9   about celebratory gunfire or random gunfire as it's sometimes
10  referred to; is that -- is that correct?  Is that a fair
11  statement?
12        MR. LUTE:  Objection.  Go ahead.
13   A.    Yeah, I -- that's -- that's fair.
14   Q.    And you -- you talk about looking at different
15  journals and the training and experiences you've had and have
16  never seen that as a required aspect of building a proper
17  police policy?
18   A.    Correct.  I've not ever seen any police association,
19  accrediting body, research entity, case law along that -- that
20  regard at all.
21   Q.    And you know why I think that's interesting, is that
22  in Canton v. Harris when the plaintiff in that case is getting
23  booked and she has her medical crisis, the -- the Court focused
24  on the complete absence of any policy around that issue, how
25  she was to be cared for, that sort of thing.  You're familiar

                                                              148

1   with that?
2       A.   Oh, yes.
3       Q.   Does the Court engage, to your understanding, of any
4   knowledge of or assessment of whether publications or other law
5   enforcement require or make it a condition of a good policy --
6            MR. LUTE:  Objection.  Go ahead.
7       Q.   -- in this assessment?
8       A.   I have -- I have actually seen Supreme Court
9   decisions to some extent, but lower court, appellate court,
10  decisions that do discuss a lack of a policy or not a policy or
11  in -- or in primarily, what I have seen, that policy does not
12  necessarily inform a court's decision on whether force was
13  excessive or not excessive.  It's only looking at it on the
14  objective reasonableness of the officer's abuse of force, but I
15  have also seen where policy can inform a court's decision in
16  that regard.  So in answer to your question, I think it's all
17  over the board in terms of court, and certainly in the Monell
18  decision, guides officer -- or administrators to develop
19  appropriate policies and procedures.
20      Q.   You mean Monell and its progeny?
21      A.   Yes.
22      Q.   Because Monell stood for the proposition that a
23  municipality can be a person --
24      A.   Correct.
25      Q.   -- under 1983?

149

1       A.   Correct.
2       Q.   And that was the seminal issue?
3       A.   Correct.  And there's a lot of other decisions after
4   that.
5       Q.   Certainly.  Absolutely.  Okay.  So I'm trying to get
6   an understanding then of this notion of proactive police policy
7   making.  You speak to that quite a bit, don't you, what it --
8   what it takes to be proactive as an agency?
9       A.   Sure.
10      Q.   And you speak of assessing your -- your policies to
11  make sure that they are consistent with contemporary legal
12  standards?
13      A.   Correct.
14      Q.   And you talk about assessing policies for dealing
15  with areas of concern within the department that might create
16  liability for the department?
17      A.   Okay.
18      Q.   Right?
19      A.   Yes.
20      Q.   And you -- you speak about and talk about, research,
21  even, incidents where officers or agencies have failed to
22  address needs within the department with their policies and
23  been subjected to liability, right?
24      A.   Correct.
25      Q.   Okay.  Do you believe -- as an academic or law

150

1   enforcement professional, trainer, do you believe, given
2   your -- your career that there ought to be guidance given to
3   officers at Canton on New Year's and 4th of July, specifically,
4   regarding the prevalence of and how to address or think about
5   considering the totality of circumstances, celebratory gunfire?
6            MR. LUTE:  Objection.  Go ahead.
7       A.   No.  I mean, you can't differentiate.  How would you
8   differentiate between any gunfire?  That -- that's -- so no,
9   they're not -- officers are not trained to differentiate,
10  classify, categorize.  And I think the administrators that I
11  read opine on that quite -- quite articulate.  That would be
12  negligence on their part to try to tell an officer to make any
13  distinction or differentiation between any type of gunfire,
14  which would necessarily render that officer, I think, unsafe in
15  their response.
16           So to try to say, "Well, that's just July 4th
17  gunfire," gunfire is gunfire.  And that's how officers are --
18  are trained to investigate gunfire, not to make it a
19  differentiation between whether it's of a celebratory nature.
20  And how -- how would an officer know that?  That -- that's I
21  think a key and core and critical issue to try to -- well, this
22  is just celebratory.  What it birth-- is it somebody's
23  birthday?  Is it their wedding?  Is it their anniversary?  So I
24  think that's -- that's almost impossible to do, and I don't
25  think that would be good policy or good training.

151

1       Q.   In your report, you speak of certain things that
2   we'll talk later about it that may have been in the mind of
3   Huber as he responds to the house.  Do you remember that line
4   of reasoning in your opinion --
5       A.   Oh, yes.
6       Q.   -- your report?
7       A.   Are you -- are you specifically -- can you give me
8   specifics on that?
9       Q.   Sure.  The notion that he was responding to shots
10  fired with knowledge that other shots had been fired earlier in
11  the day involving officers and that sort of thing?
12      A.   Yeah, prior to his shift.
13      Q.   Correct.
14      A.   He was told at roll call -- and he actually went to
15  those, at least one location, to check that out -- that there
16  had been a homicide or shootings that involved subjects who
17  were wounded or perhaps killed.  I'm not sure.  So that would
18  be top of his mind, as well as the volume intensity cadence
19  of -- of the firearm that was being shot.
20      Q.   Now, to be fair, he didn't testify that that was top
21  of his mind?
22      A.   Well, I would say -- okay.  It's my language, but it
23  would be in his thinking.
24      Q.   If he didn't testify that that was in his thinking,
25  would he respond --

152

1    A.    I believe I saw that it was.

2    Q.    That he was thinking about that as he responded to

3    the shots being fired?

4    A.    That coming on the heels of those two incidents prior

5    to his shift, I think was in the background of his --

6    Q.    Well, he was --

7    A.    -- his thinking.

8    Q.    -- I think he testifies he's aware of --

9    A.    Yeah, he's aware of it.

10   Q.    -- okay.

11   A.    Sure.

12   Q.    Fair enough.  And so we're on the same page.  Would

13   it be useful for him to also be aware of it being

14   New Year's Eve?

15   A.    Could be.

16   Q.    Would it be useful for him to -- and -- and helpful

17   for his safety and the safety of Mr. Williams -- to be reminded

18   at roll call, not only of the murders that took place but of

19   the prevalence of gunfire today, which it's New Year's Eve, and

20   we're going to experience a lot of gunfire, and so let's

21   exercise extreme caution, that sort of thing?

22              MR. LUTE:  Objection.  Go ahead.

23   Q.    Would that -- would that be prudent?

24   A.    I -- I mean, it's possible, but I don't think that's

25   going to be part of the roll call on any given time or any

153

given day.  Now, if they did that, that's fine, but not doing

it certainly doesn't, to me, smack of any negligence or

deliberate indifference or any problem of advising an officer.

I mean, that's part and parcel being an officer, being safe,

regardless in his shift or her shift, as the case may be.

6    Q.    Well -- and in fairness, you're -- you're not here to

7    decide what is deliberately indifferent?

8    A.    That's correct.

9    Q.    Right.  Okay.  So my -- my question was a little

10   different.  Would it be prudent from a law enforcement

11   procedural standpoint for officers to be advised on the fact

12   that 4th of July, New Year's is going to be a time when we're

13   going to be hearing a lot of shots fired?

14              MR. L'HOMMEDIEU:  Objection.

15              MR. LUTE:  Objection.  Go ahead.

16   A.    I'm not going to say it's not prudent, but I don't

17   think it would be necessary.

18   Q.    Different issue.  Is it -- would it be prudent?

19              MR. LUTE:  Objection.

20   A.    It wouldn't be imprudent.

21   Q.    So therefore, it would be prudent?

22   A.    It would be, but I'm just saying that that's not

23   going to be the normal course of -- of the day.

24   Q.    I agree.  But in being pro--

25   A.    I'm not saying that it's -- I'm not going to argue

154

with you that -- in terms of that, but I'm saying that as a

normal course of roll call, that's probably not going to occur.

And I'm saying that doing that is not increasing some -- an

officer's safety by not saying that.

5    Q.    So when we think of being proactive and addressing

6    the needs of an agency on a given day or at a given time, we

7    know the record shows that officers were informed of a murder

8    or series of violent acts prior to the start of Huber's shift,

9    correct?

10   A.    Correct.

11   Q.    But there was no mention made that Huber's shift

12   would be encountering potentially innocent civilians firing

13   their guns for celebratory purpose, right?

14   A.    That's correct.

15              MR. LUTE:  Objection.

16   Q.    Okay.

17              MR. LUTE:  Go ahead.

18   A.    That's --

19   Q.    And so -- and -- and it would be prudent for them to

20   be so advised.  That's fair?

21              MR. L'HOMMEDIEU:  Objection.

22              MR. LUTE:  Objection.

23   A.    Again, I'm going back to saying that I don't think

24   it's necessary.  I'm not saying it's not prudent.  I'm just

25   saying it's not necessary.

155

1    Q.    Okay.  And when we think of the kinds of tactics or

2    practices that could be recommended or suggested to deal with

3    celebratory gunfire from both a policy standpoint or

4    administrative standpoint on New Year's Eve, are you aware of

5    any agencies in America that have implemented tactics or

6    implemented staffing or patrol variations in light of

7    New Year's or 4th of July?

8              MR. LUTE:  Objection.  Go ahead.

9    A.    Using the words "celebratory gunfire" and -- and in

10   my impression, in my -- and -- all of my report, I don't think

11   there is such a thing.  It's gunfire.  So to try to

12   differentiate, again, and categorize, classify one level of

13   firearm discharge to another to try to address a policy or

14   training in the question that you've asked about a different

15   department, I don't know how you can differentiate that.  So in

16   terms of celebratory gunfire, there's gunfire and that --

17   that's it.

18   Q.    So you're not aware of any agencies in the -- in the

19   United States that have changed their practices to keep safer

20   their officers or the public on New Year's or the 4th of July

21   in light of celebratory gunfire; is that right?

22              MR. LUTE:  Objection.  You may answer.

23   A.    Again, not on celebratory gunfire.  On gunfire.

24   Q.    I'm sorry?

25   A.    Not on celebratory gunfire, as you keep using the

156

1  term.  I've not seen a policy or a practice or a tactic where
2  that addresses celebratory gunfire.
3      Q.  You've never seen a policy or practice that directs
4  officers to change their ordinary patrol behavior with respect
5  to New Year's or 4th of July?
6          MR. LUTE:  Objection.  Go ahead.
7          MR. L'HOMMEDIEU:  Objection.
8      A.  I've never seen that.
9      Q.  Are you familiar with the City of Phoenix and what it
10  went through in that regard?
11      A.  Maybe limitedly in terms of PSAs to the community,
12  but I don't recall ever seeing anything specific in a policy or
13  procedure to officers on celebratory gunfire.
14      Q.  All right.  We'll get back to that.  Thank you for
15  your answers.  I appreciate it.  You advocate in your lecturing
16  and teaching that agencies should assess their policies by
17  asking what you have previously identified as essential
18  questions.  Are you familiar with that part of your -- your
19  lecture?
20      A.  I'm not sure what -- if you could be a little more
21  specific.
22      Q.  We can be.
23          MR. DICELLO:  Joe, if you would pull up
24  Exhibit 21.  It's going to be the October 29th, 2020, video.
25  Stop right there.  Don't play it.

157

1      Q.  (Continuing)  We're showing you the first frame of
2  this roughly one-minute long video.  Do you recognize this
3  slide?
4      A.  Yes.
5      Q.  Did you make this slide?
6      A.  Yes.
7      Q.  And it's called -- it's titled, "Essential
8  Questions," right?
9      A.  Correct.
10      Q.  And you believe that these are the essential
11  questions that agencies should ask in order to assess whether
12  their policies are -- how do you say it? -- addressing their
13  needs.
14      A.  This are among -- among these that are listed here
15  among others, but yes.
16      Q.  One of the questions is:  "Have you assessed high
17  liability issues and addressed them through policy?"  You see
18  that third question?
19      A.  Yes.
20      Q.  So here we sit in a case over a person being -- my
21  client being killed by an officer in an officer-involved
22  shooting on New Year's as he was shooting guns into the air.
23  You would agree with that?
24      A.  Yes.
25      Q.  And the liability issues surrounding that event is

158

1  real?  It's currently before us today?
2      A.  Correct.
3      Q.  Okay.  Are you aware of any assessments that the
4  City of Canton has ever done with respect to the number of
5  claims that it gets for -- or calls for service that it gets --
6  excuse me -- that it gets regarding celebratory gunfire?
7      A.  No.
8      Q.  Are you aware of any assessment ever done by the City
9  regarding how many claims for service or calls for service it
10  gets for -- I don't know -- noise or other complaints regarding
11  celebratory or random gunfire on New Year's or the 4th of July?
12      A.  I've not reviewed any data.
13      Q.  Have you --
14      A.  I don't know.
15      Q.  -- have you been given any data or seen any data that
16  the City regularly kept or keeps for that purpose?
17      A.  No.
18      Q.  You are familiar with the fact that they had
19  ShotSpotter at one point?
20      A.  Yes.
21      Q.  Did you review any ShotSpotter documents or
22  documentation?
23      A.  No.
24      Q.  Did you -- were you provided any data regarding
25  ShotSpotter gunfire statistics or gunfire hot spots that

159

1  ShotSpotter would or would not have created?
2      A.  No.  I do recall testimony and that the system was
3  not very accurate or working and they abandoned it, but I've
4  not seen any data.
5      Q.  Are you aware of any research on ShotSpotter or
6  similar technologies and that their rate of effectiveness has
7  been shown to be, according to certain published journals,
8  in --
9      A.  No, no.
10      Q.  Have you ever examined the issue yourself in your
11  academic research or in your work for officers as a trainer?
12      A.  No.
13      Q.  You also say that how frequently are the agency
14  employees trained in the policy manual.  Were you given any
15  data as to how frequently agency employees at Canton were
16  trained in the policy manual?
17      A.  Data?
18      Q.  Yeah.
19      A.  No.  I was -- I was given and provided records of
20  training.  I reviewed the testimony of the administrators and
21  Officer Huber, who indicated in their testimony -- and I think
22  I've got it identified in my report -- that was on an ongoing
23  basis to review policies and procedures.  And with the Lexipol
24  management system, policies were revised on a regular basis.
25      Q.  Do you -- do you -- and I appreciate that.  I agree

160

**[Page 161]**

1  that's in your report as well.  Do you have any data or
2  information as to the frequency -- as you quote here, an
3  essential question -- the frequency at which agency employees
4  were trained?
5      A.   At least annually.  Trained to policy and procedures,
6  that's what --
7      Q.   Yes.
8      A.   -- you're asking, right?
9      Q.   Yes.
10      A.   At least annually.  And that was Huber's testimony,
11  and the record showed that as well, as I recall.
12      Q.   Okay.  Did you get any information or data that
13  showed that the policy training -- any data or information
14  showing that the policy training actually matched field
15  performance?
16      A.   No.
17      Q.   What monitoring and assessment process had the
18  City of Canton developed in 2022 or into 2021 regarding -- you
19  know, the end of '21 into '22 -- regarding officers responding
20  to celebratory gunfire?
21      A.   Again, you keep using that -- that term, that word,
22  that concept, and I didn't see any on celebratory gunfire.
23      Q.   What monitoring and assessment process did they
24  develop to assess areas of hotspots where random gunfire would
25  be more visible or obvious or noted on a holiday such as

**[Page 162]**

1  New Year's or 4th of July?
2      A.   I didn't review any of that data.
3      Q.   Did you see any?
4      A.   No.
5      Q.   Was any given to you?
6      A.   No.
7      Q.   Was there any assessment process or third parties
8  contracted to help in that assessment of their policies, as far
9  as you know, aside from Lexipol, who you've testified to today?
10      A.   Not in my knowledge.
11      Q.   Are you familiar with them hiring any consultants to
12  do that work to assess or take a risk management approach to
13  their policy?
14      A.   No.  Other than through Lexipol with their
15  subject-matter experts.
16      Q.   And when you say, "Lexipol," let's be clear.  Lexipol
17  provides copies of the policies to be downloaded for usage at
18  the department, correct?
19      A.   Correct.  As well as in concert with writing with
20  administrators of that department.
21      Q.   Right.  Helps them write the policy?
22      A.   Yes.
23      Q.   Yeah, actually draft it --
24      A.   Yes.
25      Q.   -- from the -- from the model policies that Lexipol

**[Page 163]**

1  creates?
2      A.   Correct.
3      Q.   Right.
4      A.   Unique to the situation and issues of that
5  department.
6      Q.   Do you know if anyone has ever asked Lexipol to
7  create a policy unique to the events, the gunfire phenomena,
8  that would occur on New Year's or 4th of July?
9          MR. LUTE:  Objection.  Go ahead.
10      A.   Not to my knowledge.
11      Q.   Did you ever -- did -- were you provided any
12  information at all that the City had ever reached out to
13  Lexipol to address that issue?
14      A.   I'm not aware of that, no, not to my knowledge.
15      Q.   Are you familiar with officers in some jurisdictions
16  hiding under bridges on 4th of July or New Year's to avoid the
17  perils of celebratory gunfire?
18      A.   No --
19      Q.   Never heard --
20      A.   -- no, sir.
21      Q.   -- never heard -- I'm sorry?
22      A.   No, sir.
23          MR. DICELLO:  All right.  Joe, play the -- play
24  the video, please.  Can't hear it, Joe.
25  *(Playing of video started.)*

**[Page 164]**

1          MR. DICELLO:  You got to do it again.
2  *(Playing of video stopped.)*
3          MR. FOUCHÉ:  Start it over?
4          MR. DICELLO:  Yes, sir, we couldn't hear it.
5  *(Playing of video started.)*
6  *(Playing of video stopped.)*
7      Q.   All right.  Does that refresh your recollection as to
8  what you said on October 29th, 2020, with regard to how
9  agencies can assess their policies?
10      A.   Yes, yes.
11      Q.   Do you still hold the beliefs and views expressed in
12  that recording?
13      A.   Yes.
14      Q.   Okay.  In your 2006 article -- I'm referring to
15  Exhibit 11 that we spoke of earlier -- you wrote at page 40,
16  "Many police executives have taken proactive measures by
17  implementing a risk management program within their
18  organization."  That's consistent with how you actually
19  advocate today and teach today, right?
20      A.   Correct.
21      Q.   And in that space, are you aware of any risk
22  management programming at the City of Canton?
23      A.   I would say that there's evidence of it.  I don't
24  know that they've embraced a total risk management system as a
25  risk manager on the department or through the law office.  But

1    it's certainly, as it applies to this case, shown me that
2    there's evidence of risk management in the policy management
3    system that they're using through Lexipol, one.
4         Secondly, officers, in particular Officer Huber in
5    this case, was provided access to them, to the policies through
6    the database.  And thirdly, provided training on an annual
7    basis.  So to me --
8         Q.   What --
9         A.   -- to me, that's a demonstration of a risk management
10   process, a portion on use-of-force management, particularly
11   with policy and training.
12        Q.   Is that all the aspects of a proactive management
13   response in your view?  Is that what that requires?
14        A.   I wouldn't say it's all, but it's a piece of it.
15        Q.   What is the -- who are the individuals of the City
16   that conduct the risk management program there?
17        A.   I said I don't know that there is one.  I'm saying
18   this is evidence of a slice that could be part of a risk
19   management system.
20        Q.   Well, I don't want you to speculate.  I want you to
21   speak from the knowledge that you have from the documents and
22   involvement in the case.  Okay?  So -- okay?
23        A.   Yes.
24        Q.   Okay.  So who runs a risk management program at
25   Canton?

165

1         A.   I don't know of anyone.
2         Q.   Who has ever participated in or conducted any risk
3    management oversight at the City as far as you know?
4         A.   I don't know of anyone.  It doesn't mean it's not
5    there.  I'm not aware of it.
6         Q.   All right.  I understand.  With respect to the
7    proactive management response that an agency can have, have you
8    seen any evidence of officers or administrators of the City
9    tracking citizen complaints?
10        A.   I've not been provided that information.  I'm sure
11   they do, but I've not seen it.
12        Q.   You've never been provided a single citizen complaint
13   regarding random or celebratory gunfire?
14        A.   No.
15        Q.   Do you know that the day after my client was killed,
16   that is, January, later in the day -- I should say of
17   January 1st -- there was a police report made regarding
18   celebratory gunfire on 10:00 a.m. that morning.  Did you see
19   that --
20        A.   No.
21        Q.   -- in your -- you were not provided that?
22        A.   I don't know who you're talking about or what you're
23   talking about.
24        Q.   Okay.  And just so that we're clear, you were never
25   given any -- any police reports, any incident reports, any

166

1    calls for service, documentation, or information about this --
2    regarding this case, except for that which involved
3    Mr. Williams alone; is that right?
4         A.   Those are the documents I reviewed, yes.
5         Q.   All right.  So do you have any knowledge or
6    information as an expert here today that the City of Canton
7    tracks citizen complaints in an effort to reduce potential
8    problems for the City?
9         A.   I'm not aware of that.
10        Q.   At page 55 of your 2006 article, you indicated,
11   quote, Tracking citizen complaints is a proactive management
12   response, which may be useful in improving employee conduct and
13   reduce potential problems from occurring.
14             Do you agree with that statement?
15        A.   Yes.  That's one -- that's one of many factors or
16   components.
17        Q.   And so let's go now to your report regarding the
18   performed research that you did -- the research you performed
19   on celebratory gunfire.  I'll find that spot here.  Let me see.
20   All right.  Page 15, you say -- in the middle of the second
21   paragraph or so, after laying out the instruction and so on
22   that you've given to graduates regarding policies and the
23   criminal justice system -- you say, "I have also performed
24   legal case research specific to law enforcement agency policy
25   development through West Law, dating back to 1989."

167

1             And you cited the Department of Justice, Special
2    Litigation Division's publications from 1997 to '22 -- 2022
3    comprising federal consent decrees.  And you say, "The research
4    did not produce a specific source or document, which" -- here's
5    the language -- "directs or infers that a law enforcement
6    agency is required to develop or train officers, and/or to
7    implement a specific policy designed to guide an officer when
8    responding to an incident of alleged 'celebratory gunfire.'"
9    Did I read that correctly?
10        A.   Yes.
11        Q.   Is that still true today?  You -- as you sit here
12   right now, you have no -- you have found no -- not a specific
13   source or document even which directs or infers the need to
14   respond to an incident of alleged celebratory gunfire?
15        A.   I've not seen -- seen it.  And that's consistent with
16   what I know today in terms of that statement, nor does -- on
17   the same page -- State of Ohio have a model policy in that
18   regard.
19        Q.   You are familiar with the IACP *Police Chief* magazine?
20        A.   Yes.
21        Q.   And that's the International Association of Chiefs of
22   Police?
23        A.   Correct.
24        Q.   Are you familiar with their report on random gun
25   violence in Phoenix?

168

1    A.   I haven't read it in a while.

2    Q.   Have you ever read it to your knowledge?

3    A.   I don't -- it's been a while.

4    Q.   Let's pull it up.  This is the beginning of the

5  article.  We're going to pull up the entire article, but do you

6  see the -- on the page -- let me see if I can get this right.

7  There we go.  Okay.  What is going on with this thing.  Oh,

8  it's so frustrating.  There we go.

9         This is just a reference to the article which allows

10  you to link on it.  I'm showing it to you as it's presented

11  online.  It says, "Faced with a growing epidemic of random

12  celebration gunfire during holidays, the Phoenix Police

13  Department said, 'Enough is enough.'  It began combating this

14  problem with an unusual, if not unique, two-pronged approach."

15  Does that ring any bells?

16    A.   No.

17         MR. L'HOMMEDIEU:  I mean, we can't -- is this

18  an exhibit?  We can't see it.

19         MR. DICELLO:  I'm going to show it to you,

20  yeah, one second.  I apologize, I'm having some technical

21  difficulties with showing things here.  Can you see it now?

22         MR. L'HOMMEDIEU:  Yeah, I would see a -- yeah.

23         MR. DICELLO:  Okay.

24    Q.   All right.  Now we're going to go to the -- oh,

25  goodness gracious.  I apologize to everybody.  I'm just not

                                                            169

1  doing well here.  One second.  Off the record.

2         (A discussion ensued off the record.)

3    Q.   So here's 22.  It's going to display properly now.

4  So I showed you the beginning pieces from the International

5  Association of Chiefs of Police and how it cites to the *Police

6  Chief, Professional Voice of Law Enforcement* journal of

7  August 2010.  Do you see that document?

8    A.   Yes.

9    Q.   All right.  Now, let me see if I can get the right

10  page.  There it is, 78 of the journal, 66, almost there, 70,

11  74.  There we go.  And finally, page 78 of the *Police Chief*

12  journal's edition contained in Exhibit 22, we see the full

13  article and we're going to go through it.

14         The -- as you -- as you understand, Phoenix Police

15  Department named the reduction of random gun violence a top

16  priority back in 2003.  Are -- are you aware of that?

17    A.   No.

18    Q.   Are you aware of Shannon's Law?

19    A.   No.

20    Q.   Have you ever studied the Department of Phoenix --

21  how the Department of Phoenix conducted Shannon's Law of

22  Operations each New Year's Eve and New Year's Day?

23    A.   No.

24    Q.   Are you familiar with it -- the first year of their

25  operations brought an 18 percent reduction in gunfire

                                                            170

1  throughout the city?

2    A.   What was their operation?

3    Q.   First, are you familiar with --

4    A.   No.  But I want to know what the operation was.

5  You've read the article.  I have not, so --

6    Q.   Well --

7    A.   -- you're asking me questions, which I have --

8    Q.   -- what did --

9    A.   -- no regard to.

10    Q.   I understand, and I appreciate that.  So there's an

11  education phase where they --

12    A.   Of whom?

13    Q.   Pardon me?

14    A.   An education phase of whom?

15    Q.   The Phoenix Police Department.  It's called their

16  Shannon's Law Operations.  It says they're broken down into two

17  phases, education and enforcement, says the article.  Are you

18  familiar with that?

19    A.   No.

20    Q.   The education, that phase of, found officers working

21  with nonprofit organization, Arizonans for Gun Safety.  And

22  they, at that time, children in kindergarten through eighth

23  grade are invited to participate in a stop random gunfire

24  poster billboard contest.  Are you aware of anything like that

25  in Canton?

                                                            171

1    A.   No.  And I don't see how this has to do anything

2  with -- with a policy.

3    Q.   Okay.  From an enforcement standpoint, it says, "The

4  education phase transitions into the enforcement phase.

5  Operations on New Year's Eve as 12 midnight approaches and

6  gunfire begins to occur, the enforcement team transitions their

7  roles from educators to enforcers.  They stop passing out

8  flyers and begin to hunt for violators.  The team is positioned

9  themselves in their assigned zones where they can see violators

10  shooting and move in to safely arrest them."  Are you familiar

11  with any of this?

12    A.   No.  This to me smacks of a public safety

13  announcement with officers working with school children and

14  others in the community like they normally do on other projects

15  to try to reduce gunshots.  And when they do hear what I'm

16  seeing up there -- I've not read the article, just listening to

17  you -- when they hear it, they go arrest people, which is a

18  good thing.  But I don't see any directive by the IACP with

19  this article that says here's a model policy on this issue.  In

20  fact, there is not one on their policy research center because

21  I've checked.

22    Q.   Granted, there's no model policy by the IACP or

23  Lexipol.  We agree with that?  Okay?

24    A.   Yes, sir.

25    Q.   You are aware that Phoenix uses teams of officers --

                                                            172

1   as I read it to you just now -- they use teams of officers
2   stationed where the gun -- where and when the gunfire occurs to
3   respond to gunfire on New Year's Eve?
4       A.   That's what they do in Phoenix.
5       Q.   Yeah.
6       A.   That's one example.
7       Q.   That would be an operational change as it relates to
8   the City of Canton that could have been implemented
9   correctly --
10          MR. LUTE:   Objection.
11      Q.   -- in 2002, right?
12      A.   No.
13          MR. LUTE:   Objection.  You may answer.
14      A.   No, I don't agree with that at all.  This is one
15  article, one department's experience.  There's no mandate here.
16  There's no requirement.  That's how they responded.  That does
17  not mean that we transfer that to all 18,000 police departments
18  and sheriff's departments in the United States.
19      Q.   Okay.  I -- I appreciate what you're saying, but
20  I'm -- I'm trying to understand it.  Are you saying that the
21  only policies and procedures that the City of Canton ought to
22  use are those that are mandated by some law agency's
23  understanding of the law?
24          MR. LUTE:   Objection.  You may answer.
25          MR. L'HOMMEDIEU:   Objection.

173

1       A.   No.  What I'm saying, is that they have a policy
2   management system through Lexipol that addresses pertinent
3   issues and policies within the City of Canton like numerous
4   other law enforcement departments across the United States.
5   And somehow -- I think what you're trying to do -- my
6   impression of your question in showing me this article is
7   somehow can't missed it with this article that they should have
8   been doing this.  And I disagree with that --
9       Q.   Well, no --
10      A.   -- because there's not a requirement here and there's
11  no mandate.  There's no recommendation by the leading
12  International Association Chiefs of Police, but what I do find
13  on page 15, is that Canton wrote their policies consistent what
14  was required in Ohio that did not address this.  So they're
15  uncompliant with the criminal justice system -- or justice
16  services in -- in Ohio, vis-à-vis the Attorney General's
17  Office.
18      Q.   And I -- and I appreciate that.  First of all, just
19  to be clear, I'm showing you this because you wrote you have
20  never -- how'd you put -- your research did not produce a
21  specific source or document, which even infers that a law
22  enforcement agency is required to develop or train officers.
23  Here, we have an agency that not only made that decision, but
24  came up with a -- a proactive approach to keep officers safer
25  on that --

174

1       A.   I just --
2           MR. LUTE:   Wait, hold on, wait for the
3   question.
4       Q.   Are you aware -- and you weren't aware of that,
5   correct?
6       A.   Correct.
7       Q.   Okay.
8       A.   But there's -- but it goes to what I state in my --
9   my report.
10      Q.   Yes, which is?
11      A.   There's no requirement.  There's no mandate.
12      Q.   Right.  So let's --
13      A.   So this is a police article from a department, not
14  something that's a model policy recommended or suggested.
15  That's the big difference here.
16      Q.   And so --
17      A.   We can't make a quantum leap from that article to now
18  to a required or recommended policy, vis-à-vis IACP, in which
19  this was published.
20      Q.   So understand -- I want the record to be clear -- I'm
21  not saying that this says all agencies, all 18,000 of them,
22  should or must do that, but I am asking you if finding this
23  article by the IACP, which you believe is a credible
24  organization, right?
25      A.   This article is not by the IACP.

175

1       Q.   It's published by them.
2       A.   It's published, but it was not written by them.
3   There's a big difference.
4       Q.   And do you believe that their journal that they
5   publish is a authoritative journal in your field?
6       A.   I -- I wouldn't say authoritative.  That -- it's not
7   peer reviewed either.
8       Q.   Is it --
9       A.   It's practitioners writing articles.  And from time
10  to time, there are attorneys who write legal articles and that
11  type of thing.  So it's not a peer-reviewed journal article of
12  publication.
13      Q.   Did you -- and in preparation of your report, did you
14  actually look through IACP's publication for any -- as you put
15  it -- any articles?
16      A.   Yeah, I did.
17      Q.   Okay.  And this article doesn't issue a mandate, does
18  it?
19      A.   It doesn't even offer -- yeah, you're correct.  It
20  doesn't offer a recommendation either.
21      Q.   You haven't read it?
22      A.   Well, show me where it says it.
23      Q.   Well, we'll -- we'll get to that.  My -- but
24  before -- I just want to make sure that we're communicating,
25  because what I understand is, what's important to you, is that

176

1    there be a mandate in order for Canton to be, in your opinion,
2    at fault for not putting a celebratory gunfire provision in
3    their policies?
4         A.   A mandate or a recommendation from any of these
5    entities that I referenced on page 15, including IACP, Lexipol,
6    PERF, PowerDMS, American's for Elective -- Effective Law
7    Enforcement, or even the DOJ for that matter with their special
8    -- my -- my concern is that you're trying to use this article,
9    2010, that's just an article published in the magazine of the
10   IACP.  If this was such a prominent issue, why wouldn't the
11   IACP -- and this is what I looked at -- made it a model policy
12   to address that, that might guide chiefs to consider that?  We
13   don't have that here.
14        Secondly, the DOJ doesn't even address this in any of
15   the consent decrees that I've ever read.  Talks about a whole
16   host of other things that we've talked about today, but
17   certainly not -- and there's, thirdly, I've not seen anything
18   that quantifies how an officer can distinguish, differentiate
19   between gunfire and celebratory gunfire with which you would
20   even provide a policy statement or a policy.
21        And thirdly -- or fourthly, wherever we're at -- in
22   reviewing the Office of Criminal Justice Services out of Ohio,
23   if that was the big problem, certainly in their 12 sections of
24   policies, that would have been addressed.  I didn't see that
25   there.  It's not there.  It's not that I didn't see it there,

177

1    it's not there.
2         Q.   Yeah.  Okay.  That's all --
3         A.   That's all I'm saying.
4         Q.   -- that's all stated in your report?
5         A.   Yes, sir.
6         Q.   Okay.  So without the City doing an assessment or a
7    risk management review that's known to you, let's assume for a
8    second that the City evaluates what's happening on the streets
9    and decides that, you know, New Year's, 4th of July, we should
10   maybe warn citizens to stay safe.  Would that be evidence of
11   some knowledge on the part of the City that there's a real
12   problem in the city with respect to this gunfire?
13             MR. L'HOMMEDIEU:  Objection.
14             MR. LUTE:  Objection, go ahead.
15        A.   If you're asking me -- first of all, I don't know if
16   there is a risk management.  We've already identified that.
17   I -- I don't know.  There may be.  I -- I'm not privy to it, so
18   I don't -- didn't look at any data.  I've not been retained or
19   asked or requested, "Oh, by the way, create another opinion on
20   our risk management process."  It may happen.
21        But again, you'd have to look at the issues that are
22   of a frequent nature, and that's how we begin to -- how I train
23   and have always looked at suggesting a policy or procedure.
24        Q.   So if there's something frequent in nature that would
25   put the public at risk and that would include celebratory

178

1    gunfire and the City had actually issued a press release about
2    it, that would be important to you?
3             MR. LUTE:  Objection.
4         A.   It may be.  To do a public service announcement, I
5    don't see any problem.  I don't have a problem with that, but
6    like everything else, people are going to abide by what they
7    want to abide by.
8         Q.   But it would -- it would --
9         A.   In terms of, you know, buckle up with your seat belt
10   and how many people don't -- you know, don't drink and drive --
11   public service announces, particularly around holidays, don't
12   drink and drive, and how many -- and we're going to make a lot
13   of issues out there on that, because that's a very dangerous --
14   so -- but people don't always abide by public service
15   announcements.
16        I'm not saying it's not something that you might want
17   to consider, but I'm talking about now, in terms of what I put
18   in my report, and I stick with it.  I'm not deviating from
19   that.  I don't know of any law enforcement association, entity,
20   or the Department of Justice or even the Ohio Attorney
21   General's Office says, you know, you need to develop a policy
22   and training on this particular issue.  You can't quantify
23   celebratory gunfire.
24        Q.   Well, to be fair, there's no outside agency that
25   knows Canton better than Canton knows itself, right?

179

1         A.   Correct.
2         Q.   Okay.
3         A.   But --
4         Q.   Hold on a second.
5         A.   -- but -- but -- but let me -- can I --
6         Q.   Yes.
7             MR. LUTE:  Wait for the question.
8         Q.   Let me just finish my question and -- and make the
9    question.  In light of the fact that Canton can know itself,
10   I'm not asking you to consider a mandate found in a public
11   service announcement.  What I'm asking you, is does the
12   evidence of a public service announcement indicate that the
13   City would be aware of conditions on the ground that officers
14   might need to be reminded of or even trained on?  Could that be
15   evidence of such a thing in your experience?
16        A.   No --
17             MR. LUTE:  Objection.  Go ahead.
18        A.   -- I don't think so, but it's not my experience.  No,
19   that wouldn't be.
20        Q.   So have you seen any public service announcements in
21   this case from the City of Canton to the public regarding
22   celebratory gunfire?
23        A.   In this case?
24        Q.   Yes.
25        A.   No.

180

1    Q.  No one's ever provided to you anything that was
2  published shortly after my client's death?
3    A.  You said, "in this case"?
4    Q.  Yes.  Has everything provided to you in this case?
5    A.  You're talking about in this case and prior to this
6  case, no.
7    Q.  Have you seen anything from July of 2022 after my
8  client died that went out by Chief Gabbard that explained the
9  dangers of celebratory gunfire?  Have you seen that PSA?
10       MR. LUTE:  Objection.  You may answer.
11    A.  I don't recall seeing that.
12    Q.  Okay.  Were you provided it?
13    A.  I don't recall seeing it, so I don't know.
14    Q.  Okay.  Did you list it in your report?
15    A.  Let's look.  I've got numerous newspaper articles.
16  If it's in that, I don't recall it.  But I don't recall a
17  specific document that gets to what you're talking about.  No,
18  I don't recall that at all, sir, and I don't have it listed in
19  any of the documents I reviewed for this case.
20    Q.  So the reason I ask that question, is there any -- in
21  your opinion of page 17, just above paragraph 18, you say, "In
22  my opinion, the CPD has taken proactive steps to provide their
23  officers with the written policies, which appropriately guide
24  their performance in the field and to respond to a wide range
25  of circumstances."

                                                        181

1       And if it was issued to the public as a warning,
2  ought it have been made to the officers in roll call that
3  there's going to be celebratory gunfire?  Could that have --
4  should that have been happening at the City of Canton?
5    A.  I don't know --
6       MR. LUTE:  Objection.  You may answer.
7       THE WITNESS:  I'm sorry.
8    A.  (Continuing)  I don't know that it wasn't happening,
9  because I didn't see evidence one way or the other.
10    Q.  Different question.
11    A.  But again --
12    Q.  Different question.
13    A.  -- to answer your question.
14    Q.  It's a different answer to my question.  You didn't
15  answer my question, though, if I may.
16    A.  Well --
17    Q.  Did -- I'm saying --
18    A.  -- can I continue?
19    Q.  -- if -- if the --
20    A.  Then I'll answer your question.
21    Q.  -- if the -- well, you didn't answer, so I want to be
22  careful --
23    A.  All right.
24    Q.  -- so the record's clear.  If citizens are being
25  notified by the chief beware of celebratory gunfire, in sum or

                                                        182

1  substance, don't do it, right?  It's dangerous.  Should
2  officers have been made aware of it in roll call on, say,
3  New Year's or January -- or rather New Year's or 4th of July --
4       MR. LUTE:  Objection.
5    Q.  -- at the City?
6       MR. LUTE:  You may answer.
7    A.  The -- the -- I go back to what I said -- I don't
8  know -- two hours ago.  What -- how do you differentiate
9  celebratory gunfire?  That's the real question that I have and
10  the problem, because again, you're trying to inform an officer
11  some way there's a difference.  There's gunfire.  I don't care
12  what day it is or what night or what morning or what afternoon.
13  It's gunfire.  And so to try to say that there should be
14  something about that, that the officers should somehow be more
15  alert to, I find that just totally out of the norm or out of
16  anything that I've ever look -- or read, looked, opined on,
17  wrote on, trod on, that somehow an officer should know the
18  difference.
19       And again, I go back to what I think was -- was
20  pretty good line of questioning to your question -- answers or
21  responses to your question or someone else's in their
22  depositions that we don't teach officers to differentiate or
23  categorize celebratory gunfire versus active gunfire or
24  gunfire.  And nothing that I have reviewed in all of my time
25  differentiates that, that an officer should somehow distinguish

                                                        183

1  that.  That's the problem.
2    Q.  The chief testified to making that distinction,
3  didn't he?
4    A.  No, not that I recall.
5    Q.  Do you remember him encountering a man on a porch
6  with a revolver?
7    A.  No, I don't.  I remember him --
8    Q.  Do you remember --
9    A.  -- saying that --
10    Q.  -- did you remember -- hold on a second.  Did you
11  even read his full deposition?
12    A.  Yes, I did, sir.
13    Q.  Okay.  I'm just checking.  I'm not trying to --
14    A.  Well, I hear you say it with some --
15    Q.  -- no, I was --
16    A.  -- incredulous type of accusation that --
17    Q.  -- no, no, no, no.  My -- my reason for that was I
18  would show you the transcript, but if you read it, that's fine.
19  If you read the transcript, that's all I needed to know.
20    A.  Yeah, can I answer that question by saying what I
21  have in my --
22    Q.  Sure.
23    A.  -- my report?
24    Q.  Yeah.
25    A.  And just take me a few minutes to find it.  Now,

                                                        184

1  which chief are you talking about?
2      Q.   Chief Gabbard.
3      A.   On page 20 of my report, second -- or first full
4  paragraph, Chief Gabbard also testified use-of-force policies
5  covered in training scenarios are not specific to
6  New Year's Eve or July 4th.  Officers are not trained on the
7  term "celebratory gunfire," and that de-escalation and training
8  has been provided.
9           Captain Marino at the time in his deposition also
10  said that would be negligence to try to train or have a policy
11  in that regard.  That's my --
12      Q.   I saw that.  I read that.
13      A.   -- yes.
14      Q.   My question's different.
15      A.   But it goes with what you're asking.
16      Q.   I appreciate that, and I want to make sure that
17  you're heard in that way.  You don't recall Gabbard's testimony
18  about encountering a man with a revolver and how he recognized
19  that to be an occasion of celebratory gunfire in his own
20  career, correct?
21           MR. LUTE:  Objection.  You may answer.
22      A.   No, I -- I do not.  I don't -- I don't, I'm sorry.
23      Q.   Is it impossible for an officer to decide whether
24  there's celebratory gunfire going on?  Is that impossible?
25      A.   I think it is, yes.

185

1      Q.   You do?
2      A.   I don't -- I mean, I'd like to see how that could be
3  taught to an officer.
4      Q.   Well, if an officer -- I think from your training and
5  from your teaching -- was to follow your advice and look at the
6  situational awareness and the body position and the gesturing
7  of a person shooting a gun into the air, would they be able to
8  discern that as a act of celebration or as act of violence?
9           MR. LUTE:  Objection.  You may answer if you
10  know.
11      A.   I -- I don't know how -- how the officer would get
12  into the mind of the subject firing the weapon.
13      Q.   Well, if the officer was reminded and carried with
14  him or her into the field that it's New Year's Eve and
15  encounter someone shooting into the air, could they combine the
16  reminder with the behavior, as you have indicated in your
17  teaching, and make the match that this is celebratory gunfire?
18           MR. LUTE:  Objection.  You may answer if you
19  know.
20      A.   No.  I don't see how that occur -- could occur, not
21  in my mind.
22      Q.   And so how did you make the link that he would be
23  thinking about the murder that happened earlier as he
24  approaches my client's house?
25      A.   Because it was in his testimony.

186

1      Q.   Do you know if he understood what was happening when
2  he got to the scene?  Do you --
3      A.   When you say, "he," you're talking about --
4      Q.   Huber.
5      A.   -- Officer Huber?
6      Q.   Yes, sir.  Do you -- do you remember if he knew what
7  was happening when he got to the scene?
8      A.   No, he didn't.  He had to investigate.
9      Q.   Was there any testimony or any piece of his original
10  statement to BCI that indicated he was carrying the memory of
11  the murder in his mind as he investigated his call for service?
12      A.   I don't recall specifically at the BCI interview, but
13  it's certainly in my report that I believe it was out of his
14  deposition testimony.
15      Q.   Yes.
16      A.   But whether it was in the BCI investigation, I -- I
17  don't recall that.  And maybe the investigator didn't ask that
18  question.
19      Q.   In the article that IACP produces in its journal, it
20  indicates that in the past seven years relative to the 2010
21  publication, there had been no officer-involved shootings in
22  any of the New Year's Eve and New Year's Day operations.  Does
23  that infer a need to consider policy changes for an
24  organization?
25      A.   Not that I --

187

1           MR. L'HOMMEDIEU:  Objection.
2      Q.   Go ahead.
3      A.   I'm sorry, not that I would see.
4      Q.   And you know that officer -- there's hundreds of
5  officers at the Phoenix Police Department?
6      A.   I don't know how many they have, but I would assume.
7  But I do not know that.
8      Q.   The article goes on to say this is, quote, Due in
9  part to the training reminders given to the officers, which are
10  based on training they received earlier in their careers.
11           Are you aware of any training reminders that are
12  given to officers in Canton regarding how to approach citizens
13  on New Year's Eve or New Year's Day?
14      A.   I didn't look at the curriculum, so I can't answer
15  that.
16      Q.   Okay.  The article goes on to say, "When the teams
17  are approaching and communicating with violators, the
18  supervisors are normally there with them."  Is that something
19  that Canton could have done?
20           MR. LUTE:  Objection.
21      A.   I doubt it.
22      Q.   On what facts?
23      A.   On the facts that each incident is unique and a
24  supervisor will not be on scene until an officer requests that.
25  Now, Officer Huber, in this case, did ask for backup.  He did

188

1  ask for additional cars after he was on the porch and backed
2  away from the porch.  So I think he had a good plan in place.
3  And if there were available supervisors -- I don't know how
4  many were available or not -- might've responded to that radio
5  transmission that he gave after he backed off of the porch.  So
6  that would be, to me, a appropriate thing if I'm a sergeant in
7  the vicinity, I'm not tied up on something else, sure.
8       Q.  So could Canton have assigned supervisors to work
9  specific zones with teams of officers on New Year's Eve as
10  happens in Phoenix?
11      A.  I don't --
12              MR. LUTE:  Objection.  Go ahead.
13      A.  -- I don't know that they would have to do that.
14      Q.  Oh, they have to.  Could they have done that?
15      A.  No.  I don't think that that would be necessary.
16      Q.  I didn't ask if it was necessary.  I asked could it
17  have been done?
18      A.  I don't think it could have been done --
19      Q.  Upon what --
20      A.  -- because they have other things going on that
21  night.
22      Q.  -- what facts do you have to share with us about
23  that?
24      A.  Well, they had two homicides.  I know that.  And they
25  were investigating those and trying to clear the scene there.

189

1  So I don't know how many officers were on duty that night or
2  how many supervisors were on duty that night, but it certainly
3  had two homicides that they were perhaps probably coordinating
4  and calling in investigators to cordon off the area to make
5  sure evidence was not moved or tampered with so that they could
6  do an investigation of those, and then all of a sudden you have
7  the shooting.  So --
8       Q.  Did you receive --
9       A.  -- I don't know that that could be possible in this
10  incident on that night.
11      Q.  I hear you.  Did you receive any facts or evidence or
12  information in your review of this matter to support the notion
13  that there was not enough manpower on the streets of Canton?
14      A.  No, but again, they may be tied up with other duties.
15  Beyond just the homicides, there may be other calls.  I know
16  one sergeant recorded the firing and the fireworks,
17  Sergeant Davis, if I -- I may have his name wrong -- but he
18  submitted a video of -- of that and audio recording.  So I'm
19  not sure what his -- his duties were that night, but I know he
20  was tied up with that.
21      Q.  Did you receive any information or data at all from
22  the City regarding how busy the officers were that night?
23      A.  No.
24      Q.  "These operations," says the article, "have
25  successfully reduced random gunfire in Phoenix by 64 percent."

190

1  Undoubtedly, the same success can be achieved elsewhere
2  throughout the United States through this type of cooperative
3  operation, which employs education combined with enforcement.
4          Is it significant to you as a law -- former law
5  enforcement professional and as a teacher of law enforcement,
6  that Phoenix reduced its random gunfire by 64 percent by
7  implementing the -- tactics stated in that article?
8       A.  Well, first, that's what they say.  I don't see any
9  data that reports one way or the other that -- that that's a
10  reduction in that but from what the paragraph right there
11  you're showing me, so I don't see any data.  It's what they
12  report in that.  So I have -- you know, what are the
13  limitations to that?  Does that mean everything that the
14  officers did or other things reduce that, and is that an
15  accurate number?  So I'd have to -- that -- that's the first
16  thing.  There's limits to that.  So I don't know that that's
17  accurate or not.  I'm just going by what that article says.
18      Q.  So my question was:  Is it significant to you as a
19  former professional of law enforcement?
20      A.  Again, I can't make that distinction because I don't
21  know what data they've looked at.  What was it like before?
22  And what -- and over those seven years, how have they tracked
23  that data?
24      Q.  So you don't have enough information to have a
25  thought about whether a 64 percent reduction in random gunfire

191

1  on New Year's is important or is significant to you; is that
2  right?
3       A.  I don't have any data that would support data one way
4  or the other.  Now, maybe because -- the only thing I could
5  comment on -- maybe because the community saw people were being
6  arrested for it.  Don't do that.  That might have significance.
7  So you got to look at other -- the variables than just they
8  made like a proactive enforcement on that, that looks like to
9  me --
10      Q.  So --
11      A.  -- and arrested people.
12      Q.  -- so just in the case of the City of Phoenix,
13  12 years prior to my client's death, you're thinking that
14  perhaps their program, just as you said as a comment -- you
15  just made a comment, could have reduced the gunfire because
16  people were seeing all officers engaged in the community
17  enforcing that law; is that --
18      A.  Making arrests.
19      Q.  Making arrests.
20      A.  That's possible.
21      Q.  Is it significant to you at all, as a former
22  professional law enforcement officer or as a teacher of law
23  enforcement officers today, that there had not been a
24  police-officer-involved shooting in the past seven years
25  relative to that article being published?  So seven years after

192

1  they implemented the change, there hadn't been a single
2  officer-involved shooting.  Is that significant to you?
3            MR. LUTE:  Objection.  You may answer.
4            MR. L'HOMMEDIEU:  Objection.
5    A.  It -- again, I don't know what happened before.
6  There's nothing that showed that pre-test, post-test.  There's
7  no pre-data analyzing.  Now, when you say, "officer-involved
8  shootings," what, on -- on just this issue or in general?  Who
9  knows?  Based --
10   Q.  On --
11   A.  -- on this article --
12   Q.  -- it says --
13   A.  I can't make that determination.
14   Q.  -- "No officer-involved shootings in any of the
15  New Year's Eve and New Year's Day operations."  Is that
16  significant to you as a law enforcement professional?
17   A.  Not without data.
18            MR. L'HOMMEDIEU:  Objection.
19   Q.  Not without data.
20   A.  Not without more information.
21   Q.  And what kind of information would you need for that
22  to be significant to you?
23   A.  Well, let's see, what -- how many -- were there no
24  officer-involved shootings before that or were they very rare
25  or was it for other reasons?

                                                      193

1    Q.  And had you read the article, you might've known
2  that?
3    A.  Well, sure I would've known -- I would've known the
4  article.
5    Q.  But you couldn't find it?
6    A.  I didn't say I didn't find it.  I didn't -- I
7  didn't -- I never read the article.  It has nothing to do with
8  my opinion in this case.
9    Q.  Okay.  Fair enough.  I -- I hear you.  It doesn't --
10   A.  Okay.
11   Q.  -- have anything to do with your opinion.
12   A.  But you keep beating a dead horse.
13   Q.  Okay.  So when we look at your Opinion Number 2,
14  let's go to that --
15   A.  Yes, sir.
16   Q.  -- at page 17, "Huber has received ongoing training
17  commensurate with his assigned duties."
18   A.  Yes, I'm with you.
19   Q.  All right.  The opinion in italics is,
20  "Administrators have provided Officer Huber with ongoing
21  training commensurate with his law enforcement duties."
22        Do you know if Officer Huber -- let me see if I have
23  this right -- actually qualified on all of the weapons that he
24  is supposed to have qualified in 2022 -- or 2023 -- excuse me,
25  2021?

                                                      194

1    A.  September, I think, 9th or 2nd, he qualified with his
2  firearms.
3    Q.  Do you know if he qualified for all of the firearms
4  he was supposed to qualify for?
5    A.  I don't know that for sure, but I know that the BCI
6  reported that.  There was a document in the training records
7  and the file that I read.  I don't know what all firearms he
8  qualified.
9    Q.  Okay.  Let's see if --
10   A.  But he -- he was qualified on, to be more specific,
11  September 9th, 2021.
12   Q.  All right.  Let's see if I can -- are you familiar --
13  have you seen this in-service attendance?  Have you seen it?
14   A.  Say again.
15   Q.  Huber's in-service attendance, have you ever seen it?
16   A.  Yes.  I mean, you show me what you -- yes.
17   Q.  Yeah.
18   A.  Okay.
19   Q.  We're going to put this and shift for the screen.
20  This is going to be marked as Exhibit 23.  We're going to look
21  at Column 17, the first empty yellow column here for Huber, and
22  that's a shotgun.  Did he qualify on shotgun?
23   A.  I don't -- I can't see that.  You've got a --
24   Q.  Okay.  I'll make it bigger.
25   A.  -- so --

                                                      195

1    Q.  I'll make it bigger.
2    A.  -- and I can't see the columns or the --
3    Q.  I'll show you the columns.  Okay.  So here at the
4  bottom left corner it says, "Robert Huber, Patrolman," and the
5  dates when he qualified.  And I want to go up to shotgun.  See
6  this column?
7    A.  Yes.
8    Q.  Says, "Shotgun."  We go down.  You see he doesn't
9  qualify for the shotgun, does he?
10   A.  Not on that day.
11   Q.  On any day, looks like he --
12   A.  I don't -- I don't see it.  Maybe he doesn't carry a
13  shotgun.
14   Q.  Well --
15   A.  I don't know what he carries.
16   Q.  -- do you know if he was required to --
17   A.  I do not know.
18   Q.  -- were you ever given any information, or -- at all
19  as to whether he was required to --
20   A.  No, no.
21   Q.  -- qualify for -- all right.  And how about the same
22  for rifle?  Do you know what kind of weapon that would've
23  involved in this particular matter?
24   A.  No.
25   Q.  Do you know if he was required to attend in-service

                                                      196

1 training for a rifle?
2    A.  I think, as I recall reading material, he qualified
3 on a monthly basis with a lot of different firearms through the
4 SWAT team training that he had.  Now, whether it's recorded or
5 not, I don't know.
6    Q.  Okay.  Do you know if he ever attended in-service
7 training or was required in-service -- attended in-service
8 training for rifle?
9    A.  I don't know that.
10   Q.  Were your --
11   A.  I know that he qualified with all sorts of weapons on
12 a monthly basis as part of his duties as on a SWAT team.
13   Q.  And you would imagine that he would have to -- he
14 would have to qualify for less lethal --
15   A.  Less than --
16   Q.  -- wouldn't he?
17   A.  -- lethal what?
18   Q.  Force, less lethal force --
19   A.  In terms of -- give me an example.
20   Q.  Well, control techniques, anything.  I mean, it's --
21 I don't know what they mean here in this sheet.  All I can tell
22 you is --
23   A.  Well, then I can't answer your question if you don't
24 even know what it means.
25   Q.  -- oh, no, no, I know what it means.  I am saying --
                                                          197

1    A.  Okay.
2    Q.  -- on --
3    A.  What does it mean?
4    Q.  -- Column 18, it means he was supposed to qualify or
5 he does not enter a date for qualifying on less lethal.  Do
6 you -- do you have any knowledge about that at all?
7    A.  No, I don't.
8    Q.  Okay.  And you have -- you were not provided any
9 information about that, were you?
10   A.  Not on that chart, no.  There were other -- there
11 were other charts that I looked at.
12   Q.  And did you see him qualifying for less lethal of any
13 kind known to you in --
14   A.  I'd have to go back and look, sir.  I don't remember
15 because there were so many records.  Less lethal can mean his
16 TASER, if he carried one, pepper spray, impact weapon
17 projectiles.  It can be mean a whole host of things.  So I
18 think if you look at other documents, that was -- as I recall
19 it, there were documentation to that regard.
20   Q.  Okay.  Regarding his training or lack thereof in this
21 case, did you ever review that document and ask for information
22 or seek more information about it in this case?
23   A.  No.  Because I looked at other records of training.
24   Q.  All right.  Now, let's do this, let's go to -- at
25 Page 24 of your report, you write, "Based on my review of the
                                                          198

1 aforementioned documents, it's evident that CPD administrators
2 have made a conscious choice and by practice to provide Huber
3 with ongoing training in order for him to competently perform
4 his law enforcement duties."
5       In writing that sentence, did you have in your
6 possession -- do you know -- the Exhibit 23, his in-service
7 attendance sheet?
8    A.  What you just showed me?
9    Q.  Yes, sir.
10   A.  Yes.  I looked at that, as well as other training
11 records.
12   Q.  Yes.  Let's see.  All right.  Moving on now to
13 Opinion Number 3 listed at page 25, "Huber appropriately
14 responded to active gunfire."
15      You indicated that Huber would have been cognitively
16 processing potential scenarios as he drove to the location,
17 which would heighten his sense of anticipation and alertness.
18 Can you find that in your report?  I'm looking for it now.
19   A.  Page 29 to help you out, last paragraph --
20   Q.  There it is.
21   A.  -- last sentence of the fourth paragraph.
22   Q.  So these potential scenarios would be cognitively
23 processed.  Did -- did Huber ever tell you that?
24   A.  No.  I didn't interview him.
25   Q.  Did -- did he testify to that?
                                                          199

1    A.  He testified to unknowns.
2    Q.  Did he testify as to what he was cognitively
3 processing as he drove to the location?
4    A.  I don't recall that specifically.
5    Q.  Did he -- did he testify as to what heightened his
6 sense of anticipation?
7    A.  I think I recall reading that in the BCI
8 investigation report to the investigator that that voluminous
9 amount of gunfire to where he was sitting in the parking lot, I
10 believe, of the hospital was so loud and so cadenced that --
11 that that's what drew his attention there.  And that would put
12 him on -- as I recall him talking about his brain and
13 processing that, that -- that's where I got that from, his BCI
14 interview with the investigator.
15   Q.  So you also write, "Huber would also be thinking
16 about the two homicide incidents which occurred just prior" --
17 "hours prior to his shift."  Do you see that there?
18   A.  Yes.
19   Q.  And you said --
20   A.  And I --
21   Q.  -- and you said he would be thinking simultaneously
22 about that?
23   A.  I -- yes.  I -- I recall him talking about it in the
24 combination, thereof, of his interview and the deposition about
25 that being part of his thinking process as he was responding or
                                                          200

1  trying to respond to wherever the gunfire was coming from.
2      Q.   All right.  You don't have any specialized knowledge
3  or training with respect to cognitive processing, do you?
4      A.   In terms of as it relates to reaction time, I do.  As
5  it -- as it applies to processing information with which to a
6  selective force option or to try to understand and identify
7  suspect behaviors that are a resistance notion, yes.
8      Q.   I mean --
9      A.   I've trained that many, many years, going back to the
10 late '80s, to the early '90s, to the current, actually.
11     Q.   So you're referencing --
12     A.   Written on it.
13     Q.   -- so you're referencing your human factors teaching?
14     A.   Yes.
15     Q.   Yeah.  I'm asking if you have been trained in
16 cognitive processing, how we process information and how we
17 store information and then how we ultimately carry with us or
18 have awareness of events?
19     A.   Yes, sir --
20     Q.   Have you been trained that --
21     A.   -- yes, yes, sir, I have.
22     Q.   -- where did you get your training?
23     A.   Well, starting at Ferris State University when I was
24 certified by the State of Michigan to provide such training.  I
25 was part of the -- oh, man -- several month-long certification

201

1  process I went through and trained curriculum at the academy in
2  that regard.
3          Secondly -- because it was required basic academy
4  training -- second, I trained at -- in terms with PPCT,
5  learning that and being trained by numerous individuals that
6  brought in that to our -- to add on to our training curriculum
7  with PPCT, as well as other training conferences, sessions that
8  I have been to over the years, written on it, actually done
9  research on it myself, so....
10     Q.   What parts of his neurobiology would be involved in
11 cognitively processing scenarios?
12     A.   His brain.
13     Q.   What parts?
14     A.   I would say the frontal cortex for sure and the
15 hippocampus, as well as a thalamus region of the brain.
16     Q.   Did you author the triune brain theory in your 2018
17 book?
18     A.   Did I author it or did we write a chapter on it?
19 Yes, it talks about the limbic system, yes.
20     Q.   Are you aware that the triune brain theory has been
21 debunked?
22     A.   Yeah.  Some circles say that, other circles do not
23 say that.
24     Q.   Do you have any specialized knowledge or training
25 with respect to how the brain works or stores information?

202

1      A.   Other than what I've been trained to with human
2  factors I've already alluded to.
3      Q.   And that relates to what a stimulus does to a
4  person's ability to process that stimulus?
5      A.   Correct.
6      Q.   Okay.
7      A.   To some extent, yes.  Not totally, but yes.
8      Q.   Okay.  And so beyond that, do you have any other
9  specialized knowledge of training?
10     A.   What do you mean "beyond that"?
11     Q.   Beyond know -- beyond studying how a specific
12 stimulus will or will not affect the person under stress as a
13 function of their human factor?
14     A.   Yes, how the autonomic nervous system processes a
15 stressful or stimuli that a person -- which can be
16 idiosyncratic.  All of us look at it differently and undertake
17 stress, but if it activates the sympathetic nervous system,
18 then the whole process goes into place in terms of trying to
19 help that individual or officer, as it may be, to deal with
20 what is producing that particular stressful stimuli, fear,
21 anxiety, anticipation, perception, so forth.
22     Q.   In light of your experience, knowledge, and training
23 in those areas, do you know how many thoughts we can carry with
24 us at any one time?
25     A.   Well, you get confused.  It's -- it's -- I think

203

1  it -- not to give you a quantified number, but it varies from
2  person to person based on their training and experience.
3      Q.   And --
4      A.   I can't quantify that.
5      Q.   -- so you don't know?
6      A.   I don't.  I can't quantify it because it varies
7  with --
8      Q.   Well, do you know the --
9      A.   -- we might have a -- you know, you may be able to
10 process 42 of the items, and I may be able to browse 4 or 5, so
11 it's all variable --
12     Q.   Well, not -- not process.  How many thoughts --
13     A.   -- or carry --
14     Q.   -- how many thoughts can we attend to in any given
15 moment?
16     A.   Not very many.
17     Q.   Do you know how many?
18     A.   Not exactly off the top of my head, no.
19     Q.   You indicated that proceeding lights and sirens would
20 have been unsafe for Huber; is that right?
21     A.   Yes.
22     Q.   And proceeding to the location -- you write at
23 page 30, "Without lights and sirens provided a safe and
24 tactical advantage for Huber, and it was not contrary to police
25 procedures"; is that right?

204

1    A.  That's correct.

2    Q.  Did you read Huber's testimony in its entirety?

3    A.  Yes, sir.

4    Q.  And -- and I just had to ask just to make sure we're

5  on the same page.  Are you aware of what he said at transcript

6  page 186 when asked, "I'm talking at the time when you pulled

7  up, were you aware of anything that would have made it unsafe

8  to turn on your overhead lights?"  Do you recall what his

9  answer was?

10         MR. LUTE:  Objection.  Go ahead.

11    A.  I don't -- didn't memorize this deposition.

12    Q.  His answer, "No, I don't think there was anything

13  unsafe at that time to turn them on, no."  Do you recall that

14  testimony?

15    A.  Not specifically, no, now that you read it.  I don't

16  recall it specifically, but to me it would be in response to

17  your question.

18    Q.  Well, at the time he pulls up, he was not aware of

19  anything that would have made it unsafe to turn on his lights,

20  right?

21    A.  Right.  That's on that page, but I think the

22  subsequent pages, now that I think about it, I think he does go

23  back and answer and provide more information about the tactical

24  advantage and his safety, as I recall.

25    Q.  And under the circumstances encountered by

1  Officer Huber, you wrote, "It would not be advisable for him to

2  contact Mr. Williams, and he's not required to announce that he

3  is on location."  Isn't that in your report?

4    A.  Yes.

5    Q.  But Captain Davis testifies in his deposition at

6  page 253, quote, I mean, I don't know why he didn't knock on

7  the door or knock on the window or yell or scream.  I don't

8  know.  That would be a question for him.  I don't know.

9         "Knocking on the door and knocking on the window,"

10  asks the questionnaire, "would have been an opportunity to

11  announce himself and possibly de-escalate," fair?

12         He says, "Possibly."

13         Do you remember that testimony?

14    A.  Vaguely.

15    Q.  Why didn't you include Davis's testimony at

16  transcript 253 or Huber's at transcript 186 in your analysis of

17  this issue?

18         MR. LUTE:  Objection.  You may answer.

19    A.  I don't know if I didn't.  I mean, I have 50 pages

20  here.  If you ask me a specific page in a passage, I'd have to

21  go back and look or look at my report, but --

22    Q.  Well, if you just go to page -- here's the point, if

23  you just go to page 30 where you wrote, "Proceeding to the

24  location without lights and sirens provided a saving type of

25  advantage."  And above that, you spoke of, "He could possibly

1  have alerted the shooter and others that he was arriving

2  drawing" -- "unnecessarily drawing the focus of attention of

3  the shooter to his vehicle."  I'm just wondering if you had any

4  factual support for that from the record that you've reviewed.

5    A.  Well, I -- to answer your question, I'm back on

6  page 26 and 27.  I identified quite a few pages from his

7  deposition --

8    Q.  Who's he?

9    A.  -- in that regard.

10    Q.  Who's he?

11    A.  Huber --

12    Q.  Do you --

13    A.  -- that's who you're asking me, right?

14    Q.  -- do you identify 186?

15    A.  Maybe somewhere in here I do.  I'd have to look.  And

16  if I didn't, I -- okay -- so -- so be it.  I mean, that's

17  your -- your impression.  I think it's later on in the report

18  where I talk more about that in detail where we actually have

19  him, Huber, on the front porch and then backing off the front

20  porch as part of his de-escalation.  That's my recollection.

21    Q.  You -- at page 30, you wrote, "Under the

22  circumstances encountered" -- this is the last paragraph, first

23  sentence -- "Under the circumstances encountered by

24  Officer Huber, it would not be advisable for him to contact

25  Mr. Williams, and he's not required to announce that he's on

1  location."  Did I read that right?

2    A.  Yes.

3    Q.  And did you cite any record in support of that

4  observation?

5    A.  No, it's my opinion.

6    Q.  What was the factual basis for that opinion?

7    A.  Reading all the evidence and all the file and all the

8  information in this case.

9    Q.  Does that include Captain Davis' testimony?

10    A.  Everything that I've read.

11    Q.  And so when he says, "Knocking on the window or the

12  door would have been an opportunity to announce himself and

13  possibly de-escalate, fair?"

14         He says, "Possibly."  Did you consider that?

15    A.  Possibly.  But I also looked at what Officer Huber

16  said.  Let's be fair.  He was by himself.  He wasn't going to

17  knock and announce at that time when he just saw an individual

18  with a high-powered rifle that could have startled him, could

19  have shot through his -- his vest.  So he did the prudent

20  thing, in my opinion, not doing that.  And Captain Davis wasn't

21  there.  Let's go with what Officer Huber's perception was, his

22  impression.

23    Q.  Let's do that.

24    A.  Yeah, what -- what he says.

25    Q.  When Huber -- when Huber looks through the window,

what is the man in the window doing with the gun?

    A.  I think he put it down on the dining table as I recall.

    Q.  Is there anything else you recall him saying?

    A.  Not that I recall.

    Q.  All right.  Do you recall him saying he was putting the gun -- or he radioed putting the gun away?

    A.  Yeah.  Later he did, yes.  Putting it -- well, putting it away, I don't know what that means.  He didn't secure it.  He put it on the table.

    Q.  So we'll get to this then.  You say at page 31, in the middle of -- or towards the end of that first full paragraph, "With numerous unknowns facing Huber at the time, knocking on the door and contacting Mr. Williams as he placed the rifle on the table would've placed him in an unnecessary and unsafe situation."  That's what you wrote, right?

    A.  Correct.  And that's based on Huber's testimony.

    Q.  Did that include his testimony at page 269?

    A.  I don't know what is on 269.

    Q.  It says, question, "Can we agree that there was no situation that forced you to make a split-second decision when you got out of your car?"

    "That is a fair statement, yeah.  There was nothing right there driving me, no," he says.

    A.  Not at that time.

    MR. LUTE:  Hold on, wait one second.

    THE WITNESS:  I'm sorry.

    Q.  Next -- next -- I'm going to keep reading the transcript for you.

    "And there was no situation that forced you to make a split-second decision when you were on the front porch looking at the window, correct?"

    "That is correct."

    Reading on, "And when you were on the porch, you, if we look at what you said at 12:07:06, you saw the male putting the rifle away?"

    Answer, "Yes, what appeared to be him putting it away, yeah."  Going on, "So I think," he says, "my brain attributed to, 'Okay.  I think he's putting it away.'"

    At 280, "And you had the opportunity to knock on the front door, correct?"

    "That was an option, yes."

    "And you made the intentional decision not to do that, correct?"

    Answer, "That is correct."

    At 280 to 81 at the bottom, "Can we agree that the earliest opportunity to engage or talk with Mr. Williams was when you saw him in the house when he had" -- "was no discernible and no lethal threat to you over Mr. Williams."

    Beck's objection.

    "That would've been the earliest, yes.  I could have maybe made contact with him.  That is a fair statement."

    Did you include any of that transcript in your deposition review?

    A.  I read all of it.

    Q.  Did you include it and cite it in your report at all?

    A.  I don't know.  I'd have to look, but --

    Q.  Go ahead, please.

    A.  Yes.  So he's saying he's agreeing with whoever the questionnaire is, if it's you or someone else, but he chose not to based on what I've already articulated, which is part of his testimony.  And there was no split second at that point in time.  He didn't shoot Mr. Williams then.

    Q.  And he had --

    A.  He had actually backed away.

    Q.  -- and he had an opportunity, based on his testimony, to make contact with him.

    A.  But he felt it was unsafe.

    Q.  The question asks, "When you saw him in the house when he was no discernible and no lethal threat to you?"

    Answer "That would've been the earliest, yes.  I could have maybe made contact with him.  That is a fair statement."

    A.  He said he could --

    MR. LUTE:  Wait, wait for the question.

    Q.  Yeah.  Is that consistent with your recollection of his testimony?

    A.  No.  I mean, it is there, but on -- further on, he talks about his safety, knowing what that rifle can do because he's -- he has one.  He's shot and trained with that and his vest -- knowing that his vest would not stop a round coming from that particular type of high-powered firearm.  And he moved away, backed off for that very reason for his safety.

    Q.  I believe you also cited in your report Policy 300.6, which speaks to verbal warnings in a deadly-force situation.  I think you actually cited the entire 300 section use-of-force policy in your report and at transcript page 271, Captain Davis testifies as follows:  Question, "Officers are expected to provide verbal warnings in a deadly-force situation whenever it is feasible and safe to do so.  Did I read that right?"

    Answer, "Yes."

    "Prior to the gunfire breaking out and as my client puts the gun on the table, did Officer Huber have an opportunity to announce his presence safely?"

    Answer, "He could have."

    Did you include that or critique any of that in your report?

    A.  Yeah.  I considered it.

    Q.  And why did you include that in your report?

    A.  Because he wasn't there and Officer Huber was and

1    gave his testimony based on what I've already identified.
2         Q.   And so we know that the subjective information
3    received by an officer is important, his point of view.  We
4    would also understand that the objective circumstances and
5    facts come into play, right?
6         A.   It can.
7         Q.   Can or it does all the time?
8         A.   Yes, they do.
9         Q.   Objectively speaking, I mean, as a man's putting a
10   gun away, given the testimony I've just read to you from both
11   Huber and Captain Davis, doesn't the record support the idea
12   that Huber had an opportunity to announce his presence safely?
13        MR. LUTE:  Objection.  Go ahead.
14        A.   Not by Officer Huber's perception and his testimony.
15        Q.   How about by your perception?
16        A.   I would agree with his perception.
17        Q.   So you agree with Huber?
18        A.   Yes, I do.
19        Q.   You disagree with Captain Davis?
20        A.   Yes, I do.  He wasn't there.
21        Q.   Why did you put that in your report?
22        MR. LUTE:  Objection.  Go ahead.
23        A.   I don't -- I don't -- there's no need for me to put
24   it in my report.  What -- I agree or I don't agree with
25   somebody else that that wasn't on scene?

                                                          213

1         Q.   Well --
2         A.   I wouldn't put that there.  I did put a lot of --
3    you're picking and -- you know, cherry picking, which is
4    appropriate, but I did put a lot of other things that you're
5    leaving out.  And the testimony by Officer Huber is -- is
6    there, which is in my report by the way.
7         Q.   And I'm going to make something perfectly clear.  You
8    wrote a 50-page report.  There's a lot more in your report than
9    what I'm questioning you about today --
10        A.   Yeah, so you're --
11        Q.   -- all of which --
12        A.   -- selectively picking out what you want.
13        Q.   -- well, I -- I'm selectively addressing the parts of
14   the record that seem to support plaintiff's case that you don't
15   address, and these pieces would support plaintiff's case; you
16   would agree?
17        A.   I disagree.
18        MR. LUTE:  Objection.  Go ahead.
19        Q.   You disagree?
20        A.   I totally disagree with you, sir.
21        Q.   And -- and so when -- when the officer in this case
22   testifies that he could have made contact but chose not to,
23   that there was no discernible lethal threat at that time, that
24   he chose not to engage him, your -- your position is that
25   that's not something favorable to plaintiff's case?

                                                          214

1         MR. LUTE:  Objection.  You may answer.
2         A.   You can look at it however you want to.  I look at --
3         Q.   I'm asking you as an expert.
4         A.   -- I look at it differently.
5         Q.   Well, I'm not the expert.  I'm just asking you as an
6    expert if you think that supports plaintiff's case or not?
7         A.   No.  I don't think it does at all.
8         Q.   Are there any facts in this whole universe of facts
9    that you reviewed that does support plaintiff's case at all?
10        MR. LUTE:  Objection.
11        A.   No --
12        Q.   Go ahead.
13        A.   -- no, sir.
14        Q.   Let's talk for a second about de-escalation.  What is
15   your -- first of all, you cite Policy 300 in your opinion -- or
16   in your report at Use of Force 300.5(a) it says, "When
17   feasible, an officer shall use de-escalation techniques to
18   reduce the need for force and increase the likelihood of
19   voluntary compliance."  Let's stop right there.
20        In your opinion, you say, "Officer Huber de-escalated
21   as he backed away from the window, walked off the porch, moved
22   to the street, continued to assess the situation, radioed
23   dispatch to send more cars and corrected the location of the
24   address"; is that correct?
25        A.   That's correct.

                                                          215

1         Q.   Is it my understanding that it would be a fair
2    reading of your report to say anytime an officer does as you
3    wrote here, an officer would be engaging in de-escalation?
4         A.   Anytime what?  I don't -- I don't follow your
5    questions.
6         Q.   Anytime an officer backs away from a home, moves to a
7    street, continues to assess, radios dispatch to send more cars,
8    and correct the location of an address, would that be evidence
9    of de-escalation in every case?
10        A.   I'm saying it in this case.  It could be in other
11   cases depending on the fact patterns, but I'm only applying it
12   to this case.
13        Q.   And so how do you define de-escalation?
14        A.   De-escalation is oftentimes misconstrued and it's not
15   just verbalization.  It's using prudent thinking, tactical
16   assessment, and sometimes using other strategies.
17   Verbalization can be one.  In this case, I don't think that was
18   appropriate to do.  That would've increased officer's -- his
19   safety would've been jeopardized, but it's moving back, giving
20   distance between a person and a subject, or in this case, a
21   house and the subject.  It's radioing for backup.  It's using
22   time as a tactic.  So there's a lot of variables that go into
23   play that all were evidence in -- in this -- in Huber's
24   decision.
25        Q.   Would de-escalation be a tactic used based on officer

                                                          216

1  discretion at the time he's on scene with -- at my client's
2  house?
3      A.  Now you're asking me specific could it be --
4      Q.  Is de-escalation, as you understand it, something
5  that an officer has discretion to employ?
6      A.  Yes.
7      Q.  And in this case, are you saying that Officer Huber
8  chose to de-escalate when he backed away from the window?
9      A.  Yes.
10     Q.  Are you aware of any testimony to that effect?
11     A.  No.  I'm looking at the -- I'm looking at the -- his
12 behaviors, his actions, which shows me that without anyone
13 asking him that, or even the investigator from BCI, it's
14 evident.  It's -- it's right there.  It's -- it's jumping off
15 the pages.
16     Q.  And when he walks off the porch, that's de-escalation
17 as well?
18     A.  Yes.  That's backing away from the situation.  It's
19 not throwing fire -- water -- gas on the fire.  It's moving
20 back.  It's giving him safety.
21     Q.  What -- what --
22     A.  He had a plan in place from my reading and my
23 impression.
24     Q.  Wouldn't de-escalation require Mr. Williams to know
25 an officer is there for de-escalation to actually take place?

                                                    217

1      A.  No, absolutely not.
2      Q.  No?  So if Mr. Williams doesn't know that Mr. Huber
3  is present and Mr. Williams is putting a gun away, what was the
4  threat that Huber was de-escalating and how was he
5  de-escalating, aside from just making distance between him and
6  the house?
7      A.  Giving him safety and giving him time as a -- as a
8  tactic for waiting for backup as he suggested -- well, first of
9  all, we don't know that Mr. Williams didn't see him.  That's --
10 that's speculative on your part.  We don't know what he saw or
11 didn't see.
12     Q.  Well, was there --
13     A.  And so --
14     Q.  -- any -- was there any announcement by Huber that he
15 was spotted or identified or felt threatened by -- by Williams?
16     A.  Not at that particular time, but the car was parked
17 right underneath the -- the stop -- or the -- the streetlight,
18 so it was pretty obvious that he was there.  He was on the
19 porch.  But going to your specific question, yeah, that --
20 based on Officer Huber's thinking and testimony about the
21 rifle, the high-powered nature of the rifle, okay, and knowing
22 that his vest wouldn't stop any of those rounds and not knowing
23 if he did announce or didn't announce what that might create
24 for Mr. Williams.
25         So backing away from -- part of de-escalation, you

                                                    218

1  have to understand, is proximity, distance, and using time as a
2  tactic and calling for additional backup and -- and additional
3  cars, which Officer Huber all -- did all those things.  And his
4  plan was to get more officers there and maybe even a
5  supervisor -- we've already talked about -- to try to call him
6  out, and, you know, secure the -- the residents in the area and
7  call him out and then deal with the -- with the firearm.  And
8  that was, in my mind, good manifestation and demonstration of
9  understanding de-escalation.
10     Q.  At transcript page 171, Captain Marino testifies to
11 the following question:  "Was the board aware of anything that
12 Officer Huber did that was or could be considered an attempt at
13 de-escalation?"  The board, of course, is the board of review
14 that took --
15     A.  Yes.
16     Q.  -- place after the shooting.
17         His answer, "We were not."
18         So they were not aware -- that the entire board of
19 all those officers were not aware of anything that Huber did
20 that was or could be considered an attempt to de-escalation.
21 How is it that you come to a different conclusion?
22     A.  That's a good question for him, because I looked at
23 what he did, you know, in his testimony.  And to me, that's
24 evidence of de-escalation as I've referenced in my report why
25 they didn't -- I can't -- I can't surmise that.  I don't know

                                                    219

1  the intent of what they did or that they didn't do, the board.
2  But in my mind, that's what exactly what he did.
3      Q.  Let's go to Exhibit 24.  Almost done.
4      A.  Okay.
5      Q.  Are you familiar with the National Consensus Policy
6  and Discussion Paper on the Use of Force originally published
7  October 2017 and revised July 2020?
8      A.  I reviewed it many years ago but not for this case,
9  but I've reviewed it many years ago.
10     Q.  Are you familiar with that source's definition on
11 de-escalation?
12     A.  I've reviewed it.
13     Q.  "It's taking action or communicating verbally or
14 nonverbally during a potential force encounter in an attempt to
15 stabilize the situation and reduce the immediacy of the threat
16 so that more time, options, and resources can be called upon to
17 resolve the situation without the use of force or with a
18 reduction in the force necessary.  De-escalation may include
19 the use of such techniques as command, presence, advisements,
20 warnings, verbal persuasion, and tactical repositioning."
21         Of those items listed in that definition that I just
22 read to you, it would be your position that tactical
23 repositioning took place as a de-escalation technique; is that
24 right?
25     A.  Yes.  And time.

                                                    220

```
1      Q.  Well, the actual techniques indicated here are
2  command presence.  Did he make a command presence?
3      A.  He was on the scene and he backed away.  Command
4  presence involves more than -- than just being on the scene.
5  But as a -- that's one definition of de-escalation, so -- and
6  that's one that you're choosing to use.
7      Q.  I am.  And I'm just wondering if given that
8  definition -- and I'm limiting it -- and you -- and I'll let
9  you, you know, deal with this in any way you want, but I just
10  want to be clear -- as to command presence, he didn't use that
11  as a de-escalation technique.  I'm not saying he -- anything
12  else about it.  He just didn't, correct?
13      A.  That's correct.
14      Q.  And he didn't use advisements, right?
15      A.  Correct.  He didn't use any verbal.
16      Q.  And he didn't use warnings or verbal persuasion of
17  any kind?
18      A.  Correct.
19      Q.  Okay.  Now, I understand your position.  You've put
20  it in your paper -- your -- your report that you believed it
21  would've been unsafe for him to do so; is that right?
22      A.  That's my -- that -- that is my opinion, and it's
23  also his opinion, Officer Huber.
24      Q.  Correct.  "Whenever possible and when such delay will
25  not compromise the safety of the officer or another and will
```

221

```
1  not result in the destruction of evidence, escape of a suspect,
2  or commission of a crime, an officer shall allow an individual
3  time and opportunity to submit to verbal commands before force
4  is used."  And that's in page 3 and that's B, paragraph 2, of
5  this document.  Do you agree with that statement?
6      A.  If it's feasible.  And -- and that's just a summary
7  statement.  That's not a full rendition of all de-escalation
8  training that's available to officers.
9      Q.  So you agree with the statement?
10      A.  Generally, if it's feasible.
11      Q.  And I understand in your report you would take issue
12  and say it was not feasible in this case or you have said that,
13  essentially?
14      A.  No.  I -- I'm -- I'm saying that he did de-escalate
15  and that was feasible.
16      Q.  So de-escalation was feasible in this case?
17      A.  And he did it.  See, you're -- you -- we have to
18  quantify what de-escalation is.  You have to define it.  It's
19  more than just verbal or being on the scene.  It's a lot of
20  different tactics, strategies, planning, thinking, movement,
21  tactical positioning, so forth.  And that's -- that's the --
22  that's the problem when most people say, "Well, he didn't
23  de-escalate."  Well, wait a minute, how are you defining
24  de-escalation?  There's a lot of variables involved, a lot of
25  components.  And it's not just verbal in trying to negotiate or
```

222

```
1  persuade or talk to someone.
2          De-escalation can be using time to back away from a
3  situation and not try to escalate.  That's what de-escalation
4  is.  It's trying to -- if I can talk someone into handcuffs or,
5  you know, when it's feasible, yeah.  But this -- this -- so
6  there's a lot of nuances.  That's why I have problems, as many
7  of us have problems, with this particular document on
8  de-escalation and others.
9      Q.  So you have a problem with this document?
10      A.  Yeah, with -- with some of it, yes, I do.
11      Q.  Of what I've just read to you, do you have a problem
12  with it?
13      A.  Because it doesn't go into all the full definition of
14  what de-escalation is.  It gives a piece and a portion of
15  de-escalation, which then leads others to try to say, well,
16  this is it and this is the way it's supposed to be done.  Well,
17  no, that's not quite accurate or true.
18      Q.  Okay.  Anything else that you don't agree with in
19  Exhibit 24?
20          MR. LUTE:  Objection.
21      Q.  As it relates to what I've shown you?
22      A.  I -- I mean, I don't recall all of this document, but
23  I know in terms of de-escalation, there's been a lot of
24  questions that folks have had on this, chiefs, sheriffs, and
25  even attorneys and trainers and so forth.  So that's all I can
```

223

```
1  say.
2      Q.  Okay.  I believe you've spoken and taught on the
3  subject of how use-of-force incidents can be defended by law
4  enforcement when it comes to civil liability, right?
5      A.  And I've also in that same -- I'm not sure what
6  you're referring to -- but I know I've also talked about in
7  that regard, too, that if you don't comply with the law and do
8  these things, you're going to get sued and successfully sued.
9  So write the check, so to speak.
10      Q.  So there's a certain thing you always do, you say,
11  when you do your reports, one of which is to focus on the
12  behaviors.  That's something that you always do --
13      A.  Yes --
14      Q.  -- when you do your reports?
15      A.  -- I do.  You're right.
16      Q.  Right.  And you said, I think at one presentation,
17  "If I can focus on the behaviors and get the Court there, then
18  I'm ahead of the game."
19      A.  I don't recall making -- but you'd have to show me
20  that.  But I do talk about -- I've always taught -- and that
21  was what my dissertation was on, active resistance from
22  *Graham versus Conner.*  What are the types of subject resistance
23  officers encounter?  And that's how you base your decisions on
24  how you respond.  You can't get inside someone's head.  You
25  have to go by their actions and behaviors or lack thereof to
```

224

1    officer's instructions or commands.
2    Q.   Okay.  Thank you.  I was just clarifying that.  And
3    when it -- when we go to your fourth opinion in this case, you
4    say, "Officer" -- well, there's another opinion at page 35.  "In
5    my opinion, Huber formed the perception that he would be shot
6    and killed by Mr. Williams as he fired the rifle, and Huber
7    fired his firearm in self-defense."  You say that, right?
8    A.   Yes.
9    Q.   And I believe your fourth opinion follows that.  I'm
10   just double checking to see which page it's on so I don't -- I
11   don't want to say I missed it, make sure I got it.  That's
12   prior, yeah.  So under -- at page 33, paragraph 20, you offer
13   your fourth opinion and as a subopinion or a repeat of that
14   opinion, at page 35, you echo the opinion at Number 4,
15   is that correct?
16   A.   Yes.  That goes into then -- that's a header that
17   goes into the -- my narrative of supporting that opinion.
18   Q.   Okay.  And in your report, you say as shown -- I'm
19   going to find the spot here.  You believe -- let's be clear --
20   you believe that it was appropriate for Huber to move towards
21   the gunfire?
22   A.   Yes.
23   Q.   And you also say that officers are trained to
24   immediately do that, move to the gunfire, even when responding
25   to a shooting situation as a solo officer, right?

225

1    A.   Yes.  Can you tell me where you're reading?
2    Q.   I'm sorry, 37.
3    A.   Okay.  37.  I'm not sure where you're at, but....
4    Q.   Bottom of the page.
5    A.   Yes, I see that first sentence in that last
6    paragraph.
7    Q.   What's the factual support for that in this case?
8    That he was trained to immediately move to the gunfire, even
9    when responding as a solo shooter?
10   A.   He completed the ALERRT training, of which that's how
11   the ALERRT training, the curriculum, guides officers to do
12   that.
13   Q.   Okay.  And so when you write in the next paragraph,
14   "Officers are trained when faced with an active shooting
15   situation to immediately respond, not without caution, but
16   recognizing and accepting the responsibility that by
17   responding, an officer's personal safety may be at risk."  Is
18   that part of the ALERRT training too?
19   A.   Yes.
20   Q.   Yeah.  And then in this incident, in the next
21   paragraph, you write, "Officer Huber had to quickly transition
22   from performing an assessment and investigation of possible
23   gunshots fired on location to an immediate situation of active
24   gunfire a few yards away from him," correct?
25   A.   Correct.

226

1    Q.   Okay.  When the gunfire erupts, is Huber in danger of
2    being shot at that point?
3    A.   I don't know because I don't know where the barrel is
4    being pointed at that time.  Possibly.
5    Q.   Do you know where Huber is when he is -- when the
6    shots start?
7    A.   He is in the street.
8    Q.   Are you aware of any investigation in this case that
9    said -- that showed rounds headed towards the street at any
10   point?
11   A.   No.  But you asked me is it possible, and I'm saying
12   it's possible because I don't know where the barrel's pointing
13   at that time.
14   Q.   Let me ask you the question again.  From your review
15   of the facts of this case, was he in a safe position when the
16   shots rang out?
17        MR. LUTE:  Objection.  You may answer.
18   A.   I don't think so --
19   Q.   And what was --
20   A.   -- no, sir.  He was out in the street.
21   Q.   -- and so --
22   A.   On the street or on the curb of the -- curb of the
23   front yard of the house, in that vicinity, in that area.
24   Q.   And at the time that the shots rang out, it's your
25   opinion that things become stressful and fast paced at that

227

1    point?
2    A.   Yes.
3    Q.   And to be fair, prior to the shots ringing out,
4    things were not fast paced, were they?
5    A.   Things?
6    Q.   The situation, the scene, it was not fast paced prior
7    to the shots ringing out?
8    A.   There was a limited amount of time that he was on --
9    on the location of the property, and then he went to the front
10   porch.  So there was a continual, I'd say, a fluid flow of
11   what's going on.  And then within him -- well, Officer Huber
12   radioing to send me more cars within at least two seconds is my
13   count, then shots begun to be fired again by Mr. Williams.  So
14   I think it's a continuous flow, but certainly he was in the
15   street when Mr. Williams begun to fire.
16   Q.   So from the time he pulled up until the time he was
17   making his last radio communication prior to the shots being
18   fired, you would agree with me that that was not a fast-paced
19   scene.
20   A.   He wasn't on scene very long and things started -- in
21   terms of fast pace, are --
22   Q.   Just trying to get to the clarity on that question.
23   Is it a fast-paced scene as you have been trained and as you
24   have trained others?
25   A.   Not at that particular time.

228

1    Q.   Okay.  And so it's when the gunfire erupts that
2  things give -- that -- that gets -- you -- I think you state,
3  Huber little time to react; that it's a stressful stimuli?
4    A.   Yes.
5    Q.   Yeah.  And so in essence, by hearing and responding
6  to that stimuli as he does, you think he acts appropriately
7  thereafter?
8    A.   Oh, yes.
9    Q.   Was Huber trained on what stress does to him when
10  he's --
11    A.   I think I recall in his BCI interview, he talked
12  about that in and understanding sensory peroeption and what
13  happens under stress, sensory response to stress, human
14  response to stress, as I recall his testimony.  And I certainly
15  after reading his training records, know he participated in
16  Simunitions training, realistic training, and simulator and
17  scenario-based training beyond the range.  So there would be an
18  understanding with all these scenarios in my mind.
19    Q.   There was this indication of the amount of time he
20  was on the scene before the shots rang out and the timing of
21  his radio transmissions.  And you concluded from looking at his
22  vest, a two-second response or a two-second delay between his
23  last communication and shots ringing out; is that right?
24    A.   From his body-worn camera.
25    Q.   Yeah.  Are you familiar with his testimony to that

                                                              229

1  effect that at the transcript page 238, he's talking on the
2  radio at 12:06:39 saying, "Male inside the residence with
3  firearm, rifle, heavy-set black male.  Can com, can you send me
4  some cars, please?"  Are you familiar with that?
5    A.   Yes.
6    Q.   At transcript 240, it says -- and at 12:07:06, Huber
7  says -- it says, "Correction, it's going to be 2300 block of
8  10th Street, 2307 10th Street, Southwest, saw a male's head
9  through the fence after I have heard the shots, got out of my
10  cruiser, went up to the porch and saw him putting a rifle
11  away."  And that's, again, at 12:07:06.  Are you familiar with
12  that?
13    A.   With -- with the testimony?
14    Q.   Yes.
15    A.   Yes, with the testimony.
16    Q.   Yeah.  And the testimony at 279 goes on 12:07:06 the
17  question is:  "That's when you radio a correction; is that
18  right?"
19         Answer, "Yes."
20         Transcript 279, "And at that point in time, the male
21  did not pose a discernible threat?"
22         Answer, "At that time?"
23         Question, "Yes."
24         "No," is the answer.
25         Question, "Would you agree with me?"

                                                              230

1         "No.  He didn't pose a -- okay -- a -- a -- inside
2  the house? No."
3         Question, "And at that point in time, this male did
4  not pose a lethal threat, correct?"
5         "No."
6         "Is that correct?"
7         "That is correct."
8         Is that consistent with your knowledge of the
9  testimony?
10    A.   I'd have to go back and look, but it -- it appears to
11  be from what you read there, if you're reading it --
12    Q.   And it -- and --
13    A.   -- correctly.
14    Q.   -- at about 12:07:26, Williams resumed firing his
15  rifle.  Is that consistent with your understanding?
16    A.   Correct.  And my understanding, as I had put in my
17  report, that his -- that Officer Huber's correction of the
18  address and information as you -- was around -- on his
19  body-worn camera is where I looked at it at about 12:06:24 as I
20  recall, and within two seconds, 26, is when the -- Mr. Williams
21  begun firing his firearm.
22    Q.   And 24 would be the time when he ended the
23  communication?
24    A.   Within that time period, roughly, estimate.  These
25  are all estimates.

                                                              231

1    Q.   So that's a problem because we have radio
2  transmissions.  We have logs.  What do you mean it's an
3  estimate?
4    A.   Well, some could be the syncing of the body-worn
5  camera takes problems, which it does from time to time.
6  Okay?  So -- and dispatch logs are not always accurate or
7  timely in terms of actually when those transmissions are placed
8  on a log.  I mean, I've noticed numerous times were that's --
9  but my -- my opinion and my impression was it was in a matter
10  of two seconds after that last radio transmission that
11  Mr. Williams begun firing his firearm, which coincides with
12  what I think BCI investigators put in their report, as well as
13  the sound waves and the audio portion from the body-worn
14  camera.
15    Q.   Okay.
16    A.   That's my recollection.
17    Q.   All right.  Now, as it relates to the shooting that
18  takes place itself, in your report, you mention nowhere the
19  notion that an officer is to know his target and beyond before
20  he pulls the trigger; isn't that right?
21    A.   I may have not put that in there.  I mean, that's
22  certainly part of their training --
23    Q.   And you're --
24    A.   -- if they -- if they can, if it's feasible.
25    Q.   -- and you're aware of that -- that rule of gun

                                                              232

1    safety, you don't shoot unless you can see your target and
2    beyond?
3              MR. LUTE: Objection. Go ahead.
4         Q.   Right?
5         A.   Well, there's a difference between law enforcement
6    activity and other gun safety, but generally that's true. But
7    in law enforcement situations, it can be a totally different
8    situation altogether.
9         Q.   All right. I don't -- I honestly do not -- I'm not
10   arguing with you. I do not understand your answer. Could you
11   explain?
12        A.   I think I just did. There's a difference between
13   general gun safety and knowing where your -- what your backup
14   is or your target. Officers try to know that as well, but in
15   some situations -- and this is a good example of that -- that
16   didn't happen here. That wasn't going to happen here.
17        Q.   When Huber comes on the scene, he knows there's a
18   porched-in fence on the west side of the property, right?
19        A.   I don't know. I don't remember his testimony to
20   that.
21        Q.   Do you -- well, doesn't he see a fence and a door
22   opening and the top head of a man walking into the house when
23   he arrives?
24        A.   Yes. But I don't know that he said, "fence," then.
25   He does later.

                                                          233

1         Q.   I mean, the fact when he came around the side, there
2    wasn't a surprise for him that there was a fence, was there?
3         A.   I don't know.
4         Q.   Did he ever testify to that?
5         A.   I can't recall that.
6         Q.   And so when he comes up to the fence --
7         A.   What point?
8         Q.   At the point that he's responding to the gunfire.
9         A.   Okay.
10        Q.   Can he see Mr. Williams?
11        A.   He can see his silhouette and he can see through the
12   slats based on his testimony.
13        Q.   He can see through the slats?
14        A.   Yes. Where there was not full connection of the
15   slats of the fence. You can see through there light, as well
16   as his silhouette, as well as the top portion, 3 to 4 inches, I
17   think, he said of his head and about 4 to 6 inches of the
18   barrel of the weapon.
19        Q.   And I -- and I remember his testimony about the
20   silhouette too. Do you know if he told that to BCI, the seeing
21   of a silhouette?
22        A.   I don't know that he was even asked. I don't know,
23   sir.
24        Q.   Fair enough. Do you know how much of the scene Huber
25   could see when he pulls the trigger?

                                                          234

1              MR. LUTE: Objection. You may answer.
2         A.   Of the scene?
3         Q.   That is, the scene that is in front of him how much
4    he's able to discern?
5         A.   I just said that. 3 to 4 inches of Mr. William's
6    forehead, his silhouette through the open portions of the slat,
7    and the barrel about 4 to 6 inches as it was moving.
8         Q.   And you're familiar with Huber's testimony at
9    transcript 250, "Did it obstruct my view?" Meaning the fence.
10             Answer, "Yes, it did."
11             Question at 278, "And when you chose to run toward
12   that gun, you could not tell if the gun was pointed at you,
13   correct?"
14             Answer, "Correct."
15             Under those circumstances, do you still believe that
16   Huber was lawfully permitted to shoot my client when he could
17   not tell if the gun was pointed at him as he ran towards the
18   gun?
19             MR. LUTE: Objection.
20        A.   Yes.
21             MR. LUTE: You may answer if you know.
22        A.   Yes.
23        Q.   And it's the sheer intensity of the gunfire that
24   leads you to that conclusion?
25        A.   And Officer Huber's testimony of his perception that

                                                          235

1    the barrel was moving in his direction.
2         Q.   We know the barrel never does move in his direction
3    by the video that we see, right?
4              MR. LUTE: Objection.
5         A.   I don't know that I would agree with that.
6         Q.   Do you have a sense that Mr. Williams wanted to kill
7    or even knew -- start there -- that Officer Huber was outside?
8              MR. LUTE: Objection. You may answer.
9         A.   I don't know if anybody knows. I saw him looking to
10   his left towards the street as he fired several times.
11        Q.   Do you have any indication that Williams knew Huber
12   was there, such that he would be shooting at -- at Huber?
13        A.   Nobody does.
14        Q.   Actually, the video does. Doesn't the video show my
15   client shooting the gun into the sky?
16             MR. LUTE: Objection.
17        A.   As he's looking left towards the street.
18        Q.   Right. But as he's looking in that direction, can
19   Huber see his face?
20        A.   He can see the top of his head as I've already
21   indicated.
22        Q.   But can he see where my client is looking or what
23   he's trying to do with the gun?
24             MR. LUTE: Objection.
25        Q.   Do you remember that testimony?

                                                          236

1    A.  What he's trying to do with the gun?  He can see
2 definitely what he's doing with the gun because there's
3 evidence of the muzzle flash and the smoke and haze coming from
4 him discharging the gun.  And in his perception, as he's
5 articulated, as I've already said, moving in his direction.
6    Q.  And while that was his perception, did he put himself
7 in a position where his own stress reaction to the stimuli of
8 the gun going off rendered his perception at odds with what was
9 actually happening?
10    A.  I don't believe so.
11    Q.  And so if it -- if that's what he did, just if, if he
12 put himself in a position responding to that stimuli where his
13 perceptions were distorted and he responds to those distortions
14 and kills my client, would that be reasonable police conduct in
15 your opinion?
16    MR. LUTE:  Objection.  You may answer.
17    A.  It was reasonable for him to use deadly force because
18 he feared for his life and he shot in self-defense based on
19 Mr. Williams' actions.
20    Q.  Did you answer my question?
21    A.  I don't know.
22    Q.  Please try.
23    A.  I did.  You're asking me was his force justified
24 in --
25    Q.  No.

237

1    A.  -- using deadly force --
2    Q.  I said if --
3    A.  -- or in response to Mr. Williams' behavior.  And
4 that's -- that's -- I agree that that's true, yes.
5    Q.  No, my question was different.  My question was:  If
6 Mr. Huber responds to the stimuli of the gunfire in such a
7 manner where his perceptions become distorted and he has been
8 trained -- that could happen -- and he misperceives the gun
9 being pointed towards him and kills my client because of that
10 perception, is he acting as a reasonable police officer in that
11 case?
12    A.  Yes.
13    MR. LUTE:  Objection.
14    Q.  And how so?
15    A.  Because it's based on his perception.  And
16 Mr. Williams created the need to -- for Mr. -- for
17 Officer Huber to respond, not the other way around.
18    Q.  Is Mr. Huber or my client trained on how to respond
19 to gunfire?
20    A.  Yes, he is.  Officer Huber is.
21    Q.  Yes, Mr. Huber is.  And Officer Huber is trained on
22 how to do that safely, correct?
23    MR. LUTE:  Objection.  You may answer.
24    A.  Now we're getting into various issues about safety.
25 Based on his ALERRT, he may have to take risks that put him in

238

1 a vulnerable position, or any officer, but to -- to stop the
2 shooting.
3    Q.  I mean --
4    A.  So -- so yeah, we try to -- the officer -- we train
5 officers.  I've trained officers.  Officer Huber, yeah, you go
6 to the gunfire.  And it may put your life at risk, but the need
7 to respond over -- overtakes that risk and the safety of the
8 officer.
9    Q.  And I'm just trying to be clear as to how you
10 perceive this as an expert and how you would teach the subject,
11 perhaps even where an officer knows that he -- stimuli can warp
12 his perceptions, he can become tunnel-visioned on any number of
13 things, or even narrow-visioned, and have any number of
14 distortions by virtue of that stimuli.  If Huber runs to the
15 gunfire, knowing his perceptions could be distorted, and they
16 are, is he acting reasonably in your opinion?
17    A.  Yes.
18    Q.  And so when my client shoots the gun off, not -- you
19 don't know, do you, if he's aware of Huber being present?
20    A.  Well, it looks like he does.  I mean, he's looking
21 towards his left, and that's where Officer Huber's coming up
22 the driveway.
23    Q.  And as he is discharging his weapon into the air, do
24 you see my client make any motions with the gun that points the
25 weapon ever at Huber's direction?

239

1    MR. LUTE:  Objection.  You may answer.
2    A.  I didn't see any pointing of the barrel but certainly
3 moving in the direction of Officer Huber.
4    Q.  It's moving in the direction, you think?
5    A.  Yes.
6    Q.  And you base it on the video that you saw?
7    A.  Yes.
8    Q.  Captain Davis testified to this question at
9 transcript 86, "Is there a video that shows the gun ever
10 pointed in the direction of Huber?"
11    And he says, "Not that I saw."
12    Do you agree with that?
13    A.  Yeah, yes.
14    Q.  When the gunshot starts, Huber runs to the fence
15 porch, and he testified that it obstructed his view.  Do you
16 disagree with that?
17    A.  I think he answered that, but I think later on, that
18 same line of testimony and questioning that, again, it was
19 obstruct-- he couldn't see the full body of Mr. Huber, but you
20 could see the light through the slats.  You could see his
21 silhouette, and you could see the top of Mr. -- 3 to 4 inches
22 of his forehead, Mr. Williams' forehead.
23    Q.  But his view was obstructed.  You would agree with
24 that?
25    A.  Yes.

240

1    Q.   Okay.  And when -- when he chose -- when Huber chose
2  to run towards the gun, he couldn't tell if the gun was pointed
3  at him; isn't that right?
4    A.   I don't know that he ever testified the gun was
5  pointed at him.  As he said, it was coming at his direction.
6    Q.   He says at a transcript 278, question, "And when you
7  chose to run toward the gun, you could not tell if the gun was
8  pointed at you, correct?"
9         Answer, "Correct."
10   A.   Correct.
11   Q.   Okay.  At no point does your report address the
12 decision of Huber to shoot through a fence.  And I'm just
13 curious, did -- did you consider in your report the risk that
14 Huber put his wife in who was standing by the door with the
15 storm door open?
16   A.   Actually, you're inaccurate, because I do talk about
17 him shooting through the fence on page 45 in paragraph -- full
18 paragraph 2.
19   Q.   Yeah, you mentioned.  What I mean is --
20   A.   No mentioning, I --
21   Q.   Yeah.
22   A.   -- I discussed it.
23   Q.   But do you just discuss --
24   A.   Described it.
25   Q.   -- the risk to -- what I'm getting at -- and I'm -- I

241

1  apologize, it has been a long day.
2    A.   Yes, sir.
3    Q.   Do you -- do you discuss at all the risk he put to
4  Ms. Williams?
5    A.   No.
6    Q.   Did he put Ms. Williams in risk of getting shot?
7    A.   I don't believe so.
8    Q.   Could he have seen Ms. Williams near the doorway as
9  he begun to shoot?
10   A.   No.  But Mr. Williams could see.  I think
11 Mr. Williams put himself and his wife at risk.
12   Q.   Where an officer discharges his weapon under
13 circumstances where his target is obstructed and he can't see
14 beyond his target, does that officer act recklessly?
15        MR. LUTE:  Objection.
16   Q.   In your opinion?
17   A.   You have to look at the whole totality of the facts.
18 No, it does not.
19   Q.   Do you have an opinion as I -- that you state in your
20 report -- and we're almost done -- Huber testifies in
21 transcript 286 to 287, "And when you heard the gunfire, you had
22 the opportunity to call for assistance."
23        He said, "That could have been an option."
24        Do you agree with him?
25   A.   He said it, "could have been," but it was not --

242

1  you're talking about once he heard the -- the gunfire?
2    Q.   Yes.  Did he --
3    A.   Or ran to the gunfire?
4    Q.   -- once he heard the gunfire --
5    A.   What -- what -- what stage are we at here?
6    Q.   -- "When you heard the gunfire," the question is,
7  "you had the opportunity to call for assistance?"
8         And his answer was:  "That could have been an
9  option."
10   A.   It "could have been."  I would agree with that, but
11 the time essence of that and the severity of -- of the threat
12 that was responding to, in my mind, did not allow him to do
13 that.
14   Q.   You have an opinion that the review board's process
15 of assessing the incident was performed consistent with
16 expected law enforcement standards.  I'm trying to find the
17 actual spot there.  This would be with respect to Opinion 6.
18 It's you just have an investigation of the incident there at
19 page 47.  I'm trying to find the spot where you said it in the
20 report.
21        You write, "As I would expect," -- this is on
22 page 50.  It's the last opinion.  "As I would expect,
23 command" -- or, "CPD commanders complied with their policy and
24 practice by performing an administrative review of the shooting
25 incident."

243

1         You go on to say -- where is the rest of it? -- yeah,
2  at the very bottom of the last sentence.  "In my opinion, the
3  review board's process of assessing the incident was performed
4  consistent with accepted law enforcement practices," right?
5    A.   Yes.
6    Q.   Okay.  Transcript 170, Marino testified, "Did the" --
7  question, "Did the board consider whether or not Officer Huber
8  made any attempt to de-escalate before Williams began actively
9  firing the weapon?
10        Answer, "I don't remember if he had attempted to
11 make -- I don't know if it was feasible at that time, but I
12 don't remember the board discussing that, no."
13        Question, "So the board's discussion was limited at a
14 time period after Mr. Williams began actively firing his
15 rifle?"
16        Answer, "Yes."
17        Is that consistent with your knowledge of the
18 testimony in this case?
19        MR. LUTE:  Objection.  Go ahead.
20   A.   Without reading it, but from my impression of it,
21 yes, without having it in front so I can go back over it, but,
22 yes.
23   Q.   Do you -- do you believe that it was appropriate for
24 the board to limit the time period of its review to the time
25 after Williams began firing his rifle in deciding whether Huber

244

1    committed any policy violations?
2         A.   Yes.
3         Q.   And why is that?
4         A.   Because that's the core of this -- of the facts of
5    this case, of this incident, in my mind.
6         Q.   So the core of -- of it is -- what does that mean?
7    This is the core of --
8         A.   That's a central feature, a central focus.
9         Q.   So for you as well, your focus is -- or the core
10   feature is the gunfire that is sounding from the porch that
11   Huber hears when he's in the street?
12        A.   Yes.  Because that led to his response, which was
13   appropriate, which I've already indicated.  And then having
14   to -- based on the create of the need and his perception,
15   firing self-protection and self-defense by firing his firearm
16   at Mr. Williams.
17              COURT REPORTER:  I'm sorry, say that last part
18   again.
19              THE WITNESS:  And firing his firearm at
20   Mr. Williams.
21        Q.   Would there have been anything improper or wrong for
22   Huber to stay by his car until backup arrived, in light of the
23   sound that he heard?  Did that violate any training that you're
24   aware of?
25        A.   He's trained to go to the gunfire, and so yeah, I

245

1    think it would violate his training.
2         Q.   Would he have been disciplined for that, you think?
3         A.   I don't know.  I know -- or all I can say is I can
4    give you a lot of examples where there was no law enforcement
5    response on active gunfire where they were disciplined and
6    where numerous lives were lost because of inaction of police
7    officers.
8         Q.   I think we saw that from the holiday.
9         A.   Yes, sir, we did.
10        Q.   In this particular case, do you have any belief that
11   the -- that the officer -- that Officer Huber could have
12   averted the shooting death of my client?
13              MR. LUTE:  Objection.  You may answer.
14        A.   No.
15        Q.   Do you have any belief or thought at all based on
16   your training, knowledge, or experience that Mr. Huber failed
17   to take the time to assess and to connect with or communicate
18   with my client at any point?
19        A.   No, sir.
20        Q.   What factual basis do you have for believing that him
21   arriving lights and sirens would have put him in danger as he
22   testified to seeing the man go into the house -- seeing a man
23   go into the house as he arrived?
24        A.   It would alert the neighborhood.  It would alert
25   other people.  He doesn't know where the shooting is coming

246

1    from.  So for him to arrive on the scene -- and he testified to
2    this, as I recall, that typically when you come in, you like to
3    park maybe a block away or two.  Here, he happened to come in
4    and there he finds that this is where the actual gunshot
5    perhaps was coming from.
6              So had he gone lights and siren, I think that
7    would've put him in more jeopardy because he didn't know what
8    the unknowns were.  He didn't know what was there or what was
9    not there or if someone, as I say in my report, had set up an
10   ambush waiting, because typically some folks know, oh, yeah,
11   officers may come with lights and siren, which is like, "Here I
12   am.  Here I am."  And that's not a safe thing for the officer
13   to do, and certainly I think that's evidence in this case.
14        Q.   Is there any evidence in this case that Mr. Huber
15   faced an ambush?
16        A.   No.  But he didn't know what he was going to face.
17        Q.   And in light of not knowing what he was going to
18   face, would it have been prudent for him to have his lights and
19   sirens on to alert individuals that he was arriving?
20        A.   Not in my mind, no, sir.
21        Q.   The more prudent tactic in your mind is to keep
22   lights and sirens off?
23        A.   Yes.  In this kind of situation, yes, where you don't
24   have the knowns.
25        Q.   And then the other question I have is, is there any

247

1    factual support for the notion that he was in an area of the
2    City of Canton known to either ambush or create murderous
3    conditions for police officers?
4         A.   I don't know that, sir.
5         Q.   You know of Mr. Huber's prior history with
6    shootings?
7         A.   I don't.  I remember looking just briefly at his
8    criminal history, but I don't know the extent of that.  I can't
9    comment on that.
10        Q.   Did you review any documentation or information at
11   all that discussed any prior uses of force involving Huber?
12        A.   I don't see that -- I didn't see that.
13        Q.   Were you provided it?
14              MR. LUTE:  Objection.  Go ahead.
15        A.   I don't recall that, sir, actually.  I didn't -- that
16   was not my focus.
17        Q.   If you knew that he had been involved in a prior
18   shooting, would that have any bearing or would you have wanted
19   to know that as an expert?
20        A.   No.
21        Q.   And if he had been involved in a prior shooting where
22   someone had died, would that even mattered to you?
23        A.   No.
24              MR. LUTE:  Objection.  You may answer.
25        A.   No, sir, it wouldn't.

248

1    Q.   If you had been aware that officers were not
2  disciplined for uses of force at the City of Canton, would that
3  be anything that you would want to know?
4         MR. LUTE:  Objection.  Go ahead.
5    Q.   Would that -- would that impact your opinions at all
6  in this case?
7    A.   No, sir, no.
8    Q.   If officers were allowed to run lawless through the
9  city, would that be something you'd want to know?
10    A.   No, sir.  I'm looking at the fact-based pattern on
11  this case and this case in law.  That's it.
12         MR. DICELLO:  I have no further questions at
13  this point.
14         MR. LUTE:  All right.  He'll read.
15         (Whereupon, the deponent or a party having
16  specifically reserved reading and signing of the deposition,
17  the taking of the deposition was concluded at 6:20 p.m. the
18  same date.)
19         (Plaintiff's Exhibits 1 through 24 were marked for
20  identification by the court reporter.)
21
22
23
24
25

                                              249

---

                      C E R T I F I C A T E

1
2  STATE OF GEORGIA,
3  COUNTY OF TIFT:
4       I hereby certify that the foregoing transcript was taken
5  down, as stated in the caption, and the questions and answers
6  thereto were reduced to typewriting by computer-aided
7  transcription under my direction; that the foregoing 249 pages
8  represent a true, correct, and complete transcript of the
9  evidence given on the 4th of March 2024, by the witness
10  DARRELL L. ROSS, Ph.D. who was first duly sworn by me.
11       I further certify that I am not of kin or counsel to the
12  parties in the case, am not in the regular employ of counsel
13  for any of the said parties, nor do I have any interest in the
14  outcome or events of the case.
15       I further certify that the original of this deposition
16  will be filed with Robert F. DiCello, Esquire, Counsel for the
17  Plaintiff.
18
19       This the 20th day of March 2024.
20
21       Debbie Young
         Debbie Young
22       Certified Court Reporter
         Certificate No. 6072-1397-4926-1312
23
24
25

                                              250

---

                      D I S C L O S U R E

1
2  STATE OF GEORGIA           WITNESS:  Darrell L. Ross, Ph.D.
   COUNTY OF TIFT
3
4       Pursuant to Article 10-B of the Rules and Regulations of
5  the Board of Court Reporting of the Judicial Council of
6  Georgia, I make the following disclosure:
7       I, Debbie Young, am a Georgia Certified Court Reporter. I
8  am here as an independent contractor.
9       I am not disqualified for a relationship of interest under
10  the provisions of O.C.G.A. 9-11-28(c).
11       I was contacted by the offices of Memory Reporting, Inc.,
12  to provide court-reporting services for these proceedings.
13       I will not be taking this deposition under any contract
14  that is prohibited by O.C.G.A. 15-14-37 (a) or (b).
15       I have no written contract to provide reporting services
16  with any party to the case, any counsel in the case, or any
17  reporter or reporting agency from whom a referral might have
18  been made to cover this deposition.
19       I will charge my usual and customary rates to all parties
20  in the case.
21       Dated this 4th day of March 2024.
22
23       Debbie Young
         Certified Court Reporter
24       No. 6072-1397-4926-1312
25

                                              251

---

                      E R R A T A   S H E E T

1
2  Deposition of DARRELL L. ROSS, Ph.D.
3       I do hereby certify that I have read the foregoing
4  transcript of my testimony given on March 4, 2024, and that:
       _____ 1) There are no changes noted.
5       _____ 2) The following changes are noted:
   Corrections to be made pursuant to Rule 30(7)(e) of the Federal
6  Rules of Civil Procedure and/or Georgia Code Annotated
   9-11-30(e), both of which read in part:  Any changes in form or
7  substance which you desire to make shall be entered upon the
   deposition...with a statement of the reasons given...for making
8  them.  Accordingly, use the form below:

9  Page No. _____ Line No. _____ should read: _____
10
   And the reason for the change is: _____
11
12  Page No. _____ Line No. _____ should read: _____
13
   And the reason for the change is: _____
14
15  Page No. _____ Line No. _____ should read: _____
16
   And the reason for the change is: _____
17
18  Page No. _____ Line No. _____ should read: _____
19
   And the reason for the change is: _____
20
21  Page No. _____ Line No. _____ should read: _____
22
   And the reason for the change is: _____
23
24  And the reason for the change is: _____
25

                                              252

Page No. _____ Line No. _____ should read: __________________
__________________________________________________________
And the reason for the change is: ___________________________
__________________________________________________________
Page No. _____ Line No. _____ should read: __________________
__________________________________________________________
And the reason for the change is: ___________________________
__________________________________________________________
Page No. _____ Line No. _____ should read: __________________
__________________________________________________________
And the reason for the change is: ___________________________
__________________________________________________________
Page No. _____ Line No. _____ should read: __________________
__________________________________________________________
And the reason for the change is: ___________________________
__________________________________________________________

If supplemental or additional pages are necessary, please furnish same in typewriting annexed to this deposition.

______________________________________
DARRELL L. ROSS, Ph.D.

Signed before me this ________ day of

__________________ , 2__________.

________________________________
Witness/Notary Public

COURT REPORTER: [5] 25/21 67/7 67/9 91/8 245/17
MR. DICELLO: [41] 6/4 7/25 8/5 25/22 26/2 26/5 30/2 30/6 32/6 32/10 32/13 37/4 51/5 51/8 51/11 54/12 57/7 57/10 57/13 57/23 64/5 64/9 67/5 67/8 67/12 67/14 82/17 82/21 83/14 83/25 84/3 84/8 123/3 141/15 157/23 163/23 164/1 164/4 169/19 169/23 249/12
MR. FOUCHÉ: [5] 51/7 57/9 57/12 82/19 164/3
MR. L'HOMMEDIEU: [13] 30/1 30/4 32/12 154/14 155/21 157/7 169/17 169/22 173/25 178/13 188/1 193/4 193/18
MR. LUTE: [83] 7/1 8/4 25/3 28/12 34/22 35/21 41/16 54/11 54/13 56/2 58/14 62/23 64/1 64/4 84/2 108/18 122/14 122/19 125/25 131/3 133/8 143/17 148/12 149/6 151/6 153/22 154/15 154/19 155/15 155/17 155/22 156/8 156/22 157/6 163/9 173/10 173/13 173/24 175/2 178/14 179/3 180/7 180/17 181/10 182/6 183/4 183/6 185/21 186/9 186/18 188/20 189/12 193/3 205/10 206/18 210/1 211/25 213/13 213/22 214/18 215/1 215/10 223/20 227/17 233/3 235/1 235/19 235/21 236/4 236/8 236/16 236/24 237/16 238/13 238/23 240/1 242/15 244/19 246/13 248/14 248/24 249/4 249/14
THE WITNESS: [5] 64/3 91/9 182/7 210/2 245/19

$
$20,000 [1] 102/9
$3,000 [2] 11/4 11/5
$450 [1] 11/14

'
'09 [1] 103/8
'12 [1] 89/3
'21 [2] 139/19 161/19
'22 [3] 139/19 161/19 168/2
'23 [7] 9/25 12/6 90/24 90/25 91/21 92/2 92/7
'24 [1] 7/8
'60s [3] 28/25 41/8 84/21
'61 [2] 111/17 111/19
'70 [1] 82/15
'70s [3] 41/8 41/9 84/22
'71 [4] 80/5 82/16 111/16 111/19
'73 [3] 74/8 80/7 80/8
'78 [1] 74/8
'79 [1] 74/8
'80s [2] 73/20 201/10
'81 [1] 114/11
'85 [2] 74/6 79/1
'90s [3] 73/20 121/7 201/10
'91 [2] 103/17 114/11
'97 [1] 117/4
'98 [1] 117/2
'celebratory [1] 168/8
'continued [1] 81/23
'Enough [1] 169/13
'Okay [1] 210/14

.
.001 [1] 61/11

0
00655 [1] 1/7
0693 [1] 1/24

1
1 percent [1] 24/15
1,741 [1] 111/10
1.8 percent [1] 60/5
10 [6] 2/15 54/12 70/12 78/14 110/16 138/25
10-B [1] 251/4
100 [2] 3/7 5/3
10:00 [1] 166/18
10th [3] 58/19 230/8 230/8
11 [3] 2/17 55/5 164/15
11:25 [1] 1/18
12 [6] 2/19 57/8 57/17 144/15 172/5 177/23
12 years [1] 192/13
124 [1] 111/10
125 [1] 80/18
12:06:24 [1] 231/19
12:06:39 [1] 230/2
12:07:06 [4] 210/10 230/6 230/11 230/16
12:07:26 [1] 231/14
13 [8] 2/20 57/24 58/4 128/22 135/22 144/16 144/16 146/9
1312 [3] 1/23 250/22 251/24
14 [10] 2/21 58/10 128/22 135/18 135/25 135/25 147/11 147/13 147/14 147/18
15 [6] 2/22 30/7 74/16 167/20 174/13 177/5
15 years [1] 70/12
15-14-37 [1] 251/14
157 [1] 3/8
16 [6] 2/23 30/7 129/14 132/15 137/2 138/5
168 [1] 81/9
169 [1] 3/9
17 [12] 2/6 3/3 30/7 82/18 82/19 84/1 84/2 84/3 139/11 181/21 194/16 195/21
17,000 [1] 58/21
170 [1] 244/6
171 [4] 115/24 116/1 116/6 219/10
172 [1] 54/15
18 [8] 3/4 30/7 82/20 84/4 129/22 132/7 181/21 198/4
18 percent [1] 170/25
18,000 [2] 173/17 175/21
1805 [1] 1/17
186 [3] 205/6 206/16 207/14
19 [2] 3/5 30/7
195 [1] 3/11
1967 [2] 111/9 114/7
1970 [1] 111/16
1970s [2] 37/16 121/7
1971 [5] 80/3 111/10 111/21 114/7 114/11
1973 [6] 74/4 79/1 79/5 79/15 80/6 80/13
1982 [1] 52/23
1983 [10] 42/1 45/6 72/21 73/19 112/23 112/25 113/2 114/16 114/24 149/25
1985 [1] 32/4
1985-1999 [2] 2/18 55/8
1989 [2] 103/17 167/25
1990 [3] 103/17 113/11 113/15
1993 [1] 128/9
1996 [3] 38/7 60/4 122/20
1997 [2] 38/7 168/2
1998 [2] 32/18 32/24
1999 [5] 2/18 16/15 37/25 55/8 135/9
1:15 [1] 64/6
1:36 [1] 64/7
1st [2] 74/19 166/17

2
2,400 [1] 81/9
20 [7] 3/7 29/24 30/7 30/7 30/15 185/3 225/12
20 years [1] 70/16
2000 [9] 16/15 54/7 110/17 114/5 116/10 116/11 116/23 117/22 135/9
2002 [1] 173/11
2003 [2] 38/23 170/16
2006 [4] 55/5 55/25 164/14 167/10
2008 [4] 2/8 29/23 30/17 103/8
2010 [7] 3/9 74/19 74/23 89/3 170/7 177/9 187/20
2011 [2] 55/5 96/17
2012 [3] 102/13 102/18 107/25
2013 [1] 83/3
2015 [2] 103/22 104/11
2016 [2] 60/17 94/13
2017 [1] 220/7
2018 [5] 8/20 20/22 89/18 109/16 202/16
2018-2023 [1] 2/5
2019 [1] 89/18
2020 [20] 2/7 2/14 2/19 3/8 25/19 26/1 27/15 27/25 51/10 52/5 57/10 57/18 61/22 122/2 122/2 122/6 122/16 157/24 164/8 220/7
2021 [3] 161/18 194/25 195/11
2022 [4] 161/18 168/2 181/7 194/24
2023 [19] 2/5 2/20 3/4 8/20 8/22 20/17 38/25 46/24 48/9 58/1 58/19 64/13 84/5 84/11 87/18 92/10 116/9 117/22 194/24
2024 [7] 1/19 88/24 89/19 250/9 250/19 251/21 252/3
208 [1] 142/14
20th [1] 250/19
21 [2] 3/8 157/24
218 [1] 4/14
22 [4] 3/9 132/24 170/3 170/12
220 [1] 3/12
229-392-3309 [1] 1/25
23 [4] 3/11 93/18 195/20 199/6
2300 [1] 230/7
2307 [1] 230/8
232 [3] 48/18 50/15 64/15
238 [1] 230/1
24 [10] 3/12 16/18 23/25 24/25 25/12 198/25 220/3 223/19 231/22 249/19
240 [1] 230/6
249 [1] 250/7
25 [8] 2/7 16/18 20/1 23/25 24/25 25/13 81/22 199/13
250 [1] 235/9
253 [2] 206/6 206/16
26 [2] 207/6 231/20
269 [2] 209/18 209/19
26th [1] 74/23
27 [1] 207/6
271 [1] 212/12
278 [2] 235/11 241/6
279 [2] 230/16 230/20
28 [1] 251/10
280 [2] 210/15 210/21
286 [1] 242/21
287 [1] 242/21
29 [7] 2/7 2/8 2/14 2/19 3/8 61/22 199/19
29th [7] 9/16 25/19 26/1 51/10 57/10 157/24 164/8
2nd [1] 195/1

3
3,000 [1] 68/14
3,894 [1] 111/10
30 [6] 72/7 204/23 206/23 207/21 252/5 252/6
30 years [1] 95/3
300 [2] 142/14 215/15
300 section [1] 212/11
300.5 [1] 215/16
300.6 [1] 212/9
302 [1] 142/14
30th [1] 9/16
31 [1] 209/11

3
310 [1] 142/14
311 [3] 49/21 50/15 64/15
31793-0693 [1] 1/24
31st [3] 80/3 80/6 80/13
32 [1] 2/10
33 [1] 225/12
330-489-3395 [1] 4/15
330-499-6000 [1] 4/22
330-670-7602 [1] 5/4
3309 [1] 1/25
3395 [1] 4/15
35 [6] 9/2 9/14 9/24 72/7 225/4 225/14
36 [2] 2/12 2/13
37 [3] 226/2 226/3 251/14
3737 [1] 5/2
3:19 [1] 135/10
3:43 [1] 135/11

4
40 [2] 78/14 164/15
40 years [1] 72/8
400 [1] 4/21
42 [3] 9/3 9/9 204/10
44 [3] 9/4 9/6 9/12
440-953-8888 [1] 4/6
44060 [1] 4/6
44333 [1] 5/3
44702 [1] 4/15
44720 [1] 4/22
45 [1] 241/17
47 [1] 243/19
4th [7] 1/18 151/3 151/16 154/12 185/6 250/9 251/21

5
5 years [1] 70/17
50 [7] 11/17 11/19 45/5 117/19 133/14 206/19 243/22
50-page [1] 214/8
500 [1] 74/10
500,000 [1] 38/6
501 [1] 35/24
51 [1] 2/14
54 [2] 2/15 55/18
55 [3] 2/17 56/17 167/10
57 [2] 2/19 2/20
58 [1] 2/21
5:23-CV-00655 [1] 1/7

6
60 [1] 117/19
60,000 [1] 45/5
6000 [1] 4/22
601 [1] 36/24
606 [1] 36/24
6072-1397-4926-1312 [3] 1/23 250/22 251/24
64 percent [3] 190/25 191/6 191/25
66 [1] 170/10
67 [1] 33/1
69 [1] 33/10
693 [1] 1/24
6:20 [1] 249/17

7
70 [1] 170/10
74 [2] 2/22 170/11
75 [1] 38/9
7602 [1] 5/4
78 [2] 170/10 170/11
79 [1] 2/23
7:30 [1] 81/6

8
81 [1] 210/21
8160 [1] 4/5
82 [1] 3/3
83 [1] 68/13
84 [1] 3/4
85 [1] 68/14
86 [1] 240/9
8888 [1] 4/6
8th [4] 2/13 20/16 36/25 46/23

9
9-11-28 [1] 251/10
9-11-30 [1] 252/6
97 [1] 3/5
99 [1] 24/14
9th [2] 195/1 195/11

A
a.m [3] 1/18 81/6 166/18
abandoned [1] 160/3
abdicated [4] 139/2 142/8 142/19 142/20
abide [3] 179/6 179/7 179/14
ability [4] 37/6 110/13 134/15 203/4
able [10] 7/11 31/19 86/18 86/20 93/3 138/6 186/7 204/9 204/10 235/4
about [139]
above [4] 48/18 132/25 181/21 206/25
abreast [1] 89/10
absence [1] 148/24
absolute [1] 33/3
absolutely [9] 24/22 25/14 26/22 35/22 60/22 121/17 123/10 150/5 218/1
abuse [1] 149/14
academia [3] 84/15 84/16 84/17
academic [20] 30/9 30/16 33/18 33/20 33/23 40/16 40/23 46/20 50/13 83/22 109/25 110/3 112/23 117/20 120/10 130/14 131/1 134/20 150/25 160/11
academy [6] 29/13 86/19 93/20 93/21 202/1 202/3
accepted [1] 244/4
accepting [1] 226/16
access [5] 66/22 66/22 66/23 84/25 165/5
accessibility [1] 41/19
according [2] 52/1 160/7
Accordingly [1] 252/7
account [1] 77/24
accountable [1] 22/11
accrediting [1] 148/19
accurate [17] 7/5 18/18 36/7 43/25 45/10 58/17 60/19 60/21 63/20 118/1 131/20 135/22 160/3 191/15 191/17 223/17 232/6
accurately [1] 37/11
accusation [1] 184/16
accusations [1] 43/25
achieved [1] 191/1
acknowledge [1] 34/12
acknowledgement [2] 34/9 135/2
acknowledgements [2] 134/2 134/5
acknowledging [1] 29/14
acquire [1] 129/15
acronym [1] 69/9
across [4] 40/7 122/17 146/13 174/4
act [8] 24/10 77/17 77/23 78/6 88/7 186/8 186/8 242/14
acting [3] 81/20 238/10 239/16
action [5] 1/6 81/8 141/6 145/5 220/13
actions [5] 33/4 141/2 217/12 224/25 237/19
activates [1] 203/17
active [8] 92/22 92/24 183/23 199/14 224/21 226/14 226/23 246/5
actively [2] 244/8 244/14
activities [3] 7/19 85/16 85/20
activity [3] 77/20 88/4 233/6
acts [4] 52/3 126/14 155/8 229/6
actual [5] 93/7 105/24 221/1 243/17 247/4
actually [32] 39/25 60/6 61/21 63/22 78/2 79/17 81/10 81/12 83/21 89/18 91/15 111/5 126/12 149/8 152/14 161/14 162/23 164/18 176/14 179/1 194/23 201/10 202/8 207/18 211/15 212/11 217/25 232/7 236/14 237/9 241/16 248/15
actuarial [1] 131/25
add [6] 7/18 19/23 110/11 116/9 117/16 202/6
adding [1] 116/23
addition [2] 8/10 10/20
additional [8] 7/2 14/18 19/11 107/14 189/1 219/2 219/2 253/11
additions [1] 122/22
address [15] 142/6 143/2 143/24 150/22 151/4 156/13 163/13 174/14 177/12 177/14 214/15 215/24 216/8 231/18 241/11
addressed [3] 147/7 158/17 177/24
addresses [3] 141/20 157/2 174/2
addressing [3] 155/5 158/12 214/13
administered [2] 111/8 114/6
administrate [1] 145/6
administration [4] 30/21 31/1 39/23 75/24
administrative [5] 39/13 43/8 43/9 156/4 243/24
administrator [2] 53/6 130/8
administrator's [1] 145/7
administrators [24] 29/17 48/20 48/24 49/10 51/3 53/7 87/25 96/4 106/21 138/22 139/2 139/11 142/8 142/19 145/25 146/12 147/7 149/18 151/10 160/20 162/20 166/8 194/20 199/1
admit [2] 59/14 76/14
admittance [2] 89/25 89/25
advance [1] 84/20
advantage [3] 204/24 205/24 206/25
advice [2] 77/15 186/5
advisable [2] 206/1 207/24
advised [2] 154/11 155/20
advisements [2] 220/19 221/14
advising [1] 154/3
advocacy [1] 78/24
advocate [2] 157/15 164/19
advocated [1] 145/19
AELE [19] 2/12 2/20 3/4 7/21 7/21 35/25 36/15 36/18 57/25 58/1 73/20 84/6 84/11 89/1 89/19 92/7 111/9 111/24 114/6
affairs [1] 34/10
affect [3] 2/21 58/12 203/12
afield [1] 53/5
aforementioned [1] 199/1
African [1] 112/7
after [33] 6/6 12/18 14/24 44/4 51/16 57/16 58/4 79/11 79/18 79/22 80/1 82/13 83/18 88/10 91/15 104/7 113/10 116/2 137/11 150/3 166/15 167/21 181/2 181/7 189/1 189/5 192/25 219/16 229/15 230/9 232/10 244/14 244/25
afternoon [3] 80/20 131/15 183/12
again [40] 23/3 30/4 30/14 31/21 41/18 43/1 43/8 54/20 57/11 68/20 84/14 89/14 94/10 95/2 111/17 111/20 116/21 122/15 130/21 131/6

A
again... [20] 143/11 144/16 155/23 156/12 156/23 161/21 164/1 178/21 182/11 183/10 183/19 190/14 191/20 193/5 195/14 227/14 228/13 230/11 240/18 245/18
against [18] 8/1 33/3 34/21 45/6 45/10 50/6 50/24 85/3 111/9 113/23 114/6 116/12 117/9 117/23 127/11 127/21 129/19 146/23
agencies [44] 2/18 20/25 21/23 23/6 24/3 24/6 24/12 26/12 29/5 35/2 35/14 40/10 41/4 41/15 43/13 48/9 55/7 58/22 68/4 68/8 90/14 90/17 95/6 96/1 101/25 106/10 106/12 107/16 107/20 107/21 128/12 128/23 129/7 129/18 130/6 133/1 134/11 150/21 156/5 156/18 157/16 158/11 164/9 175/21
agency [27] 21/12 24/6 33/13 35/3 50/5 59/25 65/8 65/16 95/22 118/5 118/5 140/12 140/17 140/21 145/2 150/8 155/6 160/13 160/15 161/3 166/7 167/24 168/6 174/22 174/23 179/24 251/17
agency's [1] 173/22
Ages [1] 101/3
aggressive [1] 101/4
ago [6] 16/18 43/19 45/14 183/8 220/8 220/9
agree [39] 21/4 36/17 49/18 60/21 85/6 101/20 110/2 110/4 110/5 114/9 114/10 114/11 142/22 144/21 145/23 154/24 158/23 160/25 167/14 172/23 173/14 209/20 210/21 213/16 213/17 213/24 213/24 214/16 222/5 222/9 223/18 228/18 230/25 236/5 238/4 240/12 240/23 242/24 243/10
agreed [1] 46/13
agreeing [1] 211/9
ahead [38] 8/4 25/3 26/2 28/12 35/21 41/16 51/11 56/2 62/23 84/8 122/14 122/19 125/25 133/8 148/12 149/6 151/6 153/22 154/15 155/17 156/8 157/6 163/9 178/14 180/17 188/2 189/12 205/10 211/8 213/13 213/22 214/18 215/12 224/18 233/3 244/19 248/14 249/4
aided [1] 250/6
air [4] 158/22 186/7 186/15 239/23
Akron [1] 5/3
al [3] 1/8 4/10 60/17
ALERRT [4] 226/10 226/11 226/18 238/25
alert [4] 183/15 246/24 246/24 247/19
alerted [1] 207/1
alertness [1] 199/17
align [1] 101/18
all [184]
allegation [1] 120/4
allegations [5] 16/6 33/12 45/9 122/12 143/25
allege [1] 77/6
alleged [2] 168/8 168/14
alleging [2] 49/1 49/17
allow [4] 110/9 110/11 222/2 243/12
allowed [1] 249/8
allows [1] 169/9
alluded [2] 110/12 203/2
alluding [1] 113/21
almighty [1] 56/10
almost [10] 68/14 93/22 94/23 116/1 130/8 130/11 151/24 170/10 220/3 242/20
alone [2] 29/5 167/3
along [2] 131/19 148/19
already [23] 8/10 46/19 52/20 93/11 110/12 110/23 111/15 111/21 122/20 123/12 128/15 131/4 131/14 134/23 138/3 178/16 203/2 211/11 213/1 219/5 236/20 237/5 245/13
also [43] 5/7 9/6 14/25 15/12 15/23 21/24 24/8 24/12 40/11 40/22 41/22 43/13 48/10 56/13 56/16 86/4 90/8 94/4 101/3 102/2 109/14 110/25 116/15 116/15 117/7 119/23 140/11 143/6 149/15 153/13 160/13 167/23 185/4 185/9 200/15 200/15 208/15 212/9 213/4 221/23 224/5 224/6 225/23
although [3] 16/11 58/20 118/7
altogether [1] 233/8
always [11] 93/24 93/24 101/12 130/8 130/11 178/23 179/14 224/10 224/12 224/20 232/6
am [14] 51/8 60/10 120/18 124/6 175/22 197/25 221/7 247/12 247/12 250/11 250/12 251/7 251/8 251/9
ambitious [1] 120/19
ambush [3] 247/10 247/15 248/2
Amendment [4] 118/8 118/8 118/10 118/17
amendments [1] 118/13
America [1] 156/5
American [5] 38/13 38/17 39/2 44/2 44/2
American's [1] 177/6
Americans [4] 7/22 35/24 36/4 112/7
among [3] 158/14 158/14 158/15
amongst [2] 88/2 119/5
amount [3] 200/9 228/8 229/19
amounts [1] 129/6
ampere [1] 89/25
analysis [25] 2/17 15/11 43/3 55/6 66/9 67/2 67/15 68/7 70/5 70/19 93/4 111/7 113/23 113/25 118/9 118/16 131/6 137/14 137/16 137/24 138/1 138/2 138/4 147/10 206/16
analyze [4] 66/9 68/9 70/11 138/16
analyzed [3] 69/25 70/3 108/4
analyzes [1] 111/6
analyzing [4] 108/5 108/6 137/21 193/7
ANDREA [1] 4/20
andreaz [1] 4/23
angles [1] 23/13
annexed [1] 253/12
anniversary [1] 151/23
Annotated [1] 252/5
announce [9] 206/2 206/11 207/25 208/12 208/17 212/19 213/12 218/23 218/23
announcement [5] 172/13 179/4 180/11 180/12 218/14
announcements [2] 179/15 180/20
announces [1] 179/11
annual [6] 2/9 7/21 39/24 42/1 94/19 165/6
annually [3] 45/6 161/5 161/10
another [11] 60/8 73/7 87/17 92/8 92/9 92/25 144/17 156/13 178/19 221/25 225/4
answer [64] 7/1 24/19 34/22 58/14 67/5 92/1 108/18 112/21 119/16 123/3 131/3 133/16 143/17 149/16 156/22 173/13 173/24 181/10 182/6 182/13 182/14 182/15 182/20 182/21 183/6 184/20 185/21 186/9 186/18 188/14 193/3 197/23 205/9 205/12 205/23 206/18 207/5 210/12 210/20 211/21 212/16 212/20 215/1 219/17 227/17 230/19 230/22 230/24 233/10 235/1 235/10 235/14 235/21 236/8 237/16 237/20 238/23 240/1 241/9 243/8 244/10 244/16 246/13 248/24
answered [3] 125/2 131/4 240/17
answering [1] 107/12
answers [4] 122/1 157/15 183/20 250/5
anticipation [3] 199/17 200/6 203/21
anxiety [1] 203/21
any [195]
anybody [2] 6/6 236/9
anyone [9] 12/13 42/18 44/12 44/17 105/2 163/6 166/1 166/4 217/12
anything [35] 6/6 6/21 13/3 42/21 62/18 63/2 63/4 76/9 77/14 83/15 91/4 112/6 125/11 125/12 127/3 146/22 157/12 171/24 172/1 177/17 181/1 181/7 183/16 194/11 197/20 205/7 205/12 205/19 209/4 219/11 219/19 221/11 223/18 245/21 249/3
anytime [3] 216/2 216/4 216/6
anyway [1] 121/2
anywhere [2] 45/5 133/14
AOC [1] 43/9
apologize [5] 38/5 64/16 169/20 169/25 242/1
apparently [2] 64/14 127/9
appear [2] 60/15 109/9
APPEARANCES [1] 3/17
appeared [1] 210/12
appears [6] 54/16 55/23 116/22 132/7 132/8 231/10
appellate [3] 40/21 46/17 149/9
application [4] 89/19 91/5 91/6 93/7
applied [4] 96/10 96/19 102/6 136/24
applies [2] 165/1 201/5
apply [1] 91/18
applying [2] 50/3 216/11
appreciate [7] 131/24 157/15 160/25 171/10 173/19 174/18 185/16
approach [19] 15/8 15/13 16/8 35/12 92/19 93/2 93/5 93/10 101/12 104/13 104/22 138/23 144/22 144/25 145/10 162/12 169/14 174/24 188/12
approaches [2] 172/5 186/24
approaching [1] 188/17
appropriate [9] 20/14 101/23 149/19 189/6 214/4 216/18 225/20 244/23 245/13
appropriately [4] 144/7 181/23 199/13 229/6
approved [1] 96/18
approximately [1] 1/18
archival [1] 138/3
are [188]
area [10] 17/8 17/10 81/14 114/12 114/22 121/5 190/4

**A**

**area... [3]** 219/6 227/23 248/1
**areas [4]** 66/10 150/15 161/24 203/23
**argue [1]** 154/25
**arguing [1]** 233/10
**ariding [1]** 38/9
**arising [1]** 38/9
**Arizonans [1]** 171/21
**around [13]** 9/20 14/10 23/8 41/8 66/7 103/24 104/9 117/8 148/24 179/11 231/18 234/1 238/17
**arrest [9]** 20/21 42/13 91/1 91/12 106/25 123/12 131/18 172/10 172/17
**arrest-related [3]** 91/1 106/25 123/12
**arrested [4]** 113/1 119/18 192/6 192/11
**arrestees [1]** 92/20
**arrests [4]** 113/4 122/13 192/18 192/19
**arrival [1]** 114/23
**arrive [1]** 247/1
**arrived [2]** 245/22 246/23
**arrives [1]** 233/23
**arriving [3]** 207/1 246/21 247/19
**arrow [1]** 9/19
**Arthur's [1]** 101/9
**article [77]** 3/9 32/17 34/11 34/17 34/19 35/7 47/9 54/7 54/16 54/20 54/22 55/4 55/10 55/19 55/25 56/17 56/24 60/11 66/15 66/17 66/18 66/20 67/20 75/22 79/5 79/13 80/9 81/5 110/17 110/25 111/8 111/15 111/23 112/17 112/24 113/4 113/6 114/4 114/5 115/17 115/25 116/1 116/6 116/11 164/14 167/10 169/5 169/5 169/9 170/13 171/5 171/17 172/16 172/19 173/15 174/6 174/7 175/13 175/17 175/23 175/25 176/11 176/17 177/8 177/9 187/19 188/8 188/16 190/24 191/7 191/17 192/25 193/11 194/1 194/4 194/7 251/4
**articles [15]** 20/12 40/22 46/21 47/12 54/25 56/5 108/24 115/2 117/19 117/20 117/20 176/9 176/10 176/15 181/15
**articulate [2]** 140/12 151/11
**articulated [4]** 8/11 46/19 211/11 237/5
**as [361]**
**ascribe [1]** 63/7
**aside [3]** 89/9 162/9 218/5
**ask [14]** 23/3 33/22 84/14 143/11 158/11 181/20
187/17 188/25 189/1 189/16 198/21 205/4 206/20 227/14
**asked [16]** 16/20 16/23 19/6 23/12 32/3 78/17 103/5 115/2 131/14 156/14 163/6 178/19 189/16 205/6 227/11 234/22
**asking [19]** 47/2 75/8 78/20 125/17 157/17 161/8 171/7 175/22 178/15 180/10 180/11 185/15 201/15 207/13 215/3 215/5 217/3 217/13 237/23
**asks [2]** 206/10 211/19
**aspect [8]** 22/9 22/13 23/17 25/5 41/14 42/9 139/22 148/16
**aspects [6]** 21/25 24/15 91/24 107/9 123/10 165/12
**aspiring [1]** 86/21
**assaulting [2]** 86/5 86/5
**assertion [1]** 143/19
**assertions [2]** 16/7 110/22
**assess [11]** 70/17 93/4 93/4 157/16 158/11 161/24 162/12 164/9 215/22 216/7 246/17
**assessed [1]** 158/16
**assesses [1]** 111/6
**assessing [4]** 150/10 150/14 243/15 244/3
**assessment [13]** 70/13 94/12 106/17 149/4 149/7 159/8 161/17 161/23 162/7 162/8 178/6 216/16 226/22
**assessments [1]** 159/3
**assigned [4]** 82/9 172/9 189/8 194/17
**assimilates [1]** 15/12
**assist [10]** 31/3 31/22 34/11 35/10 35/14 50/5 53/3 105/12 146/17 252/7
**assistance [2]** 242/22 243/7
**assisted [1]** 105/8
**assisting [1]** 35/1
**association [9]** 69/4 89/7 94/19 103/4 148/18 168/21 170/5 174/12 179/19
**assume [2]** 178/7 188/6
**at [338]**
**attack [2]** 23/22 33/12
**attempt [4]** 219/12 219/20 220/14 244/8
**attempted [1]** 244/10
**attend [5]** 89/5 89/14 94/23 196/25 204/14
**attendance [4]** 3/11 195/13 195/15 199/7
**attended [5]** 73/10 73/21 89/16 197/6 197/7
**attention [3]** 64/10 200/11 207/2
**attitudes [1]** 21/2
**attorney [10]** 10/9 73/3 73/4 73/6 75/16 77/16 78/13 78/23 174/16 179/20
**attorneys [12]** 11/18 12/16 17/4 17/11 25/6 72/7 73/23 78/15 78/15 147/2 176/10 223/25
**attributed [2]** 24/9 210/14
**audience [1]** 17/17
**audio [2]** 190/18 232/13
**August [7]** 3/9 12/6 79/16 80/3 80/6 80/13 170/7
**August 2010 [1]** 170/7
**author [2]** 202/16 202/18
**authored [8]** 16/12 20/12 20/15 20/19 20/23 37/1 55/8 109/15
**authoritative [2]** 176/5 176/6
**authorities [1]** 68/23
**authority [4]** 66/24 68/21 101/11 128/13
**authorize [1]** 76/24
**authors [1]** 116/14
**autonomic [1]** 203/14
**availability [1]** 41/19
**available [6]** 60/12 116/10 117/2 189/3 189/4 222/8
**avenue [3]** 1/17 4/14 87/15
**average [1]** 60/14
**avert [3]** 49/1 49/17 50/24
**averted [1]** 246/12
**avoid [3]** 23/22 51/20 163/16
**avoidance [1]** 110/21
**award [2]** 82/25 83/6
**awarded [2]** 52/10 53/1
**awards [1]** 130/5
**aware [49]** 10/18 34/13 108/19 110/5 110/8 117/5 117/5 121/9 122/18 125/22 125/24 126/3 129/12 130/22 134/6 153/8 153/9 153/13 156/4 156/18 159/3 159/8 160/5 163/14 164/21 166/5 167/9 170/16 170/18 171/24 172/25 175/4 175/4 180/13 183/2 188/11 202/20 205/5 205/7 205/18 217/10 219/11 219/18 219/19 227/8 232/25 239/19 245/24 249/1
**awareness [3]** 35/5 186/6 201/18
**away [19]** 189/2 209/7 209/9 210/11 210/13 211/15 212/8 213/10 215/21 216/6 217/8 217/18 218/3 218/25 221/3 223/2 226/24 230/11 247/3
**away.' [1]** 210/14

**B**

**B-O-D-A-P-A-T-I [1]** 55/9
**B-R-O-D-S-K-I [1]** 116/17
**back [43]** 8/24 9/2 9/2 9/5 12/6 17/14 23/8 28/25 38/11 45/19 54/23 57/17 58/16 64/9 67/5 67/17 72/23 73/20 79/4 82/3 112/12 113/6 113/7 123/22 131/13 135/12 141/15 155/23 157/14 167/25 170/16 183/7 183/19 198/14 201/9 205/23 206/21 207/5 216/19 217/20 223/2 231/10 244/21
**backed [7]** 189/1 189/5 211/15 212/8 215/21 217/8 221/3
**background [7]** 6/23 15/16 19/7 64/18 75/14 135/21 153/5
**backing [3]** 207/19 217/18 218/25
**backs [1]** 216/6
**backup [6]** 188/25 216/21 218/8 219/2 233/13 245/22
**Baker [1]** 4/21
**bakerfirm.com [2]** 4/23 4/23
**bankruptcy [1]** 39/15
**Barber [1]** 60/16
**barrel [6]** 227/3 234/18 235/7 236/1 236/2 240/2
**barrel's [1]** 227/12
**base [3]** 130/6 224/23 240/6
**based [34]** 12/10 20/5 25/10 34/16 35/6 36/8 42/5 77/15 84/18 104/17 104/18 122/2 134/22 135/25 136/19 138/7 188/10 193/9 198/25 204/2 209/17 211/11 211/16 213/1 216/25 218/20 229/17 234/12 237/18 238/15 238/25 245/14 246/15 249/10
**basic [2]** 93/23 202/3
**basis [10]** 13/20 39/8 56/7 160/23 160/24 165/7 197/3 197/12 208/6 246/20
**BCI [11]** 13/25 187/10 187/12 187/16 195/5 200/7 200/13 217/13 229/11 232/12 234/20
**be [239]**
**bearing [1]** 248/18
**bears [1]** 76/10
**beat [1]** 121/8
**beating [1]** 194/12
**became [4]** 74/9 79/11 79/15 122/23
**because [74]** 14/8 17/3 25/8 43/1 43/22 44/22 44/23 46/10 53/2 57/4 61/25 62/11 62/13 63/9 63/16 63/23 67/10 67/23 76/5 76/14 78/4 85/1 86/17 87/13 103/16 105/23 106/6 117/10 118/12 121/5 122/22 126/5 130/12 130/19 130/21 134/21 144/4 144/15 145/18 149/22 172/20 174/10 174/19 176/25 179/13 182/9 183/10 186/25 189/20 191/20 192/4 192/5 192/15 198/15 198/23 202/3 204/6 212/4 212/25 219/22 223/13 227/3 227/12 232/1 237/2 237/17 238/9

**B**

**because... [7]** 238/15 241/16 245/4 245/12 246/6 247/7 247/10
**Beck [4]** 12/3 12/5 12/12 14/13
**Beck's [1]** 210/25
**become [9]** 37/15 38/13 38/17 39/5 83/21 96/4 227/25 238/7 239/12
**becoming [1]** 79/18
**been [113]**
**before [22]** 6/16 14/10 14/11 53/15 73/20 80/20 89/15 102/3 103/4 104/9 125/8 125/12 159/1 176/24 191/21 193/5 193/24 222/3 229/20 232/19 244/8 253/18
**beg [1]** 66/3
**began [10]** 19/6 81/6 81/15 104/7 104/10 140/3 169/13 244/8 244/14 244/25
**begin [3]** 15/21 172/8 178/22
**beginning [5]** 82/3 138/23 140/13 169/4 170/4
**begins [2]** 48/20 172/6
**begun [5]** 228/13 228/15 231/21 232/11 242/9
**behalf [6]** 10/10 10/11 76/15 76/15 77/25 78/22
**behavior [5]** 88/4 127/4 157/4 186/16 238/3
**behaviors [5]** 201/7 217/12 224/12 224/17 224/25
**behind [5]** 88/1 92/15 116/7 120/10 147/1
**being [34]** 19/12 42/24 52/18 59/18 65/13 72/12 82/25 93/3 101/16 114/25 129/5 145/1 145/8 152/19 153/3 153/13 154/4 154/4 154/24 155/5 158/20 158/21 182/24 192/5 192/25 200/25 202/5 221/4 222/19 227/2 227/4 228/17 238/9 239/19
**belief [15]** 27/8 44/1 45/25 46/2 46/5 48/9 48/16 49/4 49/8 49/19 50/8 50/10 88/5 246/10 246/15
**beliefs [3]** 21/2 21/3 164/11
**believe [55]** 7/6 23/23 26/14 26/16 33/8 33/16 35/7 35/13 36/4 36/16 40/14 41/6 41/22 41/24 48/11 49/2 57/20 62/11 63/15 69/4 76/10 77/2 79/25 81/3 81/13 87/24 95/19 109/25 112/13 128/7 133/4 139/9 140/7 140/11 140/15 140/19 142/18 146/15 150/25 151/1 153/1 158/10 175/23 176/4 187/13 200/10 212/9 224/2 225/9 225/19 225/20 235/15 237/10 242/7 244/23
**believed [2]** 26/10 221/20
**believing [1]** 246/20
**bells [1]** 169/15
**below [4]** 9/22 80/18 144/11 252/8
**belt [1]** 179/9
**benefit [1]** 77/20
**benefits [1]** 108/12
**Berkeley [1]** 129/10
**besides [1]** 107/10
**best [8]** 13/18 50/5 56/19 84/24 117/12 117/15 117/15 123/14
**better [6]** 44/7 55/20 56/14 63/19 63/21 179/25
**between [19]** 82/6 85/24 101/16 117/22 122/3 137/17 137/19 137/22 140/23 143/8 151/8 151/13 151/19 177/19 216/20 218/5 229/22 233/5 233/12
**beware [1]** 182/25
**beyond [12]** 19/12 104/22 113/18 190/15 203/8 203/10 203/11 203/11 229/17 232/19 233/2 242/14
**bias [3]** 15/9 15/10 16/9
**big [8]** 85/8 87/18 88/6 88/11 131/9 175/15 176/3 177/23
**Big Bubba [2]** 88/6 88/11
**bigger [2]** 195/24 196/1
**bill [3]** 11/12 68/18 75/19
**billboard [1]** 171/24
**birth [1]** 151/22
**birthday [1]** 151/23
**bit [8]** 41/25 59/14 70/2 70/3 110/1 112/1 124/9 150/7
**black [6]** 80/16 119/17 122/3 123/1 129/5 230/3
**block [4]** 74/10 93/24 230/7 247/3
**blocks [1]** 70/17
**blue [15]** 124/11 124/14 124/17 124/23 125/4 125/8 125/12 125/15 125/19 126/8 126/18 127/4 127/7 127/8 127/8
**Blum [1]** 41/23
**board [11]** 96/17 149/17 219/11 219/13 219/13 219/18 220/1 244/7 244/12 244/24 251/5
**board's [3]** 243/14 244/3 244/13
**Bobby [1]** 30/5
**Bodapati [1]** 55/9
**body [9]** 56/6 142/15 148/19 186/6 229/24 231/19 232/4 232/13 240/19
**body-worn [5]** 142/15 229/24 231/19 232/4 232/13
**boil [1]** 13/9
**bona [1]** 63/12
**book [68]** 20/19 36/20 36/24 37/10 38/23 38/25 40/5 40/9 40/19 40/19 41/6 41/9 41/14 42/7 44/16 45/5 46/9 46/10 46/14 46/18 46/23 46/24 47/12 47/14 47/17 48/18 50/15 52/13 55/24 55/25 56/6 57/4 64/12 64/15 109/15 112/9 112/17 114/2 114/18 115/3 115/5 115/25 116/5 116/9 116/20 116/21 116/24 117/12 118/7 118/9 118/23 119/8 120/14 120/16 121/24 122/25 124/10 124/20 125/3 127/10 127/25 129/7 131/10 133/13 133/20 134/1 134/20 202/17
**booked [1]** 148/23
**books [3]** 20/15 133/17 138/4
**both [12]** 22/19 24/10 24/21 69/19 69/20 103/23 115/1 115/18 116/2 156/3 213/10 252/6
**bottom [9]** 37/17 37/18 60/11 110/2 146/8 196/4 210/21 226/4 244/2
**bound [1]** 3/15
**BOX [1]** 1/24
**boy [1]** 74/17
**brain [8]** 113/19 200/12 202/12 202/15 202/16 202/20 202/25 210/13
**Brave [1]** 73/3
**breadth [1]** 130/5
**break [3]** 64/3 64/4 70/16
**breaking [1]** 212/17
**bridges [1]** 163/16
**briefly [1]** 248/7
**bring [7]** 7/12 46/2 46/5 49/8 50/10 94/11 94/20
**bringing [4]** 48/16 49/19 133/6 133/11
**brings [1]** 16/4
**broad [1]** 130/6
**broad-base [1]** 130/6
**Brodski [1]** 116/17
**broken [1]** 171/16
**brought [10]** 36/20 64/10 69/2 69/3 103/10 103/12 114/3 146/23 170/25 202/6
**brown [2]** 73/6 119/17
**browse [1]** 204/10
**brutality [1]** 63/6
**Bubba [4]** 85/8 87/18 88/6 88/11
**buckle [1]** 179/9
**building [2]** 80/15 148/16
**bulk [1]** 132/21
**Bureau [5]** 13/23 58/20 60/2 122/1 122/16
**Burge [4]** 120/23 121/4 121/14 121/18
**business [4]** 39/25 106/5 145/5 146/14
**businesses [1]** 39/16
**busy [1]** 190/22
**but [238]**

**C**

**C E R T I F I C A T E [1]** 249/21
**cadence [2]** 13/10 152/18
**cadenced [1]** 200/10
**calendar [2]** 10/15 10/20
**call [20]** 16/3 43/18 51/5 57/7 80/9 82/17 115/17 123/18 143/1 152/14 153/18 153/25 155/2 182/2 183/2 187/11 219/5 219/7 242/22 243/7
**called [9]** 1/13 15/11 25/6 63/19 70/13 84/23 158/7 171/15 220/16
**calling [3]** 43/20 190/4 219/2
**calls [4]** 159/5 159/9 167/1 190/15
**came [8]** 67/25 82/13 82/15 84/21 95/14 103/16 174/24 234/1
**camera [5]** 142/15 229/24 231/19 232/5 232/14
**campaign [2]** 77/20 77/25
**Campbell [1]** 5/2
**can [126]**
**can't [32]** 25/8 31/5 32/8 41/23 52/24 74/17 75/6 83/14 117/18 119/16 123/7 151/7 163/24 169/17 169/18 174/7 175/17 179/22 188/14 191/20 193/13 195/23 196/2 197/23 204/4 204/6 219/25 219/25 224/24 234/5 242/13 248/8
**cannisters [1]** 81/16
**CANTON [41]** 1/8 4/10 4/15 4/22 15/2 15/6 49/10 139/1 141/11 141/20 141/24 142/8 142/19 147/6 147/12 148/7 148/22 151/3 159/4 160/15 161/18 164/22 165/25 167/6 171/25 173/8 173/21 174/3 174/13 177/1 179/25 179/25 180/9 180/21 182/4 188/12 188/19 189/8 190/13 248/2 249/2
**cantonohio.gov [1]** 4/16
**capacity [3]** 22/10 24/8 64/25
**cape [1]** 23/8
**Captain [9]** 185/9 206/5 208/9 208/20 212/12 213/11 213/19 219/10 240/8
**Captain Davis [6]** 206/5 208/20 212/12 213/11 213/19 240/8
**Captain Davis' [1]** 208/9
**Captain Marino [2]** 185/9 219/10
**caption [1]** 250/5
**car [4]** 64/25 209/22 218/16 245/22
**care [2]** 82/23 183/11

**C**

**cared [1]** 148/25
**career [10]** 51/24 64/19 72/6 84/15 84/24 85/5 113/14 133/22 151/2 185/20
**career's [1]** 54/2
**careers [1]** 188/10
**careful [1]** 182/22
**Carmen [1]** 128/20
**Carolina [3]** 32/20 55/15 55/16
**CARRIE [1]** 4/13
**carried [2]** 186/13 198/16
**carrier [1]** 16/16
**carries [1]** 196/15
**carry [5]** 74/11 196/12 201/17 203/23 204/13
**carrying [1]** 187/10
**cars [6]** 189/1 215/23 216/7 219/3 228/12 230/4
**case [141]**
**cases [31]** 2/5 10/14 10/19 25/5 25/8 38/7 38/9 39/10 40/20 44/1 46/15 46/18 53/1 54/24 54/25 58/25 110/10 111/10 111/10 117/10 117/12 117/13 117/19 118/7 119/23 119/25 120/4 120/7 134/12 145/11 216/11
**catalog [1]** 39/18
**catalyst [1]** 28/16
**categories [2]** 55/20 56/13
**categorize [3]** 151/10 156/12 183/23
**caution [3]** 59/21 153/21 226/15
**cautioned [1]** 59/20
**CCR [1]** 1/23
**CDC's [1]** 60/16
**celebration [2]** 169/12 186/8
**celebratory [42]** 65/1 141/12 141/21 142/1 143/2 143/8 148/9 151/5 151/19 151/22 155/13 156/3 156/9 156/16 156/21 156/23 156/25 157/2 157/13 159/6 159/11 161/20 161/22 163/17 166/13 166/18 167/19 168/14 177/2 177/19 178/25 179/23 180/22 181/9 182/3 182/25 183/9 183/23 185/7 185/19 185/24 186/17
**cell [3]** 74/9 94/4 94/4
**cells [3]** 80/21 81/11 82/3
**cells,' [1]** 81/24
**center [8]** 1/17 36/5 96/10 96/18 102/6 102/9 103/20 172/20
**central [3]** 130/20 245/8 245/8
**Ceremonies [1]** 101/6
**certain [5]** 34/24 110/5 152/1 160/7 224/10
**certainly [25]** 16/1 23/14 25/7 28/14 28/16 37/10 45/13 47/25 114/3 123/21 127/4 127/5 149/17 150/5 154/2 165/1 177/17 177/23 187/13 190/2 228/14 229/14 232/22 240/2 247/13
**Certificate [2]** 3/5 250/22
**certification [3]** 104/22 105/3 201/25
**certifications [1]** 104/25
**certified [6]** 1/15 105/2 201/24 250/22 251/7 251/23
**certify [4]** 250/4 250/11 250/15 252/3
**chair [2]** 30/18 42/3
**chairperson [1]** 30/21
**challenging [4]** 26/11 29/6 29/8 29/17
**chance [3]** 7/10 8/6 135/3
**change [20]** 117/10 117/10 117/10 117/14 117/14 117/14 145/20 157/4 173/7 193/1 252/10 252/13 252/16 252/18 252/21 252/23 253/2 253/5 253/7 253/10
**changed [1]** 156/19
**changes [5]** 117/11 187/23 252/4 252/4 252/6
**changing [1]** 85/5
**chapter [18]** 39/13 41/1 46/21 48/19 56/8 112/13 119/1 122/10 123/17 132/22 132/23 132/24 133/11 133/13 133/20 133/25 133/25 202/18
**Chapter 1 [1]** 132/23
**Chapter 3 [1]** 112/13
**Chapter 5 [1]** 123/17
**chapters [4]** 40/19 49/23 50/3 119/3
**charge [5]** 11/8 11/11 11/12 89/23 251/19
**charged [1]** 21/16
**chart [2]** 24/14 198/10
**charts [1]** 198/11
**Chauvin [2]** 62/16 62/20
**check [3]** 30/10 152/15 224/9
**checked [1]** 172/21
**checking [2]** 184/13 225/10
**cherry [1]** 214/3
**Chicago [5]** 42/1 42/2 73/17 120/22 121/5
**chief [13]** 3/9 29/7 106/20 107/15 168/19 170/6 170/11 181/8 182/25 184/2 185/1 185/2 185/4
**Chief Gabbard [1]** 185/4
**chiefs [9]** 69/4 116/17 128/17 146/12 168/21 170/5 174/12 177/12 223/24
**children [2]** 171/22 172/13
**chivalrous [1]** 101/4
**choice [4]** 27/12 118/15 120/12 199/2
**choosing [1]** 221/6
**chose [9]** 135/1 211/10 214/22 214/24 217/8 235/11 241/1 241/1 241/7
**chosen [2]** 24/25 25/4
**Christmas [1]** 14/10
**Christopher [1]** 120/25
**chronicled [1]** 60/3
**chunk [1]** 70/16
**circles [2]** 202/22 202/22
**circuit [2]** 75/19 78/1
**circumstances [9]** 144/8 151/5 181/25 205/25 207/22 207/23 213/4 235/15 242/13
**cite [16]** 39/12 40/18 54/20 58/12 116/16 116/18 116/19 118/7 120/7 127/9 127/20 142/14 144/12 208/3 211/6 215/15
**cited [6]** 41/14 66/15 128/7 168/1 212/9 212/11
**cites [5]** 41/20 60/16 127/25 128/1 170/5
**cities [1]** 28/11
**citing [4]** 37/8 39/10 50/23 116/21
**citizen [7]** 113/1 113/3 113/24 166/9 166/12 167/7 167/11
**citizens [8]** 43/4 43/5 44/2 44/3 101/9 178/10 182/24 188/12
**city [36]** 1/8 4/10 9/2 28/14 107/13 142/19 157/9 159/4 159/8 159/16 161/18 163/12 164/22 165/15 166/3 166/8 167/6 167/8 171/1 173/8 173/21 174/3 178/6 178/8 178/11 178/12 179/1 180/13 180/21 182/4 183/5 190/22 192/12 248/2 249/2 249/9
**City of [1]** 161/18
**civil [53]** 1/6 1/14 2/13 20/16 25/1 25/1 33/3 34/13 36/10 36/25 37/15 38/9 38/14 38/18 41/6 44/3 64/12 68/12 68/12 110/21 111/2 111/4 111/9 114/6 114/8 114/14 114/22 116/12 117/9 117/23 118/23 120/19 122/12 123/5 129/8 129/16 129/24 130/21 131/7 132/3 132/16 133/1 134/3 134/9 134/10 134/11 134/12 134/13 134/16 134/20 135/8 224/4 252/5
**civilians [1]** 155/12
**claim [10]** 33/14 55/21 56/15 56/21 57/3 68/14 123/1 143/4 143/5 143/7
**claims [23]** 2/17 16/7 55/6 61/20 66/24 67/4 67/16 67/22 68/9 68/12 70/25 71/1 71/2 71/4 127/10 127/20 128/8 128/11 131/25 132/1 142/24 159/5 159/9
**clarify [4]** 6/21 61/18 64/11 71/7
**clarifying [2]** 71/17 225/2
**clarity [1]** 228/22
**class [6]** 72/13 72/14 86/24 87/5 87/16 88/22
**classes [2]** 87/6 125/14
**classify [2]** 151/10 156/12
**classroom [1]** 93/7
**clear [22]** 28/10 54/16 55/24 64/14 64/24 78/18 79/14 90/22 115/6 132/7 132/8 142/23 162/16 166/24 174/19 175/20 182/24 189/25 214/7 221/10 225/19 239/9
**Cleveland [1]** 4/14
**client [14]** 158/21 166/15 181/8 212/17 235/16 236/15 236/22 237/14 238/9 238/18 239/18 239/24 246/12 246/18
**client's [4]** 181/2 186/24 192/13 217/1
**clients [3]** 95/25 104/18 105/12
**Clinton [1]** 9/4
**clip [1]** 26/1
**close [3]** 30/12 58/5 115/19
**co [3]** 20/23 55/8 96/22
**co-authored [2]** 20/23 55/8
**co-founder [1]** 96/22
**coached [2]** 95/6 95/8
**Coast [1]** 41/24
**code [5]** 124/14 125/12 127/3 127/8 252/5
**coding [1]** 136/17
**cognitive [3]** 65/25 201/3 201/16
**cognitively [4]** 199/15 199/22 200/2 202/11
**coincides [1]** 232/11
**collect [3]** 58/21 70/11 129/19
**collected [2]** 70/3 129/23
**collecting [3]** 111/2 113/22 136/18
**collection [1]** 58/24
**collective [2]** 136/17 147/3
**collects [1]** 111/6
**college [3]** 2/9 96/3 129/7
**column [4]** 195/21 195/21 196/6 198/4
**columns [2]** 196/2 196/3
**com [1]** 230/3
**combat [1]** 101/2
**combating [1]** 169/13
**combination [2]** 16/3 200/24
**combine [1]** 186/15
**combined [2]** 50/4 191/3
**combines [2]** 136/17 138/5
**come [13]** 20/8 41/4 43/21 48/6 59/22 60/25 95/20 146/10 213/5 219/21 247/2 247/3 247/11
**comes [8]** 6/21 116/25 117/11 122/9 131/19 224/4

**C**

**comes... [2]** 233/17 234/6
**coming [9]** 45/4 153/4 201/1 212/6 237/3 239/21 241/5 246/25 247/5
**command [6]** 220/19 221/2 221/2 221/3 221/10 243/23
**commanded [1]** 121/5
**commanders [1]** 243/23
**commands [2]** 222/3 225/1
**commencing [1]** 1/18
**commensurate [2]** 194/17 194/21
**comment [5]** 114/2 192/5 192/14 192/15 248/9
**comments [1]** 25/19
**commission [3]** 2/22 120/25 222/2
**commitment [2]** 48/25 49/16
**committed [1]** 245/1
**common [2]** 37/16 70/17
**communicate [1]** 246/17
**communicating [3]** 176/24 188/17 220/13
**communication [7]** 94/11 137/16 137/22 137/23 228/17 229/23 231/23
**communities [1]** 27/18
**community [11]** 21/14 22/10 26/23 29/16 36/9 56/25 146/20 157/11 172/14 192/5 192/16
**companies [1]** 69/13
**company [8]** 68/3 96/13 103/25 105/18 108/13 130/15 146/7 146/9
**comparative [1]** 43/3
**compared [1]** 116/6
**comparisons [1]** 66/16
**competence [2]** 56/18 56/25
**competently [1]** 199/3
**compile [1]** 53/19
**compiled [1]** 39/18
**complaint [6]** 143/12 143/14 143/18 143/21 144/1 166/12
**complaints [6]** 113/23 113/24 159/10 166/9 167/7 167/11
**complete [4]** 8/9 18/8 148/24 250/8
**completed [1]** 226/10
**compliance [2]** 140/4 215/19
**complied [1]** 243/23
**comply [1]** 224/7
**components [3]** 50/3 167/16 222/25
**compre [1]** 18/16
**comprehensive [6]** 18/17 18/21 18/23 129/3 129/12 131/7
**comprise [1]** 33/11
**comprising [1]** 168/3
**compromise [1]** 221/25
**computer [1]** 250/6
**computer-aided [1]** 250/6
**concept [7]** 125/23 125/24 126/3 126/17 126/22 131/1 161/22
**concepts [1]** 101/15
**concern [5]** 18/5 116/15 117/8 150/15 177/8
**concerned [1]** 108/17
**concerning [1]** 77/11
**concerns [1]** 18/7
**concert [1]** 162/19
**concluded [5]** 1/19 54/25 75/18 229/21 249/17
**conclusion [6]** 13/16 13/20 60/25 132/19 219/21 235/24
**condition [1]** 149/5
**conditions [2]** 180/13 248/3
**conduct [4]** 140/24 165/16 167/12 237/14
**conducted [7]** 37/25 69/10 92/10 94/24 119/19 166/2 170/21
**conductive [1]** 119/19
**conference [11]** 1/17 7/22 42/1 42/3 68/1 72/17 89/5 89/19 94/10 94/19 94/23
**conferences [6]** 73/1 73/10 73/11 89/8 89/9 202/7
**conferred [1]** 108/13
**confessions [1]** 121/21
**confidence [2]** 56/18 56/25
**confirm [1]** 7/14
**confrontations [1]** 63/22
**confused [3]** 47/7 92/9 203/25
**confusing [2]** 47/5 64/16
**confusion [1]** 63/8
**Congratulations [1]** 83/10
**connect [1]** 246/17
**connection [1]** 234/14
**Conner [1]** 224/22
**Connor [1]** 147/8
**conscious [1]** 199/2
**Consensus [2]** 3/12 220/5
**consent [6]** 122/8 124/9 145/13 146/1 168/3 177/15
**consider [10]** 12/7 24/21 78/22 177/12 179/17 180/10 187/23 208/14 241/13 244/7
**considered [3]** 212/23 219/12 219/20
**considering [1]** 151/5
**consistencies [1]** 15/25
**consistent [14]** 16/5 129/16 147/8 147/17 150/11 164/18 168/15 174/13 212/1 231/8 231/15 243/15 244/4 244/17
**Consolidated [1]** 2/9
**conspiracy [5]** 123/8 125/6 126/24 126/25 127/1
**constitutional [4]** 42/10 43/2 72/21 118/10
**consultant [4]** 21/22 23/5 90/13 106/7
**consultants [2]** 90/16 162/11
**Consulted [1]** 95/11
**consulting [4]** 20/24 24/16 104/8 105/24
**contact [10]** 82/6 82/9 103/14 122/6 206/2 207/24 211/2 211/17 211/22 214/22
**contacted [3]** 12/7 103/5 251/11
**contacting [1]** 209/14
**contacts [1]** 60/5
**contain [1]** 19/3
**contained [6]** 15/19 133/12 138/8 142/12 144/18 170/12
**contemporary [4]** 139/17 139/24 145/1 150/11
**content [7]** 15/11 111/7 137/24 138/1 138/4 138/15 138/16
**contents [3]** 15/18 15/19 138/7
**contest [1]** 171/24
**contested [1]** 60/21
**context [7]** 24/5 71/18 89/12 113/12 120/19 127/14 136/24
**continual [1]** 228/10
**continue [10]** 27/13 38/5 48/24 49/15 54/17 55/2 129/17 132/10 133/1 182/18
**continued [2]** 35/9 215/22
**continues [3]** 132/8 132/9 216/7
**continuing [7]** 27/12 30/15 37/14 54/14 72/6 158/1 182/8
**continuous [1]** 228/14
**continuum [4]** 147/12 147/20 147/21 147/24
**contract [3]** 68/8 251/13 251/15
**contracted [1]** 162/8
**contractor [1]** 251/8
**contrary [1]** 204/24
**contribute [1]** 40/25
**contributed [1]** 59/25
**contributor [3]** 109/14 109/19 109/23
**control [8]** 15/9 73/1 91/12 91/16 91/16 93/22 95/13 197/20
**conversation [1]** 17/3
**conversations [1]** 12/5
**conversed [1]** 14/13
**conviction [3]** 62/16 62/17 62/20
**cooperative [1]** 191/2
**coordinating [1]** 190/3
**cop [1]** 43/23
**Cope [1]** 5/7
**copies [2]** 6/5 162/17
**copy [10]** 7/5 7/5 8/9 8/19 17/17 18/2 36/21 37/13 135/13 135/17
**copying [1]** 37/6
**cordon [1]** 190/4
**core [6]** 140/20 151/21 245/4 245/6 245/7 245/9
**corner [1]** 196/4
**Corporation [1]** 102/12
**correct [238]**
**corrected [1]** 215/23
**correction [3]** 230/7 230/17 231/17
**correctional [4]** 22/20 42/15 68/11 110/14
**corrections [27]** 6/24 19/9 19/12 21/13 23/15 34/1 41/18 45/7 45/12 72/24 74/2 74/7 74/12 79/2 79/15 79/18 84/24 85/15 86/10 86/13 87/24 88/2 88/15 94/5 95/23 252/5 252/7
**correctly [5]** 56/9 67/10 168/9 173/9 231/13
**correlational [1]** 67/18
**corrupt [1]** 120/21
**cortex [1]** 202/14
**cost [2]** 11/8 23/23
**could [92]**
**couldn't [4]** 164/4 194/5 240/19 241/2
**Council [1]** 251/5
**counsel [9]** 5/11 7/25 16/25 106/20 107/13 250/11 250/12 250/16 251/16
**count [4]** 7/25 17/20 116/13 228/13
**counted [1]** 60/14
**counties [2]** 38/10 68/14
**country [4]** 23/8 29/8 122/17 146/13
**County [5]** 9/4 74/24 75/20 250/3 251/2
**couple [1]** 110/1
**course [14]** 39/9 94/21 94/21 94/21 94/22 120/15 131/11 131/15 134/20 145/4 145/5 154/23 155/2 219/13
**courses [13]** 20/1 20/7 71/13 71/24 72/10 72/10 73/6 73/13 73/15 86/21 94/20 96/3 132/4
**court [41]** 1/1 1/15 10/12 16/12 34/25 35/9 39/23 40/20 40/21 40/21 46/16 46/17 46/17 52/2 52/22 52/24 53/7 64/10 67/13 75/20 78/1 94/16 101/9 114/21 123/19 130/11 141/16 145/12 148/23 149/3 149/8 149/9 149/9 149/17 224/17 249/20 250/22 251/5 251/7 251/12 251/23
**court's [2]** 149/12 149/15
**court-reporting [1]** 251/12
**courtroom [2]** 10/1 134/15
**courts [4]** 21/14 39/14 43/9 43/9
**cover [8]** 3/15 19/24 122/8 123/10 127/1 127/4 131/24 251/18

**C**

covered [4] 123/21 130/15 132/12 185/5
covers [1] 122/16
CPO [7] 138/22 139/11 144/5 146/4 181/22 199/1 243/23
create [11] 16/20 16/24 16/24 126/14 150/15 163/7 178/19 218/23 245/14 248/2
created [4] 17/11 102/18 160/1 236/16
creates [1] 163/1
creation [1] 108/23
credible [1] 175/23
crime [1] 22/22
crimes [1] 127/6
criminal [62] 2/13 13/2/3 20/16 21/8 21/12 21/15 21/19 21/22 22/2 22/7 22/9 22/16 23/5 23/14 23/23 24/6 26/12 28/22 29/4 30/23 31/3 31/22 31/25 33/24 34/5 36/9 36/10 36/10 36/25 39/1 40/8 40/10 42/23 41/3 41/15 41/18 41/20 43/13 44/3 48/9 51/19 52/14 55/15 62/7 64/13 75/15 78/19 83/6 84/16 110/3 110/10 118/23 120/20 132/4 132/22 134/9 142/17 145/2 146/3 146/23 174/15 177/22 248/8
CRIPA [1] 122/9
crisis [4] 93/19 94/5 94/7 148/23
critical [4] 110/21 145/20 145/25 151/21
criticizing [1] 121/3
critique [1] 212/21
cross [1] 15/24
cross-reference [1] 15/24
cruiser [1] 230/10
culture [5] 29/1 45/15 63/4 63/21 140/16
cumbersome [1] 122/23
cumbrance [1] 120/24
curb [2] 227/22 227/22
curious [2] 115/7 224/13
current [12] 7/5 7/23 8/9 18/9 34/9 73/22 73/23 89/4 89/10 140/1 140/1 201/10
currently [4] 10/14 74/20 139/18 159/1
curriculum [3] 24/18 64/14 202/1 202/6 226/11
custodial [2] 106/25 123/12
custody [6] 2/11 20/21 32/19 61/22 66/11 89/1
customary [1] 25/19
CV [14] 1/7 7/5 7/5 7/15 8/7 8/9 17/19 19/20 19/24 100/21 100/22 100/25 106/2

**D**

DISCLOSURE [1] 250/23
D'ANDREA [1] 4/13
D-A-R-R-E-L-L [1] 6/14
Dale [1] 81/18
damages [1] 128/24
danger [2] 227/1 246/21
dangerous [2] 179/13 183/1
dangers [1] 181/9
DARRELL [11] 1/13 2/4 2/5 2/6 5/13 6/14 75/22 250/10 251/2 252/2 252/3 253/13 253/18 253/20
DARRELL-L [1] 250/10
data [52] 58/24 59/15 59/18 59/20 59/22 59/25 60/12 60/15 60/24 63/16 63/18 63/17 63/20 66/18 67/1 76/21 122/18 122/18 129/12 129/13 129/15 159/24 160/4 160/5 160/17 161/1 161/12 161/13 162/2 162/2 178/18 190/3 190/25 190/9 191/23 192/11 192/15 192/23 193/7 193/17 193/19
database [1] 163/8
date [7] 1/19 14/25 51/19 130/22 140/23 198/5 249/18
Dated [1] 25/12/1
dates [1] 196/5
dating [1] 167/25
Davie [1] 190/17 206/5
Davie's [1] 206/15
day [27] 116/12 118/24 80/4 78/5 92/16 93/1 93/2 94/22 143/1 153/1 154/1 154/4 154/15 156/5 156/16 162/12 188/13 189/15 196/10
dealing [4] 15/22 44/14 66/7 150/14
dealt [3] 69/17 69/23 71/5
death [8] 60/9 60/12 60/13 60/14 106/25 107/1 181/23 192/21 197/9 193/10 193/13 193/1 192/21 197/20 197/9 193/13 193/1
debate [1] 11/9/5
Debbie [4] 1/15 1/23 250/21 25/17
debunked [1] 202/21
decades [2] 101/13 104/13
decide [3] 13/1 154/7 154/1
decided [3] 40/20 46/16 84/14 106/6 111/19
decides [1] 178/9
deciding [1] 244/25
decision [16] 54/3 41/14 52/12 123/19 141/4 142/16 149/12 149/15 149/18 149/21 182/21 179/25 204/4 204/4 205/24 215/16 216/24 241/12
decisions [19] 34/16 38/25 39/11 40/21 46/16 47/11 47/14 53/23 54/23 51/15 66/10 75/2 123/10 139/6 139/21 149/9 149/10 150/3 150/3 150/3
deck [1] 164/20
declare [2] 145/13 146/1
decrees [4] 122/8 124/9 168/3 177/15
dedicated [4] 21/21 23/4 32/16 36/6
dedication [1] 222/3
deep [1] 183/7
defend [12] 33/4 33/14 104/5 50/24 55/21 56/14 1 103/9 110/9 110/1 110/1 110/1 125/9 110/1 110/1
Defendant [1] 4/18

**De**

de-escalating [2] 216/4
de-escalation [40] 93/14 93/18 93/24 94/1 94/7 95/1 95/7 185/7 207/20 215/14 215/21 216/3 216/9 216/13 217/18 217/18 219/1 220/23 217/24 217/25 219/3 220/9 219/13 219/20 220/8 220/13 220/18 220/21 222/13 222/20 222/23 223/7 223/9 223/14 223/15 223/23 223/25 224/9 224/23 224/23
dead [1] 194/12
deadly [7] 60/6 62/8 92/15 212/10 212/14 237/17 238/1
deadly-force [2] 212/10 212/14
deaf [1] 77/3
deal [8] 34/1 69/4 141/12 142/14 150/22 203/9 219/7 221/9
dealing [4]
dealt [3] 69/17 69/23 71/5
death [8]
deal [3] 20/11 22/8 23/2
debate [1]
debatable [1] 154/7
debate [1] 119/5
Debbie [4]
debunked [1]
decades [2]
decide [3]
decided [3]
deciding [1]
decision [16]
decisions [19]
deck [1]
declare [2]
decrees [4]
dedicated [4]
dedication [1]
deep [1]
defend [12]

**De** (col 2)

defendants [1] 75/4 410
defendant [7] 212/2 23/5 23/7 23/9 23/17 23/24 24/6
defending [4] 30/10 35/15 56/20 57/2
defense [7] 22/19 23/25 51/21 110/22 225/7 237/18 245/15
defenses [1] 101/10
deficiencies [1] 241/3
define [2] 126/23 245/3
126/23
defining [2] 126/21 222/23
definitely [2] 44/5 237/2
definitely [1] 129/24
definitive [2] 220/10 220/21 221/5 221/8 223/13
definitional [1] 72/9
definitively [1] 129/24
DeFace's [1] 143/20
DeFrances [1] 177/25
defraud [1] 127/1
defunding [1] 27/19
degree [4] 30/22 86/9 86/15 86/17
del [1] 128/20
delay [2] 221/24 222/22
delays [1] 56/11
deliberate [1] 154/5
deliberately [1] 154/7
deliberation [2] 82/13 82/15 83/22 83/25 86/23 86/25
demonstrate [1] 132/22
demonstrated [1] 58/21
demonstrative [1] 165/9
demonstration [2] 165/9
219/8
dep [1] 11/4
department [45] 15/2 15/6 30/17 38/1 52/11 55/14 56/18 72/24 74/7 79/2 86/12 94/5 95/13 95/23 100/20 141/14 141/14 141/24 143/19 143/25 145/5 145/6 145/15 146/20 145/24 156/15 162/18 162/21 162/5 163/18 173/4 178/14 216/13 216/5 228/17 228/9 235/8 242/5 245/2 174/6 216/4 242/6 246/8 248/24
depending [4] 35/19 63/18 91/17 216/11
depends [1] 27/2
depo [2] 6/6 6/7
deponent [1] 249/15
deposed [1] 6/16
deposes [1] 11/5
deposition [29] 1/13 9/1 9/3 9/4 9/5 9/9 9/11 9/15 1 [continues]

**D** (col right top)

difference [1] 140/23
deposition [1] 175/3 183/11 183/18 233/20 233/12
disparage [1] 23/22
disparate [1] 112/8
dispatch [3] 215/23 216/7 232/6
display [1] 170/3
dispute [3] 80/24 81/4 141/9
disqualified [1] 25/19
disruption [1] 81/9
dissertation [4] 113/3 113/11 113/16 224/21
distance [4] 93/3 216/20 218/5 219/1
dissatisfaction [1] 151/13
differently [2] 203/16 215/4
difficult [7] 29/2 29/3 32/21 128/18 128/24 132/19 132/18
difficulties [1] 169/21
digitally [1] 6/5
dining [2] 81/14 209/2
direct [2] 51/14 105/11
direction [3] 17/10 102/21
directing [2] 48/20 115/21
direction [12] 35/10 104/4 201/13 201/11 203/18 215/22 235/24 240/1 248/10 248/15
DIVISION [1] 1/2
Division's [1] 168/2
do [301]
Doctor [5] 6/10 30/18 37/10 64/1 82/25
docosa [1] 30/22
Doctorate [1] 30/23
doctrine [1] 114/24 119/23
document [3] 170/5
document [23] 9/20 12/21 12/23 16/5 18/5 30/20 32/6 30/18 33/6 33/24 43/6 76/10 187/7 174/21 187/12 187/1 187/6 187/21 187/8 190/7 225/10 225/21 225/23 227/23 228/7 247/8
documentation [1] 168/1
documented [2] 12/23 110/16
documents [21] 9/8 12/25 16/1 16/23 116/4 116/6 116/18 116/20 117/3 134/1 134/1 135/1 135/17 135/21 138/1 138/13 138/15 138/18 174/11 174/1 174/1 174/25 175/1
does [48] 19/3 30/25 43/10 43/10 82/13 84/15 82/13 85/8 89/5 89/25 90/1 92/1 92/1 101/18 108/1 135/1 135/1 146/25 151/1
doesn't [25] 19/24 62/18

**E** (far right top)

119/8 122/25 143/14 145/17 154/2 166/4 170/17 176/19 176/20 177/14 194/9 196/1 196/12 213/11 218/2 223/13 223/24 234/4 244/24 54/25 64/1 67/2 76/18 96/2 105/23 107/13 114/1 155/3 170/1 174/8 178/6 208/20 209/1 237/2
DOJ [3] 122/9 177/7 177/14
domestic [2] 92/2 192/1
don't [24] 8/15 43/3 65/10 65/11 68/22 69/2 69/19 70/3 89/14 116/16 113/11 123/25 124/3 143/2 159/4 159/9 166/1 173/1 174/1 188/10 189/7 208/4 213/1 213/12 243/21
doorway [1] 242/8
double [1] 188/21
doubt [1] 188/5
down [13] 13/9 25/7 25/8 29/20 103/20 103/1 103/10 73/16 140/16 171/16 188/6 188/7 208/24
downloaded [1] 162/17
Dr [14] 64/2
Dr. Darrell Ross [1] 75/22
draft [3] 16/5 30/1 162/23
drafting [1] 46/14
drew [1] 200/11
drift [2] 170/17 179/12
drive [3] 12/20 119/19
drive's [1] 12/20
drive [1] 140/15
drive [2] 199/16 191/12
drive [2] 193/16 195/17
drive [1] 136/18
Dublikar [1] 4/21
due [6] 14/11 22/18 68/2 79/15 207/23 207/24
Duffrin [1] 101/1
duly [2] 6/2 250/10
during [19] 6/6 27/23 38/7 42/1 42/13 91/1 63/16 163/1 74/8 74/10 83/12 86/7 86/23 108/1 108/1 138/14 159/1 159/1 186/1 18/18 189/17 196/1 199/1 199/1 198/1 199/1 196/1 199/1 196/1
**E R R A T A** [2] 251/25
**E-G-U-E-S** [1] 96/22
each [11] 27/4 33/10 33/14 59/15 63/16 90/16 93/1 123/13 131/1 134/1 134/1 175/1 247/13 128/1 113/11 185/19 188/1 186/21 189/1
earlier [11] 46/1 46/22

**E** (bottom left col 1)

earlier... [9] 78/17 110/12 115/3 122/20 134/23 152/10 164/15 186/23 188/10
earliest [3] 20/2 20/1 121/21
early [5] 28/4 73/20 84/22 121/7 201/10
East [3] 1/17 79/1
East [3] 32/20 41/24 55/15
East Carolina University [3] 32/20 55/15
EASTERN [1] 1/2
easy [12] 37/14 40/1 43/14 43/14 40/10 44/11 44/21 45/6 45/19 45/21 48/14 81/10 50/25
ebbs [1] 28/25
echo [1] 225/14
economic [1] 39/15
ed [1] 29/5
edict [1] 145/4
edition [9] 2/13 20/16 36/25 41/13 46/23 74/23 116/9 117/22 135/20 146/1
educated [1] 68/18
educating [1] 31/25
education [23] 2/9 6/24 19/18 24/17 29/4 64/18 71/13 72/6 84/18 84/21 84/14 86/14 94/22 95/1 95/21 94/25 171/11 171/14 171/17 172/20 172/4 175/11
educational [2] 36/9 94/18
educators [2] 89/17 172/17
effect [2] 21/17/10 49/12
effecting [1] 252/7
effective [6] 31/15 35/24 34/5 110/14 131/13 177/6
effectively [1] 177/5
effectiveness [1] 110/6
efficient [2] 110/14 131/13
effort [1] 167/7
efforts [4] 166/22 58/24 129/9 129/15
eight [2] 134/21 134/24
eight-hour [1] 94/21
eighth [1] 171/22
either [10] 14/13 16/18 46/23 48/24 57/2 91/1 112/1 170/7 178/20 248/23
El [1] 129/10
elaborate [1] 174/11
electric [1] 89/23
else [12] 12/13 133/3 43/1 61/10 112/1 119/8 191/16
else's [1] 183/21
elsewhere [1] 139/11
email [5] 14/10 76/17 76/17 77/24 78/4
Embassy [1] 5/2
embraced [1] 194/24
emerge [2] 12/1 110/6

**E** (bottom col 2)

emerging [5] 2/15 22/15 54/9 110/19 114/12
emphasis [2] 85/1 124/21
emphasize [1] 140/19
emphasized [1] 101/5
employ [2] 217/5 250/12
employed [3] 21/11 64/21 66/21
employee [1] 167/12
employees [6] 77/17 77/18 92/20 93/10 93/15 160/3
employ-hand [1] 91/16
employs [1] 191/3
empty [2] 91/16 195/21
empty-hand [1] 91/16
encounter [3] 190/21 220/14 224/23
encountered [3] 200/25 207/22 207/24
encounters [2] 35/10 122/17
encourage [2] 75/18 131/11
encouraged [1] 92/20
enforcement [102] 2/12 16/8/20 20/9/12 16/12 19/11 [continues]
enforce [1] 45/21
enforces [1] 162/12
engage [3] 85/16 126/14 149/3 212/24
engaged [2] 113/22 158/10
engaging [2] 77/19 77/18
enhance [1] 110/15
enhancement [1] 36/9
enough [16] 37/14 169/13 169/15 169/19 170/24
enter [3] 23/16 29/11 185/25
entered [3] 101/14 202/6 212/11 219/20
entirely [2] 115/21 154/1
entitle [2] 211/1 [...]
enrolled [1] 129/14
enter... [continues]
enters [1] 129/14
entities [2] 211/1 211/5
entitled [3] 1/9 118/9 178/14
entity [8] 115/1 118/4 129/18 145/16 146/17 147/1 177/14 197/24
enumerate [1] 118/24
environment [2] 39/15
environmental [1] 39/15
events [4] 192/6 193/5
epidemic [1] 169/11
equal [3] 212/1 221/23
eventually [1] 102/9
Eques [13] 3/6 96/22 101/12 102/3 104/10 104/12

**E** (bottom col 3)

104/22 105/1 106/1 106/2 106/4 106/10 107/20
Eques's [1] 104/12
equipment [2] 89/24 104/6
era [1] 101/3
Equals [2] 22/1 22/91
escalate [7] 216/11 208/3 217/8 222/22 222/25 223/8
escalated [1] 93/14 93/18
escalation [40] 93/14 93/18 93/24 94/1 94/7 95/1 95/7 185/7 [continues]
escaped [1] 186/6
especially [2] 118/19 141/14
Esquire [6] 4/3 4/4 4/11 4/12 4/13 4/19 4/21
essay [1] 221/11
essentially [1] 222/13
establish [2] 45/15 145/1
established [1] 105/14
estimate [3] 25/3 35/1
estate [1] 207/24
et [1] 5/8 410 60/16
ether [1] 168/25
ethics [2] 36/9 36/12 207/24
evaluation [1] 178/8
Eve [13] 143/5 153/14 153/22 156/12 172/11 172/15 173/7 177/6
even [31] 20/4 23/8 34/18 45/13 63/10 114/11 116/6 122/13 149/11 189/22 203/1 214/4 220/20 232/1 234/1 234/2
event [2] 102/9 103/1
events [4] 26/6 26/6 26/8 130/22 130/22
eventually [1] 102/9
ever [32] 8/15 10/24 10/25 22/19 23/23 46/4 46/22 48/16 71/15 83/25 116/20 174/4 186/12 210/11 243/24 243/25
everybody [4] 32/10 35/19 37/13 169/25
everything [12] 6/5 12/20 14/15 14/16 48/5 71/17 132/7 133/21 156/17 161/17 164/1 165/6

**E** (bottom col 4)

106/10 112/6 113/18 113/22 123/25 124/24 125/8 125/18 126/17 127/13 131/25 132/2 132/6 147/14 158/7 158/15 159/8 159/24 160/12 161/12 163/12 166/2 166/9 170/2 171/15 177/15 181/4 186/12 186/18 186/19 187/18 187/21 188/21 208/25 209/10 233/5 234/6 235/21 242/21 244/24 246/2
every [13] 8/6 122/1 122/3 132/17 146/4 150/15 154/5 159/8 170/25 188/3 190/21 231/5 234/24
everybody [4]
everything [12]

**Ex** (bottom right col 1)

exhibit... [15] 82/18 82/19 84/1 110/1 110/16 111/1 135/17 157/24 164/15 169/18 169/23 192/5 197/5 220/23 222/22
exists [1] 115/1
Exhibit 10 [2] 51/25 144/15
Exhibit 12 [5] 55/5 144/15
Exhibit 15 [2] 57/8 58/3
Exhibit 16 [1] 58/16
Exhibit 17 [1] 58/22
Exhibit 2 [1] 82/18
Exhibit 21 [1] 83/12
Exhibit 22 [1] 82/18
Exhibit 24 [3] 92/24
Exhibit 26 [1] 196/22
Exhibit 28 [1] 192/5
Exhibit 3 [1] 82/18
Exhibit 4 [1] 84/1
Exhibit 5 [2] 52/22 110/1
Exhibit 6 [1] 220/23
Exhibit 7 [1] 52/18
Exhibit 8 [2] 82/18 82/19
Exhibit 9 [1] 82/1
exists [1] 115/1
existing [1] 86/22
expand [1] 212/4
expanding [1] 216/2
expect [6] 90/9 102/1 122/13 156/14 232/24 241/1
expected [2] 101/1 101/9 212/13 243/16
expecting [1] 122/4
expense [1] 101/9
experience [23] 22/17 22/18 23/19 45/22 68/19 73/1 94/13 94/25 104/10 106/14 113/4 113/9 124/25 159/8 160/9 180/13 203/22 204/2 224/21 225/5 225/12 226/19
experienced [1] 84/18
experiences [1] 24/4
experiences [3] 20/17 20/17 20/17
expert [6] 65/10 65/10 143/20 167/1 211/24 211/25 230/9
expertise [1] 211/22 221/24
explain [1] 16/1 119/10
explained [3] 16/1 119/10
explore [2] 120/9 211/11
explored [1] 211/11
exposed [1] 161/1
extent [7] 16/21 16/22 130/6 130/17
extensive [1] 59/21
external [1] 115/14

**Ex** (bottom right col 2)

extreme [1] 153/21

exhibit... [15]

face [24] 91/16 229/19 247/16 247/18
faced [5] 56/20 57/3 169/11 226/14 246/1
facing [2] 134/16 209/13
fact [23] 17/10 20/1 24/1 45/15 45/17 45/20 46/11 47/17 48/16 53/19 57/1 143/23 158/11 168/6 168/13 216/8 231/1 247/18 248/12
facts [5] 56/6 56/6 56/14 57/1 57/5
fact-based [2] 121/10 249/19
faced [5]
facilities [1] 121/12
factor [1] 203/16
factors [6] 32/10 32/14 35/1 131/13 206/8 207/3
factory [1] 81/1
faculty [4] 66/18 79/19 79/21 80/1 80/13
fair [12] 33/16 127/16 212/25 228/3 231/1 247/20
fairly [4] 25/24 31/10 245/11
fairness [1] 164/8
faith [2] 127/19 127/23
fall [1] 101/22
false [4] 26/12 26/12 127/1 127/16
familiar [32] 16/25 36/8 36/18 86/22 96/14 96/18 110/1 113/24 119/24 123/24 124/19 127/1 135/24 146/23 149/16 159/17 162/24 168/13 168/16 168/24 190/20 190/25 196/22 212/13
familiarity [1] 190/20
family [6] 24/6 60/12
far [9] 35/13 53/22 54/2 68/25 117/3 121/25 128/6 128/10 142/11
fashion [1] 220/12
fast [1] 103/11
fast-forward [1] 103/11
fatigue [1] 85/6
fault [1] 177/2
favorable [1] 214/25
FBI [2] 168/6 113/6

**Ex** (bottom far right col)

195/7 197/3
153/3 154/13 225/6 225/7 236/8 238/13 228/18 236/13 240/11
fearing [1] 151/15 151/10
firing [13] 17/24
firm [13] 4/11 230/14 231/21 231/23 233/1 244/16 244/17 244/21 244/25 245/15 245/17
first [50] 6/2 12/18 12/18 13/16 13/21 28/19 31/19 31/19 37/18 37/20 40/7 40/19 47/9 54/23 57/8 63/5 75/1 79/12 80/1 82/1 82/19 83/13 96/8 101/9 101/12 103/4 103/16 103/1 104/4 107/20 110/1 110/16 120/1 122/19 130/1 130/5 132/1 147/8 158/11 159/1 159/18 187/11 190/1 213/18 214/8 231/15 235/11 237/8
fit [1] 225/17
five [23] 7/7 18/1 20/1 221/6 221/9 229/1 229/19 225/6 230/5
flare [1] 35/13
flat [1] 191/25
flexible [1] 147/24
flip [2] 196/1 191/25
floor [1] 156/6
flow [1] 216/11
focus [10] 22/1 59/18 69/1 204/1 240/1
folded [2] 47/24 48/8
follow [13] 45/3 49/10 49/13 50/18 50/19 50/21 145/15 147/16 207/22
following [13] 34/5 147/12 5/18 11/18 52/18 52/18 54/13 56/14 58/4 60/1 190/25 215/24 225/9
force [73] 2/13 7/20 42/13 60/6 62/8 91/1 91/25 92/1 92/15 93/1 110/10 130/12 212/10 212/14 237/17 238/1

**F**

force... [56] 66/10 69/17 69/24 84/7 89/4 89/10 89/12 89/13 91/20 91/24 91/25 92/9 92/15 92/15 95/20 106/18 106/19 106/22 106/24 108/7 113/23 118/18 122/5 122/5 122/13 122/13 123/2 131/17 139/5 142/6 143/15 147/7 147/12 149/12 149/14 165/10 185/4 197/18 197/18 201/6 212/10 212/11 212/14 215/16 215/18 220/4 220/14 220/17 220/18 222/3 224/12 231/17 237/23 238/1 248/11 249/2

forced [8] 80/20 111/3 145/1 145/8 145/9 145/25 209/21 210/5

foregoing [3] 250/4 250/7 252/3

forehead [3] 235/6 240/22 240/22

Form [1] 107/24

forever [1] 7/16

form [12] 6/25 19/16 20/17 20/17 20/22 20/25 21/3 21/6 138/12 140/16 252/8 252/8

format [1] 107/10

formation [1] 96/18

formed [4] 13/20 17/7 137/10 225/5

former [8] 78/13 78/23 88/14 102/2 122/2 191/4 191/19 192/21

forming [4] 19/14 46/24 48/7 133/17

forth [7] 86/5 110/7 117/20 131/18 203/21 222/21 223/25

Forum [3] 94/15 108/8

forward [6] 6/20 12/10 145/21

forward-thinking [1] 145/21

forwarded [1] 78/3

FOUCHÉ [4] 4/4

found [10] 13/21 51/24 77/23 78/6 102/5 111/24 139/25 168/12 171/20 180/10

foundation [2] 103/20 104/1 106/1

founder [1] 96/22

founding [1] 103/20

four [4] 41/10 77/3 86/15 94/21

four-hour [1] 94/21

four-year [1] 86/15

fourth [5] 137/24 199/21 225/3 225/9 225/13

fourthly [1] 177/21

frame [3] 113/5 114/7 158/11

frankly [1] 236

fraudulently [2] 77/4 77/5

frequency [3] 33/6 161/2 161/3

frequent [2] 178/22 178/24

frequently [3] 39/20 160/13 160/13

Friday [1] 80/13

friend [1] 103/14

friends [3] 88/17 90/8 90/16

front [13] 16/2 18/6 36/2 139/14 234/25 257/19 207/19 207/19 210/6 210/16 227/23 227/23 228/1 228/3

frontal [1] 22/24

froze [1] 9/18

frustrated [3] 30/13 56/11 169/8

full [19] 16/8 17/16 17/23 19/21 107/8 109/12 115/24 116/6 117/7 131/20 134/2 134/21 141/11 173/2 176/3 184/11 185/3 209/12 222/7 223/13 234/14 240/17 241/17

fully [3] 19/19 19/25 24/19

fun [1] 79/5

function [3] 68/8 132/3 136/5

Fund [1] 84/23

funded [1] 69/10

funding [5] 69/5 69/7 84/23 84/25 104/6

furnish [1] 253/12

further [5] 84/17 212/3 246/12 250/11 250/15

future [6] 36/17 35/11 35/15 49/1 49/17 50/24

**G**

GA [1] 1/24

Gabbard [3] 181/8 185/2 185/4

Gabbard's [1] 185/17

gained [1] 66/22

game [1] 224/18

gaps [1] 15/25

Garrison [1] 116/16

Gary [1] 109/15

gas [7] 2/24 80/10 80/20 81/15 81/23 82/11 217/19

gathered [1] 81/8

gave [8] 57/25 84/7 86/15 91/2 106/19 107/17 107/17 213/3

gear [1] 103/19

general [6] 28/22 28/23 38/24 39/1 39/2 39/3 39/12 45/15 45/17 45/18 45/20 47/1 48/1 193/8 233/13

General's [3] 76/11 174/16 179/21

generally [6] 43/23 102/19 143/8 222/10 233/8

generated [1] 71/1

generic [1] 34/24

genuine [2] 26/20 26/21 26/25 27/4

George [2] 27/21 27/24 28/9 28/11 28/19 62/21 135/19

George Floyd [1] 62/21

Georgia [7] 1/17 96/18

gesturing [1] 186/6

get [58] 7/10 7/12 9/1 9/19 14/14 23/4 25/6 25/15 28/22 29/23 29/24 30/6 30/11 32/5 32/22 33/1 34/23 34/24 44/17 50/21 50/22 51/15 51/23 52/20 52/22 54/10 62/2 63/20 68/9 68/9 68/13 78/8 81/5 82/9 86/9 86/22 86/22 91/7

gets [6] 15/15 159/5 159/6 159/8 161/25 162/5

give [24] 7/9 19/25 22/4 23/23 37/10 43/11 52/24 53/7 63/20 73/2 73/3 78/15 87/23 92/24 124/1 129/21 140/16 164/9 189/25 249/11 249/14

given [39] 3/6 6/6 79/9 81/7 82/2 96/22 104/12 115/22 Group's [3] 101/12 104/22 104/22

gives [3] 15/21 90/19 223/14

giving [6] 76/18 142/25 216/19 217/20 218/7 218/7 218/17 218/22 68/7 226/4 227/1 229/3 229/18

Glasgow [2] 35/5 36/8 139/13 141/25 142/25 151/2

glaze [5] 235/1 238/24

GLOVE [4] 89/20 89/21 90/2 90/10

go [117]

goal [9] 32/1 52/13 52/21 52/22 52/23 54/7 54/4 140/16 142/11 142/14 143/8 148/12 159/18 159/18 161/16

going [39]

goings [1] 78/9

good [15] 6/10 6/11 23/8 29/8 53/6 55/6 71/22 74/8 193/25 227/10 227/11 233/20 233/23

goodness [3] 56/11 72/7

Gordon [1] 146/25

gosh [3] 56/10 93/17 108/5

got [25] 9/19 9/23 14/10 29/19 40/6 52/25 67/10 68/6 71/4 80/16 85/4 134/12 147/12 165/17 187/11 187/12 193/25 195/15 200/13 209/22 225/11 230/9 236/15

governed [2] 218/5 218/8

government [2] 21/9 65/8

governmental [2] 218/5 129/18

Governor's [1] 76/10

gracious [2] 56/12 169/25

grade [1] 171/23

graduate [1] 87/14

graduated [1] 71/22

graduates [1] 167/22

graduation [3] 146/25 147/8

Graham versus [1] 224/22

granted [3] 119/25 121/25 172/22

Great [1] 31/21

greatly [1] 134/12

Greenville [1] 55/15

ground [3] 91/11 91/12

grounded [9] 15/12 91/16 135/14 136/11 136/15 136/22 136/24 137/6 137/10 137/10

grounding [3] 91/15 91/16 91/20

group [8] 3/6 6/6 79/9 81/7 82/2 96/22 104/12 115/22 115/22 115/22

group's [3] 101/12 104/22

groups [1] 173/19

growing [1] 169/11

growth [1] 114/22

Guardian [1] 58/23

guards [2] 81/15 81/23

guess [3] 23/7 23/17 105/9

guest [2] 72/14 87/16

guides [1] 114/11

**H**

H-A-Z-L-E-T-T [1] 107/25

had [71] 8/6 13/12 14/12 14/13 14/15 14/16 17/23 29/10 37/7 43/19 69/10 71/1 78/14 78/14 78/17 79/3 86/14 88/9 92/25 94/7 95/13 100/6 104/5 104/5 104/8 107/13 113/25 121/14 121/23 143/8 143/11 146/17 150/10 150/18 153/3 154/15 181/4 180/10 213/3 220/10 220/14

half-million [3] 208/18 212/8

hall [6] 3/3 61/14 83/8 63/8 hang [8] 129/8 237/8 262/5 hand [3] 235/6 240/22 240/22

handcuffs [2] 91/18 223/4

handle [1] 123/14

hands [5] 92/24 93/2 93/6 93/8

hands-on [6] 92/24 93/2 93/5 93/6 93/10

Hang [1] 67/11

Hanna [1] 5/2

happen [12] 34/16 43/10 44/8 45/14 61/11 63/22 126/16 126/18 153/20 223/16 233/16 238/1

happened [7] 86/7 178/8 182/4 182/8 187/3 230/19 234/1

happening [7] 86/7 178/8 182/4 182/21 182/23

happy [1] 3/7

Harlow [1] 5/22/23

Harris [1] 148/22

has [50] 10/6 24/8 28/23 34/25 34/25 37/17 37/15 38/13 38/17 56/5 76/10 96/4 101/4 120/10 126/10 130/21 133/19 134/10 134/13 174/16 131/1 137/16 138/20 162/25 177/5 193/10 208/8 209/8 232/9 236/23 237/7

Hazlett [2] 107/25 108/1

hazy [1] 237/3

He'll [1] 249/14

he's [28] 43/22 68/19 78/13 153/8 153/9 206/2 207/25 207/25 210/20 210/23 211/21 211/25 211/25 212/12 213/8 220/9 220/18 222/20 232/21 232/22 232/24 250/18 250/23

head [11] 40/4 41/7 42/4 73/8 134/15 204/18 225/13 230/8 235/2 234/24 235/3 235/3 237/23 237/24 239/20 245/11 245/25

heads [9] 39/13 39/14 96/20 96/21 131/13

heal [1] 24/8

healing [1] 114/21

health [5] 24/23 24/24 24/24 44/7 77/3 107/3 113/25 123/22

hear [10] 26/15 148/14 197/11 199/23

heard [22] 22/21 24/14 41/7 73/8 73/17 73/18 73/18 73/23 74/6

hearing [5] 54/13 124/13 143/10

hears [1] 245/11

heavy [1] 123/22

heel [3] 83/4 185/14

helicopter [1] 62/12

hello [1] 53/9

help [12] 52/14 53/7 54/8 66/6 80/4 118/19 118/19 118/19 163/19 168/8 168/9 169/10 203/19

helped [3] 102/5 102/11 223/16

helpful [2] 94/23 103/16

helps [4] 114/7 168/7 168/8 169/7 169/8 181/17 181/13

her [9] 249/22 249/18

Here's [9] 67/18 129/9 130/9 130/12 130/18 130/19 130/25

hesitate [1] 6/20

hey [63]

hi [28]

**I**

IACP... [1] 187/19

IACP's [1] 116/14

idea [9] 15/21 31/2 63/23 68/9 68/10 71/17 87/24 87/24 118/1 117/8

ideas [1] 101/5

ideas [1] 117/8

identical [1] 116/24

identification [1] 249/20

identified [13] 181/1 204/22/ 34/25 71/19 128/16 138/5 157/17 160/22 178/16 178/23 191/10 199/15 205/11 205/12 207/10

identify [1] 203/16

identifying [1] 134/24

ideologies [1] 85/1

idiosyncratic [1] 203/16

if [176]

ILEETA [5] 89/6 94/8 94/9 94/10 94/16

ill [1] 74/10

Illinois [12] 2/8 222/22/ 30/19 30/20 73/1 73/17 74/19 80/18 185/3 196/1 253/16

illustrated [2] 133/9 134/14

imagine [1] 107/13

immediacy [1] 161/8

immediate [1] 226/23

immediately [2] 226/20 227/3

immunity [14] 44/21 51/15 51/21 51/24 52/3 52/8 52/18 52/22 53/12 53/8 54/5 54/7 119/25 120/25 121/18 121/25

impact [2] 22/17 198/16 249/5

impaired [1] 106/22

impetus [2] 85/16 147/1

implement [2] 107/12 168/7

implemented [7] 105/13 105/21 106/24

implemented [4] 155/6 156/6 156/12 159/12 159/13 159/14 159/17 161/7 180/5 159/17

implies [1] 137/23

important [2] 87/13 176/25 176/25

impossible [3] 15/24 185/23 185/24

impression [13] 14/1 22/6 23/2 48/6 143/4 146/19 156/19 174/24 207/7 208/22 245/13 245/25

impressions [1] 142/1

imprisonment [1] 131/18

improper [1] 242/23

improving [1] 170/8

imprudent [1] 154/20

in [884]

in-custody [2] 66/11 89/1

in-service [3] 3/11 93/20 195/11 195/15 196/25 197/6 197/17 197/19 197/6

inaccurate [4] 45/11 63/13 63/17 241/16

inaction [1] 246/6

inadequate [2] 49/1 49/17

inc [1] 251/17

inches [6] 234/16 234/17 235/5 235/7 240/21

incidence [1] 61/3

incident [24] 20/5 20/6 25/11 40/2 48/3 63/12 79/12 100/19 121/10 141/22 141/24 142/2 145/12 166/25 168/9 168/18 168/20 219/6 224/19 234/5 234/6 234/25

incidents [2] 34/2 34/7 34/2 34/2 138/18

include [18] 27/11 107/3 88/7 117/3 121/11 133/23 139/17 123/22 162/25 167/4 167/6

included [3] 75/14 116/10 134/19

includes [2] 20/19 90/11

including [7] 20/15 36/24 40/16 133/17 133/24 195/4 247/24

incoming [1] 146/6

incorporating [1] 116/23

incorrect [1] 65/6

increase [4] 161/18 56/6 113/11 160/14 235/11 252/24

increased [2] 134/12 218/16

increasing [1] 155/3

incredulous [1] 184/16

indemnification [2] 130/16 131/1

indemnified [3] 130/8 130/11 132/5

index [4] 22/9 25/16

Indiana [1] 79/22

indicate [4] 147/19 180/2

indicated [14] 277/1 64/14 82/1 142/7 146/6 160/21 245/13 245/25

indicates [2] 147/15 147/5

indicating [4] 45/18 172/20 172/20

indication [3] 149/25 149/3

indicator [1] 89/6

individual [4] 43/19 97/11 145/4 202/19 216/22 216/25

individuals [2] 207/8 209/8

industry [1] 68/8

integrated [1] 94/1

integrity [1] 40/22

induces [1] 145/13

induct [1] 143/8

inductive [1] 136/16

industries [1] 39/19

industry [1] 39/25

infer [1] 137/23

influence [1] 202/5

inference [1] 22/23

influence [2] 48/6 133/23

inform [8] 46/15 47/12 47/14 149/12 149/15 183/1 45/12 72/12 115/4 115/24 interesting [8] 149/8 150/23 149/4 47/2 115/6 115/8 136/6 115/8 158/23 173/9 191/1 191/14 191/24

information [40] 7/12 12/10 12/11 13/20 16/13 36/8 37/13 46/19 47/1 47/18 72/11 72/20 113/25 115/3 115/4 131/15 133/13 149/17 150/8 158/18 183/6 183/18 195/7 196/21 197/7 197/8 200/25 203/13 222/15 223/18 245/13 245/16 246/10 246/10 246/14 248/4

informational [1] 141/25

informed [3] 72/19 108/20 114/19

informing [1] 47/19

informs [1] 133/21

initial [11] 6/14 6/15 6/16 13/15 13/20 14/1 14/2 14/4 14/6 22/1 22/13 22/22 22/5 24/12 24/22 24/23 52/1 144/24

initially [3] 46/18 63/1 161/23

initiation [3] 143/11 144/9

inject [1] 7/16

inlets [1] 223/20

inmates [9] 79/9 80/19 81/7 81/15 81/23 82/1 82/2 82/5 82/17 82/20 82/23 82/23

inn [2] 121/16 222/23 223/1 223/24

input [1] 105/11

inside [3] 22/24 230/24 231/21

inspector [1] 76/11

inspired [1] 111/22

insofar [1] 111/24

instability [1] 134/19 182/18 182/25 243/23 inst.

installation [1] 26/6

instance [2] 179/5 187/12

instances [2] 149/8 214/10

instant [3] 23/25 159/12

institution [3] 111/8 167/13

instruction [1] 167/21

instructions [1] 95/13

instructor [6] 89/14 89/16 89/16 92/25 93/2 93/8

instructors [14] 94/19 92/25 95/2

instrument [1] 147/1

insult [1] 172/1

insurance [6] 68/6 69/5 69/6 115/1 130/13 131/25

integral [1] 99/1

integrated [1] 94/1

integrity [1] 40/22

intensity [3] 13/10 152/18 205/23

intensive [1] 15/18

intent [3] 52/6 126/7 220/1

intention [1] 76/22

intentional [3] 212/18

intentionally [1] 77/18

interaction [2] 87/15 137/17

interactions [3] 122/7 137/16

intercept [1] 104/21

interest [2] 250/13 251/9

interested [6] 12/9 36/6 117/7 118/14 121/3 121/4

interesting [8] 149/8 150/23 149/4 47/2 115/6 115/8 136/6 115/8 158/23 173/9 191/1 191/14 191/24

interests [2] 108/23 109/23

intermediate [1] 17/17

International [7] 89/7 94/16 110/17 110/18 168/21 170/4 186/12

interpretation [1] 114/24

intervened [1] 43/21

intervention [2] 93/19 94/5 94/7

interview [3] 13/13 13/25 14/24 83/12 153/3 155/4 187/12 199/21 204/12 207/5

interviewed [2] 82/25 83/3

interviews [2] 13/24 14/5

into [45] 6/25 9/16 47/6 48/8 49/9 50/10 53/22 62/9 67/19 67/22 68/4 68/19 75/9 78/25 82/6 85/4 86/6 93/17 96/19 102/6 105/9 106/25 133/12 136/20 137/14 137/25 139/25 141/25 148/5 148/8 160/8 161/5 161/10 171/22 178/1 184/15 203/18 209/10 209/12 212/11 224/3 224/7 225/2 225/24

intrinsic [2] 140/13 225/4

introduction [1] 140/13

investigate [3] 65/1 151/18 231/21

Investigating [2] 58/17 65/7 227/2

investigation [2] 20/16 65/2 100/16

investigator [4] 127/17 200/9 200/10 205/9 205/10

investigators [3] 205/10

investment [1] 187/3

invite [1] 117/20

invited [1] 171/21

involve [2] 115/19 136/14

involved... [16] 112/10 123/11 132/16 158/21 167/2 187/21 192/24 193/2 193/7 193/14 199/2 215/24 244/1 245/21

involvement [2] 165/22

involves [1] 215/24

involving [4] 92/23 122/21 132/1 225/7 224/11

is [480]

Isidore [1] 41/6

isn't [8] 42/18 59/15 102/16 123/20 123/16 159/6 232/20 241/3

issue [21] 22/7 24/10 27/18 41/4 41/9 42/19 42/22 68/24 78/25 78/25 129/11 148/12 159/23 172/12 172/19 172/22 176/19

issued [6] 165/21 227/14

issues [25] 16/5 21/1 22/1 22/18 22/20 24/9 26/14 26/20 38/24 42/25 59/18 66/8 89/9 114/8

It [209]

it's [209]

item [8] 114/11 129/9 130/9 131/13 132/8 132/12 132/12 132/12

items [1] 103/21

its [34] 38/1 111/5 111/13 145/24 154/22 157/9

itself [5] 26/12 82/21 137/25 156/23

**J**

Jackson [3] 2/24 79/24 89/10

Jail [1] 42/16 80/19 81/25 87/25 89/1

January [14] 7/8 9/3 9/18 9/24 14/11 56/19 78/6 74/23 74/23 78/24 78/24 166/16 166/17

January 1st [1] 14/11

January 26th [1] 7/8 14/11

Jeanne [1] 41/5

jeopardized [1] 216/19

jeopardy [1] 42/7

jerk [1] 229/19

jitchney [1] 5/4

job [6] 119/20 220/22 220/23 220/23 223/17 224/21

**JOE** [14] 4/4 26/5 51/5 51/11 51/7 57/23 82/17 112/8 112/12 130/22 199/11

**JOHN** [1] 5/1

join [2] 103/25 104/11

joined [1] 64/8

Jon [3] 109/10 165/1

journal [3] 55/25 66/18

journals [5] 55/25

journals [8] 40/23 40/23 55/20 116/15

judge [5] 22/19 53/9 53/17 199/12 199/12

judges [1] 95/5

judgeship [1] 78/8

judgment [1] 76/19

Judicial [5] 22/19 89/7

jumped [1] 185/4

junior [1] 76/12

juris [1] 78/16

jury [1] 151/23

just [155]

justice [73] 21/3 21/16 21/18 21/18 21/23 21/23 21/25 22/1 22/4 59/15 59/15 77/18 104/7 104/9 134/4 134/5 164/25 165/11 165/13 165/15 166/8 167/7 167/15 200/21 202/8 202/10

justification [4] 42/7 72/21 72/23

justified [1] 237/23

justify [1] 33/14

justifying [1] 56/20

**K**

K-A-P-P-E-L-E-R [1] 116/13

Kalamazoo [1] 9/5

kansas [1] 110/3

Kappeler [2] 116/13 128/9

Karen [1] 41/23

Karen Blum [1] 41/23

keep [9] 117/11 117/15 155/18 174/24 201/3 237/24 247/21

keeping [1] 64/11

keeps [2] 155/9 162/10

Kent [1] 5/6

kept [1] 159/16

KEVIN [1] 4/11

kevinhcomreidau [1] 4/16

key [1] 151/5

kick [1] 93/6

kill [6] 83/1 189/5 202/6 205/2 214/18 215/2

killed [4] 152/17 158/21

killing [1] 62/21

kills [1] 202/10

kind [31] 14/4 14/22 15/6 16/17 84/24 87/15 102/17 111/18 166/5 166/6 167/7 167/7

kinds [2] 88/20 103/2

King [2] 101/9

knee [16] 167/8 186/9 186/22 186/22 187/2 187/7 187/7 187/13 229/8

knew [7] 32/20 207/11 235/5 235/7 235/20 235/22

knock [1] 92/25

knocking [4] 93/6 93/8

know [376]

knowing [5] 133/13 167/13

knowledge [15] 47/17 47/19 203/18 204/9 205/4 218/13 227/25

known [8] 39/14 45/9 85/19 129/17 129/18 129/18 132/19 191/17 234/22

knows [1] 232/9

**L**

L'HOMMEDIEU [4] 4/11 176/16 241/10 241/12

L-E-E [1] 6/15

label [1] 198/17

lack [3] 168/19 218/2

lacks [1] 222/24

laid [2] 101/9 178/10

landmark [1] 104/22

language [5] 5/22/23 162/25 165/5

Karen [1] 41/23

**LAPD** [1] 181/9

large [3] 36/24 126/8 126/14

largely [2] 38/10 129/21

Las [1] 54/11

Las Vegas [1] 54/11

last [27] 6/15 16/16 23/23 24/25 32/15 55/4 55/9 54/15 58/10 82/21 82/21 167/17 237/6

late [2] 167/20

late [2] 148/19

later [12] 13/6 14/8 39/13 14/16 46/3 83/24 89/16 105/3 105/3 208/6 208/9 208/18 224/2 224/20

LATCHNEY [1] 5/1

lateral [1] 20/11

latest [1] 123/11

law [58] 21/9 54/19 85/23 85/25

laws [1] 130/11

lawsuit [2] 9/8 108/24

lawsuits [20] 33/3 108/4

lawyer [4] 212/10 212/11

lay [2] 15/15 137/10

layer [2] 221/16

leader [1] 131/20

leadership [1] 109/24

leads [1] 111/16

learn [4] 66/5 80/20

learned [3] 167/11 167/13

learning [1] 167/7

least [15] 46/10 52/15

leave [2] 42/4 92/8

leaves [6] 191/10 191/12

lecture [3] 137/10 137/10

led [4] 121/16 212/14

Lee [2] 6/14 6/15

left [9] 11/3 67/9 134/2

leg [2] 188/22 196/20

legal [9] 31/25 68/5 73/8

**L**

**legal [18]** 22/18 33/4 36/5 36/7 40/23 53/14 56/21 57/3 73/24 106/20 107/13 110/7 110/22 117/20 134/13 150/11 167/24 176/10
**LEJA [1]** 30/25
**LEJA's [1]** 30/22
**lengthy [1]** 12/22
**less [9]** 61/12 61/13 70/3 197/14 197/15 197/18 198/5 198/12 198/15
**let [55]** 6/7 8/15 16/15 17/13 20/8 23/3 23/23 29/4 29/18 29/24 30/6 30/10 30/11 30/12 31/6 31/6 31/10 32/5 32/22 47/4 47/4 47/5 47/8 47/21 47/21 54/9 55/18 56/16 58/10 61/16 67/9 74/17 78/18 79/14 83/24 115/8 115/17 115/19 116/2 130/13 134/4 138/10 138/23 141/17 141/17 143/11 144/16 167/19 169/6 170/9 180/5 180/8 194/22 221/8 227/14
**let's [38]** 9/3 11/22 25/15 25/25 32/15 34/14 34/14 40/6 55/4 56/12 74/16 79/14 80/9 82/22 83/14 84/4 134/8 153/20 162/16 167/17 169/4 175/12 178/7 181/15 193/23 194/14 195/9 195/12 198/24 198/24 199/12 208/16 208/21 208/23 215/14 215/19 220/3 225/19
**lethal [14]** 91/20 92/9 92/15 108/7 197/14 197/17 197/18 198/5 198/12 198/15 210/24 211/20 214/23 231/4
**lethal-force [1]** 92/9
**letter [8]** 74/25 75/3 75/14 75/18 76/14 76/18 77/24 78/22
**level [6]** 20/2 40/21 56/20 57/2 123/24 156/12
**levels [1]** 147/19
**Levitt [1]** 4/5
**Lexipol [19]** 146/5 146/9 146/13 146/16 146/23 147/1 147/2 160/23 162/9 162/14 162/16 162/16 162/25 163/6 163/13 165/3 172/23 174/2 177/5
**liability [28]** 2/10 2/16 7/21 20/16 32/14 32/18 34/13 36/10 36/25 54/9 64/12 68/13 110/7 110/20 118/23 120/19 123/5 130/15 130/21 131/8 132/3 133/1 134/16 150/16 150/23 158/17 158/25 224/4
**Liberty [1]** 2/13
**license [3]** 79/10 80/23 81/8
**life [5]** 21/21 23/4 86/11 237/18 239/6
**light [8]** 156/6 156/21 180/9 203/22 234/15 240/20 245/22 247/17
**lights [10]** 204/19 204/23 205/8 205/19 206/24 246/21 247/6 247/11 247/18 247/22
**like [31]** 19/23 23/7 33/22 59/20 68/13 68/23 70/11 80/17 87/24 101/6 103/17 104/8 105/19 106/18 118/25 125/12 127/1 138/3 145/11 171/24 172/14 174/3 179/6 186/2 191/21 192/8 192/8 196/11 239/20 247/2 247/11
**like-styled [1]** 68/23
**likelihood [3]** 41/17 129/4 215/18
**likely [6]** 82/15 122/4 123/1 127/11 127/21 128/8
**limbic [1]** 202/19
**limit [1]** 244/24
**limitations [6]** 59/21 59/22 63/17 63/25 130/1 191/13
**limited [5]** 13/11 63/24 94/3 228/8 244/13
**limitedly [2]** 101/17 157/11
**limiting [1]** 221/8
**limits [1]** 191/16
**line [16]** 78/21 110/2 143/20 152/3 183/20 240/18 252/9 252/12 252/14 252/17 252/19 252/22 253/1 253/3 253/6 253/8
**link [2]** 169/10 186/22
**LinkedIn [1]** 3/7
**list [4]** 8/13 10/21 10/23 181/14
**listed [13]** 10/2 18/11 18/13 18/17 20/3 20/10 128/14 135/22 137/1 158/14 181/18 199/13 220/21
**listen [1]** 25/17
**listening [1]** 172/16
**listing [2]** 39/18 64/12
**literature [1]** 148/7
**litigation [42]** 2/17 23/21 25/2 33/6 34/21 35/8 35/11 35/14 35/15 39/14 40/11 42/1 42/11 43/14 44/18 45/21 48/11 50/10 50/25 54/17 55/2 55/7 68/13 72/21 92/16 110/21 111/2 111/4 112/11 112/23 112/25 114/8 114/14 114/22 122/12 128/12 129/17 129/25 132/10 132/16 134/11 168/2
**litigators [3]** 134/3 134/10 134/23
**litigious [4]** 38/2 38/13 38/17 39/6
**Litras [1]** 37/25
**little [6]** 40/6 70/2 70/3 154/9 157/20 229/3
**live [2]** 45/16 101/11
**lives [1]** 246/6
**LLC [2]** 3/6 96/23
**LLP [2]** 4/5 5/2
**lob [1]** 81/23
**lobbying [1]** 81/15
**local [1]** 58/21
**location [11]** 152/15 199/16 200/3 204/22 206/3 206/24 208/1 215/23 216/8 226/23 228/9
**locked [1]** 115/8
**log [1]** 232/8
**logic [1]** 67/19
**logs [2]** 232/2 232/6
**long [8]** 31/25 43/19 63/19 138/18 158/2 201/25 228/20 242/1
**longer [4]** 17/18 96/24 105/23 109/5
**longitudinal [7]** 66/25 67/1 70/1 70/5 70/13 70/15 70/19
**look [48]** 8/6 8/14 10/16 15/23 17/6 21/25 24/10 58/16 60/2 66/19 67/17 67/19 91/23 105/10 111/23 112/10 112/13 113/20 116/2 127/12 127/17 127/25 131/9 137/21 137/21 176/14 178/18 178/21 181/15 183/16 186/5 188/14 192/7 194/13 195/20 198/14 198/18 203/16 206/21 206/21 207/15 210/10 211/7 215/2 215/2 215/4 231/10 242/17
**looked [16]** 66/25 66/25 69/25 71/2 106/18 114/3 177/11 178/23 183/16 191/21 198/11 198/23 199/10 208/15 219/22 231/19
**looking [30]** 12/9 13/21 17/7 22/8 24/15 58/18 63/16 66/7 71/4 92/16 113/3 123/5 127/5 137/1 139/24 146/23 148/14 149/13 199/18 210/6 217/11 217/11 229/21 236/9 236/17 236/18 236/22 239/20 248/7 249/10
**looks [15]** 7/18 7/18 22/14 22/14 22/14 22/15 40/20 80/17 112/12 136/17 138/2 192/8 196/11 208/25 239/20
**lose [2]** 88/4 131/8
**loss [5]** 68/9 68/12 68/14 132/1 132/1
**losses [6]** 2/17 55/7 66/24 67/22 128/12 131/9
**lost [3]** 67/3 70/25 246/6
**lot [23]** 8/2 29/13 42/10 52/25 53/6 95/13 123/21 150/3 153/20 154/13 179/12 197/3 200/9 214/2 214/4 214/8 216/22 222/19 222/24 222/24 223/6 223/23 246/4
**loud [3]** 38/16 48/23 200/10
**love [1]** 120/17
**Lovell [2]** 9/5 9/6
**low [1]** 89/25
**lower [4]** 40/20 42/25 46/17 149/9
**lute [7]** 4/19 4/23 12/3 14/7 14/13 14/18 14/19

**M**

**M-A-C-M-A-N-U-S [1]** 116/19
**M-A-D-H-A-V-A [1]** 55/9
**M-C-D-O-N-O-U-G-H [1]** 74/24
**M.H. [1]** 107/25
**M.H. Hazlett [1]** 107/25
**machine [2]** 103/3 103/3
**MacManus [1]** 116/19
**mad [1]** 82/4
**made [28]** 16/7 26/20 29/2 45/10 51/1 59/17 76/21 82/6 143/7 143/25 155/11 166/17 174/23 177/11 182/2 183/2 192/8 192/15 199/2 205/7 205/19 210/18 211/2 211/22 214/22 244/8 251/18 252/5
**Madhava [1]** 55/8
**magazine [2]** 168/19 177/9
**Main [1]** 4/21
**maintain [3]** 48/24 49/15 77/4
**maintained [2]** 22/2 139/12
**major [2]** 116/15 117/8
**make [54]** 7/10 7/20 14/15 17/16 24/19 25/16 25/18 27/3 28/10 34/13 37/10 37/17 40/17 55/24 67/9 78/18 84/15 84/24 108/16 110/5 110/8 115/3 128/18 143/15 146/11 146/19 149/5 150/11 151/12 151/18 158/5 175/17 176/24 179/12 180/8 185/16 186/17 186/22 190/4 191/20 193/13 195/24 196/1 205/4 209/21 210/5 211/17 214/7 221/2 225/11 239/24 244/11 251/6 252/6
**makes [4]** 9/22 42/10 96/14 103/18
**making [14]** 21/25 24/11 40/3 139/21 141/5 146/2 150/7 184/2 192/18 192/19 218/5 224/19 228/17 252/7
**male [5]** 210/10 230/2 230/3 230/20 231/3
**male's [1]** 230/8
**males [1]** 85/24
**malpractice [1]** 39/15
**man [7]** 184/5 185/18 201/25 209/1 233/22 246/22 246/22
**man's [1]** 213/9
**management [38]** 2/17 50/4 52/18 55/6 66/15 66/16 66/24 68/21 68/22 101/13 104/13 104/19 110/18 110/19 128/13 131/15

**M**

**management... [22]** 140/12 146/14 160/24 162/12 164/17 164/22 164/24 165/2 165/2 165/9 165/10 165/12 165/16 165/19 165/24 166/3 166/7 167/11 174/2 178/7 178/16 178/20
**manager [6]** 68/2 68/7 68/17 69/13 74/9 164/25
**managers [4]** 67/24 68/3 69/8 69/11
**managing [1]** 7/20
**mandate [8]** 145/14 173/15 174/11 175/11 176/17 177/1 177/4 180/10
**mandated [1]** 173/22
**manifestation [1]** 219/8
**manner [5]** 53/4 112/7 119/17 119/18 238/7
**manpower [1]** 190/13
**manual [3]** 140/14 160/14 160/16
**many [48]** 10/14 11/15 25/7 25/7 25/7 25/8 45/14 58/24 60/14 60/25 61/2 70/21 73/8 79/25 81/9 91/24 96/7 103/3 103/3 103/3 104/9 105/20 131/14 134/2 134/9 134/16 146/12 159/9 164/16 167/15 179/10 179/12 188/6 189/4 190/1 190/2 193/23 198/15 201/9 201/9 203/23 204/12 204/14 204/16 204/17 220/8 220/9 223/6
**March [5]** 1/19 250/9 250/19 251/21 252/3
**March 2024 [1]** 1/19
**marches [1]** 118/19
**Marino [3]** 185/9 219/10 244/6
**marked [10]** 8/12 17/15 29/21 36/3 57/16 58/4 58/10 135/16 195/20 249/19
**MARQUETTA [2]** 1/4 4/2
**masters [1]** 71/14
**match [1]** 186/17
**matched [1]** 161/14
**matches [1]** 116/1
**material [4]** 12/9 16/2 143/19 197/2
**materials [11]** 12/15 12/18 12/25 13/5 13/7 13/17 13/21 14/6 14/9 14/12 18/13
**matter [20]** 10/24 11/16 12/2 13/1 14/3 17/9 17/11 19/4 25/9 76/11 77/11 110/6 136/9 137/9 137/17 162/15 177/7 190/12 196/23 232/9
**mattered [1]** 248/22
**matters [6]** 10/23 22/15 25/12 25/13 111/7 134/11
**maximize [3]** 31/3 31/15 31/23
**may [61]** 7/1 7/19 15/17 16/1 25/9 28/3 28/4 34/22 34/23 43/25 55/20 56/13 58/14 62/1 62/5 87/16 92/7 108/18 123/3 131/3 143/17 152/2 154/5 156/22 167/12 173/13 173/24 178/17 178/20 179/4 181/10 182/6 182/15 183/6 185/21 186/9 186/18 190/14 190/15 190/17 193/3 203/19 204/9 204/10 206/18 215/1 220/18 226/17 227/17 232/21 235/1 235/21 236/8 237/16 238/23 238/25 239/6 240/1 246/13 247/11 248/24
**maybe [16]** 38/2 45/10 45/11 56/7 145/12 157/11 178/10 187/17 192/4 192/5 196/12 207/15 211/2 211/22 219/4 247/3
**McDonough [2]** 74/24 75/20
**me [140]**
**mean [72]** 14/12 18/21 22/4 22/12 23/24 23/24 28/24 34/4 42/7 42/8 42/14 42/18 43/11 43/15 50/11 52/13 66/6 69/23 72/10 72/12 72/23 76/6 86/6 87/2 112/17 112/21 113/12 113/24 117/12 117/17 119/10 120/24 121/1 122/24 125/1 134/21 137/5 137/10 142/24 144/24 145/9 149/20 151/7 153/24 154/4 166/4 169/17 173/17 186/2 191/13 195/16 197/20 197/21 198/3 198/15 198/17 201/8 203/10 206/6 206/19 207/16 212/3 213/9 223/22 232/2 232/8 232/21 234/1 239/3 239/20 241/19 245/6
**Meaning [4]** 18/12 43/16 85/19 235/9
**means [7]** 76/7 130/16 131/23 197/24 197/25 198/4 209/9
**meant [2]** 71/19 76/15
**measures [4]** 33/5 53/2 53/8 164/16
**mechanics [2]** 35/8 35/13
**media [1]** 28/10
**medical [6]** 39/15 65/21 66/2 66/4 106/8 148/23
**medium [1]** 128/23
**meet [1]** 105/13
**meeting [2]** 5/12 64/8
**Meggitt [11]** 102/3 102/5 102/8 102/12 102/23 103/1 103/22 104/3 104/4 104/6 109/23
**MEL [1]** 4/19
**member [1]** 65/8
**members [1]** 78/11
**Memorial [1]** 28/4
**memorize [1]** 205/11
**memory [2]** 187/10 251/11
**men [3]** 23/15 29/11 82/2
**mentally [2]** 74/10 106/22
**mentally-impaired [1]** 106/22
**mention [14]** 109/20 109/22 111/14 111/20 119/4 119/8 119/20 120/20 122/1 122/6 122/25 127/7 155/11 232/18
**mentioned [13]** 77/14 87/16 105/22 106/2 113/16 123/15 125/2 126/9 128/11 129/4 129/6 130/3 241/19
**mentioning [2]** 125/11 241/20
**Mentor [1]** 4/6
**met [3]** 11/18 11/20 11/22
**metaphor [2]** 101/19 101/20
**method [2]** 66/12 111/1
**methodologies [2]** 136/4 136/11
**methodology [10]** 15/11 16/4 17/2 41/5 66/9 66/17 66/21 136/10 137/25 138/12
**methods [4]** 35/1 66/8 66/13 104/18
**Michael [4]** 73/3 108/1 108/2 128/21
**Michigan [22]** 2/17 3/3 43/19 55/7 66/16 66/23 68/21 71/15 71/16 72/5 79/2 79/24 79/24 80/12 80/19 81/6 83/1 83/7 95/23 128/13 136/23 201/24
**middle [5]** 6/14 6/15 101/3 167/20 209/12
**midnight [1]** 172/5
**might [13]** 64/24 77/6 110/9 110/11 120/22 150/15 177/12 179/16 180/14 192/6 204/9 218/23 251/17
**might've [3]** 28/16 189/4 194/1
**military [1]** 136/3
**mind [14]** 45/20 152/2 152/18 152/21 186/12 186/21 187/11 219/8 220/2 229/18 243/12 245/5 247/20 247/21
**minute [5]** 7/13 139/8 144/16 158/2 222/23
**minutes [1]** 184/25
**misappropriating [1]** 77/19
**misconduct [3]** 41/7 63/5 127/6
**misconstrued [1]** 216/14
**misper [1]** 108/4
**misperceives [1]** 238/8
**Misperceptions [2]** 108/5 108/6
**miss [1]** 58/24
**missed [4]** 38/3 38/13 174/7 225/11
**missing [2]** 38/12 62/1
**mission [6]** 2/12 21/16 36/15 36/17 140/7 140/9
**Mississippi [5]** 16/16 16/17 69/3 69/9 69/11
**mitigate [1]** 34/14
**MM [1]** 68/20
**MMRA [1]** 68/17
**MMRA's [1]** 67/21
**MMRMA [6]** 66/23 68/18 68/21 70/12 70/23 132/1
**model [6]** 162/25 168/17 172/19 172/22 175/14 177/11
**moment [4]** 51/7 57/9 67/7 204/15
**Monell [4]** 114/20 149/17 149/20 149/22
**money [1]** 96/13
**monitoring [3]** 105/13 161/17 161/23
**Monroe [4]** 111/15 111/20 114/8 114/20
**month [2]** 70/14 201/25
**month-long [1]** 201/25
**monthly [2]** 197/3 197/12
**months [3]** 70/6 70/21 106/19
**more [49]** 13/6 19/24 26/19 28/15 28/17 28/17 28/18 28/18 33/20 34/10 34/23 44/9 70/3 70/7 70/22 76/2 87/22 94/16 110/13 117/11 118/13 119/15 122/4 122/6 123/1 127/10 127/21 128/8 128/18 129/3 131/13 157/20 161/25 183/14 193/20 195/10 198/22 205/23 207/18 214/8 215/23 216/7 219/4 220/16 221/4 222/19 228/12 247/7 247/21
**morning [6]** 6/10 6/11 131/15 132/13 166/18 183/12
**most [10]** 26/11 70/1 82/3 82/15 120/21 122/5 129/11 130/22 131/6 222/22
**motion [1]** 134/14
**motions [1]** 239/24
**motivation [3]** 83/21 86/6 86/16
**motor [2]** 16/16 92/4
**mouse [2]** 7/9 7/16
**move [5]** 172/10 225/20 225/24 226/8 236/2
**moved [3]** 190/5 212/8 215/21
**movement [1]** 222/20
**moves [2]** 93/6 216/6
**movie [3]** 82/13 83/22 87/2
**moving [8]** 199/12 216/19 217/19 235/7 236/1 237/5 240/3 240/4
**Mr [6]** 5/7 6/9 102/2 143/20 238/16 240/21
**Mr. [65]** 12/3 12/3 12/3 12/5 12/12 13/11 14/7 14/13 14/13 14/18 14/19 14/22 15/4 75/19 76/8 76/9 77/25 78/2 102/11 103/11 103/13

**M**

**Mr.... [44]** 106/1 107/24 108/12 109/15 109/19 109/23 153/17 167/3 206/2 207/25 209/14 210/22 210/24 211/13 217/24 218/2 218/2 218/3 218/9 218/24 225/6 228/13 228/15 231/20 232/11 234/10 235/5 236/6 237/19 238/3 238/6 238/16 238/18 238/21 240/19 240/22 242/10 242/11 244/14 245/16 245/20 246/16 247/14 248/5
**Mr. Beck [4]** 12/3 12/5 12/12 14/13
**Mr. Bill Poncin [1]** 75/19
**Mr. Gary Vilke [1]** 109/15
**Mr. Huber [7]** 218/2 238/6 238/18 238/21 240/19 246/16 247/14
**Mr. Huber's [1]** 248/5
**Mr. L'Hommedieu [3]** 12/3 14/22 15/4
**Mr. Lute [5]** 12/3 14/7 14/13 14/18 14/19
**Mr. Murphy [7]** 102/11 103/11 103/13 106/1 107/24 108/12 109/19
**Mr. Murphy's [1]** 109/23
**Mr. Poncin [3]** 76/8 76/9 78/2
**Mr. Poncin's [1]** 77/25
**Mr. William's [1]** 235/5
**Mr. Williams [27]** 13/11 153/17 167/3 206/2 207/25 209/14 210/22 210/24 211/13 217/24 218/2 218/3 218/9 218/24 225/6 228/13 228/15 231/20 232/11 234/10 236/6 238/16 242/10 242/11 244/14 245/16 245/20
**Mr. Williams' [3]** 237/19 238/3 240/22
**Ms [2]** 5/12 64/8
**Ms. [3]** 242/4 242/6 242/8
**Ms. Williams [3]** 242/4 242/6 242/8
**much [11]** 28/17 28/18 42/25 101/6 106/5 118/12 129/13 134/21 138/3 234/24 235/3
**Multiple [1]** 70/9
**Municipal [3]** 66/23 68/21 128/13
**municipality [2]** 33/3 149/23
**murder [3]** 155/7 186/23 187/11
**murderous [1]** 248/2
**murders [1]** 153/18
**Murphy [12]** 3/7 96/23 102/2 102/5 102/11 103/11 103/13 106/1 107/24 108/12 109/14 109/19
**Murphy's [1]** 109/23
**must [2]** 92/9 175/22
**muzzle [1]** 237/3
**my [196]**
**myself [6]** 84/17 84/18 86/12 92/25 95/15 202/9

**N**

**Nahmod [2]** 42/2 73/16
**name [8]** 6/12 6/15 6/15 41/22 68/16 73/5 137/23 190/17
**named [1]** 170/15
**narrative [1]** 225/17
**narrow [3]** 34/7 34/7 239/13
**narrow-visioned [1]** 239/13
**nation's [1]** 120/21
**national [6]** 3/12 28/10 60/8 60/13 129/23 220/5
**nationwide [1]** 130/7
**nature [15]** 34/5 34/6 35/19 42/9 44/22 57/4 57/5 101/4 136/8 136/17 145/14 151/19 178/22 178/24 218/21
**near [1]** 242/8
**nearly [1]** 115/24
**necessarily [4]** 42/19 59/7 149/12 151/14
**necessary [9]** 108/20 109/10 154/17 155/24 155/25 189/15 189/16 220/18 253/11
**need [19]** 10/16 14/14 37/9 61/18 76/3 108/16 118/22 138/19 145/2 168/13 179/21 180/14 187/23 193/21 213/23 215/18 238/16 239/6 245/14
**needed [4]** 27/15 27/16 37/5 184/19
**needs [6]** 6/6 27/15 145/22 150/22 155/6 158/13
**negative [1]** 146/22
**negligence [3]** 151/12 154/2 185/10
**negotiate [1]** 222/25
**neighborhood [1]** 246/24
**nervous [2]** 203/14 203/17
**neurobiology [1]** 202/10
**neuroscientist [1]** 65/23
**never [30]** 16/11 53/14 64/21 65/4 65/7 65/15 65/18 68/3 71/24 72/12 77/8 77/14 85/14 108/15 112/5 112/24 116/10 119/1 125/15 129/4 148/16 157/3 157/8 163/19 163/21 166/12 166/24 174/20 194/7 236/2
**nevertheless [1]** 81/4
**new [45]** 14/24 18/12 18/13 28/14 29/23 30/8 30/16 30/22 114/23 116/25 117/16 117/17 117/18 117/19 143/3 151/3 153/14 153/19 154/12 156/4 156/7 156/20 157/5 158/22 159/11 162/1 163/8 163/16 170/22 170/22 172/5 173/3 178/9 183/3 183/3 185/6 186/14 187/22 187/22 188/13 188/13 189/9 192/1 193/15 193/15
**New Year's [12]** 156/7 156/20 157/5 158/22 159/11 162/1 163/8 163/16 178/9 183/3 183/3 192/1
**New Year's Day [3]** 170/22 188/13 193/15
**New Year's Eve [9]** 153/14 153/19 170/22 173/3 185/6 186/14 188/13 189/9 193/15
**news [1]** 58/22
**newspaper [3]** 74/25 78/3 181/15
**newspapers [1]** 63/13
**next [12]** 37/23 38/4 38/8 50/6 50/24 54/8 139/10 147/10 210/3 210/3 226/13 226/20
**night [7]** 183/12 189/21 190/1 190/2 190/10 190/19 190/22
**Niles [1]** 9/2
**nine [1]** 134/24
**Ninth [1]** 75/19
**Nixon [1]** 84/22
**no [258]**
**Nobody [1]** 236/13
**noise [1]** 159/10
**noncelebratory [1]** 143/8
**nondeadly [1]** 62/8
**none [1]** 123/14
**nonexistent [2]** 61/4 61/8
**nonfatal [1]** 122/5
**nonprofit [1]** 171/21
**nonverbalization [1]** 137/18
**nonverbally [1]** 220/14
**nor [6]** 66/2 82/20 108/12 109/22 168/16 250/13
**norm [1]** 183/15
**normal [2]** 154/23 155/2
**normally [3]** 52/12 172/14 188/18
**North [2]** 4/22 55/16
**North Carolina [1]** 55/16
**NORTHERN [1]** 1/1
**Norton [1]** 4/5
**not [339]**
**Notary [2]** 1/16 253/20
**note [2]** 40/6 56/24
**noted [4]** 109/14 161/25 252/4 252/4
**nothing [6]** 88/3 143/2 183/24 193/6 194/7 209/23
**notice [1]** 111/25
**noticed [3]** 26/18 58/12 232/8
**notified [1]** 182/25
**notion [14]** 16/9 44/11 60/19 60/20 122/25 126/13 130/10 148/5 150/6 152/9 190/12 201/7 232/19 248/1
**November [3]** 90/24 90/25 93/18
**November 23 [1]** 93/18
**now [71]** 7/18 18/6 25/15 27/4 29/21 30/14 31/21 32/5 32/22 37/4 44/5 46/2 47/1 47/13 47/20 48/15 49/24 50/13 54/7 58/5 60/5 63/6 63/6 63/8 63/11 63/23 64/3 64/17 67/8 72/23 73/25 83/18 86/21 89/13 103/22 109/25 113/19 115/2 115/20 132/24 135/13 142/23 144/24 146/4 146/15 148/4 152/20 154/1 167/17 168/12 169/21 169/24 170/3 170/9 173/1 175/17 179/17 184/25 188/25 192/4 193/7 197/4 198/24 199/12 199/18 205/15 205/22 217/3 221/19 232/17 238/24
**nowhere [1]** 232/18
**nuance [1]** 22/22
**nuances [1]** 223/6
**number [35]** 9/2 9/3 9/4 9/6 9/9 9/12 9/14 12/22 20/2 25/16 30/3 30/7 32/24 40/22 54/11 112/3 117/13 122/12 122/17 124/1 124/4 130/6 135/18 135/25 138/20 139/11 144/14 159/4 191/15 194/13 199/13 204/1 225/14 239/12 239/13
**Number 1 [1]** 138/20
**Number 14 [2]** 135/18 135/25
**Number 17 [1]** 139/11
**Number 2 [1]** 194/13
**Number 35 [2]** 9/2 9/14
**Number 4 [3]** 25/16 32/24 225/14
**Number 42 [2]** 9/3 9/9
**Number 44 [3]** 9/4 9/6 9/12
**Number 5 [1]** 30/3
**numbered [2]** 135/19 138/21
**numbers [7]** 43/11 59/10 59/11 63/9 112/10 112/11 112/14
**numerous [15]** 33/11 39/10 43/20 73/21 95/16 95/17 114/21 123/17 129/11 174/3 181/15 202/5 209/13 232/8 246/6
**NVDRS [1]** 60/9

**O**

**O.C.G.A [2]** 251/10 251/14
**Oath [1]** 101/6
**oaths [1]** 101/5
**obey [1]** 101/11
**objection [79]** 7/1 25/3 28/12 34/22 35/21 41/16 56/2 58/14 62/23 108/18 122/14 122/19 123/3 125/25 131/3 133/8 143/17 148/12 149/6 151/6 153/22 154/14

**O**

**objection... [57]** 154/15 154/19 155/15 155/21 155/22 156/8 156/22 157/6 157/7 163/9 173/10 173/13 173/24 173/25 178/13 178/14 179/3 180/17 181/10 182/6 183/4 185/21 186/9 186/18 188/1 188/20 189/12 193/3 193/4 193/18 205/10 206/18 210/25 213/13 213/22 214/18 215/1 215/10 223/20 227/17 233/3 235/1 235/19 236/4 236/8 236/16 236/24 237/16 238/13 238/23 240/1 242/15 244/19 246/13 248/14 248/24 249/4
**objective [3]** 36/7 149/14 213/4
**Objectively [1]** 213/9
**observation [8]** 38/24 39/1 39/3 39/5 59/3 59/4 59/5 208/4
**observe [1]** 59/14
**observer [1]** 29/10
**obstruct [2]** 235/9 240/19
**obstructed [3]** 240/15 240/23 242/13
**obvious [2]** 161/25 218/18
**obviously [5]** 33/11 45/8 131/17 139/19 146/19
**occasion [1]** 185/19
**occasions [2]** 69/5 79/25
**occupation [1]** 39/25
**occupations [1]** 39/16
**occupied [1]** 80/19
**occur [7]** 45/13 52/21 155/2 163/8 172/6 186/20 186/20
**occurred [8]** 45/13 46/12 60/4 79/21 79/23 81/2 84/19 200/16
**occurring [1]** 167/13
**occurs [3]** 80/3 145/12 173/2
**October [19]** 2/7 2/14 2/19 3/8 9/6 9/8 25/19 26/1 27/15 28/2 51/10 52/5 54/8 57/10 57/18 61/22 157/24 164/8 220/7
**October 29 [1]** 61/22
**October 29th [5]** 25/19 26/1 51/10 157/24 164/8
**odds [2]** 42/24 237/8
**off [27]** 25/21 25/23 26/6 32/15 32/16 40/4 41/7 42/4 73/8 82/22 82/24 86/14 107/22 134/24 170/1 170/2 189/5 190/4 204/18 207/19 212/8 215/21 217/14 217/16 237/8 239/18 247/22
**offer [5]** 16/24 104/18 176/19 176/20 225/12
**offered [2]** 17/4 25/19
**offering [3]** 36/6 38/23 76/4
**offhand [1]** 106/14
**office [17]** 3/11 12/13 39/13 39/23 43/8 43/9 76/10 76/16 77/1 77/21 78/5 84/22 142/21 164/25 174/17 177/22 179/21
**officer [134]**
**Officer Huber [30]** 13/12 15/1 137/19 160/21 165/4 187/5 188/25 194/20 194/22 206/1 207/24 208/15 212/18 212/25 214/5 215/20 217/7 219/3 219/12 221/23 226/21 228/11 236/7 238/17 238/20 238/21 239/5 240/3 244/7 246/11
**Officer Huber's [8]** 13/25 144/11 208/21 213/14 218/20 231/17 235/25 239/21
**Officer Paris [1]** 137/20
**officer's [5]** 149/14 155/4 216/18 225/1 226/17
**officer-involved [15]** 59/23 59/24 60/1 60/20 65/4 65/7 65/12 112/10 123/11 158/21 187/21 193/2 193/7 193/14 193/24
**officers [114]**
**officers' [2]** 15/6 130/14
**offices [2]** 71/1 251/11
**official [1]** 82/7
**officials [2]** 77/17 81/10
**often [2]** 43/4 43/5
**oftentimes [1]** 216/14
**oh [29]** 7/16 9/23 24/22 28/3 38/5 44/5 59/1 60/22 72/5 74/17 75/9 89/11 89/13 93/17 101/21 108/5 113/13 121/17 134/9 149/2 152/5 169/7 169/24 178/19 189/14 197/25 201/25 229/8 247/10
**OHIO [14]** 1/1 4/6 4/15 4/22 5/3 95/7 95/14 95/17 95/20 168/17 174/14 174/16 177/22 179/20
**okay [166]**
**old [5]** 111/15 111/16 111/18 111/19 111/21
**on [392]**
**onboard [1]** 147/4
**once [3]** 52/10 243/1 243/4
**one [83]** 14/13 17/4 17/20 21/11 22/7 22/24 29/10 29/20 30/6 30/10 30/11 30/12 30/12 31/10 32/5 34/20 35/17 41/7 42/20 43/17 48/15 51/7 52/17 57/9 67/7 67/25 68/1 68/2 72/14 73/7 76/19 78/9 78/15 79/8 84/7 85/4 85/24 91/25 92/21 94/16 106/13 110/1 112/6 118/6 120/20 121/22 121/22 122/22 123/8 129/3 129/10 130/20 131/16 136/11 139/7 152/15 156/12 158/2 158/16 159/19 165/3 165/17 167/15 167/15 169/20 170/1 172/20 173/6 173/14 173/15 182/9 190/16 191/9 192/3 198/16 203/24 210/1 212/5 216/17 221/5 221/6 224/11 224/16
**one's [1]** 181/1
**one-minute [1]** 158/2
**one-sided [1]** 22/24
**ones [3]** 10/21 128/3 132/2
**ongoing [10]** 55/19 56/13 56/16 56/17 56/24 110/20 160/22 194/16 194/20 199/3
**online [2]** 87/14 169/11
**only [21]** 19/21 22/7 24/14 25/1 28/11 39/11 40/19 46/18 48/15 85/24 101/2 111/22 123/16 131/8 132/2 149/13 153/18 173/21 174/23 192/4 216/11
**open [2]** 235/6 241/15
**opening [2]** 116/3 233/22
**openings [1]** 86/13
**operation [5]** 96/24 145/6 171/2 171/4 191/3
**operational [5]** 36/8 139/3 139/12 142/9 173/7
**operationalized [1]** 140/20
**operations [8]** 140/15 170/22 170/25 171/16 172/5 187/22 190/24 193/15
**opine [1]** 151/11
**opined [1]** 183/16
**opinion [61]** 13/16 17/8 18/23 19/1 46/11 46/15 48/7 135/13 135/16 136/21 138/7 138/20 138/21 138/22 139/1 139/5 142/7 142/7 142/11 142/12 143/10 144/17 144/18 145/25 146/8 146/11 152/4 177/1 178/19 181/21 181/22 194/8 194/11 194/13 194/19 199/13 208/5 208/6 208/20 215/15 215/20 221/22 221/23 225/3 225/4 225/5 225/9 225/13 225/14 225/14 225/17 227/25 232/9 237/15 239/16 242/16 242/19 243/14 243/17 243/22 244/2
**opinions [32]** 2/6 6/25 14/21 15/1 16/21 16/24 16/24 17/1 19/3 19/17 20/5 20/13 20/17 20/22 20/25 21/6 46/14 46/24 47/12 47/17 53/20 133/18 133/21 133/23 135/25 136/21 137/4 137/5 137/11 138/13 142/13 249/5
**opportunity [12]** 17/23 26/7 206/10 208/12 210/15 210/22 211/16 212/19 213/12 222/3 242/22 243/7
**opted [1]** 72/14
**option [4]** 201/6 210/17 242/23 243/9
**options [1]** 220/16
**or [460]**
**oral [2]** 85/25 86/1
**orange [1]** 40/6
**order [12]** 13/1 34/24 48/25 49/16 51/20 51/20 52/10 85/1 146/1 158/11 177/1 199/3
**ordinary [1]** 157/4
**Oregon [1]** 28/7
**organization [10]** 3/5 35/24 55/20 56/14 110/15 131/13 164/18 171/21 175/24 187/24
**organizations [3]** 21/12 58/22 140/16
**original [3]** 116/11 187/9 250/15
**originally [3]** 12/6 12/7 220/6
**other [102]**
**other's [1]** 125/23
**others [15]** 34/12 55/1 56/1 66/19 73/8 121/1 127/6 134/8 147/1 158/15 172/14 207/1 223/8 223/15 228/24
**ought [3]** 151/2 173/21 182/2
**our [17]** 29/1 29/1 37/12 45/6 54/8 62/14 63/8 63/21 103/4 104/18 105/11 112/9 123/11 128/15 178/20 202/6 202/6
**out [57]** 13/6 13/8 24/12 25/11 25/24 29/24 30/12 34/25 38/9 38/9 38/15 45/4 48/23 59/15 59/23 64/25 66/16 68/14 73/1 82/14 82/15 84/21 86/17 94/4 103/1 104/6 112/20 116/25 117/11 128/23 129/13 131/19 152/15 163/12 167/21 172/7 177/22 179/13 181/8 183/15 183/15 187/13 199/19 209/22 212/17 214/5 214/12 219/6 219/7 227/16 227/20 227/24 228/3 228/7 229/20 229/23 230/9
**outcome [8]** 34/16 67/3 124/7 130/19 131/5 131/5 131/22 250/14
**outcomes [3]** 43/12 66/10 70/18
**outline [1]** 147/17
**outlines [1]** 147/19
**outside [5]** 46/20 52/11 146/16 179/24 236/7
**over [36]** 9/20 13/6 14/20 20/1 20/12 24/25 38/6 51/23 59/23 64/18 66/24 69/25 70/12 70/15 70/20 70/22 70/24 71/2 72/7 80/24 81/3 89/22 95/3 110/23 117/18 122/17 128/16 130/5 149/17 158/20 164/3 191/22 202/8 210/24 239/7 244/21
**overall [1]** 38/6
**overhead [1]** 205/8

**O**

oversight [1] 166/3
overtakes [1] 239/7
own [10] 17/1 17/7 95/2 118/15 139/23 145/7 146/2 146/2 185/19 237/7

**P**

P-O-N-C-A-N [1] 75/4
p.m [5] 64/6 64/7 135/10 135/11 249/17
P.O [1] 1/24
pace [1] 228/21
paced [6] 227/25 228/4 228/6 228/18 228/23
page [20]
page 10 [1] 138/25
page 13 [1] 144/10
page 14 [2] 147/11 147/13 147/18
page 15 [1] 167/20 174/13 177/5
page 16 [1] 132/15
page 17 [2] 181/21 194/16
page 171 [1] 155/24
page 172 [1] 54/15
page 18 [2] 129/22 132/7
page 186 [1] 205/6
page 20 [4] 29/24 30/7 30/15 185/3
page 22 [1] 132/24
page 24 [1] 198/25
page 25 [1] 199/13
page 26 [1] 207/6
page 269 [1] 209/18
page 271 [1] 212/12
page 30 [3] 204/23 206/23 207/21
page 31 [1] 209/11
page 33 [1] 225/12
page 35 [2] 225/4 225/14
page 40 [1] 164/15
page 45 [1] 241/17
page 47 [1] 243/19
page 5 [3] 115/7 115/13 118/19
page 50 [1] 243/22
page 55 [1] 167/10
page 6 [1] 135/19
page 69 [1] 33/10
page 78 [1] 177/11
page 9 [1] 128/17
pages [16] 8/18 17/20 36/24 37/9 47/25 50/15 64/14 117/13 131/6 133/4 205/22 206/19 207/6 217/15 250/7 253/11
pagination [1] 30/16
paid [3] 11/5 128/23 129/6
painstakingly [1] 15/14
Pape [4] 111/15 111/20 114/8 114/20
paper [3] 3/12 66/17 115/22 220/6 221/20

paragraph [41] 8/18 37/21 37/22 40/7 40/8 48/18 56/15 81/5 115/8 115/13 115/21 115/23 115/24 115/25 116/4 116/5 116/9 135/18 135/19 135/25 139/9 139/10 146/8 147/10 147/18 147/18 167/21 181/21 185/4 191/10 199/19 199/21 207/22 209/13 222/4 225/12 226/6 226/13 226/21 241/17 241/18
paragraph 14 [1] 135/25
paragraph 20 [1] 225/12
paragraphs [1] 135/22
parallels [1] 45/3
parcel [3] 24/13 50/11 101/22 105/10 154/4
Pardon [1] 171/13
Paris [1] 137/20
parked [2] 92/19 218/16
parking [1] 200/9
Parkway [2] 4/5 5/2
parole [2] 21/14 86/18
part [47] 13/2 17/1 24/13 39/11 39/11 46/7 50/11 51/14 58/1 58/1 64/16 66/12 69/5 69/7 77/7 84/7 93/17 95/17 101/21 102/2 105/9 105/25 117/25 123/20 124/20 124/24 124/21 143/3 143/15 151/12 153/25 154/4 157/18 165/18 178/11 186/9 197/12 205/24 205/25 207/8 207/20 211/11 218/10 218/25 226/18 232/22 245/17 252/6
participate [1] 171/23
participated [2] 166/2 229/15
particular [37] 11/16 15/22 16/6 16/23 17/8 20/6 23/12 25/13 36/15 41/5 41/20 55/8 66/10 71/5 76/18 78/5 86/8 101/19 109/11 112/5 116/1 121/10 121/10 124/22 124/22 136/9 138/20 145/15 165/4 179/22 196/23 203/20 211/25 216/18 220/4 223/8 246/10
particularly [4] 29/11 139/4 165/10 179/11
parties [5] 36/6 162/7 250/12 250/13 251/19
parts [3] 202/10 202/13 214/13
party [3] 11/5 249/15 251/16
passed [2] 95/3 249/20
passing [1] 77/20
past [9] 23/13 61/3 72/7 73/5 89/19 140/7 146/16 146/20 250/10
patrol [2] 156/6 157/4
Patrolman [1] 196/4
pattern [2] 20/5 249/10

patterns [1] 16/6
16/5 22/16 35/6 40/25 41/17 43/11 48/3 57/5 66/14 67/3 113/2 120/10 131/16 136/6 216/11
payouts [2] 129/9 129/11 130/5
PDF [1] 30/16
Pearson's [1] 67/19
peer [6] 66/18 100/19 100/4 66/11 71/14 113/16 250/10
peer-review [1] 112/4
peer-reviewed [2] 66/18 176/11
pending [1] 10/17
people [12] 23/22 119/18 121/21 172/17 179/9 179/10 179/13 179/21 180/25 180/25 192/11 192/16 228/11 249/8
people's [2] 42/10 43/2
pepper [1] 198/16
per [1] 17/20
perceive [1] 239/10
percent [4] 24/14 24/15 60/5 61/11 61/12 61/13 111/10 170/25 190/25 191/9 192/12
percentage [2] 34/7 44/5
perception [14] 203/21 203/4 203/23 213/16 213/18 225/5 229/12 235/5 235/15 236/14 236/5 236/15 245/14
PERF [3] 94/12 94/14 177/6
perfectly [2] 145/18 214/7
perform [2] 42/15 199/3
performance [4] 139/22 144/7 161/15 181/24
performed [6] 167/18 167/18 167/23 243/15 244/3
permission [1] 131/21
permitted [1] 235/16
permittee [2] 24/7 177/3 27/16 29/15
person [1] 71/15 201/4
personal [2] 226/17 personally [3] 11/20 11/22 21/6
petition [1] 156/6 157/4
Patrolman [1] 196/4
pattern [2] 20/5 249/10

persons [2] 122/4 123/1
perspective [9] 66/8 67/1 67/2 69/18 69/24 112/25 113/2 120/10 131/16
persuade [1] 223/1
persuasion [2] 220/20 221/16
pertinent [3] 20/4 44/9 174/2
Ph [1] 1/13 24 2/5 26 6/1 71/14 113/16 250/10 251/2 252/2 253/15
phase [3] 171/11 171/14 171/20 171/24 172/4
phases [1] 171/17
phenomena [1] 163/7
phenomenon [2] 120/10 140/3
philosophy [1] 140/12
Phoenix [16] 3/10 157/9 168/25 169/12 170/14 170/20 170/21 171/15 172/25 173/4 188/5 189/10 190/25 191/6 192/12
phone [2] 11/21 11/24
phrase [2] 125/9 125/11
phrasing [1] 126/22
physical [2] 82/6 93/7
physically [1] 86/4
picking [3] 214/3 214/3 214/12
picture [5] 93/17 140/25 213/12 214/22 214/18
pie [1] 24/14
piece [12] 8/7 6/17 69/21 67/17 89/24 137/13 137/14 141/2 141/16 187/9 223/14
pieces [2] 170/4 214/15
place [17] 52/17 53/2 53/8 55/20 56/14 56/19 56/25 72/4 79/6 153/18 189/2 203/18 217/22 217/25 219/16 220/23 232/18 243/20 243/24
placard [4] 94/24 209/14 209/15 229/21
placing [1] 120/5
plaintiff [12] 1/5 1/14 4/2

pleas [1] 81/10
please [25] 6/7 6/12 6/20 8/14 20/8 30/4 37/24 38/5 38/16 48/23 61/17 67/8 127/13 127/11 127/17 134/19 138/11 141/14 141/15 163/14 211/8 230/4 237/22 252/8 253/1
Port [1] 80/12
portion [8] 19/22 24/9 80/19 140/14 149/12 154/12 223/13 234/16 241/11
portions [2] 34/23 235/6
Portland [1] 28/7
portrayed [1] 80/16
pose [2] 44/11 229/1
position [17] 22/17 22/18 50/2 50/15 55/20 56/14 56/19 57/1 74/20 186/6 214/24 220/22 221/19 227/15 237/7 237/12 239/1 240/2
points [1] 239/24
police [118]
police-directed [1] 110/21
police-officer-involved [1] 192/24
police [52] 2/21 15/2 15/6 15/15 58/10 105/8 105/12 105/20 106/22 106/23 139/4 139/12 139/20 139/25 140/1 140/9 140/10 140/17 140/19 141/7 141/10 141/11 141/16 142/15 142/18 144/8 145/6 145/10 148/8 149/23 150/14 150/14 150/22 157/16 156/12 160/23 160/24 162/8 162/17 162/21 164/5 164/9 165/18 166/14 166/15 167/1 167/13 167/16 167/20
policing [1] 139/24
policy [74] 3/12 106/24 107/11 107/11 107/12 107/12 140/11 140/14 140/23 141/10 142/5 142/15 143/15 143/21 144/16 145/5 145/20 145/22 146/1 146/2 146/14 146/18 146/20 146/23 147/17 147/24 149/10 149/10 149/11 150/15 151/25 153/5 153/6 153/17 153/19 154/7 159/21 161/25 162/13 162/21 163/7 166/5 166/16 166/16 167/11 167/22 167/24 168/13 173/3 184/1 196/5 196/23 198/13 198/15 198/18 205/7 205/15 212/2 217/10 231/24 249/1
political [1] 77/20
Poncin [5] 75/4 75/19 76/8 76/9 76/2

Poncin's [2] 75/15 77/23
population [2] 88/3 88/3
porch [16] 184/5 189/1 189/2 189/5 207/19 207/20 207/25 210/9 210/10 210/16 210/18 211/20 211/21 217/9 217/15 220/10 221/22 221/10
present [6] 57/ 57/2 53/20 94/22 218/3 239/19
presentation [5] 3/4 7/20 58/6 84/6 224/16
presentations [3] 24/11 60/24 89/6
presenter [3] 29/9 36/18 29/9
preserve [3] 84/22 204/22 206/23
proceeding [2] 8/23 204/19
proceedings [2] 10/2 253/12
process [23] 16/21 22/1 82/10 95/4 103/2 103/4 193/16 103/25 106/1 106/22 106/23 132/8 134/13 136/16 136/22 136/24 136/25 139/1 149/8 150/8 165/15 169/19 178/20 200/25 201/16 202/3 203/3 203/14 processing [7] 109/16 179/17 180/4 189/20 205/11 205/17 206/8 207/1 production [2] 205/11 206/16 product [1] 114/23 profession [2] 45/11 101/4 professional [4] 7/19 22/10 65/21 66/2 88/14 77/23 79/24 80/10 80/15 82/6 93/19 94/2

**P**

programming [1] 164/22
programs [2] 91/24 105/24
prohibited [2] 77/19 251/14
prohibits [1] 77/18
project [5] 102/10 102/11 103/8 104/5 104/5
projectiles [1] 198/17
projects [2] 105/20 172/14
prominent [1] 177/10
pronounce [4] 84/15 84/18 86/9 86/12
promotion [1] 78/24
prone [6] 91/7 91/7 91/9 91/14 91/15
proper [2] 32/15 169/14
proper [2] 145/4 148/16
proposal [2] 128/23 221/9
proportion [3] 21/22 23/25 78/19
proposal [1] 30/9
proposed [1] 30/22
proposition [1] 142/2
prosecutor's [1] 13/23
prosecutorial [1] 22/19
protect [1] 101/10
protecting [1] 126/13
protection [2] 33/3 245/15
protects [1] 51/25
protesters [1] 118/18
protocols [2] 15/5 140/6
proven [1] 104/18
provide [17] 151/ 46/11 68/4 69/3 117/15 139/13 140/15 141/6 144/4 177/22 187/22 216/25 222/24 222/12 251/12 251/13
provided [28] 13/7 15/13 15/15 16/2 66/23 68/8 77/16 72/16 72/22 138/8 138/15 159/24 160/19 163/11 165/5 165/18 166/10 166/10 166/21 167/3 168/14 169/24 190/4 208/22 220/25
provider [1] 36/6
provides [4] 122/18 130/4 147/5 142/17
providing [9] 6/5 35/9 48/25 49/13 49/16 55/19 56/13 101/22 107/14
provision [2] 142/23 148/6 177/22
qualify [1] 47/21 195/4
195/22 199/6 196/7 198/1 223/25 251/10 252/17
proximity [1] 210/1
prudent [1] 153/23 154/10
PSA [1] 181/9
PSAs [2] 157/1
psychiatric [1] 74/9
public [18] 1/16 21/17 75/19

programming [1] 164/22
72/12 178/25 179/4 179/11 179/14 180/10 180/12 180/20 183/21 183/22 183/25 184/9 186/23 188/17 207/12 payments [2] 129/9 129/11
publication [7] 412 58/12 108/24 109/6 176/12 176/14 187/21
publications [3] 24/11 149/4 168/2
publish [1] 176/5
published [2] 20/16 20/17
36/20 64/13 66/17 95/4 107/23 108/8 109/15 112/19 112/24 113/5 129/12 164/7 176/10 176/13 187/21 181/12 192/1 184/22 229/2
pull [6] 9/19 83/25 115/18 157/23 158/4 195/5
pulled [2] 205/6 228/16
pulls [3] 205/18 206/2 234/25
purpose [6] 33/18 33/23 50/13 58/25 60/23 65/3 155/13 156/16
purposes [2] 44/25 143/17
pursuant [3] 1/24 251/4 252/5
pursuit [1] 42/14
push [2] 9/20 84/20
put [38] 10/16 13/21 13/23 14/4 168/2
73/18 81/13 88/22 93/22 90/3 92/21 105/24 112/17 115/18 116/18 115/18 174/10 166/20 127/6 201/25 201/23 186/24 200/16 216/25 216/22 221/11 217/24 221/21 222/21 222/13 227/23 241/21 241/24 242/1 243/22 245/17 246/21 247/24
puts [1] 212/18
putting [12] 67/8 177/2 206/3 209/7 209/8 220/9 210/10 212/6 220/17 224/8 242/20 249/9

**Q**

qualified [28] 44/21 51/15 51/20 51/21 51/24 52/10 52/24 52/24 53/11 53/19 54/5 123/20 123/25 124/4 199/25 196/9 199/7 193/7 199/6 199/9
qualify [8] 47/21 195/4 195/22 196/7 198/1 223/25 199/8/4
qualifying [2] 158/5 158/12
quantify [4] 34/4 235/17 235/17
Qualities [1] 75/4
Quantified [1] 204/1
quantitative [4] 179/22 204/4 204/6 222/18

69/17 89/19 69/21 69/24
quantum [1] 175/17
Quarterly [1] 32/23
Quattel [2] 224 81/10
question [81] 8/13 19/16 19/9 22/6 22/22 22/23 23/13 24/1 24/9 25/6 33/24 34/1 34/14 41/17 41/19 47/17 47/18 47/18 47/18 48/15 49/4 60/15 90/5 92/1 92/13 112/12 112/25 92/1 115/1 118/15 136/6 181/24 182/18 182/18 182/25 212/22 216/24 217/17 217/18 217/19 218/19 218/21 218/22 219/6 220/20 220/22 221/9 221/22 224/14 230/24 230/25 232/25 232/25 241/14 247/23 247/23
questionable [1] 155/6
questioned [1] 205/5
questionnaire [2] 206/10 206/20
questions [13] 8/8 8/20 46/19 107/12 155/18 156/8 158/21 158/3 158/16 169/7 212/5 230/24 240/25
quickly [1] 226/21
quite [18] 12/22 15/18 25/6 36/23 40/2 41/20 41/25 43/25 59/3 58/24 58/25 141/25 47/11 146/11 224/14 247/11 247/11

**R**

R-O-S-S [1] 6/15
racial [1] 191/11
racking [1] 113/19
radio [8] 137/20 189/6
radioed [2] 189/7 215/22
radioing [2] 216/21 228/12
Radioing [1] 216/1
Rainy [1] 9/2
rallies [1] 118/18
rapid [1] 88/22
rally [2] 75/2 86/5 88/15
Rand [2] 175/15 175/17
Randall [4] 3/7 96/23 102/5 96/25
random [3] 310 65/1 148/9 159/13 101/23 160/20 102/11 103/23 135/5 204/1

171/23 190/25 191/6 191/25
Randy [1] 101/16
 range [3] 144/8 181/24 229/10
rank [1] 52/15
raw [3] 30/22 85/23 85/24
rare [1] 85/3
rate [2] 112/1 81/15
rates [1] 251/19
rather [3] 100/20 107/12 183/3
rational [1] 250/6 250/14
reach [1] 16/20
reached [1] 163/4
react [1] 229/3
reacting [1] 22/22
reactions [2] 83/19 229/3
reactive [1] 145/20
read [84] 114/12 172/5 31/5 31/11 32/17 37/3 37/3 32/10 32/11 32/18 35/14 43/23 43/25 80/5 114/12 135/16 135/15 135/13 135/18 141/19 146/17 147/14 147/18 169/11 174/18 174/21 175/1 209/17 211/20
reader [1] 132/23
reading [23] 6/7 37/9 37/11 37/18 115/22 125/13 153/22 153/22 155/10 155/10 155/19 168/20 174/1 174/24 174/25 181/8 202/25 203/4 203/5 203/17 211/17 211/17 231/19 237/13 241/14
reads [2] 30/7 30/15
reads [3] 35/7 49/22
ready [2] 91/16 164/1
realistic [2] 93/6 229/16
realities [1] 149/8 149/6
really [18] 226/5 86/18 228/5 228/6 228/5 149/11 139/9 146/9 186/8 125/9 125/8 125/8 125/10 125/10 125/10 125/10 249/14 249/5

**R**

reason... [10] 25/0 25/10 25/21 25/23 253/21 253/23 253/25 253/25 253/7 253/10
reasonable [4] 147/7 237/14 237/17 238/10
reasonableness [1] 141/9
reasoning [1] 153/4
reasons [4] 85/4 127/8 193/18 252/7
recall [26] 12/14 14/3 14/18 16/4 86/21 107/11 215/18 220/15 225/18 225/19 225/19 226/19 238/2 246/16 248/16 219/23
receive [2] 40/9 40/10
received [10] 12/18 12/19 12/23 12/24 36/20 77/18 102/25 164/16 192/18 191/1 191/7
recent [11] 12/1 16/20 24/14 46/11 46/16 42/4 64/8 98/14 191/15 192/21 22/1
recess [2] 64/5 135/12
recite [1] 225/10
recklessly [1] 242/14
recognize [6] 95/9 96/13 102/15 158/15 172/21 174/10
recollection [1] 188/11
recommend [2] 148/13 243/21
recommendation [5] 76/19 78/25 174/11 174/22 174/18 223/8 226/18

record's [1] 102/18
recorded [3] 138/14 190/16 197/4
recording [2] 164/12 190/18
recordings [1] 138/18
records [3] 15/16 12/17 189/9 190/14
release [1] 251/15
relevance [2] 136/8 145/9
relevant [1] 20/8
reliable [4] 59/7 59/11 59/15 146/1
relied [4] 181/24 182/17 224/5
rely [19] 5/21 101/24 159/17 160/4 160/20 169/18 162/21 163/11 164/5 165/13 166/13 166/16 167/1 167/13 215/17 219/19 219/22 221/12 252/1
relying [3] 161/15 136/25 190/1
remain [1] 75/2
remainder [2] 40/21 40/23
remains [1] 239/10
remark [1] 226/18
remarked [1] 239/14
remember [41] 12/8 12/19 12/1 25/4 25/17 108/23 108/25 174/16 190/22 191/16 191/17 191/25 196/23 214/25 215/3 215/5 215/13 215/19 215/19 222/22 226/14 241/24 243/21
reminded [2] 76/6 108/4
reminds [2] 108/4
remove [1] 229/22
render [1] 119/6 155/22
rendered [4] 119/9
repeat [3] 48/19 126/19 216/1
repeatedly [1] 229/21
repeating [1] 225/10
rephrase [3] 48/22 84/19 197/8
replicate [2] 86/25 87/2
report [62] 12/19 15/8 24/16 24/17 26/5 29/6 30/11 30/12 30/18 31/3 32/8 33/1 37/7 41/12 66/20 115/6 115/13 115/22 128/16 128/17 144/24 147/25 148/11 149/6 152/24 153/2 166/16 167/16 167/19 174/1 174/18 175/1 175/1 186/22 187/10 188/20 207/16 209/18
reporting [3] 24/20 60/9 144/24
reports [12] 15/6 15/9 15/11 16/5 22/10 24/5 44/22 89/4 189/3 190/9 193/7 203/7
represent [4] 155/8 215/10 216/9 219/13
representation [2] 131/5 251/18
represented [4] 22/4 173/16

relationship [1] 102/18
republic [1] 53/21
reputation [4] 146/9 147/4
reputation [1] 146/1
requested [3] 29/23 30/8 253/13
requested [1] 178/10
require [2] 149/5 217/24
required [14] 108/20 110/10 149/14 156/14 221/17 175/18 196/16 198/16 197/1 198/6 198/16 198/17 197/2 197/11
requires [8] 124/4 124/4 125/3 125/10 125/10 124/10 123/25 124/11
requirement [5] 141/25 146/21 162/11
requirements [2] 109/6
rescue [1] 216/21
research [40] 104/17 22/5 46/22 66/19 89/15 98/19 99/4 99/7 99/22 99/23 103/20 105/13 105/22 108/11 108/18 109/5 109/8 110/3 110/9 110/23 112/21 115/2 164/18 173/16 176/2 176/10 184/15 191/1 191/7
researched [2] 104/17 191/20
researcher [6] 46/2 66/3 98/14 105/18 105/19 106/1
researchers [4] 111/3 176/1 176/3 184/16
resemble [2] 93/4 93/5
reserving [1] 36/11
resist [1] 163/4
resisting [1] 163/4
resolution [1] 201/11
resource [1] 36/8
respect [24] 9/9 36/17 54/17 132/21 155/25 155/1 156/24 158/21 159/18 191/25 194/16 194/23 223/24
respond [4] 32/13 173/16

**R**

responded... [2] 189/4 199/14
responding [11] 152/9 161/19 168/8 200/25 225/24 226/9 226/17 229/5 234/8 237/12 243/12
responds [3] 152/3 237/13 238/6
response [18] 43/18 57/13 77/11 106/22 115/10 139/22 148/3 151/15 165/13 166/7 167/12 205/16 229/13 232/14 233/22 238/13 245/12 246/5
responses [1] 183/21
responsibility [4] 139/3 142/9 142/20 226/16
responsive [1] 13/9
rest [1] 244/1
restrain [1] 91/12
restraint [4] 91/7 91/9 91/14 91/15
restraints [1] 91/18
restricting [2] 42/9 43/2
result [3] 119/19 145/15 222/1
resulting [1] 33/18
results [4] 34/16 66/4 124/8 130/19
resumed [3] 64/7 135/11 231/14
retained [9] 25 10/19 10/22 11/9 11/12 15/8 46/11 65/13 211/18
retaining [1] 15/8
retaliation [1] 118/11
retired [2] 68/19 73/22
return [2] 80/20 81/10
reveals [1] 116/11
reverse [1] 123/19
review [25] 13/8 14/6 15/18 17/23 109/1 109/4 112/24 113/4 138/12 160/3 159/21 160/23 162/2 178/7 190/12 198/1 198/25 214/1 219/13 227/14 244/24 244/24 245/4 244/24 248/10
reviewed [23] 12/25 13/5 13/22 18/16 18/21 18/22 36/15 15/16 19/5 19/6 19/7 138/16 159/12 160/20 167/14 176/7 176/11 181/19 183/24 207/4 215/9 220/8 220/9
reviewing [7] 13/16 14/9 34/17 58/4 83/18 137/11 177/22
revising [1] 160/25
revised [2] 160/24 220/7
revising [1] 106/1
revision [1] 146/19
revolver [2] 184/6 185/18
rfdicello [1] 4/7
rifle [15] 196/22 197/1 197/8

right [98]
rights [6] 25/1 42/10 43/2 114/8 114/14 118/7
ring [1] 169/15
ringing [3] 228/3 228/7 229/23
riot [11] 2/24 79/6 79/7 79/9 79/19 80/3 80/5 80/10 81/2 82/13 84/19
rioted [1] 81/12
riots [5] 27/19 27/21 27/23 28/11 84/21
risk [45] 2/17 50/4 52/18 55/6 66/15 66/15 66/23 67/24 68/2 68/7 68/7 68/16 68/21 68/22 69/8 69/11 69/13 101/12 104/13 104/18 128/13 131/15 153/23 153/25 155/2 155/12 183/2 192/17 198/21 204/23 206/17 207/22 207/23 208/7 208/22 209/3 226/8 227/2 228/7 228/11 228/11 229/4 240/6 245/13 246/3

**S**

social [4] 96/10 96/19 102/8 136/3
society [8] 28/24 29/1 38/13 38/17 39/2 39/5 45/16 63/21
society's [1] 63/4
sodomy [8] 85/4 85/10 85/13 86/3 86/23
solely [1] 63/22
soliciting [1] 77/25
solo [2] 225/25 226/9
solutions [1] 104/19
some [53] 14/20 17/3 17/18 23/21 26/19 40/9 44/23 45/10 45/11 47/25 48/6 53/1 56/9 56/19 60/9 100/7 109/7 111/25 112/18 112/25 115/4 115/9 115/11 117/18 145/1 146/14 146/15 149/9 150/15 150/24 151/24 153/12 161/8 181/3 184/14 185/16 202/17 203/10 203/14 203/16 205/11 213/14 215/24 221/7 224/8 224/24 224/24 246/8 246/9 246/11 258/17 258/23 258/24
somebody [4] 9/21 16/15 89/3 103/17 227/15
somebody's [1] 11/22
somehow [6] 174/5 174/7 189/14 183/17 183/25
someone [10] 15/7 45/8 77/6 130/12 138/2 211/9 217/9 223/1 223/4 247/9 248/20
someone's [1] 224/24
somewhat [2] 24/17 51/24 61/24 65/14 61/5 115/6 148/4 178/24 178/24 179/16 179/6 179/17 217/24 241/2 248/9
somewhere [5] 9/21 16/15 89/3 103/17 227/15
sorry [20] 7/17 36/5 50/7 54/8 61/11 61/16 84/4 89/17 89/18 111/16 111/17 138/7 150/1 150/6 153/24 150/23 160/24 187/15 199/1 221/4 241/2 246/9
sort [5] 71/14 124/1 147/23 170/25 173/23 243/2
sorts [5] 27/23 39/16 39/16 45/22 197/11
sought [1] 20/23
sound [8] 8/13 36/13
sounding [1] 245/10
sounds [1] 64/5
source [2] 30/6 30/23
South [1] 4/21

**S H E E T** [1] 252/1
**S-C-O-G-I-N** [1] 116/17
safe [6] 154/6 154/10 156/13 216/16 243/25 246/22 121/15 247/12
safely [2] 147/10 212/19 213/12 238/22
safer [3] 57/1 156/19 174/24
safety [1] 153/17 153/17

1504/4 71/21 71/22 202/24
218/21 218/21 225/6 230/3 230/10 231/15 244/13 244/25
227/6
share [17] 2/25 142/4 43/2 114/8 114/14 118/7
16/12 26/1 26/11 26/12 27/12 38/4 43/22 47/14 47/18 57/21 60/23 61/3 68/8 69/10 78/3 79/25 81/22 82/4 83/16 85/8 86/7 86/10 86/15 102/3 117/18 122/19 132/12 134/7 135/9 137/23 138/6 149/17 149/23 153/1 156/24 189/25 190/2 203/5 203/8 212/19 219/23
scene [19] 187/2 187/7 188/24 189/25 213/25 217/1 221/3 221/4 222/19 228/6 228/19 229/22 229/20 229/20 229/23 234/17 234/24 234/19
235/3 247/1
scheduled [1] 7/20 10/15
school [14] 71/22 71/24 72/1 72/10 72/13 72/18 73/13 73/15 73/22 73/25 79/23 83/6 93/9 172/13 schooled [1] 84/5 schooling [1] 84/25
schools [2] 72/11 72/17
Schwartz [2] 129/2 130/4
science [3] 66/12 82/15
133/4
Sciences [3] 96/10 96/19
102/8
scientific [11] 36/7 66/2 66/3 66/5 66/8 66/16 66/17 66/21 66/16 71/18 71/20
scientist [1] 66/25
Scogin [1] 116/16
scope [1] 13/5
score [1] 64/11
scream [1] 206/7
screen [3] 74/7 74/9 74/14

serve [1] 22/9
service [22] 3/11 74/18
93/20 101/22 101/24 147/5 159/5 159/9 159/9 167/1 179/4 180/12 180/14 180/15 180/18 180/20 187/11 187/11 193/5 193/15 193/25 195/25 197/2 197/7 197/7 199/5 199/6
services [4] 174/16 177/22 207/7 208/3
servicing [1] 93/13
sessions [3] 94/10 94/24 202/7
set [4] 43/16 45/11 230/3 247/9
setting [1] 43/22
seven [1] 29/13 71/13 94/6 187/20 191/21 192/24
192/25
seven-week [1] 94/6
several [14] 13/22 41/25 69/3 70/6 70/21 73/5 73/19 78/9 88/9 118/22 146/12 201/25 202/5 202/6 226/4
several-day [1] 94/2
severity [1] 242/11
Sexual [2] 85/11 85/18
sexually [1] 86/13
shall [3] 215/17 222/2 252/6
Shapiro [4] 158/20 158/20 252/17 252/19 252/22 252/21
Sharon [1] 33/10
shape [1] 140/16
share [3] 30/14 74/17
229/20
shared [2] 110/16 108/23
sharing [1] 26/6
she [4] 114/8 114/14 118/7 146/25
sheds [1] 195/23
sheet [1] 235/25
sheffs [2] 141/13 223/24
sheriff [1] 29/7
sheriff's [4] 29/11 29/21 68/22 69/25
shift [38] 152/12 153/3 154/3 154/10 155/6 155/8 155/9 155/12 155/15 155/18 155/19 157/2 157/3 157/13 157/23 157/3
shop [1] 80/22
shortly [2] 79/18 181/2
shot [8] 26/25 152/19
226/19 228/12 235/17 235/3
shots [14] 152/12 152/10 153/3 154/13 227/5 227/16 227/16 235/3 228/7 228/13 228/17 229/23 230/3
247/9
sight [3] 186/9 186/9 186/14
shotgun [6] 195/22 195/22 196/5 196/14 196/18 196/24
shots [14] 152/12 152/19
sides [10] 2/11 228/7 220/1 144/25 158/15
side [2] 347 165/18
side [6] 2/1/18 227 10/14
sided [1] 222/24
sign [4] 34/9 34/15 247/1
346 82/9 75/7 76/7 76/8 76/5
signature [3] 75/25 76/22
76/22
significance [1] 192/6
significant [7] 191/4 191/18 192/1 192/21 193/2 193/16 193/22

signing [2] 76/9 249/16
silence [3] 124/12 124/23
125/5 125/9 126/8
silhouette [6] 234/11 234/16
234/20 234/21 235/8 240/23
Silver's [1] 41/6
Silverdome [1] 45/9
similar [3] 80/17 138/1
160/6
Simonly [1] 60/12
simple [2] 108/7 129/16
simulators [5] 92/17 92/17
93/17 94/12 94/12 102/7
simultaneously [1] 200/21
Simunitions [1] 229/16
since [10] 9/22 32/4 37/4 41/8 60/4 98/19 103/19 114/12
116/17 107/22 203/22
single [2] 166/12 193/11
singularity [1] 91/13
sir [37] 6/17 11/3 17/22 19/3 24/24 34/24 47/9 49/13 100/17 107/21 135/22 161/18 161/24 173/24 174/4 178/23 195/8 214/11 224/9 257/6
sit [12] 101/9 101/10 108/5 114/6 117/14 117/22 133/22
sits [1] 129/22
sitting [2] 311/12 200/9
situated [1] 22/9 22/13
situation [21] 43/23 50/25 192/22 127/24 163/4 203/16
217/2 217/8 217/9 212/18
224/18 251/25 252/11 254/19
situations [1] 228/11 233/15
size [2] 347 165/18
six [9] 23/18 165/15 166/18
six months [1] 166/19
skill [10] 2/21 146/25
skills [3] 10/12 95/15
slap [1] 233/21 234/3 234/15
slice [2] 347 165/18
slice [1] 1247 158/3 158/3 158/5
smack [1] 154/2
smacks [1] 172/12
small-sized [1] 128/20
smoke [1] 233/3
snapshot [1] 71/14
snippet [2] 57/17 83/5
so [321]

**S**
Southern [3] 79/24 80/18 81/6
Southwest [2] 4/14 230/8
space [1] 164/21
spare [1] 6/18
speak [12] 12/13 12/16 61/22 81/18 101/12 130/24 150/7 150/10 150/20 152/20 165/21 224/9
speaking [7] 21/9 45/3 51/23 60/3 87/13 103/18 100/13 213/9
speaks [1] 212/10
special [2] 168/1 177/7
specialized [4] 136/1 201/2
204/5 205/6 206/22
specific [23] 14/25 56/14 129/8 129/13 129/24 133/7 141/8 141/18 141/8 167/21 167/25 168/4 176/9 186/8 186/16 187/14 189/10 203/11 206/20 211/13 219/19
specifically [21] 59/5 67/17
141/9 141/15 141/16 149/23 159/3 205/24 206/12
specifics [1] 219/21
specificity [1] 43/10
speculate [2] 11/13 11/15
speculative [1] 216/10
spell [1] 6/24
spent [1] 132/2
splits [1] 16/1
spirit [1] 164/4
split [4] 14/14 209/21 210/6
211/12
split-second [3] 141/4
spoke [8] 12/12 14/6 52/5
139/7 164/15 206/25
spoken [7] 12/1 26/19 41/25
50/5 142/23 145/19 224/2
spokeperson [1] 90/18
spoon [1] 168/19
sponsored [1] 58/24
spontaneous [1] 116/21
sport [1] 77/15 84/14 148/25
152/11 153/2 1
spots [1] 64/17
spray [1] 198/16
springboarding [1] 56/7
stabilize [1] 220/15
staffing [1] 156/8
stage [1] 243/5
staged [2] 79/10 81/7
stand [6] 3/25 101/5
standard [1] 170/9
standards [3] 105/14
107/12 243/16
standpoint [4] 154/11 156/3 156/4 172/3

start [10] 112/8 113/96/13 102/8 102/9 164/22 164/24 165/15 209/15 216/9 218/17 243/16
start-up [1] 96/13
started [18] 10/7 22/11
52/22 57/14 58/2 80/1 80/4 80/7 80/23 84/23 114/8 114/22
114/8 122/21 163/5 164/5 230/21
starting [3] 86/14 113/4 201/23
starts [1] 241/14
state [42] 2/22 3/3 6/11 22/14 29/12 34/5 35/5 44/8 69/3 69/9 69/11 71/5 71/16 72/1 72/10 73/25 74/5 74/5 74/8 74/7 74/8 75/23 76/18 77/10 84/7 87/12 87/13 88/17 91/4 92/20 100/15 106/3 121/21 123/14 133/23 146/21 166/17 205/8 205/23 220/2 240/4 252/2 253/23
state's [3] 75/16 78/13 76/19
stated [7] 19/19 102/19 129/2 224/23 178/4 221/11 225/20
statement [28] 2/12 36/15 36/17 38/19 38/23 39/8 39/11 40/4 130/4 134/14 140/8 141/14 182/9 140/24 141/16 185/20 221/15 221/24 222/7 227/9 227/12 228/11 222/25 229/19
statements [5] 33/18 48/1 48/2 51/2 229/21
states [9] 1/1 37/15 38/7 38/9 38/17 42/3 51/9 109/24 109/25 124/9 140/21 140/24 143/9 156/3
statistical [5] 66/9 67/2 67/7 67/12
statistician [2] 11/10 71/12
statistics [6] 66/2 60/16 90/12 90/16 90/19 91/2
stats [1] 106/5
stick [1] 176/15
sticky [1] 40/6
still [18] 10/16 34/10 35/11 45/14 50/1 101/19 109/23 116/17 173/8 173/8 176/16 176/20 181/7 213/15 213/24 230/10 230/10
stimulus [3] 203/3 204/4 204/5
stood [2] 13/9 14/5
stop [16] 42/25 43/8 45/9 156/4 172/3 182/18 220/10 247/11 101/5 225/13

108/25 113/12 113/13
114/15 124/24 124/25 125/4 125/6 125/16 126/7 126/10 137/20 146/10 146/14 146/17 146/20 146/25 152/9 153/23 153/23 153/23 164/2
stopping [2] 3/10 146/10
stops [4] 42/25 92/18
164/16
store [1] 242/2
stores [1] 80/20
storm [1] 241/15
story [6] 83/6 84/23 86/23 86/25 87/11 87/17 87/18 88/1
strategies [4] 35/1 50/4 131/14 131/14
strategy [2] 110/17 110/18
street [4] 13/14 34/9 186/17 237/20
streetlight [2] 218/13
streets [2] 178/8 190/1
streetlight [1] 10/10
street [1] 131/3
stress [5] 202/17 202/18
203/9 203/12 203/23 204/4 224/24
strike [2] 107/16 174/2
structure [1] 164/21
structuring [1] 104/22
student [1] 72/2 73/19
students [10] 29/1 82/3
83/3 83/3 83/3 83/6 84/1 84/8 84/8 94/2 94/3
studied [13] 38/17 66/15 66/17 66/18 66/19 66/20 72/23 82/19 90/19 90/23 91/4 110/10 110/11
study [5] 55/6 91/23 94/24 104/23 110/10 110/11
studying [2] 112/23 206/11
style [1] 107/10
styled [1] 68/1
subject [18] 76/9 189/21
191/20 195/14 195/16 206/6 215/7 215/9 215/14 216/19 230/10 234/24 240/11 240/11 240/16 246/7 246/13
subject-matter [1] 162/15
subjective [1] 217/5
subjects [7] 70/20 70/23 198/24 215/14 215/16 216/9 216/18
submitted [6] 5/11 18/1 18/4 18/8 18/10 18/16
subpoena [1] 15/20
subpoenas [1] 11/9
subsection [3] 90/17 91/3 94/7

subsequent... [1] 205/22
subsequently [1] 162/3
subset [1] 142/12
substance [8] 14/17 15/3 15/7 15/9 15/10 19/25 20/4 22/18
success [1] 191/1
successfully [4] 134/3 134/10 191/23 191/24
suddenly [1] 241/5
suffice [1] 63/8
sufficient [1] 63/8
sufficated [1] 18/18
sufficient [1] 22/18
suggested [3] 156/2 175/14 218/8
suggesting [1] 132/23
suggestion [1] 66/23
suicidal [1] 43/21
suing [1] 41/18
suit [1] 59/16 181/6 181/6
summarize [1] 120/1
summarize [1] 102/18
summary [3] 13/23 132/23 222/6
summer [1] 76/24
supervised [1] 76/24
supervision [1] 211/5
supervisor [2] 29/22
188/3 188/16 190/22
supervisors [4] 188/8 189/3 189/8 190/22
support [13] 63/8 103/18 211/9 217/19 213/8 210/13 210/14 211/14 211/14 211/14 212/19 212/19 214/17
supported [1] 65/15
supposed [1] 194/24 195/13
Supreme [1] 40/24
sure [62] 7/10 7/10 7/10 9/25 11/10 14/13 14/17 16/21 20/11 21/15 24/24 26/24 26/25 26/25 55/25 55/25 56/25 56/16 66/25 64/3 64/23 67/14 70/9 70/17 77/15 72/19 80/20 88/1 86/5 95/12 111/8 112/1 117/13 136/20 137/21 140/18 147/12 155/11 156/9 157/8

talk [21] 61/21 94/4 102/17
104/5 109/22 114/11 121/5 123/23 125/17 123/22 132/2 136/15 136/15 151/9 175/19 207/19 207/22 213/14 216/2 231/19 216/2 216/12 237/20 247/16
talked [15] 11/23 11/20 71/19 104/8 108/4 107/23
127/19 127/23 133/1 145/1 133/24 134/23 147/4 159/17 151/4
talking [23] 1/24 17/12 18/23 23/15 51/25 52/2 54/6
59/17 87/18 115/20 123/24 123/24 133/1 133/24 134/23 147/4
159/24 188/24 201/24 203/12 237/20 237/20 230/20 237/25
talks [4] 114/25 125/5 131/22 134/3
target [20] 92/18 92/20 92/22 92/24 93/17 94/6 94/8
94/10 94/12 94/15 94/20
228/10 228/11
targeted [1] 114/9
targeting [3] 114/23 115/14
115/20
targets [13] 92/17 92/18
92/22 94/6 94/15 94/9 94/10 235/8 240/22 240/23
te [1] 158/3
teach [1] 95/22
team [6] 159/18 177/22
188/3 188/9 191/23 195/14 195/17 196/4 229/17
teamed [1] 196/4
teach [1] 95/22
tear [6] 2/24 80/10 81/2 82/9
163/6
technical [3] 27/3 35/12
25/21
technique [3] 81/18 93/21 174/20
techniques [8] 91/11 91/17
91/23 95/5 107/20 108/22 110/10
technology [1] 113/4
talents [1] 134/13

**T**

thank... [6] 83/11 84/3 121/25 153/24 157/14 225/2
thanks [2] 265/6 134/2 134/9
that [1564]
That'd [1] 69/15
that's [247]
their [108]
them [33] 11/20 11/20 112/2 13/6 16/6 16/25 21/16 29/15 34/13 37/7 37/9 53/3 53/23 54/4 59/17 68/1 68/9 68/25 73/21 80/20 86/23 87/1 87/11 87/23 91/16 103/5 106/19 110/5 110/8 110/9 110/9 110/11 122/17 128/4 128/6 128/18 129/20 131/17 134/12 135/3 148/1 155/19 158/17 162/11 162/21 165/10 172/10 175/21 176/1 176/2 188/18 205/13 252/7
thematic [2] 136/19 138/6
theme [1] 53/3
themes [3] 15/20 16/5 40/25
themselves [5] 52/7 90/23 110/5 110/11 172/9
then [50] 20/8 29/14 31/10 42/15 52/21 60/16 66/11 69/16 74/9 81/13 81/14 86/18 86/19 103/4 103/19 104/11 106/18 106/19 113/6 113/7 113/15 116/12 117/3 117/22 123/6 129/22 137/10 137/13 138/15 147/10 150/2 180/20 190/14 191/13 201/17 203/18 207/19 209/11 211/13 219/21 220/15 224/17 225/16 226/20 228/9 228/11 228/13 233/24 245/13 247/25
theory [13] 15/12 136/14 136/14 136/15 136/16 136/20 136/22 136/24 137/3 137/6 137/9 202/16 202/20 226/20
there [177]
there's [77] 12/22 15/25 25/5 28/25 38/20 39/14 40/24 45/16 48/9 49/21 52/25 60/8 60/23 62/13 72/8 84/5 85/24 87/15 93/24 109/19 111/5 118/1 118/3 119/5 125/5 120/20 121/22 122/1 123/7 126/8 129/15 130/16 131/9 132/16 133/18 136/25 145/9 145/13 148/6 148/6 150/3 156/16 164/23 165/2 171/10 172/22 173/15 173/16 174/18 174/18 175/9 175/11 175/11 176/3 177/17 179/14 181/14 182/4 185/13 191/16 192/4 194/7 194/25 196/22 197/16 214/8 216/12 222/24 224/6 225/24 233/5 233/12 233/17 237/22

thereafter [1] 226/7
thereto [3] 114/23 129/23 154/21
thereof [3] 198/20 200/24 224/25
thereto [1] 250/6
these [34] 6/23 10/24 34/11 34/6 34/24 35/1 38/2 35/3 35/10 52/17 53/2 53/8 55/18 56/13 59/10 73/7 101/15 107/2 116/21 116/24 125/25 129/12 131/13 136/2 150/13 156/14 177/14 190/4 199/24 251/13
they [108]
they're [14] 18/19 20/3 33/20 33/21 37/7 125/6 140/1 145/1 145/15 145/13 151/6 165/3 171/16 174/4 194/9
they've [4] 41/4 146/14 164/24 191/21
thing [20] 71/19 43/17 49/13 63/12 66/14 93/4 123/8 148/25 152/11 153/21 156/1 157/7 172/18 177/6 182/8 206/23 239/24 251/12
things [24] 34/24 52/17 81/3 85/24 117/10 117/14 117/14 121/23 131/4 169/21 169/8 172/3 180/4 180/14 190/14 190/20 208/20 224/10 224/17 241/18 245/13 249/9 250/5 250/7
think [34]
thinking [17] 85/1 87/4 85/1 141/17 145/21 152/23 152/24 153/3 153/3 153/4 153/7 162/13 154/9 186/3 200/15 200/21 220/3 220/5
thinks [1] 229/22
third [4] 45/18 145/17 137/14 158/18 162/7
thirdly [2] 165/6 177/17 177/21
those [56] 12/25 15/19 15/24 20/10 22/19 25/9 26/12 26/21 28/9 30/12 28/15 30/23 34/11 42/4 43/12 48/1 53/23 54/25 58/5 58/8 61/12 64/1 64/15 67/3 67/16 71/12 72/22 73/11 82/3 87/25 89/23 94/23 96/4 97/10 110/19 128/2 136/11 137/13 151/10 151/18 159/24 161/15 168/5 187/7 188/15 193/10 196/16 197/16 200/25 208/22 209/22 218/15 235/19 235/24 242/24 245/18
though [69] 7/17 7/14 15/14 17/16 17/25 24/16 27/16 27/19 28/7 28/8 29/15 29/17 29/21 30/21 38/19 41/23 50/17 52/7 53/6 60/5 61/9 64/20 66/15 66/23 76/25 77/3 94/3 102/2 111/13 118/13 118/14 119/24 122/3 124/8 126/8 129/10 129/19 150/24 152/4 159/5 181/6 181/14 181/24 183/11 183/25 189/5 195/14 197/11 209/8 209/23 228/20 228/25 232/10 241/4 252/13
thought [5] 204/10/6 154/23 167/23 191/25 200/14
thoughts [3] 203/23 204/12 152/18 162/20 170/15

threat [32] 63/3 93/4 122/4 123/2 210/24 211/22 212/23 218/4 220/15 230/21 231/24 243/11
three [4] 84/20 204/14
threefold [2] 60/6 218/15
three [6] 8/18 41/10 74/5 122/22 131/5
through [69] 7/17 7/14 15/14 17/16 17/25 24/16 27/16 27/19 28/7 28/8 29/15 29/17 29/21 30/21 38/19
Topeka [4] 106/13 106/16 107/10 107/18
topic [9] 17/8 23/9 46/21 59/12 71/5 73/23 114/9 119/24 130/23
topics [3] 14/19 203/22 110/6 131/16
tort [7] 38/6 123/15 123/23 123/24 124/1 124/4 124/9 124/9 129/9 129/10 129/14 129/24
tortured [1] 121/6
total [2] 18/24 164/24
totally [3] 143/3 139/5 242/17
totally [5] 43/17 183/15 203/7 214/20 233/7
touch [1] 91/24
touched [1] 109/25
toward [2] 235/11 241/7
towards [11] 124/15 135/13 209/12 225/20 227/9 235/17 236/10 236/17 239/8 239/17 243/21 246/17
track [1] 59/24
tracked [1] 191/22
tracking [3] 117/23 166/9 167/11
tracks [1] 167/7
traffic [4] 42/25 45/9 92/19 119/18
train [6] 54/9 55/21 56/15 110/20 168/6 174/22 178/22 185/10 239/4
trained [42] 48/5 63/3 65/18 65/19 71/10 68/22 90/4 95/16 96/5 96/6 96/20 102/25 108/22 112/16 124/8 148/2 153/24 164/21 164/6 161/6 161/16 161/18 161/25 174/16 164/11 200/25 201/23 201/24 223/25 202/9 203/7 212/4 207/8 236/17 218/21 239/6 244/23 247/12
trainers [4] 89/7 90/9 94/18 223/25
training [115]
transcribe [1] 67/10
transcript [20] 164/18 184/19 205/5 206/16 206/18 71/10 68/22 90/4 95/16 206/18 21/10 221/2 219/10 247/20 224/9 243/24 248/17 250/16 250/18
transcription [1] 250/7
transfer [1] 173/17
transition [1] 172/25
transitions [2] 172/14 172/6
translate [1] 139/11
transmission [2] 232/10
transmissions [1] 229/1 232/2 232/7

transparent [2] 22/11
transport [1] 74/13
treated [1] 11/27
treatment [1] 112/8
trend [1] 113/23
trends [27] 2/15 15/20 16/5 22/16 35/6 38/6 40/25 41/17 43/11 54/9 57/5 66/14 67/3 70/17 110/19 111/3 117/12 117/14 123/5 124/8 124/9 129/9 129/10 129/14 132/16 138/6
trials [1] 10/17
triangulate [1] 60/24
triangulation [2] 15/12 16/3
trickle [1] 140/16
tried [3] 24/16 58/20 117/21
trigger [3] 28/18 232/20 234/25
tripled [1] 117/13
tried [9] 202/10 202/20
trod [1] 183/17
true [21] 201/8 211/10 121/24 133/8 40/14 47/13 157/20 58/8 158/1 168/1 168/11 102/4 133/3 134/21 168/11 222/17 230/25 238/6 250/9 251/8 253/4
truth [3] 49/2 101/12 101/12
try [30] 15/24 32/1 232/2 29/15 30/24 34/15 160/14 60/20 83/24 111/17 115/16 154/17 156/21 154/17 158/4 154/23 113/3 183/15 154/13 154/17 156/21 154/17 154/23 239/4
trying [33] 22/21 36/25 34/14 44/22 46/19 51/22 54/14 62/1 73/9 102/25 112/10 120/19 123/24 124/5 124/14 131/13 135/19 175/2 155/14 167/4 174/6 168/4 171/22 216/3 216/21 229/15 239/9 242/8 243/20 245/7 165/3 166/11 170/14 171/10 173/20 181/6
tube [2] 136/25 136/25 189/24
tune [2] 235/24 238/5
turn [5] 35/24 14/6 67/25 198/3 227/12
turning [1] 125/8
turns [1] 224/20
TV [2] 55/1
twice [1] 60/14
two [24] 14/14 35/12 58/1 58/1 69/5 70/4 91/12 79/22 80/1 94/20 131/15 146/19 183/18 159/20
TWO-PRONGED [6] 6/715 203/16
underway [1] 9/4
UNITED [9] 1/1 37/18 86/2 37/25 203/23
United States [1] 156/19
universe [1] 215/9
university [26] 15/14 17/6 18/14 160/14 168/19 223/2 239/5 226/17

two-pronged [2] 229/22 229/22
type [30] 35/8 35/14 66/14 88/4 88/7 92/20 93/4 124/8 129/12 141/6 151/13 174/11 174/22 211/1 205/23 240/22 167/22
types [11] 34/1 34/6 34/8 35/2 35/2 35/14 58/23 125/9 140/2 129/12 133/5 159/19 132/16 138/6
typewriting [2] 250/3 253/12
typically [2] 247/2 247/10

**U**

Uh [2] 57/13 115/10
Uh-huh [2] 57/13 115/10
ultimately [2] 147/23 201/21
uncompliant [1] 174/15
under [16] 7/25 96/5 96/20 115/13 176/11 176/11 176/16 176/17 215/21 148/4 196/18 181/6 189/24 148/4 196/23 240/5 240/5 241/16 241/16 241/18 241/18
undergoing [1] 106/8
undergrad [1] 71/14
underneath [1] 218/17
underscores [1] 130/7
understand [39] 6/23 9/16 10/10 10/24 13/21 32/1 22/20 22/25 22/16 71/9 22/16 222/1 210/24 29/13 215/17 59/24 212/13 222/17 72/10 222/17 226/25 72/22 72/22 84/11 144/18 163/16 165/3 173/16 195/18 195/8 182/4 193/1 173/24 186/18 186/18 225/5 246/24 218/3 226/25 224/25 218/15 246/20 224/25 250/7
understanding [17] 16/25 23/24 35/8 35/13 66/9 70/19 114/25 115/8 164/7 137/11 135/24 134/9 134/24 145/1 146/18 189/13 206/19
understood [1] 187/1
undertake [2] 67/15 203/16
underwent [1] 74/6
Undoubtedly [1] 191/1
uniform [1] 115/5
unique [7] 142/20 146/20 147/5 147/6 147/13
until [5] 10/8 62/11 224/17 228/8 228/13
unusual [1] 169/14
up [50] 62/1 7/12 82/4 9/19 62/3 113/23 145/12 17/22 9/15 176/13 77/16 97/23 125/4 155/17 201/17 216/6 143/5 146/12 146/22 146/1 175/16 201/8 216/3 229/6 116/6 118/12 235/24 135/24 186/16 163/12 163/12 175/12 219/7 151/12 149/11 151/23 152/11 229/10 135/19 242/8
United States [1] 253/24

useful [5] 30/4 148/2 103/9 103/11 123/16 136/20
uses [4] 144/5 172/25
until [3] 228/2 228/13 228/13

**V**

V-A-U-G-H-N [1] 116/18
Vaguely [1] 206/14
Valdosta [9] 116/18 117/3 128/18 149/11 184/18 184/18 195/18 186/19
Valdosta University [1] 103/15
valor [1] 101/10
value [1] 15/19
values [1] 140/20
variable [1] 204/11
variables [4] 33/11 192/7 216/22 222/4
variations [1] 156/6
vehicles [6] 204/14 2046 various [27] 16/21 21/11 24/15 24/17 39/16 39/19 40/18 40/19 41/11 41/25 42/14 42/17 45/13 45/17 46/23 48/1 60/5 133/6 230/7
Vaughn [2] 116/18 116/24 134/8
Vegas [2] 72/2 84/11
vehicle [2] 92/4 207/3
vehicles [1] 92/19
verbal [3] 212/20 212/24 220/22 221/25
verbally [1] 222/13
veritization [2] 115/25 148/6
versed [4] 104/3 105/5 105/5 105/25
verifications [1] 104/25
versus [8] 1/4 104/13 156/11 40/14 413 4/14 40/14 104/23 104/25
very [22] 25/4 29/15 34/7 42/9 67/14 63/13 89/25 105/20 119/24 128/6 133/6 138/11 138/18 139/21 189/2 189/19 189/19 183/23 189/19 183/23 139/1 145/5 145/2
vicinity [1] 189/7 227/23

**V**

victims [1] 120/22
video [47] 2/7 2/14 2/19 2/20 3/3 3/4 3/8 12/21 12/23 25/16 25/17 26/3 26/4 51/12 51/13 51/16 57/10 57/14 57/18 57/25 58/1 58/2 58/3 58/4 60/13 83/16 83/17 83/19 84/5 84/9 84/10 157/24 158/2 158/3 163/25 158/2 164/5 169/6 169/24 236/14 236/14 246/6 246/9 248/3 252/5
viewpoint [1] 63/2
viewer [1] 57/11
views [1] 164/11
Vijay [2] 104/10 104/17
Vijay [8] 18/17 245/23
violated [2] 77/23 78/6
violations [2] 118/10 245/1
violators [3] 112/8 172/9
violence [19] 61/14 61/19 61/23 61/25 62/9 62/18 62/19 62/21 63/1 63/7 63/5 63/6 83/18 84/8 129/20 246/7 246/8 246/18 246/24 248/18
warden [1] 81/20
warn [1] 178/10
warning [1] 182/1
warnings [4] 212/12 212/14
violent [7] 60/8 60/12 60/13 61/16 61/18 91/15 158/18
virtual [3] 102/20 102/21 106/9
virtually [1] 61/4
virtue [3] 239/14
virtues [1] 106/2
via [8] 21/13 21/13 68/12 68/12 174/15 174/15 175/18 175/18
vis-a-vis [4] 21/13 68/12 174/15 175/18
vocational [1] 215/19
vocation [3] 140/20 140/20
Vitae [2] 215/19
Vitae [1] 2/4
voice [1] 90/1
voltage [1] 90/1
volume [3] 13/10 32/23
Volume 1 [1] 32/23
volumes [1] 130/24
voluminous [2] 118/25 130/22
voluntary [1] 215/19
vote [1] 75/19
votes [1] 177/25
vouch [1] 146/7
vulnerability [2] 41/5 43/24
vulnerable [9] 40/11 41/14

**W**

W-O-R-R-E-L-L [1] 116/13
wage [2] 80/24 81/4
wages [1] 80/24
wait [13] 25/19 42/20 44/15 47/3 144/15 145/15 175/2 175/2 180/7 210/1 211/25 211/25
waiting [2] 218/8 247/10
walk [1] 191/23
walk [1] 217/16
walks [1] 217/16
wall [7] 124/11 124/23 125/5 125/8 126/8 126/18 127/7
wanted [3] 14/15 14/15 17/6 40/13 55/25 68/1 248/24 248/18
warm [1] 178/10
waters [1] 232/4
watching [2] 37/4 30/22
water [1] 217/19
watches [1] 73/17
waves [1] 232/13
way [33] 11/12 29/9 30/11 34/10 45/12 60/5 66/15 76/8 78/6 78/21 80/5 119/10 123/12 126/2 133/8 133/14 133/16 136/15 143/3 148/15 154/24 161/9 162/8 163/3 162/14 163/4 162/14 163/4 168/12 168/19 168/19 178/18 198/23
ways [4] 145/11 148/2 145/13 248/23
we'd [1] 68/6
we'll [4] 71/12 136/20 28/19 33/1 37/11 79/13 102/17 244/14 179/13 154/18
we're [44] 6/4 14/2 14/2 24/24 18/18 24/25 38/10 38/20

40/5 47/5 51/9 51/15 63/4 64/17 72/9 79/4 93/5 84/8 102/11 113/3 133/18 143/23 143/25 146/6 153/12 153/20 154/12 158/21 166/24 175/3 176/24 177/21 179/12 191/25 194/10 214/20 224/20
we've [13] 29/19 50/15 71/18 109/25 110/16 110/23 123/12 128/15 130/2 152/16 169/6 191/25 196/22
weak [1] 101/10
weapon [9] 92/4 92/14 125/9 126/8 146/19 246/18 246/24 224/25
weapons [8] 43/20 91/17 127/14 155/14
webinar [2] 27/25 28/6
website [2] 36/14 146/24
wedding [1] 151/23
week [3] 54/6 146/6
weekend [1] 28/24
weeks [3] 79/11 79/22 80/11
welfare [1] 101/11
well [37]
went [9] 79/8 82/3 83/18 103/5 106/17 152/14 157/10 181/22 181/22 203/13
were [85]
weren't [4] 65/9 175/24
west [1] 107/10 107/23 46/23
West Palm [1] 47/4
western [1] 107/23
what [379]
what'd [2] 86/5 86/25
what's [12] 64/1 68/13 76/18 76/19 118/3 140/16 146/18 174/15 188/17 189/19 213/18 249/3
whatever [4] 25/9 52/15 121/6 130/1
wheel [1] 90/16
when [146]
whenever [2] 212/14 222/14
where [73] 10/1 31/13 37/3 41/12 47/11 49/3 73/18

227/3 227/5 227/12 231/19 233/9 235/14 236/3 236/22 237/12 238/7 239/11 239/11 240/21 241/4 242/4 243/19 246/4 246/5 246/18 246/25 247/4 247/23 248/21
Whereupon [1] 249/15
wherever [2] 17/17 201/1
whether [17] 13/1 18/6 22/6 22/16 43/12 32/4 132/5 149/1 152/16 156/15 157/4 162/13 204/20 209/2 214/11 224/25
which [91]
while [16] 33/2 33/14 62/2 83/11 192/1 192/2 246/1
white [6] 123/12 151/7 151/8
who [56] 11/5 12/1 15/7 23/21 28/11 25/24 124/1
wide [1] 24/11
wide [1] 243/12
wider [2] 50/23 50/24
widespread [4] 117/10 117/18 140/18 130/23
will [25] 33/25 44/1 160/25 122/14 127/20 149/1 150/3 161/20 131/7 150/3 193/1 193/3 193/13 193/12 196/7 196/17 197/25 203/5 204/2 204/16 230/3 231/3 231/6 214/20
willing [1] 171/15
win [3] 127/11 127/21 128/8
wind [1] 136/22
window [3] 45/4 98/4 85/16
wing [1] 150/11
wings [2] 150/14 150/11
winners [1] 127/4
wiser [1] 228/8
wisdom [1] 228/8
wish [1] 79/17
withdrawn [1] 77/4
within [17] 75/18 82/14 135/13 189/19 189/19 212/4
without [13] 124/8

**WILLIAMS... [31]** 207/25 209/14 210/22 210/24 211/13 217/24 218/2 218/3 218/9 218/12 225/24 226/3 226/11 229/24 229/24 231/10 231/25 231/25 233/13 233/16 233/17 234/9 234/24 235/5 235/9 235/17 237/19 242/4 244/9 244/9 244/16 245/10 246/6
Williams' [3] 237/19 238/1 238/2
willing [1] 171/15
win [3] 1/7 127/11 127/20 127/21 127/21 207/21 215/10
window [1] 176/8
within [17] 121/12 135/13 135/19 189/19 189/19 212/4
without [13] 36/12 124/8 129/20 138/25
wonderful [1] 117/4 117/7
words [5] 127/4 128/15 128/25 128/25 130/1
wonky [1] 7/13
wording [2] 146/8 161/21
woods [1] 131/14
work [45] 21/18 21/17 25/5 26/20 27/14 28/8 28/15 28/25 33/4 34/14 41/15 46/2 46/25
wordings [1] 117/4
words [6] 127/4 128/15 128/25 128/25 130/1 138/25
worked [2] 19/17 19/19
worker [1] 215/11
Worrell [1] 116/13
world [6] 14/3 54/8
worry [1] 116/18
worst [2] 245/10
worth [6] 30/25 30/4 44/24 94/24 94/24 240/22 244/9
worthy [1] 130/14
would [181]
wouldn't [13] 80/23 143/24
written [6] 48/24 10/2
wrongly [2] 116/6 132/5
wrote [5] 146/8 146/8
writing [2] 136/20 144/5

works [1] 200/25
world [6] 14/3 54/8
worm [3] 142/15 229/24
worn [19] 17/24 51/13 164/24
worst [1] 245/5 245/10
Worrell [1] 116/13
world [4] 14/3 54/8 224/9
worked [2] 19/17 19/19
worker [1] 215/11
Worrell [1] 116/13
world [6] 14/3 54/8
wonderful [1] 117/4 117/7
Williams' [3] 237/19 238/1
willing [1] 171/15
win [3] 127/11 127/20
wind [1] 136/22
window [3] 45/4 98/4 85/16
wing [1] 150/11
wings [2] 150/14 150/11
winners [1] 127/4
wiser [1] 228/8
wisdom [1] 228/8
wish [1] 79/17
withdrawn [1] 77/4
within [17] 75/18 82/14 135/13 189/19 189/19 212/4
without [13] 36/12 124/8 129/20 138/25
writings [6] 117/11 117/10 117/14 123/14 124/12 124/15
written [6] 48/24 10/2
withhold [1] 146/6
witness [4] 8/1 250/9 251/12 252/25 250/10
Witness/Notary [1] 253/20
witnesses [2] 9/16
words [6] 127/4 128/15 128/25 130/1 138/25 146/18
wonderful [1] 117/4
wondering [1] 117/4 117/7
wording [2] 146/8 161/21
work [45] 21/18 25/5 26/20 27/14 28/8 28/15 28/25 33/4 34/14 41/15 46/2 46/25
worked [2] 19/17 19/19
Wrongful [2] 78/6
wrongly [2] 116/6 132/5
wrote [5] 146/8
writing [2] 136/20 144/5
your [332]
yourself [19] 26/23 27/11 42/23 48/25 27/25 84/23
Young [4] 1/15 1/23 250/2 253/23

193/15 193/16
years [37] 16/18 20/13 23/25 24/25 25/13 27/13 38/7 41/11 43/10 54/8 60/23 70/13 70/12 70/13 70/16 70/17 72/8 73/2 74/5 74/12 84/8 85/5 103/3 104/6 111/5 111/19 111/21 114/8 114/16 127/20 189/17 207/3 207/4 207/4 216/16 217/2 217/2 222/6
yeah [115]
year [1] 70/16
You've [6] 6/18 6/11 1/15 116/18 116/20 119/19 174/8 189/19
yelling [1] 245/5
yell [1] 26/6
you [1015]
you'd [6] 41/7 70/12 104/18 105/5 106/3 105/5
you're [101]
you've [81] 9/16 6/18 11/5 12/21 18/16 19/13 24/23 23/4 22/11 24/9 24/25 51/2 51/5 72/9 60/14 76/2 70/13 78/23 60/11 85/22 81/23 85/15 64/14 106/25 89/13 85/15 64/14 106/25 89/13 156/25 68/9 62/13 85/15 146/25 189/19 134/9 160/22 174/15 146/8 168/19 174/15 174/22 181/20 246/24
Young [4] 1/15 1/23 250/2 253/23
your [332]
yours [1] 189/19
yourself [19] 26/23 27/11 42/23 48/25 84/23

**Z**

ZIARKO [3] 4/20 5/12 64/8
zip [1] 189/19
zone [1] 189/19
zones [2] 125/9 189/19
zoom [15] 10/3 62/2 62/13
11/15 11/15 51/7 5/17 5/13 5/18 5/13 5/13 5/13 5/13
64/8