PEARSON, J.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| MARQUETTA WILLIAMS, Individually and as Administratrix of the Estate of James Williams, Deceased, | ) ) ) | CASE NO.  5:23CV655 |
| | ) | |
| | ) | JUDGE BENITA Y. PEARSON |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CITY OF CANTON, *et al.*, | ) | |
| | ) | **MEMORANDUM OF OPINION** |
| | ) | **AND ORDER** |
| Defendants. | ) | [Resolving ECF No. 81] |

Pending is Defendant Robert Huber's Motion for Summary Judgment in which he seeks

qualified immunity.  *See* ECF No. 81. Plaintiff Marquetta Williams, individually and as

Administratrix of the Estate of James Williams, Deceased, filed a brief in opposition.  *See* ECF

No. 90.  Officer Huber replied.  *See* ECF No. 91.  Having reviewed the briefs, the record, and the

applicable law, the Court denies Officer Hubert's Motion for Summary Judgment in its entirety.

## I. Background

Just minutes into the New Year of 2022, Officer Huber heard rapid gunshots while

patrolling a neighborhood in Canton, Ohio, in his cruiser.  Believing the gunshots occurred

nearby, Officer Huber decided to investigate the source of the gunshots and radioed dispatch.

After driving approximately one block, Officer Huber's investigation led him to 2307 10th Street

SW, the Williams' residence.  Upon arrival, Officer Huber parked his cruiser in the middle of the

street.  He did not activate his cruiser's lights or sirens.  Between slats of the Williams' privacy

(5:23CV655)

fence, Officer Huber saw Mr. Williams enter the side door of his residence carrying a rifle.  After

seeing Mr. Williams and no one else, Officer Huber dispatched fellow officers to request back-

up.

Officer Huber left his vehicle to investigate the matter more thoroughly.  He performed a

cursory inspection of the exterior of Mr. Williams' home and approached the front porch.  He did

not knock on the door or announce his presence.  After inspecting the front porch, Officer Huber

moved towards the southeast side of the Williams' residence, before returning to the middle of

the sidewalk to look inside the home for suspicious activity or disturbances.  Seeing nothing

more, he went back to the street to continue waiting for backup.

While Officer Huber waited for back-up near the southeastern corner of the residence,

Mr. Williams exited the side door of his residence onto the patio.  There, Mr. Williams began

discharging gunfire into the air above.  Hearing gunshots coming from the west side of the

house, Officer Huber charged to that side of the house, and discharged eight bullets through the

privacy fence.  He shot at Mr. Williams eight times.  Six of Officer Huber's bullets struck Mr.

Williams. [1]  Only after the sixth shot, did Officer Huber announce his presence, shouting "shots

fired, shots fired," and "Police! Get down now!  Police, Get down now!"  Mr. Williams died in

an ambulance while on the way to hospital.

Mr. Williams' wife, Marquetta Williams, individually and as Administratrix of the Estate

of James Williams, brought a claim against Officer Huber pursuant to 42 U.S.C. § 1983 for the

deprivation of Decedent Williams' clearly established rights as secured by the Fourth and

Fourteenth Amendments to the United States Constitution.  *See* Compl.  (ECF No. 1).

---

[1] *See* Pl.'s Ex. 1, Report of Autopsy (ECF No. 90-1) at PageID #: 2709-2715.

(5:23CV655)

## II. Standard of Review

"Summary judgment is appropriate when 'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'"  *Scola v. Publix Supermarkets, Inc.*, 557 F. App'x 458, 462 (6th Cir. 2014) (quoting Fed. R. Civ. P. 56(a)).  The fact under dispute must be "material," and the dispute itself must be "genuine."  A fact is "material" only if its resolution will affect the outcome of the lawsuit.  *Scott v. Harris*, 550 U.S. 372, 380 (2007).  In determining whether a factual issue is "genuine," the Court assesses whether the evidence is such that a reasonable jury could find that the non-moving party is entitled to a verdict.  *Id.*  ("[Summary judgment] will not lie . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

The moving party need not file affidavits or similar materials negating a claim on which its opponent bears the burden of proof, so long as the movant relies on the absence of an essential element in the pleadings, depositions, answers to interrogatories, and admissions on file.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "The trial court is not required to search the entire record to establish that a genuine issue of material fact exists."  *Malee v. Anthony & Frank Ditomaso, Inc.*, No. 1:16CV490, 2018 WL 1805402, at *2 (N.D. Ohio Apr. 16, 2018) (citing *Tucker v. Tennessee*, 539 F.3d 526, 531 (6th Cir. 2008)) (abrogated on other grounds).  "'[I]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c),' the court may determine that fact is undisputed."  *Malee,* No. 1:16CV490, 2018 WL 1805402, at *2 (quoting Fed. R. Civ. P. 56(e)(2)).

To survive summary judgment, the non-moving party "must 'do more than simply show that there is some metaphysical doubt as to the material facts.'"

3

(5:23CV655)

F.3d 523, 529 (6th Cir. 2019) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). Once the movant makes a properly supported motion, the burden shifts to the non-moving party to demonstrate the existence of a genuine dispute. An opposing party may not simply rely on its pleadings; it must "produce evidence that results in a conflict of material fact to be resolved" by a factfinder. *KSA Enterprises, Inc. v. Branch Banking & Tr. Co.*, 761 F. App'x 456, 464 (6th Cir. 2019) (quoting *Cox v. Ky. Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995)). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Srouder v. Dana Light Axle Mfg., LLC*, 725 F.3d 608, 613 (6th Cir. 2013) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). In analyzing a motion for summary judgment, the Court "must view the evidence in the light most favorable to the nonmoving party." *Lossia v. Flagstar Bancorp, Inc.*, 895 F.3d 423, 428 (6th Cir. 2018) (citing *Latits v. Phillips*, 878 F.3d 541, 547 (6th Cir. 2017)).

### III. Discussion

### A. Qualified Immunity

Officer Huber argues that he is entitled to qualified immunity against Plaintiff's §1983 claim of excessive force. *See* ECF No. 81 at PageID #: 2189. Plaintiff contends that Officer Huber used excessive force in violation of the Fourth Amendment, and that the defense of qualified immunity cannot apply, because no reasonable officer could justify Officer Huber's use of deadly force. ECF No. 90 at PageID #: 2694.

"Qualified immunity is a defense government officials can raise when claims arise from the performance of their discretionary functions." *Meeks v. Larsen*, 999 F. Supp. 2d 968, 977 (E.D. Mich. 2014), *aff'd*, 611 F. App'x 277 (6th Cir. 2015). Government officials performing

4

(5:23CV655)

discretionary functions are shielded from liability unless their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). To overcome Officer Huber's qualified immunity defense, Plaintiff must plausibly plead facts showing 1) that Officer Huber violated a constitutional right and 2) that "the right at issue was 'clearly established' at the time of defendant[s'] alleged misconduct." *Pearson v. Callahan*, 555 U.S. 223, 232 (2009); *see also Sterling Hotels, LLC v. McKay*, 71 F.4th 463, 467 (6th Cir. 2023). "'Clearly established', means that, at the time of the officer's conduct, the law was 'sufficiently clear' that every 'reasonable official would understand that what he is doing' is unlawful." *D.C. v. Wesby*, 583 U.S. 48, 63 (2018) (cleaned up). The Court maintains discretion to resolve either prong of the analysis first. *Pearson*, 555 U.S. at 236 ("The judges of the district courts and the court of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand.")

### 1. Constitutional Violation

The parties agree that the federal right at issue here is Mr. Williams' right, under the Fourth Amendment, to be free from excessive force during an authorized arrest. "The Fourth Amendment guarantees the right to be free from unreasonable seizures. This includes the right to be free from excessive force." *Thomas v. City of Columbus*, 854 F.3d 361, 365 (6th Cir. 2017) (citing *Graham v. O'Connor*, 490 U.S. 386, 388 (1989)).

It is undisputed that Mr. Huber "seized" Mr. Williams by shooting him. The question is whether the deadly force that Officer Huber used was objectively reasonable. *Graham v. Connor*, 490 U.S. 386, 396 (1989). "Deadly force is objectively reasonable when an officer 'has

5

(5:23CV655)

probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others.'" *Thomas*, 854 F.3d at 365 (quoting *Tennessee v. Garner*, 471 U.S. 1, 3 (1985); *see also Lee v. Russ*, 33 F.4th 860, 863 (6th Cir. 2022) (clarifying that "[t]he use of lethal force is excessive unless an officer has probable cause to believe a suspect poses an immediate threat of serious physical harm to the officer or others.").

The "reasonableness" of a particular use of force "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396 (internal citation omitted).  "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396–97.  "Nevertheless, 'the fact that a situation unfolds relatively quickly does not, by itself, permit officers to use deadly force.'" *Scozzari v. Miedzianowski*, 454 F. App'x 455, 463 (6th Cir. 2012) (citations omitted).   As such, courts assessing an excessive force claim must be especially mindful of the totality of the circumstances the officer "faced at the time [he] decided to use force[]" (*Thomas*, 854 F.3d at 365), and focus "'only on the facts that were knowable to the defendant officer[]" *Reich v. City of Elizabethtown, Kentucky*, 945 F.3d 968, 979 (6th Cir. 2019).

## A.  Relevant Facts

In ruling on a motion for summary judgment, the Court typically adopts the plaintiff's version of the facts.  *Scott*, 550 U.S. at 378.  Here, before analyzing the constitutionality of Officer Huber's actions, the Court must determine the relevant facts.  *See Heeter v. Bowers*, 99 F.4th 900 (6th Cir. 2024) (identifying the relevant facts before analyzing the constitutionality of an officer's use of excessive force) (citing *Scott*, 550 U.S. at 378).  "'There is, however, an added

6

(5:23CV655)

wrinkle' whe[n] the record contains 'a videotape capturing the events in question.'" *Shumate v. City of Adrian*, 44 F.4th 427, 438 (6th Cir. 2022) (citation omitted).  The Court must not "adopt a version of the facts that is blatantly contradicted by video footage that is not doctored or altered in any way, and which clearly depicts the events that actually happened." *Id.* (cleaned up).  The Court, however, must "view any relevant gaps or uncertainties left by the videos in the light most favorable to the [p]laintiff," and "make all reasonable inferences in their favor." *Id.* (quoting *Latits v. Phillips*, 878 F.3d 541, 544 (6th Cir. 2017)).

Officer Huber does not contest the events as seen on the video footage, but he contends that the footage does not tell the complete story.  Officer Huber claims that the video footage of Mr. William's home (Exhibit D (ECF No. 81-4 at PageID #: 2362-63)) shows that the firearm Mr. Williams is holding is being moved toward Officer Huber, and that the video footage "is taken from a completely different perspective than what Officer Huber observed."  ECF No. 91 at PageID #: 2756.

To determine the relevant facts, the Court relies electronic evidence provided to the Court--the Body Worn Camera Video of Officer Huber (Exhibit B (ECF No. 81-2) at PageID #: 2358-59), the Video Footage of Williams' Residence (Exhibit C (ECF No. 81-3) at PageID #: 2360-61), and the Video Footage of Surveillance Video [of the William's Residence] (Exhibit D (ECF No. 81-4 at PageID #: 2362-63).[2]  The Court, "draw[s] all inferences in favor of [Plaintiff] *to the extent supportable by the record*", to determine whether Officer Huber's actions rose to "a level warranting deadly force." *Scott*, 550 U.S. at 381 n.8 (emphasis in original).

---

[2]  Because this video evidence is pertinent and was only provided to the undersigned manually, Plaintiff's counsel must upload electronic copies to the docket within seven days of the issuance of this ruling.

(5:23CV655)

### B. The Segmenting Rule

The Court must also identify the relevant timeframe for its analysis. *See Dickerson v. McClellan*, 101 F.3d 1151, 1161 (6th Cir. 1996) (explaining that "[t]he time-frame is a crucial aspect of excessive force cases.") Citing the segmenting rule, Officer Huber urges the Court to focus on the circumstances at the moment that he used force—not how he approached the scene. ECF No. 81 at PageID #: 2197.

In excessive force cases, the Sixth Circuit generally applies a "temporally segmented analysis to the possible erroneous actions taken by police officers." *Chappell v. City of Cleveland*, 585 F.3d 901, 914 (6th Cir. 2009); *see also Claybrook v. Birchwell*, 274 F.3d 1098, 1103 (6th Cir. 2001) (identifying that the Sixth Circuit "embrace[s] a somewhat narrow interpretation of the Supreme Court's mandate that courts look to the totality of the circumstances in determining if excessive force is used."). Under a segmented analysis, a district court "'carve[s] up' the events surrounding the challenged police action and evaluates the reasonableness of the force by looking only at the moments immediately preceding the officer's use of force," an approach that "applies even to encounters lasting very short periods of time." *Greathouse v. Couch*, 433 Fed.Appx. 370, 372 (6th Cir. 2011).

That said, the Sixth Circuit has identified scenarios in which district courts should not employ the segmenting rule: (1) "where the events preceding the shooting occurred in close temporal proximity to the shooting, those events have been considered in analyzing whether excessive force was used", and (2) "[w]hether events leading up to a shooting are legitimate factors to consider in assessing an excessive force claim depend on the totality of the circumstances in question." *See Bletz v. Gribble*, 641 F.3d 743, 752 (6th Cir. 2011) (first citing

8

(5:23CV655)

*Claybrook,* 274 F.3d at 1103–04, then citing *Livermore ex rel. Rohm v. Lubelan,* 476 F.3d 397 (6th Cir. 2007)).

Despite the Sixth Circuit identifying those scenarios in *Bletz*, the court also opined that it "need not decide precisely which preceding events (*i.e.* the breadth of the excessive-force) should properly be considered in analyzing the reasonableness of [the defendant's] use of deadly force" because it could "instead affirm the district court's denial of qualified immunity by looking only at the facts alleged by plaintiff in the moment immediately preceding the shooting." *Bletz,* 641 F.3d at 752.  With that in mind, the undersigned looks to *Claybrook* and *Livermore* for additional guidance in determining the relevant time-frame.

In *Claybrook*, the administrator of plaintiff's estate brought an action after the decedent had been fatally shot by undercover police officers while engaged in anti-crime surveillance at a market (doubling as a front for a gambling operation) at which plaintiff's decedent daughter-in-law worked. 274 F.3d at 1100.  The undercover officers suspected that a robbery was in progress, after observing plaintiff's decedent standing in the dimly lit parking lot of the market, holding a shotgun. *Id.*  The officers radioed for backup, drove onto the lot, and confronted plaintiff's decedent.  *Id.*  After the officers and plaintiff's decedent instructed each other to drop their weapons, gunfire ensued, injuring a police officer who then reported to dispatch that shots had been fired.  *Id.* at 1101.  Around that same time, plaintiff's decedent circled behind the market.  Plaintiff's decedent positioned himself behind a concrete structure and aimed his shotgun at the officers who had pursued him.  *Id.*  After plaintiff's decedent refused to drop the shotgun, the officers fired, killing him.  *Id.*

On appeal, after denial of their motion for summary judgment, the officers argued that the only relevant events to consider in determining whether deadly force was reasonable was the

(5:23CV655)

final confrontation, in which the plaintiff's decedent fled behind the market, hid behind the

concrete structure, and the second shootout began. It was during that segment" of events, they

argued, that plaintiff's decedent was shot and killed. *Id.* at 1103. Clarifying that "the plaintiffs

brought suit to contest all use of deadly force against their deceased father, not only the shot that

took his life," (*Id.* at 1105) the Sixth Circuit rejected the officers' argument, reasoning:

> We simply disagree with their contention that the initial exchange
> of bullets should not weigh upon our analysis. Under the precedent
> of *Dickerson* and *Boyd* [*v. Baeppler,* 215 F.3d 594 (6th Cir.2000)],
> we instead conclude that the evening's events are properly viewed
> in three segments: first, the officers' approach and confrontation of
> [plaintiff decedent]; second, the initial firefight taking place in front
> of the market; and third, the shots fired after [plaintiff decedent's]
> move to a position behind the concrete steps. Moreover, we
> conclude that all events taking place in the second and third
> segments are material to our analysis.
>
> Although the officers' decision to approach Claybrook in the
> manner that they did was in clear contravention of Metro Nashville
> Police Department policy regarding procedures for undercover
> officers, under *Dickerson,* any unreasonableness of their actions at
> that point may not weigh in consideration of the use of excessive
> force. *Dickerson,* 101 F.3d at 1161–62 (citing *Drewitt v. Pratt,* 999
> F.2d 774, 778 (4th Cir.1993) (finding irrelevant to use of deadly
> force fact that officer had violated police procedure by failing to
> identify himself as an officer in stopping a suspect while dressed in
> plain clothes)).

*Id.* at 1105. This reasoning is underscored in *Bletz*:

> [T]his court analyzed an excessive-force claim in segments by "first
> identify[ing] the seizure at issue . . . and then examin[ing] whether
> the force used to effect that seizure was reasonable in the totality of
> the circumstances, not whether it was reasonable for the police to
> create the circumstances." . . . The court in *Livermore* separated the
> actions of the defendant officer that occurred in the hours leading up
> to the fatal shooting from the "split-second judgments made
> immediately before the officer used allegedly excessive force."

*Bletz,* 641 F.3d at 751–752.

10

(5:23CV655)

Officer Huber encourages the Court to only consider the events leading up to Officer Huber's use of force.   The Court is unpersuaded.  It is more appropriate to segment the analysis into two events: (1) Officer Huber's arrival at 2307 10th Street SW, and (2) the moment that Officer Huber used deadly force.  As with the undercover officers in *Claybrook*, Officer Huber believed that a crime occurred based on his own observations—not from a dispatch call that provided him with crucial details about an ongoing incident.  *See Dickerson*, 101 F.3d at 1161 (recognizing that "[o]ther than random attacks, all such cases begin with the decision of a police officer to do something, to help, to arrest, to inquire.") (quoting *Plakas v. Drinski,* 19 F.3d 1143, 1150 (7th Cir. 1994)).  Because Officer Huber had not received a dispatch call that could aid him in assessing the situation and allow him to prepare accordingly, Officer Huber relied only on his own observations.  As a result, he lacked information about the suspected crime.

This segmentation aligns with the guidance provided by *Livermore* because the Court is not evaluating whether Officer Huber unreasonably created the circumstances leading to Mr. William's death, but whether Officer Huber's interpretation of an unfolding situation, based on his own observations, was reasonable.  This approach helps to determine whether the use of deadly force was objectively reasonable.  *Burchett v. Kiefer*, 310 F.3d 937, 944 (6th Cir. 2002) (identifying that the objectively reasonable standard "contains a built-in measure of deference to the officer's on-the-spot judgment about the level of force necessary in light of the circumstances of the particular case."); *see also Chappell v. City Of Cleveland*, 585 F.3d 901, 912 (6th Cir. 2009) (explaining that "the objective reasonableness of the [officer's] conduct must be measured in light of what they actually observed in the circumstances confronting them, not in light of speculation that may arise with the benefit of hindsight.")

11

(5:23CV655)

### a. Reasonableness Analysis

The parties rely on the three-factor approach provided in *Graham v. Connor*, 490 U.S. 386, 396 (1989), when arguing the objective reasonableness of Officer Huber's use of deadly force. In *Graham*, the Supreme Court instructed courts to consider (1) "the severity of the crime at issue," (2) "whether the suspect [posed] an immediate threat to the safety of the officers or others," and (3) "whether [the suspect was] actively resisting arrest or attempted to evade arrest by flight." *Graham*, 490 U.S. at 396.

The *Graham* factors are helpful, but the Sixth Circuit, also urges district courts to look at the totality of the circumstances of the incident to determine whether the officer's use of force was reasonable. *Palma v. Johns*, 27 F.4th 419, 432 (6th Cir. 2022); *see Graham*, 490 U.S. at 395 (explaining that the reasonableness test "is not capable of precise definition or mechanical application"). In *Palma*, the Sixth Circuit specified a non-exhaustive list of factual considerations in determining whether the officer reasonably believed that a person posed an imminent threat of serious bodily harm,

> (1) why the officer was called to the scene, (2) whether the officer knew or reasonably believed that the person was armed, (3) whether the person verbally or physically threatened the officer or disobeyed the officer, (4) how far the officer was from the person, (5) the duration of the entire encounter, (6) whether the officer knew of any ongoing mental or physical health conditions that may have affected the person's response to the officer[]; and (7) whether the officer could have diffused the situation with less forceful tactics[.]

*Id*. (cleaned up). "[T]he critical factor is whether the suspect presented an immediate danger to the officers or others." *Hicks v. Scott*, 958 F.3d 421, 435 (6th Cir. 2020).

### i. Severity of the Crime

The party's debate "the severity of the crime at issue" (*Graham*, 490 U.S. at 396). That is, whether Mr. Williams' discharging his firearm into the air above, in violation of Canton City

(5:23CV655)

Ordinance § 549.08 (prohibiting the discharge of firearms within the corporate limits of a municipality) (misdemeanor of the fourth degree)[3], or Ohio Revised Code § 2923.162(3) (discharging a firearm upon or over a public road or highway) (misdemeanor of the fourth degree), constitutes a serious crime.

Rather remarkably, Officer Huber argues that the decedent, Mr. Williams, "knew it was unlawful to discharge the weapons [he] had been shooting throughout the night"[4], and that the "real and dangerous risk of harm or death to anyone within the proximity of the high-powered gunfire elevated these crimes at issue, justifying [Officer Huber's] response." ECF No. 81 at PageID #: 2193. Plaintiff responds that Officer Huber overreacted to misdemeanor offenses that were popular occurrences at holidays, and that there was not a risk of harm or death to anyone because Officer Huber observed Mr. Williams enter the residence with the firearm and did not observe any conflict with others to suggest a volatile situation. ECF No. 90 at PageID #: 2701.

Considering that Officer Huber's actions were not in response to an emergency call or dispatch, and that the possible offenses were both fourth-degree misdemeanors, the Court finds that this factor weighs against a finding of immediate danger or imminent threat of bodily harm. See *Leftwich v. Driscoll*, No. 22-1572, 2023 WL 3563207, at *3 (6th Cir. May 19, 2023) (holding the severity of crime factor weighed in the plaintiff's favor, after officers responded to a

---

[3]  Officer Huber cites Canton City Ordinance § 549.03 (Using Weapons While Intoxicated), but his briefing refers to Canton City Ordinance § 549.08 (Discharging Firearms). Both are misdemeanors. The law recognizes a violation of the former as first-degree misdemeanor, and the latter as a fourth-degree misdemeanor.

[4]  It would be difficult, if not impossible for Officer Huber to establish the knowledge of Mr. Williams, especially given that Officer Huber never engaged him except with lethal force.

13

(5:23CV655)

dispatch call to "investigate the discharge of multiple pistol rounds, which is a possible

misdemeanor.")

### 1.  Reason for Police Response

"When officers respond to an ongoing crime, or set out to arrest a suspect, they may have

some reason to fear for their safety or the safety of others based on the nature of the crime."

*Palma*, 27 F.3th at 432 (citing *Graham*, 490 U.S. at 396).  Officer Huber went to the Williams'

residence in response to hearing a series of rapid gunshots that allegedly came from the

Williams' residence.  *See* Exhibit C, ECF No. 81-3 at 04:07-04:14 (showing Mr. Williams

discharging the firearm in a continuous fashion); *see also* Dep. of Officer Huber (ECF No. 78-1)

at PageID #: 1896-97 (testifying that he had heard a continuous series of shooting from the

direction of the William's residence).  As shown in the video footage of Mr. Williams' residence,

Officer Huber arrived within seconds of Mr. Williams ceasing the discharge of his firearm and

heading into his home with the firearm.  *See* Exhibit D, ECF No. 81-4 at 00:36-00:42.

By the time Officer Huber arrived at the Williams' home, Mr. Williams had stopped

shooting--he was not actively taking part in an ongoing crime.  Nor was Officer Huber

responding to an emergency call of a person in distress or a report that a dangerous individual

was afoot.  Even Officer Huber explains that, after surveying the area, he "saw the male's head []

through the fence after [Officer Huber had] heard the shots", then Officer Huber "got out of [his]

cruiser [and] went to the porch" and witnessed Mr. Williams "put the rifle away."  Exhibit B,

ECF No. 81-2 at 00:54-1:04.

A reasonable jury could find that, after arriving at the scene, Officer Huber observed Mr.

Williams walk into his home and put the rifle away.  *See Crawford v. Geiger*, 656 F. App'x 190,

207 (6th Cir. 2016) (holding that a reasonable jury could find that the officer had no reason to

14

(5:23CV655)

suspect the plaintiff of a crime, severe or otherwise, because when the officer arrived, the plaintiff was unarmed and not behaving aggressively); *see also* Leftwich, No. 22-1572, 2023 WL 3563207, at *3.  At that point, there was no immediate danger.  This bodes in favor of Plaintiff.

### 2.  Whether Officer Huber Reasonably Believed Mr. Williams was Armed

As earlier indicated, when Officer Huber arrived at the scene, he heard gunshots, then saw Mr. Williams walk into his home carrying a gun.  When, however, Officer Huber used deadly force, Mr. Williams was outside (again) and discharging his gun at the same time.  This consideration, therefore, favors a finding of imminent danger.

### 3.  Verbal Threats or Disobeying

"When a person does not act 'aggressively' towards an officer, that fact undermines the officer's claim that the person presented an immediate threat of serious bodily harm." *Palma*, 27 F.4th at 434 (quoting *Stewart*, 970 F.3d at 673–74).

It is undisputed that Officer Huber did not announce his presence or make any commands to alert Mr. Williams of his presence before Officer Huber shot and killed Mr. Williams.  This factor weighs against a finding of immediate danger or threat of imminent harm.  This bodes in favor or Plaintiff.

### 4.  Distance Between Officer Huber and Mr. Williams

This factor is more important when the officer "is afraid of hand-to-hand confrontation with the person." *Palma*, 27 F.4th at 435 (citing *Zulock v. Shures*, 441 F. App'x 294, 302 (6th Cir. 2010)).  That is, this factor is more significant when the suspect does not have a firearm which he can aim and shoot.  *Palma*, 27 F.4th at 435. (citing *DeMerrell v. City of Cheboygan*, 206 F. App'x 418, 429 (6th Cir. 2006)).  On the other hand, if a suspect has a firearm, distance

15

(5:23CV655)

between the suspect and officers will not weigh heavily since the suspect could inflict harm at even great distances.

As revealed in the video footage of Mr. William's home, Mr. Williams was on the patio discharging a Ruger Semiautomatic AR-556 with a 50-round drum magazine[5] at 12:57 a.m., while Officer Huber was in the street.  *See* Exhibit D, ECF No. 81-4 at 2:56.  Officer Huber testified that he was about 10 to 15 feet away while hearing the gunshots.  ECF No. 78-1 at PageID #: 1920.  After Mr. Williams discharged the first shot at about 12:57:23 a.m., Officer Huber ran towards the privacy fence, while Mr. Williams was discharging his weapon into the air above (Exhibit D, ECF No. 81-4 at 2:57).  At approximately 12:57:26 a.m., Officer Huber can be seen drawing his weapon as he heads towards the privacy fence.  Subsequently, Officer Huber can be seen holding his weapon as he approaches the privacy fence (Exhibit D, ECF No. 81-4 at 3:01-3:02).  Officer Huber discharges his first shot through the privacy fence around 12:57:30 a.m. (Exhibit D, ECF No. 81-4 at 3:03), meanwhile Mr. Williams continues to discharge his weapon at an angle into the air above (Exhibit D, ECF No. 81-4 at 3:04).

When viewing the facts in the light most favorable to Plaintiff, this factor weighs against a finding of immediate danger.   Even though Mr. Williams possessed and was discharging a semiautomatic firearm, the events took place out in the open, there was privacy fence between Mr. Williams and Officer Huber, and there was sufficient space between them to allow Officer Huber a safe haven, had he chosen it.

---

[5] The parties stipulated to the type of gun that Mr. Williams discharged.  *See* Joint Stipulation (ECF No. 69) at PageID #: 334, ¶ 7.

(5:23CV655)

### 5.  Duration of the Encounter

"The fact that a situation unfolds quickly is not alone sufficient to justify the application of deadly force, but it is a factor that weighs in favor of a finding of reasonableness when it accompanies a credible threat to the safety of an officer or the public." *Palma*, 27 F.4th at 436 (internal quotation and citations omitted).  It weighs against the use of force when the incident unfolds over an amount of time that gives officers time to "assess and react to a situation." *Id.* (citing *Untalan v. City of Lorain*, 430 F.3d 312, 316 (6th Cir. 2005)).  When an officer faces a rapidly evolving situation and must make a split-second judgment, courts weigh this consideration for finding the use of force reasonable. *Graham*, 490 U.S. at 396.

A review of the surveillance video footage of Mr. William's home shows the duration of time from Officer Huber's arrival (Exhibit D, ECF No. 81-4 at 00:36) until the time he discharged his first bullet at Mr. Williams (ECF No. 81-4 at 3:03) to be approximately two minutes and 27 seconds.  According to the body camera footage of Officer Huber, "[t]he total time when the [body camera footage] video captured the first gunshot on the audio recording (likely fired by [Mr.] Williams) to the first gunshot visually observed . . . on the video recording as Officer Huber rounded the southwest corner of the residence is approximately 5.00 seconds long." *See* ECF No. 81-1 at PageID #: 2352; *see also* Exhibit B, ECF No. 81-2 at 01:02.03-:01:07:02 a.m.  When the Court also considers the "[t]he total time when the [body camera footage] video captured the first gunshot on the audio recording (likely fired by [Mr.] Williams) to the first gunshot visually observed being fired by Officer Huber, the time lapsed is approximately 8.57 seconds.  ECF No. 81-1 at PageID #: 2352; *see also* Exhibit B, ECF No. 81-2 at 01:02.03-:01:10:19.

17

(5:23CV655)

The duration of the encounter weighs against the use of force when the incident unfolds over enough time that gives officers time to "assess and react to a situation." *Id.* (citing *Untalan v. City of Lorain*, 430 F.3d 312, 316 (6th Cir. 2005)). The duration of Officer Huber's active presence at the scene was less than two minutes and thirty seconds. The situation unfolded quickly. Nevertheless, a reasonable juror could find that Officer Huber's decision to approach the privacy fence when Mr. Williams' discharged his weapon into the air above, was not accompanied "by a credible threat to the safety of an officer or the public." *Palma*, 27 F.4th at 436. Furthermore, a juror could find that Officer Huber "had sufficient time under plaintiffs' account to assess the situation before firing several rounds at [Mr. Williams]." *Kirby v. Duva*, 530 F.3d 475, 483 (6th Cir. 2008) (holding that the officers use of force was not a "split-second" decision, because the situation was estimated to have taken "up to two minutes to play out", and the officers had more than a few seconds to assess the situation before firing their weapons at the vehicle that had been moving slowly). Ultimately, a reasonable juror could conclude that Officer Huber had sufficient time before firing his weapon to assess the situation before shooting and killing Mr. Williams.

For these reasons, the Court finds that the factor weighs against a finding of immediate danger or threat of imminent harm.

### 5. Mental Health Considerations

"When assessing an excessive force claim, 'the totality of the circumstances includes the fact that at the time of the . . . [encounter] the defendant officers had reason to believe that the person was . . . mentally unstable." *Palma*, 27 F.4th at 436. No evidence suggests that Officer Huber knew of Mr. Williams' mental health. This factor, therefore, weighs against the officer's reasonable use of force.

(5:23CV655)

### 6.  Readily Available Alternatives

Officer Huber argues that the Court should not be persuaded that Officer Huber "impermissibly created the exigent circumstances without identifying himself as a police officer."  Def. Robert Huber's Reply Brief In Supp. of Mot. For Summ. J. (ECF No. 91) at PageID #: 2759.  In support, Officer Huber argues that he appropriately called for back-up assistance, and appropriately ran towards the dangerous scene as he was trained to do, and given the nature of the gunfire, he could not announce himself before the shooting.  ECF No. 91 at PageID #: 2759.

Plaintiff retorts that when Officer Huber first arrived at the scene, he decided that the reasonable action was to de-escalate the situation and wait for backup before continuing his investigation.  But after Mr. Williams engaged in misdemeanor offense of shooting his firearm into the air, "Defendant Huber inexplicably thrust himself into what he ostensibly believed to be a dangerous situation with no other evidence that any other person was even present with Mr. Williams—let alone in danger or in need of Defendant Huber's assistance."  ECF No. 90 at PageID #: 2703.

In the Sixth Circuit, an officer is generally not precluded from using deadly force even if his own "poor planning or bad tactics" unnecessarily escalated the situation.  *Reich*, 945 F.3d at 978.  But "[s]ometimes, the time or space available to an officer may mean that the reasonable thing to do is monitor the suspect, issue a warning, or take cover."  *Palma*. 27 F.4th at 439 (quoting *Thomas*, 854 F.3d at 366–67).  Citing to the Third Circuit, the *Palma* court held:

> Depending on the severity and immediacy of the threat and any potential risk to public safety posed by an officer's delayed action, . . . [i]t may [] be appropriate for the officer to attempt to de-escalate an encounter to eliminate the need for force or to reduce the amount of force necessary to control an individual.

19

(5:23CV655)

*Palma*, 27 F.4th at 439 (quoting *Johnson v. City of Philadelphia*, 837 F.3d 343, 353 (3d Cir. 2016)).  That said, the Sixth Circuit has recognized "[t]he Fourth Amendment does not require that officers expose themselves to a plausible risk of bodily injury to avoid using non-deadly force against an armed assailant[.]" *Estate of Erwin v. Greene Cnty.*, 861 F. App'x 1, 6 (6th Cir. 2021).

In this case, even Officer Huber testified that he could have responded differently.[6]  He could have taken cover behind his cruiser after hearing the gunshots.  This would have given him a better chance to assess what was going on before responding with lethal force. (ECF No. 78-1 at Page ID #: 1921-22).   A jury could find that this delayed response may have saved the life of Mr. Williams.  This discourages a finding that Officer Huber's response was reasonable.

### 7.  Other Considerations

 "Whether a suspect has a weapon constitutes just one consideration in assessing the totality of the circumstances." *Thomas*, 854 F.3d at 366.  "Where the weapon was, what type of weapon it was, and what was happening with the weapon are all inquiries crucial to the reasonableness determination." *Id*. (quoting *Perez v. Suszczynski*, 809 F.3d 1213, 1220 (11th Cir. 2016)).

While Officer Huber asserts his conduct was objectively reasonable, he relies on his own subjective view of the facts.  *See e.g.*, ECF No. 81 at PageID #: 2197 (asserting, "[t]he reasonableness of Huber's use of force hinges on the question of whether, at the moment he pulled the trigger, he reasonably perceived Williams to pose an imminent threat of serious

---

[6]  Plaintiff's expert also suggests that a reasonable officer would have acted differently than Officer Huber, with respect to approaching the scene.

(5:23CV655)

physical harm or death.”); *see also* ECF No. 91 at PageID #: 2753 (concluding, “[h]e was actively shooting the AR-15 in a manner which caused Officer Huber to believe that it was being aimed in his direction with powerful bullets being fired at an alarming speed.”).  “But just because [courts] must look at the circumstances through the eyes of a reasonable officer does not mean . . . that [courts] must accept the officers’ subjective view of the facts when making this assessment.” *Jacobs v. Alam*, 915 F.3d 1028, 1041 (6th Cir. 2019)

Officer Huber’s subjective beliefs do not rule the day; the Supreme Court has made clear that the inquiry is an objective one. *Graham*, 490 U.S. at 397; *see England v. City of Columbus, Ohio*, No. 22-3055, 2023 WL 3756177, at *4-5 (6th Cir. June 1, 2023) (denying qualified immunity because defendants’ arguments “improperly ‘rest[ed] . . . on their own version of the disputed facts and inferences they would draw from them.’”) (quoting *DiLuzio v. Village of Yorkville*, 796 F.3d 604, 611 (6th Cir. 2015)).  Additionally, at this stage, the Court must view the facts and draw all reasonable inferences for Plaintiff. *Gambrel*, 25 F.4th at 400.

Under Plaintiff's version of the events, a reasonable juror could conclude that Mr. Williams did not pose an immediate threat to Officer Huber and that his use of deadly force was objectively unreasonable.  When viewing the facts in the light most favorable to Plaintiff, the Court finds that the circumstances unfolded as follows.  Officer Huber arrived on the scene and exited his cruiser.  He quickly surveilled the Williams’ home and, through a privacy fence, saw Mr. Williams enter his home with a gun.  While no shots were being fired, and without having made law enforcement presence known, Officer Huber returned to the street to call for backup. Mr. Williams exited his home to the patio and began discharging his weapon into the air above in celebration of the New Year.  Mr. Williams did not make any threatening movements toward

21

(5:23CV655)

Officer Huber, nor did he orally threaten anyone, including the law enforcement officer.

Without objective provocation, Officer Huber fired eight shots, killing Mr. Williams.

### iii.  Actively Resisting Arrest or Evading Arrest

The Court finds that this factor favors a finding of no immediate threat of serious bodily

harm, because it is undisputed that Officer Huber did not announce his presence or issue any

commands to alert Mr. Williams of his presence before Officer Huber shot and killed Mr.

Williams.  Additionally, the argument is waived because Officer Hubert did not address it.

Based on the above, the Court finds Plaintiff has provided sufficient evidence to (1)

support a version of relevant events that, (2) raise genuine issues of material fact regarding

whether a reasonable juror could find Officer Huber's use of deadly force was an appropriate

response; and to (3) legitimately call into question whether Mr. Williams posed an immediate or

imminent serious threat to the safety of the Officer Huber or others.  Stated more simply, the

Court finds that a jury should decide whether Officer Huber violated Mr. Williams' Fourth

Amendment right to be free of unlawful seizure.

### 2.  Clearly Established

Because a reasonable juror could find that Officer Huber's deadly force was objectively

unreasonably, and, therefore, in violation of Mr. Williams' Fourth Amendment rights, the Court

must answer whether that right was clearly established at the time of the incident.

"To be clearly established, a legal principle must have a sufficiently clear foundation in

then-existing precedent.  The rule must be 'settled law' . . ., which means it is dictated by

'controlling authority' or 'a robust 'consensus of cases of persuasive authority[.]'" *D.C. v.*

*Wesby*, 583 U.S. 48, 63 (2018). (citations omitted).  While the Supreme Court "does not require a

case directly on point for a right to be clearly established, existing precedent must have placed

22

(5:23CV655)

the statutory or constitutional question beyond debate." *White v. Pauly*, 580 U.S. 73, 79 (2017) (citing *Mullenix v. Luna*, 577 U.S. 7, 11 (2015)).  "[S]pecificity is especially important in the Fourth Amendment context, where the [Supreme] Court has recognized that '[i]t is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts.'" *Mullenix*, 577 U.S. at 12 (quoting *Saucier v. Katz*, 533 U.S. 194, 205 (2001)).

When analyzing the state of the law for purposes of the clearly established prong, courts must continue to resolve genuine disputes of fact for the non-movant.  *Tolan v. Cotton*, 572 U.S. 650, 657 (2014) (holding "[o]ur qualified-immunity cases illustrate the importance of drawing inferences in favor of the nonmovant, even when, as here, a court decides only the clearly-established prong of the standard."); *see also Lopez v. City of Cleveland*, 625 F. App'x 742, 746-47 (6th Cir. 2015) (denying motion for summary judgment, because there were "contentious factual disputes about the nature of [plaintiff's] movements just before the shooting.  Those disputes go to the heart of whether it was reasonable for Defendant Officers to use deadly force.  Because the reasonableness of their actions depends on which version of the facts one accepts, the question must go to the jury.").  Under Plaintiff's version of the events, a reasonable officer would not have used deadly force against Mr. Williams, because Mr. Williams did not pose an immediate serious threat of physical harm.

Mr. Williams' right not to be fatally shot by police under the circumstances as Plaintiff alleges them was clearly established at the time of the events in question.  It has "been clearly established in this circuit for some time that individuals have a right not to be shot unless they are perceived as posing a threat to officers or others." *Jacobs*, 915 F.3d at 1040 (citing *King v. Taylor*, 694 F.3d 650, 664 (6th Cir. 2012)); *see also Ciminillo v. Streicher*, 434 F.3d 461, 468

23

(5:23CV655)

(6th Cir. 2006) (holding, "[i]t was clearly established law in this circuit at the time of the underlying events that individuals have a right not to be shot unless they are perceived as posing a threat to officers or others.") (citations omitted).

Officer Huber argues that this rule must be identified with more specificity and must be particularized to the facts of the case. ECF No. 81 at PageID #: 2199. Officer Huber argues that there was "no clearly established right to discharge 'celebratory gunfire' when it dangers the lives of officers or others." ECF No. 81 at PageID #: 2200. "But the Supreme Court has recognized that there are obvious cases in which an officer should have been on notice that his conduct violated constitutional rights, despite the generalized nature of that Court's pronouncements of constitutional standards." *Bouggess*, 482 F.3d at 895 (citing *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)). Indeed, the Sixth Circuit has relied on a general articulation of the *Garner* rule (*supra*, Section III.A.1 at 5) to conclude that a suspect's right not to be shot unless he poses a serious threat to the officer or other person was clearly established "even in situations with diverse factual distinctions." *Sample v. Bailey*, 409 F.3d 689, 699 (6th Cir. 2005); *see also Craighead*, 399 F.3d at 962 (denying qualified immunity when an officer shot an individual holding a gun when testimony diverged as to whether the gun was pointed upward or at the officer).

To the extent that a general formulation is insufficient here, Sixth Circuit precedent places the constitutional question beyond debate. Sixth Circuit precedent at the time of the incident clearly established that law enforcement may not use deadly force against a suspect for merely possessing a weapon and that there must be additional indicia of a serious threat of harm. *Bouggess*, 482 F.3d at 896 ("even when a suspect has a weapon, but the officer has no reasonable belief that the suspect poses a danger of serious physical harm to him or others, deadly force is

(5:23CV655)

*not* authorized.") (emphasis in original); *Jacobs*, 915 F.3d at 1040 ("merely possessing a weapon is not enough—the officer must reasonably believe the individual poses a danger of serious physical harm to himself or others to justify deadly force."). This more specific articulation of a rule moves this case "beyond the otherwise hazy border between excessive and acceptable force." *Kisela v. Hughes*, 584 U.S. 100, 105 (2018) (quoting *Mullenix*, 577 U.S. at 18).

While Officer Huber cites *United States v. Johnson*, 106 F. App'x 363 (6th Cir. 2004) for the proposition that qualified immunity cannot be denied in the presence of "celebratory gunfire", the Court is unpersuaded. While the defendant in *Johnson* discharged his weapon into the air above on July 4, 2004, the facts and procedure are separate and distinct from this case. In *Johnson*, two police officers responded after receiving a dispatch report that a man fired a shotgun from his home with children, and upon arriving, they saw the defendant discharge two shots into the air above, reload the gun, flee into the house after the officers heard someone indicate the officers arrival by saying "police". *Id*. at 364-65, 368. After seeing the man enter the home, the officers called for backup. Within minutes, the officers surrounded the home, knocked, and after no one answered, performed a warrantless entry to which they seized the defendant and a woman, and then searched the home and procured a shotgun. *Id*. at 365. The district court found the search for the shotgun was unconstitutional because the arrest was for a misdemeanor and not a felony. *Id*. at 365-66. The Sixth Circuit reversed the suppression of the shotgun, holding that exigent circumstances justified a warrantless search. *Id*. at 368.

Unlike *Johnson*, Officer Huber did not respond to an emergency call that would have given him information about the scene. Furthermore, in *Johnson*, there was more than one officer who arrived at the scene, and the officers had an indication that the man was aware of the officers' presence, because the officers heard someone say "police" before seeing the man flee

25

(5:23CV655)

into the house. *Id*. at 364-65, 368.  Also, the officers in *Johnson* saw the defendant reload his shotgun before fleeing inside the home.  In the instant case, objective video evidence could lead a juror to find that Mr. Williams did not know of Officer Huber's presence.  The Sixth Circuit saw importance in the man having awareness of the police's presence.  The court opined, "the man turned and fled into the home armed, rather than dropping the weapon and talking to the officers, [which] created the potential for the incident to escalate into a deadly confrontation that could have involved hostage-taking." *Id*. at 368.  In this case, the Court rejects the notion that Mr. Williams' "celebratory gunfire" is dispositive for a finding of imminent threat of serious physical harm.

When viewing the facts and drawing all reasonable inferences in favor of Plaintiff, jurors may find the Officer Huber's use of deadly force unreasonable.   Officer Huber received no emergency call or dispatch informing him of a situation.  He saw no one other than Mr. Williams when he surveilled the residence.  Soon after reaching the scene, Officer Huber saw Mr. Williams enter his home with the rifle.  Officer Huber did nothing to alert Mr. Williams of his presence, giving Mr. Williams the opportunity to reconsider his behavior.  Additionally, there is a genuine issue of material fact regarding whether Officer Huber reasonably perceived that Mr. Williams' gun was pointed in Officer Huber's direction.

While firing a gun into the air above during New Year's may be reckless, there is also an issue of material fact as to whether such celebratory shooting is a popular occurrence in Canton. *See e.g*., Dep. of Captain Lisa Broucker (ECF No. 71) at PageID #: 572, 574 (explaining first that officers get an increase of "shots fire" calls during the holidays); *see also* Dep. of Sergeant Robert Smith (ECF No. 86) at PageID #: 2426 (indicating that he has responded to celebratory gunfire, and that "I am familiar with people in the City of Canton discharging weapons on New

(5:23CV655)

Year's Eve, yes[]"); *see also* Chief John Gabbard (ECF No. 74) at PageID #: 1105-08 (explaining that he became aware of the phenomenon of people celebrating gunfire early in his career as a police officer in Canton, and that he responded to a call in either 1998 or 1999); *see also* Dep. of Scott DeFoe (ECF No. 87) at PageID #: 2480 (explaining the common occurrence of celebratory shooting on holidays). Based on this tradition, a reasonable officer could find that Mr. Williams' gunfire was not an inherently threatening act toward himself or others. In fact, no other officers showed up until Officer Huber called for backup. Clearly others were on duty that night and did not perceive the same threat as Officer Huber, making it appear that Officer Huber's concern was more subjective than objective. Also, there is no evidence of a clear intent to harm or other indications of immediate danger when the officer arrived. Furthermore, Officer Huber's failure to warn Mr. Williams before discharging his own weapon raises a material question about the necessity of force.

For the reasons above, the Court finds that Mr. Williams' had a clearly established right, under and at the time of the events in question, not to be fatally shot by Officer Huber.

### IV. Conclusion

Accordingly, Officer Huber's Motion for Summary Judgment (ECF No. 81) and, thereby, his request for qualified immunity is denied.

IT IS SO ORDERED.

| March 30, 2025 | */s/ Benita Y. Pearson* |
|---|---|
| Date | Benita Y. Pearson |
| | United States District Judge |

27